**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          IN THE EASTERN DISTRICT OF MICHIGAN
 2                 SOUTHERN DIVISION
 3   CHAD McFARLIN, individually
 4   and on behalf of all
 5   similarly situated persons,
 6         Plaintiff,
 7      -v-                      No. 2:16-cv-12536
 8                               Hon. Gershwin A. Drain
 9   THE WORD ENTERPRISES, LLC,
10   et al.,
11         Defendants.
12   _____/
13   PAGE 1 TO 80
14
15      The deposition of MICHELE FOLLMAN,
16      Taken at 221 North Main Street, Suite 300,
17      Ann Arbor, Michigan,
18      Commencing at 1:20 p.m.,
19      Monday, June 19, 2017,
20      Before Cheryl McDowell, CSR-2662, RPR.
```

**Page 2**

```
 1   APPEARANCES:
 2   MS. TIFFANY R. ELLIS - P81456
 3   Blanchard & Walker PLLC
 4   221 North Main Street, Suite 300
 5   Ann Arbor, Michigan  48104
 6   (734) 619-0970
 7   tiffanyrellis@gmail.com
 8       Appearing on behalf of the Plaintiff.
 9
10   MR. JEFFREY S. THEUER - P44161
11   Loomis Ewert Parsley Davis & Gotting PC
12   124 West Allegan Street, Suite 700
13   Lansing, Michigan  48933
14   (517) 482-2400
15   jstheuer@loomislaw.com
16       Appearing on behalf of the Defendants.
17
     ALSO PRESENT:  MR. KEVIN DITTRICH
```

**Page 3**

```
 1                TABLE OF CONTENTS
 2   Witness                                    Page
 3   MICHELE FOLLMAN
 4
 5   EXAMINATION BY MS. ELLIS:                    4
 6
 7                   EXHIBITS
 8   Exhibit                                    Page
 9   DEPOSITION EXHIBIT NO. 6                     4
10   Employee Handbook
11   DEPOSITION EXHIBIT NO. 7                     4
12   Minimum Wage Notice to Tipped Employees
13   DEPOSITION EXHIBIT NO. 11                    4
14   Conditional Employee or
     Food Employee Reporting Agreement
15
     DEPOSITION EXHIBIT NO. 12                    4
16
     Summary Report for Andrew Wilson
17
     DEPOSITION EXHIBIT NO. 13                    4
18
     Daily Delivery Orders
19
     DEPOSITION EXHIBIT NO. 14                   58
20
     The Word Enterprises, LLC Employee List - Condensed
21
     DEPOSITION EXHIBIT NO. 15                   67
22
     State of Michigan New Hire Reporting Form
23
24       (Exhibits attached to transcript.)
25
```

**Page 4**

```
 1   Ann Arbor, Michigan
 2   Monday, June 19, 2017
 3   About 1:20 p.m.
 4       (Deposition Exhibits Nos. 6, 7, 11, 12,
 5       and 13 premarked and attached.)
 6           MICHELE FOLLMAN,
 7   having first been duly sworn, was examined and testified
 8   on her oath as follows:
 9   EXAMINATION BY MS. ELLIS:
10   Q.  Could you please state your name for the record?
11   A.  Michele Follman.
12   Q.  What is your address?
13   A.  3777 Bath Road, Perry, Michigan, 48872.
14   Q.  What's your home telephone number?
15   A.  (989) 225-2408.
16   Q.  Your work address?
17   A.  3058 West Britton Road, Perry, Michigan, 48872.
18   Q.  Is that a Hungry Howie's location?
19   A.  Yes.
20   Q.  Is that the Perry, the Hungry Howie's location owned
21       by The Word Enterprises-Perry?
22   A.  Yes.
23   Q.  Who is your employer?
24   A.  Kevin Dittrich.
25   Q.  Who do you receive payments from?
```



```
                                    Page 9                                                     Page 11
 1  Q.  Were you an assistant manager that whole time?    1       everyone is in uniform, product is good, service is
 2  A.  No.                                               2       good.
 3  Q.  You became general manager during that year and a 3   Q.  Anything else?
 4      half?                                             4   A.  Oversee hiring and firing with my managers.
 5  A.  Correct.                                          5   Q.  Is that all?
 6  Q.  What did you do after you left the St. Johns location?  6   A.  I overlook their paperwork, weekly paperwork, payroll.
 7  A.  I moved to the Perry location.                    7   Q.  Anything else?
 8  Q.  What did you do there?                            8   A.  No.
 9  A.  I was an assistant manager.                       9   Q.  Do you have an office?
10  Q.  How long were you there?                         10   A.  No.
11  A.  Thirteen years, twelve years.  I've been there since. 11   Q.  Where do you work?
12  Q.  So from 2006 until now?                          12   A.  I travel.
13  A.  Uh-huh.                                          13   Q.  Between the stores?
14  Q.  Yes?                                             14   A.  Yes.
15  A.  Yes.  Sorry.                                     15   Q.  Do you spend a certain amount of your time at one
16  Q.  Okay.  When did you first meet Mr. Dittrich?     16       store versus another?
17  A.  2004.                                            17   A.  It varies.
18  Q.  Was that in your role as an assistant manager at the 18   Q.  On what?
19      Hungry Howie's location?                         19   A.  On what the stores need at the time, if they need
20  A.  Yes.                                             20       extra help inside or I need to have a meeting with the
21  Q.  And when did you start your correct position?    21       managers.  It just depends.
22  A.  2011.                                            22   Q.  Are you ever in more than one store in a day?
23  Q.  And how did that happen?                         23   A.  Yes.
24  A.  There was an opening available for an area director. 24   Q.  Do you report to anybody else besides Mr. Dittrich?
25  Q.  Had there been an area director prior to that?   25   A.  No.

                                    Page 10                                                    Page 12
 1  A.  Yes.                                              1   Q.  Who reports to you, if anybody?
 2  Q.  How did you learn of the opening?                 2   A.  The general managers of the stores and the employees.
 3  A.  I was there.                                      3   Q.  What is your goal with respect to payroll practices?
 4  Q.  Someone told you?                                 4   A.  I will receive the payroll on a biweekly basis from
 5  A.  Yeah.  The previous director was no longer with us. 5       the managers, double-check it against the schedules
 6  Q.  What do you do or what is your current title?     6       that were posted and make sure all the hours match up
 7  A.  Area director.                                    7       and then forward it on to our accountant.
 8  Q.  And what do you do as area director?              8   Q.  What do you do if the hours don't match?
 9  A.  Oversee Perry, St. Johns, Haslett, and Durand, daily 9   A.  I would talk to my managers and find out if there was
10      operations.                                      10       a reason why they do not match.
11  Q.  You said the Perry, St. Johns, Haslett, and Durand 11   Q.  And what if there's none?
12      Hungry Howie's locations?                        12   A.  I've never run into that situation.  There's always
13  A.  Correct.                                         13       been a reason if they don't match why.
14  Q.  Are those the Hungry Howie's locations owned by The 14   Q.  If they do match, what happens then?
15      Word Enterprises collectively?                   15   A.  I forward it on.  It doesn't change anything.
16  A.  Each company, each store has its own company.    16   Q.  I'm sorry.  If there is a reason why they don't match,
17  Q.  Okay.  But each one would be owned by a Word     17       what happens then?
18      Enterprise?                                      18   A.  It's usually a reason of an employee had to switch a
19  A.  Yes, except Durand.  That's owned by Dittrich    19       schedule around and it didn't get changed on the
20      Investments.                                     20       schedule.
21  Q.  And these are the companies owned by Kevin Dittrich 21   Q.  So they would be paid for the time that they worked,
22      that we discussed during his deposition earlier? 22       not scheduled?
23  A.  Yes.                                             23   A.  Absolutely.
24  Q.  What are your day-to-day duties?                 24   Q.  What is your day-to-day responsibility -- well,
25  A.  Stop in, make sure the stores are running correctly, 25       anything else with relation to payroll?
```



MICHELE FOLLMAN
McFARLIN -v- WORD ENTERPRISES

June 19, 2017
25–28

Page 25
1  Q.  What about the Haslett location, how many drivers
2      would you say are on average employed there?
3  A.  Per day or just employed altogether?
4  Q.  Altogether first.
5  A.  Five or six.
6  Q.  Does it change per day?
7  A.  Yes.
8  Q.  Based on what?
9  A.  Sales.
10 Q.  Some days are busier than others?
11 A.  Yes.
12 Q.  Fridays and Saturdays are busier?
13 A.  Yes.
14 Q.  Other days, which other days might be busy?
15 A.  Thursdays and Sundays.
16 Q.  So Thursday through Sunday are busier than Monday
17     through Wednesday?
18 A.  Yes.
19 Q.  You have more drivers on staff then?
20 A.  Yes.
21 Q.  What about in the Perry location, how many drivers
22     would you have altogether there on average?
23 A.  Eight to nine.
24 Q.  Would it be -- would the busyness of the days be the
25     same for the Perry location as the Haslett location?

Page 26
1  A.  Yes.
2  Q.  What about the St. Johns location, how many delivery
3      drivers would you have had on average there?
4  A.  Four.
5  Q.  And why would there be more in the Perry location
6      versus Haslett or St. Johns?
7  A.  More sales.
8  Q.  More people deliver or more people order pizzas from
9      that location?
10 A.  Yes.
11 Q.  Would it have anything to do with the size of the
12     delivery area?
13 A.  Yes.
14 Q.  Because Perry has a bigger delivery area than the
15     other two stores?
16 A.  Yes.
17 Q.  Why would that matter?
18 A.  So we can get our deliveries out quicker, we would
19     have more on staff with the bigger delivery area.
20 Q.  It takes longer in Perry to delivery a pizza than it
21     would in Haslett or St. Johns, in other words?
22 A.  Depending on the delivery.
23 Q.  But it could?
24 A.  Yes.
25 Q.  Are you familiar with the process by which drivers are

Page 27
1      assigned deliveries?
2  A.  Yes.
3  Q.  How does that happen?
4  A.  There is a delivery dispatch screen.  The deliveries
5      show up on one side, the drivers available are on the
6      other side.
7          They will pick their deliveries starting
8      with the top one, and then if there's any that go with
9      it in that time frame, they click them to dispatch
10     into their name, and the computer says they have taken
11     those deliveries.
12 Q.  So let's back up for a second.  When a driver comes
13     into work --
14 A.  Uh-huh.
15 Q.  Yes.  He or she checks in to the computer, is that
16     right?
17 A.  Yes.  They clock in.
18 Q.  They clock in.
19         Is that using the Revention System?
20 A.  Yes.
21 Q.  What does that person do then, wait for a delivery?
22 A.  Yes.
23 Q.  Does that person work as a cook?
24 A.  No.
25 Q.  They just sit and wait?

Page 28
1  A.  No.
2  Q.  What do they do?
3  A.  They will do dough, cleaning, any prep that we have.
4  Q.  And they're called an insider when they're doing those
5      things?
6  A.  Yes.
7  Q.  When they're an insider, are they paid at a different
8      rate than they are as an outsider?
9  A.  Yes.
10 Q.  How does the computer -- do they designate on the
11     computer what they're doing?
12 A.  The computer calculates it as a driver-in, driver-out
13     calculation.  When they dispatch a delivery, it
14     automatically puts them into the driver-out at the
15     lower rate, and as soon as they come back in and
16     return from that delivery, it puts them back into the
17     driver-in rate.
18 Q.  So the driver-in rate is the minimum wage, right?
19 A.  Yes.
20 Q.  It's always the minimum wage?
21 A.  Yes.
22 Q.  In all stores?
23 A.  Correct.
24 Q.  And let's just for the sake of the record be clear.
25     When I'm asking you these questions about driver



Page 29

1   practices, are these the same practices that are
2   followed at the Haslett, the Perry, and the St. Johns
3   stores, all three?
4   A.  Yes.
5   Q.  And if they're at any time different among the three,
6   you'll tell me, right?
7   A.  Yes.
8   Q.  So the driver clocks in and is classified as an
9   insider?
10  A.  Yes.
11  Q.  And then the driver will look at the screen when a
12  delivery comes in, correct?
13  A.  Yes.
14  Q.  And how do they know that a delivery has come in?
15  A.  They pop up on the dispatch screen.
16  Q.  Is there a separate computer just for drivers?
17  A.  Yes.
18  Q.  And they're responsible for monitoring it when they're
19  in that location?
20  A.  Yes.
21  Q.  What if there's more than one driver on at the same
22  time.  How do they determine who takes the delivery
23  out?
24  A.  The computer puts the first or the last -- whoever is
25  at the top of the screen on the list of drivers is the

Page 30

1   next one to take the next delivery, and then once they
2   take that delivery, they move to the bottom of the
3   screen and then the next person moves to the top, and
4   then it would be their turn to take the next delivery.
5   Q.  So there's a queue of drivers?
6   A.  Yes.
7   Q.  So the computer system Revention assigns drivers to
8   deliveries based on that queue?
9   A.  No.  It says this driver is the next one out, but it
10  does not assign the deliveries to them.  They assign
11  the deliveries to themselves.
12  Q.  So it notifies them that that should be their
13  delivery?
14  A.  It's just, it's just on the screen.  If they're at the
15  top of the list, whatever that first delivery is is
16  the next one to go out, and it would be theirs.  It
17  doesn't notify them necessarily.  It just is there.
18  Q.  So if a delivery comes up, first delivery of the day,
19  to 123 Main Street and there's one delivery driver
20  there, Joe Smith, it would assign that delivery to Joe
21  Smith, right?
22  A.  He would assign it to himself.  He dispatches, what we
23  call dispatch.  So when the order is ready to leave
24  the store, they highlight the order, highlight their
25  name, hit dispatch which means they're leaving the

Page 31

1   store.
2   Q.  So it would suggest that that driver be the one to
3   take it?
4   A.  Yes.
5   Q.  A different driver could potentially dispatch the
6   order?
7   A.  Yes.
8   Q.  And then when they hit dispatch, does that mean that
9   they will start accumulating time at a different rate
10  of pay?
11  A.  Yes.
12  Q.  What is that rate of pay, do you know?
13  A.  Five dollars per hour.
14  Q.  Do you know how long it's been that rate?
15  A.  Since September 1st, 2014.
16  Q.  And what was it before that?
17  A.  Minimum wage straight time.  They were not -- they did
18  not have two different pay rates before that.
19  Q.  They were paid at minimum wage prior to September 1,
20  2014?
21  A.  Yes.
22  Q.  And on September 1, 2014, they began splitting their
23  time?
24  A.  Yes.
25  Q.  Were you involved in that decision?

Page 32

1   A.  Yes.
2   Q.  And why was that change made?
3   A.  Minimum wage was going up.  To help with labor costs,
4   we made the decision to do what most other businesses
5   in this category were doing and do the split wage.
6   Q.  When you say split wage, what do you mean?
7   A.  The split to where if they're inside the store, they
8   get the minimum wage.  If they're on the road, they
9   get the five dollars per hour.
10  Q.  They were paid more than five dollars an hour, though,
11  right?
12  A.  Yes.
13  Q.  Would they -- I mean, they have to be paid minimum
14  wage, right?
15  A.  Yes.
16  Q.  Why wouldn't -- how would they get paid minimum wage
17  based on the five dollar per hour out wage?
18  A.  They're compensated seventy-five cents per delivery
19  run in Perry.  When they take a Laingsburg delivery,
20  they're given an extra dollar.
21      And then they also receive tips in the form
22  of credit cards or cash.
23  Q.  And then for the St. Johns location, was that a
24  seventy-five cent per delivery reimbursement as well?
25  A.  Yes, yes.



Page 33

1  Q.  And for the Haslett location, was that also just a
2      seventy-five cent for delivery payment?
3  A.  Yes.
4  Q.  Are those payments all still seventy-five cents today?
5  A.  Yes, except Perry.
6  Q.  Except Perry.
7           And the Laingsburg fee is now higher?
8  A.  Yes.
9  Q.  It was one seventy-five up until when?
10 A.  I believe August of last year.
11 Q.  And then it went up?
12 A.  To two twenty-five.
13 Q.  So it's your understanding that when drivers are on
14     out pay we'll call it at the rate of five dollars an
15     hour that they are brought up to the minimum wage rate
16     by two things, the run reimbursement, the vehicle
17     reimbursement which is the seventy-five cents or the
18     dollar seventy-five we discussed?
19 A.  Yes.
20          MR. THEUER:  Object to the characterization
21     of rate.
22          Go ahead.
23 BY MS. ELLIS:
24 Q.  Is that a yes?
25 A.  Yes.

Page 34

1  Q.  And what do you call that, what do you call that in
2      the stores?
3  A.  Driver compensation.
4  Q.  Driver compensation.  So that's what we'll call it for
5      the sake of today's deposition.
6           On top of the five dollars, they receive
7      driver's compensation per trip, right?
8  A.  Per delivery.
9  Q.  Per delivery.
10          And then they also receive a credit for
11     their tips, is that right?
12 A.  They receive tips.
13 Q.  If they didn't receive enough tips to get them to the
14     minimum wage, what would happen then?
15 A.  Then we would make up the difference.
16 Q.  And if they received more than the minimum wage?
17 A.  Then they just received more than minimum wage.
18 Q.  They would keep it?
19 A.  Yes.
20 Q.  Are you aware of any delivery drivers that have been
21     on a tip credit wage that guarantees them to make more
22     than minimum wage?
23 A.  No.
24 Q.  Are you aware if at any time since 2013 any of your
25     drivers were paid using a tip credit system that would

Page 35

1      guarantee them a rate of above the minimum wage?
2  A.  Nothing guaranteed.
3  Q.  Are any of your delivery drivers paid any different
4      than that system that we just discussed?
5  A.  No.
6  Q.  And that's any of the St. Johns, Perry, or Haslett
7      locations?
8  A.  Yes.
9  Q.  They're all paid the same?
10 A.  Yes.
11 Q.  They're all paid the same rate, the minimum wage, when
12     they're inside the store?
13 A.  Yes.
14 Q.  And the five dollars plus those additional funds that
15     we talked about?
16 A.  Yes.
17 Q.  And drivers are paid every two weeks, is that right?
18 A.  Yes.
19 Q.  Are drivers paid anything on a daily basis?
20 A.  Yes.
21 Q.  What are they paid on a daily basis?
22 A.  Their compensation.
23 Q.  The driver's compensation?
24 A.  Driver compensation and tips.
25 Q.  Who pays them at the end of each day?

Page 36

1  A.  The store pays the driver compensation, the customers
2      pay tips.
3  Q.  So when a driver comes back in to a store, what
4      happens when they come back in?
5  A.  They mark themselves as returned on the computer which
6      takes them from the driver-out wage to the driver-in
7      wage.
8  Q.  Do they record the tips that they've received?
9  A.  We do at the end of the night.
10 Q.  So when a driver comes back from a delivery, he or she
11     does not put the tips that he received from that
12     delivery into the system?
13 A.  No, unless it's a credit card tip.  Those go on
14     automatic, automatically.
15 Q.  At the end of the night would a driver count up the
16     amount of tips that they received total?
17 A.  Yes.
18 Q.  And then they would put it into the system?
19 A.  Yes.
20 Q.  Would a driver have to do anything else when he or she
21     came back to the store besides marking that they were
22     in?
23 A.  Not dealing with deliveries.  Then they would start
24     doing any of the inside duties they had.
25 Q.  They would go back to the other responsibilities?



Page 77
1  locations that we have not discussed here today?
2  A.  No.
3  Q.  Are you aware of any freestanding dress code that we
4     have not discussed here today?
5  A.  No.
6  Q.  Are you aware of any handbook besides that Exhibit 6
7     that we discussed earlier today?
8  A.  No.
9  Q.  Are you aware of any additional driver's rules and
10    policies besides that included in the employee
11    handbook that we have not discussed today?
12 A.  No.
13 Q.  Do you know why you would have an employee sign this
14    if those documents don't exist?
15        MR. THEUER:  I'll object to the form of the
16    question.
17        But go ahead and answer if you can.
18        THE WITNESS:  I don't know.  All that
19    information is included in the employee handbook.  So
20    I'm not sure why it has it listed as four separate
21    entities.
22 BY MS. ELLIS:
23 Q.  On TWE30, this is a Receipt of Employee Handbook and
24    Acknowledgment of Employment Terms?
25 A.  Uh-huh.

Page 78
1  Q.  Yes?
2  A.  Yes.  Sorry.
3  Q.  Employee Orientation Checklist.
4        Are employees given an orientation when
5     they are hired?
6  A.  Yes.
7  Q.  Who does that?
8  A.  Myself or a manager.
9  Q.  Are these topics one through nine topics that are
10    covered verbally?
11 A.  Yes.
12 Q.  Are there any written materials that are part of items
13    provided to these employees?
14 A.  The handbook.
15 Q.  Are there any written materials that are provided to
16    employees on these topics?
17 A.  No.
18 Q.  Is there any additional training that's given to
19    drivers besides that which is listed on this Employee
20    Orientation Checklist?
21 A.  No.
22        MS. ELLIS:  Okay.  I'll just reserve the
23    right to continue the deposition upon production of
24    additional documents that Mr. Dittrich mentioned
25    before, if necessary.

Page 79
1        MR. THEUER:  I acknowledge the request.
2        MS. ELLIS:  No further questions at this
3  time.
4        MR. THEUER:  I've got no questions, either.
5
6        (Deposition concluded at 2:58 p.m.)

Page 80
1  STATE OF MICHIGAN   )
                       )SS.
2  COUNTY OF LIVINGSTON )
3            CERTIFICATE OF NOTARY PUBLIC
4            I certify that this transcript
5  is a complete, true, and correct record of the
6  testimony of the deponent to the best of my ability
7  taken on Monday, June 19, 2017.
8            I also certify that prior to
9  taking this deposition, the witness was duly sworn by
10 me to tell the truth.
11           I also certify that I am not a
12 relative or employee of a party, or a relative or
13 employee of an attorney for a party, have a contract
14 with a party, or am financially interested in the
15 action.
16
17
18
19
20 
21
   Cheryl McDowell, CSR-2662, RPR
22 Notary Public, Livingston County
   State of Michigan
23 Commission Expires September 13, 2019
24
25