### Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          IN THE EASTERN DISTRICT OF MICHIGAN
 2                 SOUTHERN DIVISION
 3   CHAD McFARLIN, individually
 4   and on behalf of all
 5   similarly situated persons,
 6          Plaintiff,
 7       -v-                     No. 2:16-cv-12536
 8                               Hon. Gershwin A. Drain
 9   THE WORD ENTERPRISES, LLC,
10   et al.,
11          Defendants.
12   _____/
13   PAGE 1 TO 124
14
15       The deposition of KEVIN DITTRICH,
16       Taken at 221 North Main Street, Suite 300,
17       Ann Arbor, Michigan,
18       Commencing at 10:13 a.m.,
19       Monday, June 19, 2017,
20       Before Cheryl McDowell, CSR-2662, RPR.
21
22
23
24
25
```

### Page 2

```
 1   APPEARANCES:
 2   MS. TIFFANY R. ELLIS - P81456
 3   Blanchard & Walker PLLC
 4   221 North Main Street, Suite 300
 5   Ann Arbor, Michigan  48104
 6   (734) 619-0970
 7   tiffanyrellis@gmail.com
 8        Appearing on behalf of the Plaintiff.
 9
10   MR. JEFFREY S. THEUER - P44161
11   Loomis Ewert Parsley Davis & Gotting PC
12   124 West Allegan Street, Suite 700
13   Lansing, Michigan  48933
14   (517) 482-2400
15   jstheuer@loomislaw.com
16        Appearing on behalf of the Defendants.
17
     ALSO PRESENT:  MS. MICHELE FOLLMAN
18
```

### Page 3

```
 1              TABLE OF CONTENTS
 2   Witness                                       Page
 3   KEVIN DITTRICH
 4
 5   EXAMINATION BY MS. ELLIS:                        5
 6
 7                   EXHIBITS
 8   Exhibit                                       Page
 9   DEPOSITION EXHIBIT NO. 1                         5
10   Notice of Taking Deposition for
     The Word Enterprises LLC
11
     DEPOSITION EXHIBIT NO. 2                        35
12
     Articles of Organization for
13   The Word Enterprises, L.L.C.
14   DEPOSITION EXHIBIT NO. 3                        42
15   Articles of Organization for
     The Word Enterprises-St. Johns, L.L.C.
16
     DEPOSITION EXHIBIT NO. 4                        48
17
     Articles of Organization for
18   The Word Enterprises-Lansing, L.L.C.
19   DEPOSITION EXHIBIT NO. 5                        49
20   Articles of Organization for
     The Word Enterprises-Haslett, LLC
21
     DEPOSITION EXHIBIT NO. 6                        60
22
     Employee Handbook
23
     DEPOSITION EXHIBIT NO. 7                        62
24
     Minimum Wage Notice to Tipped Employees
25
```

### Page 4

```
 1   DEPOSITION EXHIBIT NO. 8                        95
 2   Google Map of St. Johns Delivery Area
 3   DEPOSITION EXHIBIT NO. 9                        95
 4   Google Map of Haslett Delivery Area
 5   DEPOSITION EXHIBIT NO. 10                       95
 6   Google Map of Perry Delivery Area
 7   DEPOSITION EXHIBIT NO. 11                      106
 8   Conditional Employee or
     Food Employee Reporting Agreement
 9
     DEPOSITION EXHIBIT NO. 12                      109
10
     Summary Report for Andrew Wilson
11
     DEPOSITION EXHIBIT NO. 13                      110
12
     Daily Delivery Orders
13
14
15        (Exhibits attached to transcript.)
```



Page 5

1   Ann Arbor, Michigan
2   Monday, June 19, 2017
3   About 10:13 a.m.
4       (Deposition Exhibit No. 1 marked and
5       attached.)
6           KEVIN DITTRICH,
7   having first been duly sworn, was examined and testified
8   on his oath as follows:
9   EXAMINATION BY MS. ELLIS:
10  Q.  Good morning, Mr. Dittrich.
11  A.  Good morning.
12  Q.  Dittrich, Deetrich?
13  A.  Dittrich.
14  Q.  Dittrich. Sorry about that.
15  A.  No, that's all right.
16  Q.  Can you please state your name for the record?
17  A.  Kevin Dittrich.
18  Q.  And what is your home address?
19  A.  5744 South Friegel Road, Owosso, Michigan, 48867.
20  Q.  What about your telephone number?
21  A.  (989) 277-7660.
22  Q.  What's your work address?
23  A.  I have a home office.
24  Q.  Okay. And that's the same on Friegel Road?
25  A.  Yes, Friegel, yes.

Page 6

1   Q.  And who is your employer?
2   A.  I'm self-employed.
3   Q.  What's your occupation?
4   A.  Restaurateur.
5   Q.  What's your work telephone number?
6   A.  Same.
7   Q.  Have you ever had your deposition taken before?
8   A.  Yes.
9   Q.  Under what circumstances?
10  A.  Lawsuit.
11  Q.  Were you being sued or did you sue?
12  A.  My company.
13  Q.  Which company?
14  A.  The Word Enterprises.
15  Q.  Is there more than one lawsuit or just one?
16  A.  It's finished. It was a long time ago. There was
17      just one.
18  Q.  And what was that lawsuit about?
19  A.  Delivery driver got in an accident.
20  Q.  And the driver sued you or the company rather?
21  A.  The company sued my company, that individual.
22  Q.  You were deposed?
23  A.  Yep. Yes.
24  Q.  Have you been involved in any other litigation with
25      The Word Enterprises?

Page 7

1   A.  No.
2   Q.  Have you been involved in any personal litigation?
3   A.  No.
4   Q.  Just a couple of reminders. I'll try to ask you
5       questions and be clear with those. If you don't
6       understand, you can ask me to clarify.
7           Let's not talk over each other for the sake
8       of the court reporter. So please wait for me to
9       finish a question even if you think you know the
10      answer to that question, and I'll try to do the same
11      with your answers.
12          At times Mr. Theuer may object, but unless
13      he tells you not to answer, still go ahead and answer.
14  A.  Okay.
15  Q.  Did you review any documents in preparation for
16      today's deposition?
17  A.  Yes.
18  Q.  What did you review?
19  A.  The plaintiff versus the defendant. It's the notice
20      of deposition for what we're about to talk about
21      today.
22  Q.  I'm handing you what's been marked as Exhibit 1.
23          Are you talking about the notice of
24      deposition that I've just handed you?
25  A.  Yes.

Page 8

1   Q.  You reviewed that prior to today?
2   A.  I did.
3   Q.  Did you review anything else prior to today?
4   A.  Can you be specific?
5   Q.  Did you review any documents to prepare for your
6       testimony today?
7   A.  Defendants' Initial Disclosures, Defendants' Answers
8       to the Class Action Complaint, Affirmative Defense and
9       Demand for Jury Trial and Class Action Complaint, and,
10      also, it looks like a spreadsheet for a Chad McFarlin,
11      Damage Estimate, June 9th of 2017. Those were the
12      documents.
13  Q.  Are those the documents that are in front of you right
14      now?
15  A.  Yep.
16  Q.  Did you review any other documents besides those that
17      you just went over?
18  A.  No, not to my knowledge.
19  Q.  Did you review any -- anything on the computer at the
20      company before today?
21  A.  No.
22  Q.  Did you speak with anyone to prepare for today's
23      deposition?
24  A.  Yes.
25  Q.  Who?

Page 29

1  Q.  Overtime?
2  A.  Yes.
3  Q.  Tips?
4  A.  They're clarified a couple of different ways.  I'm not
5      really sure if I understand your question on that one.
6          As far as tips, do you mean -- you've got
7      to be specific, please.
8  Q.  Did the system track tips?
9  A.  The new system does.  The old system didn't.
10 Q.  What was the name of the old system?
11 A.  Vital-Link.
12 Q.  Did Vital-Link do those other items that we just
13     discussed?
14 A.  Pretty much, yes.
15 Q.  Are there any of those things that Vital-Link did not
16     do?
17 A.  No, not to my knowledge.
18 Q.  But it just didn't track tips?
19 A.  Correct.
20 Q.  Do you know when Vital-Link stopped being used?
21 A.  I don't have an exact.  I don't even know the month.
22 Q.  Do you know the year?
23 A.  Not to be certain.  I apologize.  I know we had a
24     transition, so I want to say maybe 2015.
25 Q.  And did you use Vital-Link in your stores?

Page 30

1  A.  Yes.
2  Q.  Are there any other programs that you used in your
3      stores?
4  A.  No.  For us it was Vital-Link, and then we switched
5      over to Revention.
6  Q.  As a consultant for Hungry Howie's, did you consult
7      with franchisees or business owners on their pay
8      processes?
9  A.  We could give recommendations based on what other
10     people were doing, but we didn't consult and tell them
11     what to pay people or how to pay them, I mean, besides
12     Michigan or federal law.
13 Q.  When you say we could, what do you mean by that?
14 A.  If they asked, we would, we would help them.
15 Q.  Did you provide them with any guidance on how to pay
16     delivery drivers?
17 A.  I would have to refer to the employee handbook.  We
18     have a corporate -- I mean, are we talking about my
19     own personal stores, or we talking about corporate?
20 Q.  When you were a consultant.
21 A.  A consultant.  We have an employee handbook that they
22     would use, and we would refer back to that.
23 Q.  You would direct the franchisee owners to the
24     handbook?
25 A.  Yeah.

Page 31

1  Q.  Did you have a franchisee handbook as well?
2  A.  For my personal stores or in my job as a corporate
3      consultant?
4  Q.  As a corporate consultant.
5  A.  I had access to a handbook, but I didn't have a
6      handbook myself.
7  Q.  Was that something you would provide to franchisee
8      owners?
9  A.  I would not.  The corporate office would.
10 Q.  Were you ever provided with one as a Hungry Howie's
11     owner yourself?
12 A.  Yes.
13 Q.  When was that?
14 A.  Dates back to my first restaurant that I've already
15     given you, so whatever date that was.
16 Q.  Every time you bought into or opened a restaurant,
17     would you be provided with a franchisee handbook of
18     some sort?
19 A.  Yes.
20 Q.  And what would that include?
21 A.  That's something we could forward on to you if you
22     needed it, but it's just too numerous to --
23 Q.  Would it include topics such as pay practices?
24 A.  Not practices.  State law, federal law.
25 Q.  What about reimbursement processes?

Page 32

1  A.  No.
2  Q.  As a consultant would you consult with franchisee
3      owners about their reimbursement processes for
4      drivers?
5  A.  Once again, I could only give them based on previous
6      restaurants and what other franchisees might be doing,
7      but it wasn't a recommendation from me personally.
8  Q.  You said you no longer work for Hungry Howie's
9      corporate, is that correct?
10 A.  Correct.
11 Q.  Today as a restaurateur, your work is limited to
12     running restaurants, is that accurate?
13 A.  Correct.
14 Q.  How many total restaurants do you have open today?
15 A.  Nine.
16 Q.  You said there was Durand, correct?
17 A.  Uh-huh.  Yes.
18 Q.  St. Johns?
19 A.  Closed.
20 Q.  Owosso?
21 A.  Closed.
22 Q.  East Lansing?
23 A.  Yes.
24 Q.  Lansing one on Waverly?
25 A.  Yes.



Page 33

1  Q.  Lansing two on Holmes?
2  A.  Yes.
3  Q.  The Smokehouse?
4  A.  Yes.
5  Q.  Perry Hungry Howie's?
6  A.  Yes.
7  Q.  St. Johns Hungry Howie's?
8  A.  Closed.
9  Q.  What am I missing?
10 A.  Lake Lansing Road, East Lansing.
11 Q.  Are there two East Lansing locations?
12 A.  Yes.  You're missing Holt.
13 Q.  Holt.
14 A.  How many do you have there, could I ask?
15 Q.  Eight.  The Smokehouse.
16 A.  Haslett.
17 Q.  Haslett.
18 A.  I may not have given you that earlier.
19 Q.  You didn't Haslett.
20 A.  I apologize.
21 Q.  We'll go over it in a minute.
22         Is it your understanding that you're here
23      to testify on behalf of The Word Enterprises, LLC,
24      today --
25 A.  Yes.

Page 34

1  Q.  -- as well as The Word Enterprises-Perry?
2  A.  Yes.
3  Q.  St. Johns?
4  A.  Yes.
5  Q.  Haslett?
6  A.  Yes.
7  Q.  Lansing?
8  A.  Yes.
9  Q.  Owosso?
10 A.  Yeah.
11         Can I clarify, ask for a clarification?
12 Q.  Sure.
13 A.  When you said The Word Enterprises and then you
14      hyphened all those other ones, there is no Owosso,
15      there is no Lansing.  I think I saw that in the
16      documentation.  I just wanted to make sure that we're
17      clear.
18 Q.  We'll go back over that.
19 A.  Yeah.
20         MS. ELLIS:  Just off the record for a
21      second.
22         (Off the record at 10:54 a.m.)
23         (Back on the record at 10:54 a.m.)
24 BY MS. ELLIS:
25 Q.  What was the first Word Enterprises that you opened?

Page 35

1  A.  The Word Enterprises-Perry.
2         (Deposition Exhibit No. 2 marked and
3         attached.)
4  BY MS. ELLIS:
5  Q.  Was that in 2004?  2003.  I'm sorry.
6  A.  This says 2004, but --
7  Q.  Well, I'm a little confused, and I'm hoping you can
8      clear it up for me on the relationship between The
9      Word Enterprises-Perry, LLC, and --
10        MR. THEUER:  I'm sorry.  This is different.
11     The one that I have is different than the one that is
12     in front of him, Mr. Dittrich.  This says Word
13     Enterprises, LLC.  This one says The Word
14     Enterprises-Perry, LLC.
15        MS. ELLIS:  I apologize.
16        THE WITNESS:  There's two separate
17     documents.
18        MR. THEUER:  Yeah.  Those are different
19     companies.
20        MS. ELLIS:  Just a moment.  I don't know
21     how that got mixed up.
22        Let's just go off the record for a second.
23        (Off the record at 10:57 a.m.)
24        (Back on the record at 10:58 a.m.)
25        MS. ELLIS:  Go back on the record.

Page 36

1  BY MS. ELLIS:
2  Q.  Handing you Exhibit 2, this is the Articles of
3      Organization for The Word Enterprises, LLC, is that
4      correct?
5  A.  Correct.
6  Q.  And that was incorporated in 2003?
7  A.  Correct.
8  Q.  Is this your company?
9  A.  Yes.
10 Q.  You are listed here as the resident agent of this
11     company?
12 A.  Yes.
13 Q.  You are the president of this company?
14 A.  Correct.
15 Q.  Are there any other owners of this company?
16 A.  Yes.
17 Q.  Who?
18 A.  Denny Geisenhaver.
19 Q.  How much of the company does he own?
20 A.  Forty-nine percent.
21 Q.  Are there any other owners?
22 A.  Just my wife, Susan, and I.
23 Q.  Do you own fifty-one percent?
24 A.  Yes.
25 Q.  Are there any directors of this company?



Page 41

1  Q. What about you?
2  A. If need be.
3  Q. The power to supervise employees, the general manager
4     has it?
5  A. That would be Matt on a daily basis, the general
6     manager of the restaurant. Michele would oversee him.
7  Q. And then ultimately you?
8  A. Right.
9  Q. What about the rate and methods of pay. You said
10    that's something you do along with Michele?
11 A. Myself and Michele.
12 Q. That's not something the general manager would do?
13 A. They might have a starting pay after we've established
14    it, but we establish the guidelines.
15 Q. You establish the pay guidelines, and the general
16    manager would determine where in those guidelines --
17 A. Yes.
18 Q. -- an employee fits, right?
19 A. Yes.
20 Q. Okay. Now, there was also a Word Enterprises-Perry, a
21    different LLC, is that right?
22 A. I think it's a paperwork clerical error. We have --
23    I'll tell you what we do have if this helps.
24 Q. Yes.
25 A. The Word Enterprises-Perry, LLC, there is no The Word

Page 42

1  Enterprises. I think that's a paperwork issue that we
2  clarified and cleaned up maybe.
3      Okay. There's another company called The
4  Word Properties which Denny Geisenhaver and myself own
5  for the sole purpose of a building we purchased in
6  St. Johns, Michigan, which at that time we operated a
7  Hungry Howie's Pizza out of.
8  Q. And you still own that building?
9  A. Yes.
10 Q. Exhibit 2 that I just handed to you, is it your
11    understanding that that is The Word Enterprises-Perry
12    location?
13 A. Yes.
14 Q. And that that, the proper paperwork has been filed
15    with the State of Michigan to correct this?
16 A. Yes.
17        (Deposition Exhibit No. 3 marked and
18        attached.)
19 BY MS. ELLIS:
20 Q. I'm handing you Exhibit 3.
21        This is the Articles of Organization for
22    The Word Enterprises-St. Johns, Incorporated, in 2004,
23    is that correct?
24 A. Correct.
25 Q. And you are the registered agent of that company?

Page 43

1  A. Yes.
2  Q. What is the 1474 Haslett address that's on that, if
3     you know?
4  A. Yeah. That's Denny Geisenhaver. That's his address.
5  Q. And the 401 Grand River, what is that?
6  A. That's a residence that I own, used to be my home
7     office.
8  Q. Who owns this company? Are you the sole owner of this
9     company?
10 A. Denny Geisenhaver and myself.
11 Q. What percentage do you own?
12 A. Fifty-one percent, Denny at forty-nine percent.
13        But this business has been dissolved. It
14    just may not have occurred. My attorney, my
15    accountant filed the paperwork, so --
16 Q. What did this business do?
17 A. Operated a Hungry Howie's Pizza.
18 Q. Was that in St. Johns?
19 A. Yes.
20 Q. When did that location close?
21 A. I can't remember exactly how many months ago it was.
22 Q. In 2017?
23        MR. THEUER: Just testify from your own
24    knowledge.
25        THE WITNESS: '16, 2016 --

Page 44

1  BY MS. ELLIS:
2  Q. That's fine.
3  A. -- I think.
4  Q. Why did it close?
5  A. Lack of sales.
6  Q. Was there a general manager of that store?
7  A. Yes.
8  Q. Who was that, do you remember?
9  A. At that time? I'm sorry. At that time, I can't
10    remember her name.
11 Q. The Word Enterprises-St. Johns, were there officers of
12    that company?
13 A. Yes.
14 Q. Who were they?
15 A. Kevin Dittrich, myself, and Denny Geisenhaver.
16 Q. What was your position?
17 A. President.
18 Q. Was Denny vice president?
19 A. Yes.
20 Q. Anyone else?
21 A. My wife, Susan, would be treasurer and secretary.
22 Q. Did The Word Enterprises-St. Johns also employ a
23    general manager to oversee the day-to-day operations
24    of the St. Johns store?
25 A. Yes.



Page 45
1   Q.   That person would have the same responsibilities as
2        the general manager at the Perry location we just
3        discussed?
4   A.   Yes.
5   Q.   Did Michele oversee that St. Johns location?
6   A.   Yes.
7   Q.   As area director?
8   A.   Yes.
9   Q.   She did the same things for the St. Johns location as
10       she does for the Perry location?
11  A.   Yes.
12  Q.   Was there anything different in how the Perry
13       location -- pardon me -- the St. Johns location was
14       run day-to-day than the Perry location?
15  A.   One distinct difference.
16  Q.   What was that?
17  A.   Delivery range.
18  Q.   And why was that different?
19  A.   Perry had a unique delivery range because we delivered
20       to a town that was a ways away.
21  Q.   That's Laingsburg?
22  A.   Yes.
23  Q.   Are there any other differences between the day-to-day
24       operations of the Perry location and the St. Johns
25       location?

Page 46
1   A.   I don't believe so.
2   Q.   Were there any differences in the payroll practices
3        between the St. Johns location and the Perry location?
4   A.   No.
5   Q.   Were there any differences --
6   A.   Could you repeat that again?  What was that last?
7   Q.   I said were there any differences between -- in the
8        payroll practices between the Perry location and the
9        St. Johns location?
10  A.   There was, and one would be just the delivery fees
11       that we paid the drivers was more at Perry than it was
12       at St. Johns because of the distance that they drove.
13  Q.   When you say it was more, you mean that there was two
14       separate rates in the Perry store for delivery
15       reimbursement versus one rate at the St. Johns store,
16       is that right?
17  A.   Yes.
18  Q.   We'll talk about that in just a second.  We'll set
19       that aside for now.
20            Were there any other differences in the
21       payroll practices besides that between the St. Johns
22       location and the Perry location?
23  A.   I don't think so.
24  Q.   Any differences between the HR processes in the
25       St. Johns location and the Perry location?

Page 47
1   A.   No.
2   Q.   Any differences in how the payroll records were
3        maintained between the St. Johns location and the
4        Perry location?
5   A.   No.
6   Q.   And were you the sole check -- authorized check signer
7        for the St. Johns location as well?
8   A.   Yes.
9   Q.   Was -- were all the records that we discussed as being
10       capable of being stored in the Revention System stored
11       in the Revention System for the St. Johns location?
12  A.   Yes.
13  Q.   Were they also stored in that system for the Perry
14       location?
15  A.   We had a time period to where we switched from one
16       system to another system.  Perry happened first.
17       Therefore, we had two different computer systems that
18       we used.
19  Q.   When did St. Johns happen, if you recall?
20  A.   When we got the new updated system you mean?
21  Q.   Yes.
22  A.   I'm going to guess 2015 I think.
23  Q.   And were you on a Link --
24  A.   Vital-Link.
25  Q.   Vital-Link before that?

Page 48
1   A.   Yes.
2   Q.   That was at the St. Johns location?
3   A.   Yes.
4   Q.   With respect to the St. Johns location, I asked you a
5        series of questions before about what the general
6        manager could do as far as hiring and firing
7        employees, changing schedules, determining the rate of
8        pay, supervising employees.
9             Was the general manager the same way for
10       the St. Johns location?
11  A.   Yes.
12  Q.   Were Michele's responsibilities the same with respect
13       to the St. Johns location?
14  A.   Yes.
15  Q.   And did you and Michele together determine the rate
16       and level of pay and reimbursement for employees in
17       the St. Johns location?
18  A.   Yes.
19            (Deposition Exhibit No. 4 marked and
20            attached.)
21  BY MS. ELLIS:
22  Q.   Handing you Exhibit 4.  This is the Articles of
23       Incorporation -- Organization, pardon me, from LARA
24       for The Word Enterprises-Lansing.
25            Is this a company that you own?



Page 49

1  A.  We were going to start it, and then it never actually
2      took place.
3  Q.  That was in 2005?
4  A.  Correct.
5  Q.  So does The Word Enterprises-Lansing operate today?
6  A.  Never did, never went into existence.
7  Q.  Did it ever operate or own any businesses?
8  A.  No.
9          (Deposition Exhibit No. 5 marked and
10         attached.)
11 BY MS. ELLIS:
12 Q.  Handing you Exhibit 5 which is the Articles of
13     Organization for The Word Enterprises-Haslett.
14         This was incorporated in 2008, is that
15     right?
16 A.  Yes.
17 Q.  Are you an owner of this company?
18 A.  Yes.
19 Q.  What percentage do you own?
20 A.  At this time or at that time when I organized it?
21 Q.  Well, let's start with that time.
22 A.  When I organized it?
23 Q.  Yes.
24 A.  I was a fifty-one percent owner.
25 Q.  Who was the -- who are the other owners?

Page 50

1  A.  My wife, Susan.
2  Q.  What percentage does she own?
3  A.  I mean, it goes into my trust as twenty-five and
4      twenty-six.
5  Q.  She was included in the fifty-one percent?
6  A.  Yes.
7          And then the other owner would have been
8      Denny Geisenhaver and Sue Geisenhaver.
9  Q.  And they own forty-nine percent?
10 A.  Correct.
11 Q.  At some point that ownership changed?
12 A.  Yes.
13 Q.  When was that?
14 A.  I think it was either end of last year or this year.
15 Q.  And how did it change?
16 A.  They went up to seventy-four percent ownership and I
17     went to twenty-six.
18 Q.  Why?
19 A.  They live in Haslett.  They have another business in
20     Haslett.  They want their kids to possibly get
21     involved, so I wanted to sell them a restaurant that
22     would help them.
23 Q.  Who are the officers of this company?
24 A.  Same as the others, myself as president, Denny as vice
25     president, and still my wife, Susan, possibly Sue

Page 51

1      Geisenhaver would be either a secretary or treasurer,
2      one of those two.
3  Q.  And the sole purpose of The Word Enterprises-Haslett
4      is to operate the Hungry Howie's location in Haslett?
5  A.  Correct.
6  Q.  Is there a general manager at that location?
7  A.  Yes.
8  Q.  Does Michele also serve as the area director for that
9      location?
10 A.  Yes.
11 Q.  Does the general manager of the Haslett location have
12     the same responsibilities and capabilities as those
13     other two locations that we discussed already?
14 A.  Yes.
15 Q.  Does Michele have the same responsibilities as it
16     relates to the Haslett location as we discussed for
17     the other locations?
18 A.  Yes.
19 Q.  And you do as well?
20 A.  Yes.
21 Q.  So you and Michele set the pay rate and reimbursement
22     rate, and that's implemented by the general manager?
23 A.  Yes.
24 Q.  What is the name of the company that owns the Durand
25     Hungry Howie's location?

Page 52

1  A.  Dittrich Investments II.
2  Q.  Are there any other owners of that company?
3  A.  Just my wife, Susan, and I.
4  Q.  Do you own the Durand location one hundred percent?
5  A.  Yes.
6  Q.  Is Michele an area director for that location?
7  A.  Yes.
8  Q.  Is there a general manager for that location?
9  A.  Yes.
10 Q.  Does that general manager have the same duties and
11     responsibilities as the St. Johns, Perry, and Haslett
12     locations that we just discussed?
13 A.  Yes.
14 Q.  Does Michele have the same responsibilities for the
15     Durand location as the St. Johns, Perry, and Haslett
16     locations that we just discussed?
17 A.  Yes.
18 Q.  And do you have those same responsibilities?
19 A.  Yes.
20 Q.  Do you also determine the pay and reimbursement rate
21     for drivers for that Durand location?
22 A.  Yes.
23 Q.  And that's implemented by the general manager of that
24     location?
25 A.  Correct.



Page 53
1  Q.  What about the Lansing location on Waverly Road, what
2      company owns that location?
3  A.  B period, A period, C period, Foods, Incorporated,
4      B.A.C., B period, A period, C period, B.A.C. Foods.
5  Q.  And you said that Don Copus is an owner of that
6      company along with you?
7  A.  Yes.
8  Q.  What percentage does he own?
9  A.  Along with Dominic Carbone.
10 Q.  Dominic owns thirteen percent?
11 A.  No.  Switch it around.  Don owns thirteen percent,
12     Dominic owns fifty percent, I now own thirty-seven
13     percent.
14 Q.  Does Michele oversee that Lansing Waverly Road
15     location as an area manager?
16 A.  No.
17 Q.  Is there another area manager that oversees that?
18 A.  Yes.
19 Q.  Who is that?
20 A.  Brad, last name F-O-L-L-M-A-N.
21 Q.  Who is Brad paid by?
22 A.  It's an administrative fee paid for out of one of our
23     other restaurants there that we disburse evenly over
24     those five restaurants.  I can give you -- I can give
25     those to you if you want if it helps.

Page 54
1  Q.  Okay.  Help me understand.
2  A.  Sure.
3  Q.  Well, let's back up.
4          MR. THEUER:  Let me just object as to
5      relevance.
6          But go ahead.
7  BY MS. ELLIS:
8  Q.  Who is Michele paid by?  You said The Word
9      Enterprises?
10 A.  Correct.
11 Q.  But she provides services to all of the other
12     restaurants as well?
13 A.  St. Johns isn't there, but, yes, the other three.
14 Q.  St. Johns, Perry?
15 A.  Not St. Johns.  It would be Perry, Durand, and
16     Haslett.
17 Q.  But she did provide services to St. Johns?
18 A.  Yes.
19 Q.  Then you said Brad Follman is the other area manager?
20 A.  Yes.
21 Q.  And he helps the two Lansing locations?
22 A.  There would be he oversees five.  Those remaining five
23     restaurants, Hungry Howie's, he oversees those other
24     five.
25 Q.  Does he receive any funds from any of The Word

Page 55
1      Enterprises?
2  A.  No.
3  Q.  Are his duties as an area director, is that what you
4      call them?
5  A.  Yes.
6  Q.  Are they the same as those that Michele does?
7  A.  Yes.
8  Q.  Who oversees Brad?
9  A.  I do.
10 Q.  Does Brad report to anybody else?
11 A.  No.
12 Q.  Who does Michele report to?
13 A.  Myself.
14 Q.  Are there any other employees that report directly to
15     you?
16 A.  All my employees report to me.
17 Q.  Do you have an organizational structure for your
18     companies?
19 A.  I do.
20 Q.  Is it written down?
21 A.  No.
22 Q.  Can you walk me through it?
23 A.  Sure.  I am the president.  I am the operating
24     partner.
25     Brad oversees my five Hungry Howie's Pizza

Page 56
1      restaurants in Lansing area.  Michele oversees the
2      other three.  They both report to me on a daily,
3      weekly basis.  That's it.
4  Q.  Do the general managers of the stores report to them?
5  A.  Yes.  Sorry.
6  Q.  And the employees of the stores report to the general
7      managers?
8  A.  Correct.
9  Q.  Would either Brad or Michele have the power to
10     terminate an employee without you knowing?
11 A.  Yes.
12 Q.  Would the general managers have the power to do that?
13 A.  Without me knowing?  Yes.  Not without Michele knowing
14     or Brad.
15 Q.  Would the general managers be able to change the rate
16     of somebody's pay without Michele or Brad knowing?
17 A.  They could change -- no, I don't think so.  They
18     could -- no.  I mean, no.  Michele would know because
19     she does her payroll, so she would see it.
20         That was the question, right?
21 Q.  Yes.
22         Would they need her approval?
23 A.  Yes.
24 Q.  Would they need your approval?
25 A.  No.



KEVIN DITTRICH
McFARLIN -v- WORD ENTERPRISES

June 19, 2017
57–60

Page 57
1  Q.  Would they need your approval to fire somebody?
2  A.  No.
3  Q.  Would they need your approval to -- would a general
4      manager need Michele's approval to change the manner
5      in which someone was paid?
6  A.  Yes.
7  Q.  Would they need your approval to do that?
8  A.  No.
9  Q.  Would a general manager need approval to change the
10     reimbursement rate by which an employee was provided
11     for reimbursement?
12 A.  Yes.
13 Q.  Would they need Michele's approval?
14 A.  Yes.
15 Q.  Would they need your approval?
16 A.  Wouldn't need it but Michele would bring it to me.
17 Q.  Has that ever happened?
18 A.  Not to my knowledge.  If we're talking about
19     reimbursement, not hourly wage.  That's a state, a
20     federal law.
21         Compensation?  Couldn't happen without
22     Michele's knowledge.
23 Q.  You mean if somebody got a promotion and was given
24     more money?
25 A.  Either more money or less money.

Page 58
1  Q.  Does that happen?
2  A.  Not to my knowledge.
3  Q.  Who trained Michele and Brad?
4  A.  Myself.
5  Q.  And what are their job responsibilities?  You said
6      overseeing the stores.  Anything else?
7  A.  That would be my best way to explain it.
8  Q.  Do they have written job descriptions?
9  A.  No.
10 Q.  Are they paid hourly or salary?
11 A.  Salary.
12 Q.  Are they reimbursed for mileage?
13 A.  Yes.
14 Q.  Using what method?
15 A.  Compensation per week, so much money.
16 Q.  They're provided a flat rate per week?
17 A.  Yeah.
18 Q.  How much is that?
19 A.  Unless it's changed, and I don't know if it has, it
20     was between thirty-five and fifty dollars a week for
21     gas, fuel.
22 Q.  Who would change it if you weren't the one to change
23     it?
24 A.  They would have brought it to my attention.  I just
25     don't recall.

Page 59
1  Q.  Who would have?
2  A.  Either Brad or Michele.
3  Q.  Would they have the power to change it themselves?
4  A.  No, no.
5  Q.  Did you determine that it should be between
6      thirty-five and fifty dollars per week?
7  A.  We discussed and we agreed upon that rate.
8  Q.  You discussed that with each of them?
9  A.  Yeah.
10 Q.  What are the duties of a delivery driver in one of
11     your pizza locations?
12 A.  The duties of a delivery driver would be to take a
13     delivery to a predetermined destination, deliver the
14     pizza there, accept the cash if it's a cash payment or
15     it's to a credit card, online, over the phone, or
16     through our POS system, to follow all the state and
17     federal laws of driving on the road, come back to the
18     restaurant, do it over again.
19 Q.  Would you hire somebody as a delivery driver if they
20     didn't have a car?
21 A.  If they didn't own the car or --
22 Q.  If they didn't have access to a car.
23 A.  No, they couldn't be a delivery driver if they didn't
24     have access to a car.
25 Q.  Would you say the primary duty of all delivery drivers

Page 60
1      for the Hungry Howie's locations that you own is to
2      deliver pizzas to customers?
3  A.  Yes.
4  Q.  Is there any meaningful differences between those
5      duties from store to store?
6  A.  No.
7  Q.  Is there any meaningful differences between those
8      duties between driver to driver?
9  A.  Depends on if a driver's got seniority, like he's been
10     there longer so we tenured him at a different pay rate
11     or something like that.  Each and every driver is paid
12     based on, you know, the minimum wage.
13 Q.  I was asking about their job responsibilities, not
14     their pay.
15         Would there be any difference in job
16     responsibilities between driver to driver?
17 A.  No.
18 Q.  Do the delivery drivers have a written job
19     description?
20 A.  Yes, I believe they have responsibilities.  I don't
21     know if it's a written -- it's in the employee
22     handbook obviously.
23         (Deposition Exhibit No. 6 marked and
24         attached.)
25 BY MS. ELLIS:



Page 61
1  Q.  Handing you Exhibit 6.  I'll direct you to page
2      TWE000009.
3          Are these the delivery responsibilities you
4      were referring to?
5  A.  Correct.
6  Q.  Are you aware of any other written job description
7      that your delivery drivers have at any of your stores?
8  A.  No.
9  Q.  Does the same job description cover all of the drivers
10     for all of your stores?
11 A.  Yes.
12 Q.  And that's for all the pizza stores that you own,
13     correct?
14 A.  Correct.
15 Q.  Has this job description changed in any way since
16     2015?
17 A.  No.
18 Q.  Has this changed in any way since 2014?
19 A.  No.
20 Q.  How many days per week do delivery drivers work?
21 A.  It varies.  If they're a part-time driver, they're all
22     part-time drivers.  But they can work from one day
23     to -- we normally don't work people more than forty
24     hours a week, so --
25 Q.  Without considering tips for a moment, are there any

Page 62
1      delivery drivers employed by any of The Word
2      Enterprises that receive higher than a minimum wage as
3      their rate of pay?
4  A.  I want to say there might be some.
5  Q.  Do you know who they are?
6  A.  I don't have that information in front of me.
7  Q.  Have all of your delivery drivers been on a tip credit
8      since 2014?
9  A.  I believe so, yes.
10 Q.  Is the tip credit used to help the drivers meet the
11     federal minimum wage?
12 A.  I want to say yes.
13 Q.  That they may be paid less?
14 A.  Never less than minimum wage.
15 Q.  Well, a portion of their tips will be applied to their
16     wages until it reaches the minimum wage, correct?
17 A.  That is part of the calculation.
18         (Deposition Exhibit No. 7 marked and
19         attached.)
20 BY MS. ELLIS:
21 Q.  Handing you Exhibit 7.
22         Is this the tip credit policy that you use
23     at all of your Hungry Howie's locations?
24 A.  Currently or back in that time period?
25 Q.  Currently.

Page 63
1  A.  No.  I mean, I see some of it.  It's not dated.
2  Q.  Were you asked to produce documents in response to
3      requests in this lawsuit?
4  A.  Yes.
5  Q.  And did you pull those documents that you were
6      requested?
7  A.  I or my area director would have pulled these, and I
8      believe Michele pulled this one if this was provided
9      to you.
10 Q.  So it's your understanding that this is not the most
11     recent copy of the tip policy?
12 A.  I think it is.  I was reading down further.  I saw the
13     minimum wage was on.  So once I got down to paragraph
14     maybe three or four, I saw that it was getting up
15     there, but obviously minimum wage today is eight
16     ninety.  I think this would have been in effect at
17     that time, so --
18 Q.  Who's in charge of updating the tip policy?
19 A.  I would be the tip policy with Michele.
20 Q.  Do you recall updating this document at any point?
21 A.  I can't recall.  I mean, it looks like one that we
22     have and that we use, but, once again, I did not
23     provide this one myself personally.  I think I called
24     on Michele to provide the documentation that you
25     needed for some things.

Page 64
1  Q.  Well, as a representative of the company sitting here
2      today, does this accurately describe the tip policy
3      that is used at your Hungry Howie's locations for
4      delivery drivers?
5          MR. THEUER:  Objection, asked and answered.
6          You can go ahead and answer if you can.
7          THE WITNESS:  Like I said, without any
8      signature or anything on it, I don't have your answer.
9  BY MS. ELLIS:
10 Q.  Who's management on this document?
11 A.  It would be my area director, Michele, or the general
12     manager of the restaurant.
13 Q.  Did you sign this document?
14 A.  I did not.
15 Q.  Do you know who signed this document?
16 A.  No.
17 Q.  Generally is it your understanding that delivery
18     drivers may receive an hourly rate of lower than the
19     minimum wage at certain times that they are working
20     for your Hungry Howie's locations?
21 A.  Yes.  I understand that.
22 Q.  And that they receive a tip credit in order to take
23     them to the federal minimum wage, correct?
24 A.  Correct.
25 Q.  And that lower rate, is that applied or given to the



Page 65
1  drivers only when they are delivering or the entire
2  time that they're working?
3  A.  Only when they're delivering.
4  Q.  Have any of your delivery drivers been paid on a tip
5     credit method different than that?
6  A.  Not to my understanding.
7  Q.  Is there any reason that you, that you have to believe
8     that they may been paid on a tip credit method
9     different than that?
10 A.  No.
11 Q.  You said drivers are paid every two weeks?
12 A.  Correct.
13 Q.  All drivers?
14 A.  Correct.
15 Q.  Is that for all the Hungry Howie's locations you own?
16 A.  I believe so.  I have different accountants for
17    different restaurants.
18 Q.  What about the ones owned by The Word Enterprises, are
19    those all serviced by the same accountant?
20 A.  Yes.
21 Q.  Are they all -- are all those drivers paid on a
22    two-week basis?
23 A.  Yes.
24 Q.  How often are drivers reimbursed for vehicle expenses
25    at the locations owned by The Word Enterprises

Page 66
1  collectively?  When I say The Word Enterprises, I mean
2  all of The Word Enterprises.
3  A.  Well, they're not reimbursed.  They have compensation
4     on a nightly basis.
5  Q.  Okay.  What do you mean by that?
6  A.  They get paid minimum wage plus so much per run, so,
7     per address that they go to.
8  Q.  And you're saying they're paid nightly?
9  A.  Correct, for that delivery fee that they get
10    reimbursed for or compensated for.
11 Q.  So earlier you said that drivers at the St. Johns,
12    Perry, and Haslett locations are paid on a per trip
13    reimbursement rate, correct?
14 A.  Correct.
15 Q.  And that's seventy-five cents per trip?
16 A.  It depends on which restaurant it is, but it's more
17    than that in some cases like Perry if we're talking
18    specifically.
19 Q.  And Perry, if a delivery goes to the Laingsburg area,
20    they're paid a dollar seventy-five?
21 A.  Yes.
22 Q.  Is this policy written down anywhere?
23 A.  I would have to check on that, but today they're
24    actually paid more than that.
25 Q.  How much are they paid more than that?

Page 67
1  A.  Now we're up to two twenty-five per delivery to Perry.
2  Q.  When did that change?
3  A.  Sometime last year, maybe August of 2016 I think
4     maybe.
5  Q.  So drivers are paid nightly based on the number of
6     deliveries that they've made?
7  A.  They're compensated nightly for every run that they
8     make.  They get paid X amount of dollars based on the
9     number of deliveries, dependent upon where they
10    deliver to.
11 Q.  So when you say they're compensated, they walk out of
12    the restaurant with a check?
13 A.  Cash.
14 Q.  They're paid cash every night for the deliveries that
15    they make?
16 A.  Yes.
17 Q.  Do does The Word Enterprises, any of The Word
18    Enterprises that you have an ownership interest in
19    classify its delivery drivers as exempt or nonexempt
20    from the Fair Labor Standards Act?
21 A.  I don't have the answer.  I think it's nonexempt, but
22    I'm not sure to be honest with you.  I would have to
23    look at the paperwork that we filled out.
24 Q.  Do any of The Word Enterprises or do all The Word
25    Enterprises that you have an ownership interest in

Page 68
1  classify your delivery drivers as exempt or nonexempt
2  from state minimum wage laws?
3  A.  They're not exempt, so that means that they would make
4     minimum wage at least.
5  Q.  Are you asking me?
6  A.  I don't know to be honest with you.
7  Q.  Okay.
8  A.  I'm having a hard time with that one.
9       MR. THEUER:  If you don't know, just say
10    you don't know.
11      THE WITNESS:  I don't know.  I'm sorry.
12 BY MS. ELLIS:
13 Q.  I want to talk a little bit about the policies that
14    you have for delivery drivers.
15      You've already said that to be hired as a
16    delivery driver for any of the locations owned or
17    operated by your -- by The Word Enterprises, a person
18    would have to either own or have access to a vehicle,
19    is that right?
20 A.  Correct.
21 Q.  That vehicle is required to be in safe working
22    condition, correct?
23 A.  Correct.
24 Q.  It's required to be legal?
25 A.  I don't know what that means.



KEVIN DITTRICH  
McFARLIN -v- WORD ENTERPRISES

June 19, 2017  
69–72

Page 69

1  Q.  Well, registered with the state.
2  A.  Yes.
3  Q.  It's required to have insurance, right?
4  A.  Correct.
5  Q.  And it's required to actually run, correct?
6  A.  Correct.
7  Q.  And it's expected that if a driver has a vehicle that
8      didn't run that they would need to do whatever they
9      needed to do to make it run, right?
10 A.  They have to have a working vehicle.
11 Q.  So if their car broke down, they had to fix it?
12 A.  Yes.
13 Q.  If they didn't, they wouldn't be able to make
14     deliveries?
15 A.  Correct.
16 Q.  None of The Word Enterprises -- were you going to say
17     something?
18 A.  Uh-uh.
19 Q.  None of The Word Enterprises that you own or operate
20     provide vehicles to your delivery drivers, do they?
21 A.  No, we do not.
22 Q.  Are there any other requirements for delivery drivers
23     and the vehicles that you have that we haven't
24     discussed already?
25 A.  I would point me to the employee handbook, and one

Page 70

1      through twenty-three would say what the
2      responsibilities are.
3  Q.  You're looking at page nine?
4  A.  Page fourteen which it's actually page fourteen.
5         MR. THEUER:  Bates number TWE09.
6         THE WITNESS:  Yeah, there you go.
7  BY MS. ELLIS:
8  Q.  Does The Word Enterprises or any of the Hungry Howie's
9      locations that The Word Enterprises stores or
10     companies operate track the mileage that drivers use
11     on the job?
12 A.  We don't track it.  We have access to MapQuest it, a
13     delivery software that we have within our system, but
14     we do not track exactly how many miles they drive each
15     shift.
16 Q.  Do you track how many miles they drive when they're
17     not working and delivering pizzas?
18 A.  Excuse me?
19        MR. THEUER:  Object to the form of the
20     question.
21 BY MS. ELLIS:
22 Q.  Do you track the mileage of your employees when
23     they're not delivering pizza?
24 A.  No.
25 Q.  Do you track employees' delivery costs?

Page 71

1  A.  No.
2  Q.  Do you track delivery drivers' vehicle costs?
3  A.  No.
4  Q.  Do you track the amount of money that they spend on
5      gas?
6  A.  No.
7  Q.  Do you track the amount of money that they spend on
8      repairs to their vehicles?
9  A.  No.
10 Q.  Have you personally coordinated with Hungry Howie's
11     corporate on vehicle reimbursement?
12 A.  No.
13 Q.  Has The Word Enterprises, any of The Word Enterprises,
14     consulted with Hungry Howie's corporate on vehicle
15     reimbursement?
16 A.  No.
17 Q.  On driver development?
18 A.  No.
19 Q.  On trip reimbursement?
20 A.  No.
21 Q.  Have you or any of The Word Enterprises consulted or
22     coordinated with any other pizza company about vehicle
23     reimbursement?
24 A.  We do a competitive analysis by calling every -- not
25     every -- by calling some of the major pizza

Page 72

1      restaurants in each market to see what they're paying
2      their delivery drivers.
3  Q.  Who is we?
4  A.  Myself and Michele.
5  Q.  When's the last time you did that?
6  A.  2014.  No.  The last time, it would have been maybe
7      last year, 2016, but we've done it almost every year.
8  Q.  When's the first time that you did that?
9  A.  The time I ever opened a restaurant, so whatever date
10     that is.
11 Q.  2000?
12 A.  Something like that.
13 Q.  You said you did it last year in 2016, is that right?
14 A.  Uh-huh, yes, correct.
15 Q.  In 2014 you think was the time before that?
16 A.  No.  It would have been 2015, 2014, 2013, and so on.
17 Q.  Every year you do an analysis of the market?
18 A.  We do.
19 Q.  Do you have that process written down anywhere?
20 A.  No.
21 Q.  Do you have the results of that process recorded
22     anywhere?
23 A.  Not to my knowledge.
24 Q.  Who did you call last year when you did this analysis
25     of the market?



Page 73
1  A.  I won't give you exact because I don't have that, but
2     I'll tell you typically we go with the national chains
3     which would be Domino's Pizza, Poppa John's if it's in
4     the market, Pizza Hut, Jets Pizza, Cottage Inn,
5     Little Caesars.
6  Q.  And would you call a store or their corporate office?
7     Who would you call?
8  A.  We would call an individual restaurant within our
9     market, whatever the competitive set was, and we would
10    find out how much they're paying their delivery
11    drivers and if there's commission or reimbursement.
12 Q.  What was that last part?  I'm sorry.
13 A.  If there's -- what the delivery reimbursement might be
14    or what their hourly wage might be.  Some give that
15    information, some do not.
16 Q.  You said you make those calls?
17 A.  I have in the past.  Michele will most often do it now
18    or Brad.
19 Q.  And you don't keep that in a spreadsheet anywhere, the
20    results of what you found?
21 A.  No.  We'll make a calculation based on what the market
22    is paying.
23 Q.  And you said your rates changed last year in 2016?
24 A.  I believe so.
25 Q.  It went from a dollar seventy-five per delivery to

Page 74
1     Laingsburg to two twenty-five?
2  A.  That one in particular, yes.
3  Q.  Were there other changes?
4  A.  Each restaurant we look at separately and differently,
5     so it depends on if there's any unique situations.
6         Laingsburg is the only one that is unique
7     in those restaurants that Michele would watch over.
8  Q.  Well, let's go through them one by one.
9  A.  Sure.
10 Q.  Do you recall any changes in the Perry location
11    besides the Laingsburg rate change in 2016?
12 A.  No.
13 Q.  What about the Owosso location?
14 A.  Closed.
15 Q.  St. Johns was closed?
16 A.  Closed.
17 Q.  What about the Haslett location?
18 A.  No changes.
19 Q.  Did you make any changes in your Durand location?
20 A.  No.
21 Q.  Did you make any changes in any of your other
22    locations?
23 A.  I would have to check.  I don't have that information
24    available.
25 Q.  What about in 2015, do you recall if any changes were

Page 75
1     made?
2  A.  I do not recall.
3  Q.  What about in 2014?
4  A.  I do not recall.  I don't have it in front of me.
5  Q.  When you say you don't have it in front of you, what
6     do you mean?
7  A.  Such as whether it was state law, federal law, minimum
8     wage change, whether it was we decided in one
9     particular restaurant the delivery range might be
10    larger than another one.  We may have just
11    individually adjusted that one.
12        But with multiple restaurants, just not off
13    the top of my head.
14 Q.  I'm just asking in response to the survey that you do
15    of the other restaurants if you made any changes.
16        Is this part of a bigger process that you
17    evaluate laws as well?
18 A.  Well, you have minimum state and federal laws that you
19    have to abide by each year, so we look at those, and
20    recently they have been changing often and then just
21    the competitive set.
22 Q.  Is there a certain time of the year that you do this
23    analysis?
24 A.  We try to do it in the beginning, the first quarter if
25    possible, depending on, but it will be dependent upon

Page 76
1     when that minimum wage hike might take effect again.
2  Q.  You don't have records of these, though, is what you
3     said?
4  A.  No, we do not.
5  Q.  The only records would be reflected -- the only
6     records of these changes would be reflected in the pay
7     records of the employees themselves?
8  A.  Correct.
9  Q.  Does The Word Enterprises or any of The Word
10    Enterprises that you own or operate have a
11    record-retention/preservation policy?
12 A.  No.
13 Q.  Do you keep a record of your employees' -- strike
14    that.
15        How do you keep a record of your employees'
16    work schedules so that they may be paid?
17 A.  In our Revention POS System, and then, of course,
18    clock-in, clock-out time, schedules that we would, you
19    know, provide to our accountant.
20 Q.  Do you have access personally to the Revention System?
21 A.  I do.
22 Q.  Is it a website-based system?
23 A.  No.
24 Q.  Is it hosted on individual computers?
25 A.  It can be.



Page 121

1  said yes, we would ask how much they pay, how they
2  compensated their delivery drivers, and it would give
3  us an hourly rate.  They may give us you get a
4  commission or a dollar a run and you get to keep your
5  tips.
6       That's standard operating procedure for
7  most delivery pizza carryout restaurants based on what
8  we've done.
9  Q.  Would you tell them you were another restaurant owner?
10 A.  Absolutely not.
11 Q.  Does Hungry Howie's corporate ever audit any of your
12     stores for anything?
13 A.  They have never audited my stores.
14 Q.  Could they?
15 A.  If they wanted to, they could.
16 Q.  For what sorts of things?
17 A.  Financial record-keeping.
18 Q.  Do they provide you with any recommendations on driver
19     reimbursement?
20 A.  Not in writing.  Not that I know of.
21 Q.  Have you had any corporate conversations, oral
22     conversations, with people at Hungry Howie's corporate
23     about driver reimbursement?
24 A.  I worked there.  I'm going to say I think I have.
25     I've got to believe I have.

Page 122

1  Q.  Do you remember what they were about?
2  A.  No.
3  Q.  When you worked for Hungry Howie's corporate as a
4      consultant, you also owned Hungry Howie's Pizza
5      stores, is that right?
6  A.  Correct.
7  Q.  So when you spoke to other Hungry Howie's franchisees,
8      were you speaking as a Hungry Howie's -- as a
9      colleague or as a resource from the company?
10 A.  I have no idea.  Depends on what the situation was and
11     what we were talking about.
12 Q.  Are other consultants employed?  Do you work with a
13     consultant with Hungry Howie's now?
14 A.  I do.
15 Q.  Is that person a business owner, also?
16 A.  No.
17 Q.  What does that consultant provide to you?
18 A.  The same thing that I provided to those other ones
19     when you asked earlier as far as operating, opening a
20     restaurant, giving you an inspection review, make sure
21     that our standards are up to whatever corporate's
22     asking us to do.
23 Q.  Do they help you update your documents?
24 A.  No.
25 Q.  Do they provide you with the initial documents such as

Page 123

1  the employee handbook we discussed earlier?
2  A.  Yes.
3  Q.  And then it's your responsibility to update?
4  A.  Correct.
5  Q.  Do they ever provide you with additional updates of
6      those documents?
7  A.  If it's state or federal mandated, yes.  Otherwise,
8      not to my knowledge.
9          MS. ELLIS:  It sounds like there may be
10     some additional documents that haven't been produced.
11     He said he'd check on a number of things.
12         I want to reserve the right to call him
13     back to talk about those things if need be, but for
14     now, we're done with him.
15         MR. THEUER:  All right.
16
17     (Deposition concluded at 1:19 p.m.)

Page 124

1  STATE OF MICHIGAN    )
                       )SS.
2  COUNTY OF LIVINGSTON )
3             CERTIFICATE OF NOTARY PUBLIC
4             I certify that this transcript
5  is a complete, true, and correct record of the
6  testimony of the deponent to the best of my ability
7  taken on Monday, June 19, 2017.
8             I also certify that prior to
9  taking this deposition, the witness was duly sworn by
10 me to tell the truth.
11            I also certify that I am not a
12 relative or employee of a party, or a relative or
13 employee of an attorney for a party, have a contract
14 with a party, or am financially interested in the
15 action.



Cheryl McDowell, CSR-2662, RPR
Notary Public, Livingston County
State of Michigan
Commission Expires September 13, 2019