### Page 1

```
 1          IN THE UNITED STATE DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4
 5   CHAD MCFARLIN, individually
     and on behalf of all
 6   similarly situated persons,
 7
 8          Plaintiffs,
 9
10   vs.                    Civil Action No:
                            2:16-cv-12536
11
                            HON. GERSHWIN A. DRAIN
12   THE WORD ENTERPRISES, LLC,
     et al,
13
14
            Defendants.
15
16   _____/
17
18
19      The Deposition of MICHELE FOLLMAN was taken
20   before me, Barbara Phillips, (CER #5598) and Notary
21   Public, in and for the County of Washtenaw, State of
22   Michigan, at 221 N. Main Street, Suite 300, Ann
23   Arbor, Michigan, on Tuesday, December 5, 2017, at
24   1:45 p.m.
25
```

### Page 2

```
 1   APPEARANCES:
 2
 3          DAVID M. BLANCHARD (P67190)
 4          221 N. Main Street, Suite 300
 5          Ann Arbor, Michigan  48104
 6          734-929-4313
 7
 8          Appearing on behalf of the Plaintiffs.
 9
10
11          JEFFREY S. THEUER (P44161)
12          124 West Allegan Street, Suite 700
13          Lansing, Michigan  48933
14          517-482-2400
15
16          Appearing on behalf of the Defendants.
17
18                 ** ** ** ** **
19
20   REPORTED BY:   Barbara Phillips,
21                  (CER #5598)
22                  and Notary Public.
23
24
25   ALSO PRESENT:  Kevin Dittrich
```

### Page 3

```
 1                    I N D E X
 2   WITNESS:                                   PAGE:
 3          M I C H E L E   F O L L M A N
 4
 5       Examination by Mr. Blanchard             4
 6
 7
 8
 9                 ** ** ** ** **
10
11         E  X  H  I  B  I  T  S
12   EXHIBITS:                                  PAGE:
13
14       Deposition Exhibit No. 25               51
15
16
17                 ** ** ** ** **
18
19
20
21
22
23
24
25
```

### Page 4

```
 1          Ann Arbor, Michigan
 2          Tuesday, December 5, 2017
 3          1:45 p.m.
 4
 5                 ** ** ** ** **
 6
 7       M I C H E L E   F O L L M A N
 8   after having been first duly sworn to tell the
 9   truth, the whole truth, and nothing but the
10   truth, was examined and testified upon her
11   oath as follows:
12
13                 ** ** ** ** **
14          E X A M I N A T I O N
15   BY MR. BLANCHARD:
16   Q. Thank you, Ms. Follman.  You've been here the whole
17      time during part one and part two of Mr. Dittrich's
18      testimony; is that correct?
19   A. Yes.
20   Q. And he has been speaking on behalf of the companies,
21      defendant companies pursuant to what we marked
22      previously.  We've got these exhibits in front of
23      you.  The re-notice of the deposition is Exhibit 16
24      which I'm showing you right now.  It's in front of
25      you.  And you've been designated as somebody who can
```



Page 5
1  answer some of the additional questions and you've
2  heard what those questions are and stuff, right?
3  A. Yes.
4  Q. And you've heard the testimony of Mr. Dittrich. Was
5     there anything as to the topics that we're noticing
6     in this deposition that I asked about, anything in
7     particular that stands out that needs to be
8     corrected or was incorrect in any way?
9  A. No.
10 Q. I'd like you to turn to Exhibit 17 which is the next
11    one here and that's your affidavit. I'm going to
12    ask you about that one. Who, if anyone, helped you
13    prepare this document?
14 A. Counsel.
15 Q. Anyone other than counsel?
16 A. No.
17 Q. And what was your understanding of the purpose of
18    this document?
19 A. I'm not sure.
20 Q. Like, for instance, were you under the understanding
21    that this was for the purpose of informing the
22    expert or the accountant on certain business
23    practices?
24 A. I'm not sure.
25 Q. Do you know what the purpose of it was really?

Page 6
1  A. I don't know. I answered the questions my lawyer
2     asked me.
3  Q. In paragraph eight of your affidavit declaration
4     here -- are you familiar with it by the way? Do you
5     need to take time to read it or review it?
6  A. I'm familiar.
7  Q. In paragraph eight you testify the driver employees
8     at the two operating companies -- this was before
9     Durand was added, were not paid on the basis of
10    minimum wage plus vehicle reimbursement. Why did
11    you say that?
12 A. We did not pay a minimum wage plus reimbursement
13    there. We used the tip credit to get them to
14    minimum wage with their compensation for the vehicle
15    costs.
16 Q. So all you're saying in that particular sentence,
17    the first sentence of paragraph eight, is that you
18    were using the tip credit and paying a cash wage
19    that was below the minimum wage rather than on the
20    basis of minimum wage and vehicle reimbursement?
21      MR. THEUER: I'll object to the
22    characterization, but go ahead and answer.
23 BY MR. BLANCHARD:
24 Q. I'm just trying to understand what you're trying to
25    say there?

Page 7
1  A. We use the tip credit to get them to minimum wage
2     with their compensation for their vehicle costs. So
3     not just the minimum wage, but with their costs
4     included.
5  Q. What components of the money that's given to the
6     drivers is intended to be a reimbursement for their
7     mileage?
8  A. It's the whole -- the package. Their wages, their
9     compensation per delivery and their tips.
10 Q. So are you saying that there is no specific portion
11    of a driver's money that they receive that's
12    intended to be reimbursement for driving expenses?
13 A. Can you ask that again one more time?
14 Q. Yeah. I want to get a clear answer and I want to be
15    clear about what the question is, too, so I'm not
16    doing the best job. Is there any particular piece
17    of the money that changes hands between the
18    defendant companies and the driver that's intended
19    and designated as reimbursement for the expense
20    incurred by the drivers?
21 A. That is only designated for that expense?
22 Q. That is designated at all or in part as
23    reimbursement for the expense incurred by the
24    drivers.
25 A. I would say yes.

Page 8
1  Q. Can you tell me what that is?
2  A. If I'm understanding you correctly then part of
3     their pay package with the tips. The hourly pay and
4     compensation goes to reimbursing them their vehicle
5     costs.
6  Q. Which part of that?
7  A. It's a package deal so I mean there's nothing
8     specifically designated just to that.
9  Q. So we talked in your prior testimony about a
10    delivery fee that's paid to drivers?
11 A. Yes.
12 Q. And that was 75 cents per delivery?
13 A. Yes.
14 Q. Plus, at the Laingsburg location it was something
15    different. It was $1,75 and now I guess it's 2.75,
16    right?
17 A. Yes.
18 Q. And now is the base delivery fee that's paid still
19    75 cents or is it a dollar?
20 A. 75 cents still.
21 Q. And that's for all the defendant stores?
22 A. Yes.
23 Q. And we had a question about the cash wage that's
24    paid to drivers at all defendant stores. Is it
25    still $5 for all the drivers?



Page 21

1  A. This one here?
2  Q. Yes.
3  A. Yes.
4     MR. BLANCHARD: I think at some point we're
5  gonna need -- just so we understand where the math
6  is going in here, where the calculations are coming
7  from, we're gonna need an electronic format of this.
8  As far as I know I've only gotten this small PDF.
9  Will you be able to provide that?
10    MR. THEUER: I don't know with certainty, but
11 we can explain anything.
12    MR. BLANCHARD: Well, I am going to ask her
13 what she knows, but I think the simplest way to get
14 this kind of information is going to be in a
15 spreadsheet that speaks for itself.
16 BY MR. BLANCHARD:
17 Q. So you prepared for each week the information that's
18    found on this sheet, Exhibit 20?
19 A. Yes.
20 Q. And in the first three columns -- well, the first
21    column it says date of pay and that's the actual pay
22    date, right?
23 A. Yes, the check.
24 Q. And in the three columns after that you have the
25    hours in store, hours out of store, and total number

Page 22

1  of hours, right?
2  A. Yes.
3  Q. And then the pay rate in store and road because
4     there's a split wage system and it looks like it
5     went to 8.50 at some point?
6  A. Yes.
7  Q. And then if I look at the column for January 14th of
8     2016 or I should say the row for January 14th of '16
9     and it says the rate is 8.50, and then I look over
10    to the -- you inputted this column total minimum
11    wage to be paid, right?
12 A. Yes.
13 Q. Would we expect that to be -- the full minimum wage
14    at that point would be 8.50 times the total number
15    of hours?
16 A. Yes.
17 Q. So that's the kind of thing. If I look at this
18    column and the data behind it it would say take
19    column three, total hours, multiply by column four,
20    minimum wage, equals that column six?
21 A. Yes.
22 Q. And then tell me what the next three columns are.
23    Regular wage paid, credit card tips, and I think the
24    next one says estimated cash tip paid, and tell me
25    where you got those numbers.

Page 23

1  A. The regular wages would be the in store hours and
2     then the on the road hours.
3  Q. The cash wage?
4  A. The cash wage paid. The gross pay for those.
5  Q. Okay. Go ahead.
6  A. The credit card tips would be the reported credit
7     card tips that the computer kept track of. And then
8     the estimated cash tips is what we estimated based
9     on our findings of cash tips to be, what they should
10    have made for cash tips at that time period.
11 Q. So these three columns you just explained here are
12    in your formula considering the three parts of the
13    driver's wages; is that right?
14 A. Three parts, yes.
15 Q. And part of the driver's wages you're saying you
16    estimated?
17 A. The cash tips were estimated. We did not have
18    actual numbers for those, but we used a formula to
19    figure it out.
20 Q. Did you do tax withholding on the total of those
21    three columns?
22 A. On the regular wages and the credit card tips there
23    was tax withholding.
24 Q. And what is your basis for believing that the store
25    is entitled to count the tips paid by a customer to

Page 24

1  a driver as wages?
2  A. Because they're a tipped employee and we use the tip
3     credit.
4  Q. And how does the tip credit work to your
5     understanding?
6  A. To my understanding we pay them -- well, we're
7     paying them $5 an hour and they make up the
8     difference between that and the minimum wage
9     inputting all the reimbursements to the minimum
10    wage. To the 8.15, 8.50, 8.90, whatever the minimum
11    wage is at that time.
12 Q. The store gets to take a credit and treat as wages
13    that portion that brings it up to the minimum wage?
14 A. Yes.
15 Q. And that portion of tips paid to the driver that's
16    above the minimum wage, are you saying it's your
17    understanding or your belief that the store gets to
18    treat those as wages as well?
19    MR. THEUER: I'll object to the extent that it
20    calls for a legal conclusion, but you can answer if
21    you can.
22    THE WITNESS: I don't know the answer. I don't
23    know.
24 BY MR. BLANCHARD:
25 Q. Let's look -- I'm going to come back to this Exhibit



Page 25

1    20.  It's definitely going to be a touchstone we'll
2    talk about today, but I wanted to direct you to
3    Exhibit 18 which is the minimum wage notice for
4    tipped employees.  And Mr. Dittrich directed me to
5    you to ask some of these questions about this
6    notice.  You already testified to it.  We don't need
7    to repeat it all, but this is a notice that was
8    posted at each of the defendant stores, right?
9  A. Yes.
10 Q. And that was for a period of time that probably
11    would have been around 2014 to the end of 2015?
12 A. Yes.
13 Q. And then in 2016 the minimum wage went up.  Was
14    there a new notice prepared in the same format as
15    this one and then pasted at the stores?
16 A. Yes.
17 Q. And then it's going up -- has it gone up from 8.50?
18 A. Yes.
19 Q. What's the current minimum wage?
20 A. 8.90.
21 Q. And when it went up to 8.90 was it the same -- well,
22    let me ask it, was there a similar notice posted
23    that has the 8.90 number on it?
24 A. I believe so.
25 Q. Was it made off the same template?  Was it like the

Page 26

1    exact same notice except just the number was
2    changed?
3  A. It's a part of our labor law poster.
4  Q. Oh, that says what the minimum wage is?
5  A. Yes.
6  Q. But I'm asking in the format of Exhibit 18 --
7  A. There is a portion on the labor law poster that has
8    the tipped wage information on it.  It's in pretty
9    much the same format.
10 Q. Was there a version of Exhibit 18 that was posted
11    with the new rates that came out?
12 A. Yeah.  I believe so, yeah.
13 Q. And it says here we apply the difference between
14    your regular hourly rate and 8.15 as a quote, "tip
15    credit" for each hour worked.  That's the heart of
16    the tip credit, right, where a portion of the tips
17    get to be treated as wages?
18 A. Yes.
19 Q. And the amounts in this case when it was the 8.15
20    minimum wage, the amounts over 8.15 are tips from
21    the customer to the driver that belong to the
22    driver, right?
23 A. Yes.
24 Q. Exhibit 23 is this reimbursement sheet.  Have you
25    seen that before?

Page 27

1  A. No.
2  Q. Have you done any studies yourself of what a
3    reasonable reimbursement is or what factors should
4    be considered in a reasonable mileage reimbursement
5    for employees?
6  A. No.
7  Q. So let's go back to Exhibit 20 again and then next
8    we talked about the wages part.  So when you're
9    reporting on this spreadsheet the total wages paid
10    you're counting the cash wage, plus the credit card,
11    all tips.  Not just the portion that's between the
12    cash wage and 8.15 an hour, but all credit card tips
13    reported, plus an estimated cash tip, right?  You're
14    counting all of those things as wages?
15 A. Yes.
16 Q. The next column is driver commission paid?
17 A. Yes.
18 Q. Well, let me ask this way, did you put the name
19    driver commission paid in the title there?
20 A. I don't remember.
21 Q. Is that -- I'm sorry.  Go ahead.
22 A. I don't remember if that was my wording or theirs.
23 Q. Do you usually call it driver commission, the
24    delivery fee that we were talking about?
25 A. Yes.

Page 28

1  Q. And that is the delivery fee we were talking about
2    that appears in that column, right?
3  A. Yes.
4  Q. And that was -- just so I have this right, for all
5    of the numbers in that column on Exhibit 20, the
6    so-called driver commission paid, that was never
7    subject to a withholding tax reported on a paycheck
8    or reported to the IRS at the end of the year,
9    correct?
10 A. Yes.
11 Q. Yes, that's correct?
12 A. Yes, that's correct.
13 Q. So the next column over you have total wages, tip
14    and commission paid.  So that's just an adding up of
15    the previous four columns, right?
16 A. Yes.
17 Q. Treated as wages, the total amount of estimated tips
18    the driver receives, plus the untaxed so-called
19    driver commission, and total all that up together
20    for the driver commission paid -- total wages, tip
21    and commission paid?
22 A. Yes.
23 Q. And again, do you remember if you gave it that title
24    or if somebody else gave it that title?
25 A. I don't remember.



Page 37

1  Q. Actual miles driven during period. You said that's
2     data you filled out?
3  A. That's my data, yes.
4  Q. And you created that based on using Mapquest --
5     using the wonder of the Internet these days to track
6     down the distance between locations, correct?
7  A. Yes.
8  Q. I'm not going to mark those. There were some
9     spreadsheets we've been provided that look like this
10    that say daily delivery orders on the top?
11 A. Yes.
12 Q. Is this the data -- and they have addresses and
13    deliveries. Is this the data that you uses to do
14    the so-called Mapquesting and get the mileage?
15 A. Yes.
16 Q. And then there's another document that we've
17    produced that Mr. McFarlin made his own notes
18    regarding the miles driven for a certain period of
19    time. Have you seen or reviewed that?
20 A. No.
21 Q. So going to the next column, it says actual miles
22    driven less total miles reimbursed. Do you know
23    what that is?
24 A. No.
25 Q. Does it appear looking at it now that it's the

Page 38

1     difference between the previous two columns?
2  A. Yes.
3  Q. And one of those previous two columns you said
4     didn't make sense to you, right?
5        MR. THEUER: Objection as to the
6     mischaracterization.
7  BY MR. BLANCHARD:
8  Q. The one that says total miles reimbursed for period.
9     That doesn't make sense, does it?
10 A. I didn't do it. I just don't know what it means.
11 Q. Is there anything that you can think of that that
12    could possibly mean?
13 A. I don't know.
14 Q. And then there's a column for total un-reimbursed
15    for variable operating costs for a period and it's
16    all negative numbers. Total under-reimbursed. I'm
17    sorry. I read that wrong. Total dollar figure
18    under-reimbursed for variable operating costs for a
19    period. Did you create that column?
20 A. No.
21 Q. Is that some kind of formula factoring in the
22    previous three columns?
23       MR. THEUER: Objection, calls for speculation.
24 BY MR. BLANCHARD:
25 Q. If you know.

Page 39

1  A. I don't know.
2  Q. The next column over, the mile reimbursement for
3     this pay period, do you understand how that was
4     created?
5  A. I didn't create that column.
6  Q. You don't know what the formula was that comes up
7     with this?
8  A. I don't know.
9  Q. It's 47 and 41 and 43 and 44. You don't know what
10    formula was behind that either?
11 A. No.
12 Q. What about this box at the bottom that has average
13    miles driven and average miles compensation rate,
14    did you create that data?
15 A. No.
16 Q. There's an asterisk down at the bottom. It says
17    total variable cost of operating a vehicle per mile
18    is .148 per Department of Labor Bureau of
19    Transportation Statistics which include gas,
20    maintenance, tires. Did you write that or provide
21    that to your counsel?
22 A. No.
23 Q. Do you have any understanding of what the difference
24    between variable cost and fixed cost of vehicle
25    ownership are?

Page 40

1  A. No.
2  Q. Have you on behalf of the company reached any
3     conclusions regarding which type of vehicle
4     expenses, fixed or variable, are appropriately part
5     of a vehicle reimbursement policy?
6        MR. THEUER: Objection, calls for a legal
7     conclusion. Go ahead and answer if you can.
8        THE WITNESS: No.
9  BY MR. BLANCHARD:
10 Q. That reminds me. I'll just show you this. We don't
11    need to mark it. It's a vehicle information form
12    that's been produced to us. Have you seen this form
13    before?
14 A. No.
15 Q. Is there a version of a vehicle information form
16    that each new delivery driver who hires in has to
17    fill out?
18 A. No.
19 Q. What information is the delivery driver asked to
20    provide when they're hired regarding their car?
21 A. Driver's license, proof of insurance and
22    registration.
23 Q. And those three things are copied and put in the
24    personnel file in the normal course?
25 A. Yes.



Page 41

1  Q.  So in theory at least you should have those for all
2      of the delivery drivers at all of the stores?
3  A.  Yes.
4  Q.  I saw a policy at one point that suggested if the
5      current proof of insurance is not entered that the
6      system will like shut the driver down and not even
7      let them take runs?
8  A.  Yes.
9  Q.  Is that right, is there an update switch in the
10     Rejuvenate system or whatever it's called?
11 A.  In the Revention, yes.
12 Q.  The Revention system?
13 A.  You can enter in the new dates when they receive
14     their new proof.
15 Q.  So that's like a safety check to make sure that you
16     get the new proof of insurance?
17 A.  Yes.
18 Q.  So if you don't get a new proof of insurance the
19     system shuts that driver out because the old date
20     becomes expired and then it's just automatic, right?
21 A.  Yes.
22 Q.  So each time a new driver provides a new proof of
23     insurance who is it -- is it you or is it the store
24     manager who has to go in and update that?
25 A.  The store manager.

Page 42

1  Q.  And they have to go in and enter a new end date for
2      the proof in order for the system to work for that
3      driver; is that right?
4  A.  Yes.
5  Q.  Do they have to enter any other information
6      regarding the proof of insurance?
7  A.  No.
8  Q.  Are drivers required to have insurance in order to
9      be delivery drivers?
10 A.  They have to have insurance to be legal on the road.
11 Q.  Do they have to -- in order to be a delivery driver
12     for Hungry Howie's do they have to have insurance
13     for their vehicle?
14 A.  They have to be able to be legal on the road, so
15     yes.
16 Q.  So what does legal on the read entail?
17 A.  Michigan law says to drive a vehicle you have to
18     have a driver's license, registration and insurance.
19 Q.  Is there anything else?  You said they have to be
20     legal on the road, so is there anything else in
21     there?  Like, for instance, you have to have all
22     your -- your brake lights have to work, right?
23     That's a part of being legal on the road?
24 A.  That is a part of being legal on the road.
25 Q.  Other safety features.  Your windshield can't be

Page 43

1      blown out or something like that is a part of being
2      legal on the road, right?
3  A.  That is a part of being legal on the road.
4  Q.  Then there are other parts we can imagine about good
5      working order of the car, that certain parts of it
6      are a part of being legal on the road.  Again, it's
7      lights, blinkers, turn signals, brakes, muffler.
8      All of those things are a part of being legal on the
9      road, right?
10 A.  They are.
11 Q.  And does Hungry Howie's pay those expenses for its
12     delivery drivers?  I mean I should say the Word, the
13     defendant stores in this case.  Do the defendant
14     stores pay those expenses for the delivery drivers?
15     MR. THEUER:  I'll object to the foundation of
16 question.  Answer if you can.
17     THE WITNESS:  I don't understand what you're
18 asking.
19 BY MR. BLANCHARD:
20 Q.  I'm asking if the drivers have maintenance expenses
21     to keep their car legal on the road if the Word
22     reimburses them for that, the Word stores reimburses
23     them for that?
24 A.  Through their pay package.
25 Q.  Are there any components of the pay package outside

Page 44

1      of the ones we've already discussed on your
2      spreadsheet, Exhibit 20?
3  A.  No.
4  Q.  So if the drivers were going to be reimbursed for
5      all those kinds of expenses of keeping a car legal
6      on the road, insurance, registration, upkeep, et
7      cetera, it would all have to be within those areas
8      of compensation we just discussed on your
9      spreadsheet, right?
10     MR. THEUER:  Objection to the lack of
11 foundation and form of the question, but go ahead
12 and answer it.
13 BY MR. BLANCHARD:
14 Q.  Are you saying it's somewhere -- if these expenses
15     are reimbursed -- let me back up here.  You're
16     saying expenses are reimbursed and they're
17     reimbursed somewhere within the compensation package
18     that's just been discussed in your spreadsheet
19     Exhibit 20?
20     MR. THEUER:  Objection.  It mischaracterizes
21 the testimony and lack of foundation.  Answer it if
22 you understand it.
23     THE WITNESS:  I don't know.
24     MR. BLANCHARD:  It's getting tough here.
25 BY MR. BLANCHARD:



Page 49

1   MR. THEUER: The same objection as before.
2   Answer if you can.
3   BY MR. BLANCHARD:
4   Q. Or just say we don't reimburse people for those
5   kinds of expenses. It's got to be one or the other.
6   I'm just trying to figure out what the company's
7   portion is at this point when we're like two years
8   into litigation about whether they're actually
9   reimbursing drivers or not.
10   MR. THEUER: Ask a question so she can answer.
11   MR. BLANCHARD: There's a couple pending.
12   BY MR. BLANCHARD:
13   Q. Is it the company's position that they reimburse the
14   drivers for all of the expenses related to driving
15   their vehicles for the defendant companies or is it
16   the company's position that they don't reimburse all
17   of those expenses?
18   MR. THEUER: Objection as to the form and
19   foundation of the question. Answer if you can.
20   THE WITNESS: We pay them with their wages,
21   tips, commission in a package to get them to the
22   minimum wage including expenses.
23   BY MR. BLANCHARD:
24   Q. Does the amount of -- any amount in the compensation
25   package vary with the driver based on what kind of

Page 50

1   car they have or how much it costs them for
2   insurance or any other individual factors for the
3   drivers?
4   A. Does the amount that we --
5   Q. Yeah. Any amount of the compensation package vary
6   based on the individual expenses of the driver and
7   how much they pay for their car payment or
8   something?
9   A. No.
10   Q. Do you ever ask the drivers to submit oil change
11   receipts or other maintenance receipts to determine
12   how much that they are expending?
13   A. No.
14   Q. It's whatever amount they're being reimbursed as
15   part of this compensation package that you've talked
16   about. It's a generally applicable amount to all of
17   the drivers, right? It doesn't vary based on the
18   individual needs of the driver?
19   A. Yes.
20   Q. Yes, that's correct?
21   A. Yes.
22   Q. I mean I'm sorry I'm being tough here. It's just
23   that we're really frustrated. We're entitled to
24   know exactly what the defendant's position is
25   regarding the comp structure and particularly

Page 51

1   whether people are getting reimbursed or not
2   reimbursed and I appreciate you being patient with
3   me as well. I'm trying to be patient myself.
4   MR. THEUER: Do you want a break?
5   THE WITNESS: Yes.
6   MR. BLANCHARD: Do you want a break?
7   THE WITNESS: Please.
8   (Break in proceedings at 3:09 p.m.)
9   (Back on the record at 3:21 p.m.)
10   MR. BLANCHARD: Back on the record.
11   BY MR. BLANCHARD:
12   Q. One thing I forgot to follow-up on when we were
13   talking about the insurance and stuff is you said
14   that the defendant stores always make sure the
15   delivery drivers have proof of insurance, right?
16   A. Yes.
17   Q. Do they ask the delivery drivers whether they have
18   commercial insurance or just regular PL/PD
19   insurance?
20   A. We just ask for proof of insurance.
21   Q. You don't ask for the policy or for certain waivers
22   or benefits in any insurance package?
23   A. No.
24   MR. BLANCHARD: Let me mark this as an exhibit.
25   (Deposition Exhibit No. 25

Page 52

1   was marked for identification.)
2   BY MR. BLANCHARD:
3   Q. This is a payroll report. Do I have that right,
4   that's what it is?
5   A. Yes.
6   Q. Now, if we spread them out Exhibit 21 is a payroll
7   summary report. 25 is a payroll report. It's a
8   different document. 22 is your paycheck record.
9   And 20 we've been talking about as well. If we can
10   line up some of the documents I just want to talk
11   for a minute about how they interact so I'm reading
12   it properly. In Exhibit 25 if you turn to page --
13   using the numbers on the bottom right corner,
14   TWE000669. And I want you to take a look at the
15   pages before and the pages after to verify page 668
16   shows Chad McFarlin at the top. So pages 668,
17   669, 670, 671 all relate to the Chad McFarlin
18   payroll report, right?
19   A. Yes.
20   Q. And one of the troubles I'm having is that these
21   different reports have different time periods and so
22   they overlap in some way, but they're not apples to
23   apples as we say. So the payroll report says May
24   1st to 9-30, but this gives us a day-by-day report
25   of the hours worked and the amount paid; is that

Page 53

1 right, in Exhibit 25?
2 A. Of what the computer keeps track of, yes.
3 Q. And then Exhibit 21, TWE000367, that's another
4   payroll summary report?
5 A. Yes.
6 Q. And that's 3-1 through 5-31-2016. So that would
7   overlap some of the same weeks as the payroll report
8   that we looked at in Exhibit 25, right?
9 A. Yes.
10 Q. Is there a reason why the period in this Exhibit 21
11   payroll summary report at the point we're looking
12   at -- 3-1-2016 to 5-31-2016, is that part of a
13   quarter in a fiscal year or is that just how it --
14 A. That's just how someone produced them, yes.
15 Q. They just chose a start date and end date and that's
16   how it came out?
17 A. Yes.
18 Q. Do you know -- how do I ask this? Exhibit 22, this
19   is the employee check record. That's what comes
20   from the accountant, right?
21 A. Yes.
22 Q. And on TWE669 --
23     MR. THEUER: You're on Exhibit 25?
24     MR. BLANCHARD: I'm on Exhibit 25.
25 BY MR. BLANCHARD:

Page 54

1 Q. If we could look at that against the first page of
2   Exhibit 22. That's what I'm trying to understand
3   here. So 22 has a gross pay column for July 14th
4   and July 28th of 2016 and that gross pay column is
5   recorded and -- this is the accountant's stuff, so
6   reported and taxed. It's made up of -- some of the
7   numbers we see on Exhibit 25, that's what I'm trying
8   to walk you through.
9 A. Yes.
10 Q. So, for instance, at 7-14-16 we have a total of
11   590.46. Do you see that gross pay on Exhibit 22 for
12   July 14th? Do you see that?
13 A. It's 549.48.
14 Q. I'm seeing 590.46 gross pay on July 14th.
15 A. I have 549.48. Which employee are you looking at?
16 Q. Oh, you're on the second page. You're right. I'm
17   looking on the wrong page because that's not Chad
18   McFarlin. So we're looking at the second page of
19   this. It's TWE0246. You're absolutely right. For
20   July 14th we've got 549.48 you're saying --
21 A. Yes.
22 Q. -- is the number on Exhibit 22 for that payroll
23   period, right?
24 A. Yes.
25 Q. That's the gross pay. And the gross pay -- can you

Page 55

1 tell me which numbers on Exhibit 25 correspond to
2   that gross pay number.
3 A. I would have to look at a calendar because the check
4   date would be the Thursday after the pay period
5   ended and then it would go back.
6 Q. The pay period ends on?
7 A. On Sunday.
8 Q. So four days after?
9 A. So that would be the 10th. So it would have been
10   week nine and week 10 on page 669.
11 Q. So the 165.95 and the 213.85 numbers are a part of
12   that gross pay?
13 A. Yes.
14 Q. And then also the credit card tips that were
15   reported as 60.22 and 109.74 are also a part of that
16   gross pay, right?
17 A. Yes.
18 Q. And then in Exhibit 25 there's a column for comp
19   that we talked a lot about. It's the delivery fee
20   money, right?
21 A. Yes.
22 Q. And remind me. I just read through the transcript
23   for the prior deps last night. That's kind of all
24   the delivery fee money except Laingsburg does not
25   show up on there?

Page 56

1 A. Correct.
2 Q. And the only way to get an accounting for the
3   Laingsburg delivery fee is by looking at the
4   actually delivery addresses?
5 A. Yes.
6 Q. So back to this. Exhibit 25, the comp for week nine
7   and week 10, those numbers 31.50 and $48 are not a
8   part of this gross number --
9 A. Correct.
10 Q. -- that's recorded on Exhibit 22; is that right?
11 A. Yes.
12 Q. And those delivery fee numbers don't show up
13   anywhere on this Exhibit 22; is that right?
14 A. Right.
15 Q. Well, let's see if it's the same thing. If we take
16   Exhibit 20 now and look at your calculations, the
17   curious question there that reminded me when I asked
18   the other question, the delivery fees for
19   Laingsburg, did you take those into account when you
20   made this new spreadsheet thing?
21 A. Yes.
22 Q. And you did that again by looking at the actual
23   addresses and trying to figure out well, if it's in
24   Laingsburg we assume he got that extra pay for that,
25   correct?



Page 57

1   A.  Yes.
2   Q.  So this is the pay period for July 14th.  Driver
3       commission paid, we have $85 here.  It's not on
4       Exhibit 22.  We've established that.  And on Exhibit
5       25 for those two weeks you have $48 plus 31.50 is
6       79.50 that shows up on Exhibit 25.  And would I be
7       correct in assuming that the difference between
8       79.50 that shows up on there and the $85 that you
9       have on your spreadsheet you created, Exhibit 20, is
10      because of the Laingsburg deliveries?
11  A.  Yes.
12  Q.  Cool.  So we've talked about all these payment
13      components really on all these exhibits, but I'll
14      focus on Exhibit 20.  All these different components
15      of compensation that you testified, is there any
16      particular one of them that the defendant can point
17      to as intended to reasonably compensate delivery
18      drivers for the expenses incurred in driving their
19      cars?
20  A.  It is all a package deal.
21          MR. BLANCHARD:  Thanks.  I don't have anything
22      further.  Do you want to follow-up?
23          MR. THEUER:  No.  I think I have nothing.
24              ** ** ** ** **
25          (Deposition concluded at 3:36 p.m.)

Page 58

1   STATE OF MICHIGAN    )
                         ) ss.
2   COUNTY OF OAKLAND    )
3           CERTIFICATE OF NOTARY PUBLIC
                AND COURT REPORTER
4
5           I, BARBARA PHILLIPS, Notary Public in
6       and for the County of Oakland, State of
7       Michigan, do hereby certify that the witness
8       whose attached deposition was taken before me
9       was first duly sworn to testify to the truth,
10      the whole truth and nothing but the truth;
11      that thereupon the foregoing questions were
12      asked and the foregoing answers were made by
13      the witness, which were duly recorded by me
14      electronically; and were reduced to
15      typewritten form by computer-aided
16      transcription under my direction; and that
17      this is, to the best of my knowledge and
18      belief, a true and correct transcript of my
19      electronic records so taken.
20          I further certify that I am neither of
21      counsel to either party, nor interested in the
22      events of this cause.
23      
24      Barbara Phillips, #5598
        Notary Public, Oakland County, MI
25      My Commission Expires:  11-27-2018