# Doe v. Cin-Lan, Inc.

United States District Court for the Eastern District of Michigan, Southern Division

August 18, 2009, Decided; August 18, 2009, Filed

Case No. 4:08-cv-12719

**Reporter**
2009 U.S. Dist. LEXIS 72979 *; 15 Wage & Hour Cas. 2d (BNA) 1073

JANE DOE, Plaintiff, v. CIN-LAN, INC., DEJA VU CONSULTING, INC., and HARRY V. MOHNEY, Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part Doe v. Cin-Lan, Inc., 2009 U.S. Dist. LEXIS 86983 ( E.D. Mich., Sept. 22, 2009)

**Prior History:** Doe v. Cin-Lan, Inc., 2009 U.S. Dist. LEXIS 45268 (E.D. Mich., May 29, 2009)

**Counsel:** [*1] For Jane Doe, Plaintiff: Hart L. Robinovitch, Zimmerman Reed, Scottsdale, AZ; Jason J. Thompson, Sommers Schwartz, P.C., Southfield, MI; Kevin J. Stoops, Sommers, Schwartz, Southfield, MI; Timothy J. Becker, Zimmerman Reed, Minneapolis, MN.

For Cin-Lan, Inc, Defendant: Daniel W. Rucker, Hertz Schram, Bloomfield Hills, MI; Walter J. Piszczatowski, Hertz, Schram, (Bloomfield Hills), Bloomfield Hills, MI.

For Deja Vu Consulting, Inc, Defendant: Edith A. Thomas, Edi Thomas Assoc, Fallbrook, CA; Kristin Beals Bellar, Ronald A. King, Clark Hill, Lansing, MI; Paul W. Coughenour, Clark Hill, Detroit, MI.

For Harry V Mohney, Defendant: Edith A. Thomas, Edi Thomas Assoc, Fallbrook, CA; Paul W. Coughenour, Clark Hill, Detroit, MI.

For Cin-Lan, Inc, Counter Claimant: Daniel W. Rucker, LEAD ATTORNEY, Hertz Schram, Bloomfield Hills, MI; Walter J. Piszczatowski, Hertz, Schram, (Bloomfield Hills), Bloomfield Hills, MI.

For Jane Doe, Counter Defendant: Hart L. Robinovitch, Zimmerman Reed, Scottsdale, AZ; Jason J. Thompson, Sommers Schwartz, P.C., Southfield, MI; Kevin J. Stoops, Sommers, Schwartz, Southfield, MI.

**Judges:** HONORABLE STEPHEN J. MURPHY, III, United States District Judge.

**Opinion by:** STEPHEN J. MURPHY, III

# Opinion

**OPINION [*2] AND ORDER GRANTING PLAINTIFF'S AND DEFENDANT DEJA VU'S MOTIONS FOR LEAVE TO FILE EXCESS PAGES** (document nos. 90 and 97) **AND DENYING DEFENDANTS DEJA VU CONSULTING AND HARRY V. MOHNEY'S MOTION FOR SUMMARY JUDGMENT** (document no. 55)

## INTRODUCTION

This motion presents a single issue for the Court's decision: whether defendants Deja Vu Consulting, Inc ("Deja Vu")., and Harry Mohney qualify as the "employers" of plaintiff Jane Doe, within the meaning of the federal Fair Labor Standards Act, *codified at* 29 U.S.C. §§ 201 *et seq.*, or Michigan's Minimum Wage Law of 1964, *codified at* Mich. Comp. L. §§ 408.381 *et seq.*

The plaintiff Jane Doe is a nude dancer who, until she filed this lawsuit, regularly performed at the Deja Vu nightclub in Lansing, Michigan. This nightclub is owned and operated by defendant Cin-Lan, Inc ("Cin-Lan"). In her amended complaint, Doe asserts three central claims. First, she alleges that the defendants improperly treated her as a mere tenant of the nightclub, rather than as an "employee" under the FLSA and the MWL, and accordingly did not pay her the minimum wage, or keep the records of her working hours, that those statutes require for employees. Second, Doe claims that [*3] under the FLSA, all the moneys she received from customers in exchange for private dances were "tips," and that defendants accordingly violated the FLSA by requiring her to turn over a portion of these funds to them, and into a tip pool shared with employees who do not usually receive tips. Finally, Doe alleges that after she filed the original complaint in this suit, she was told that if she wished to continue dancing at the Lansing club, she would be required to turn over to Cin-Lan all funds she received from customers, and agree not to perform at other clubs. As no other dancers at the

Lansing club are subject to these terms, Doe alleges that this was unlawful retaliation in violation of the FLSA.

The amended complaint also names Deja Vu and Mohney as defendants. Deja Vu licenses Cin-Lan to use the Deja Vu trade name and other intellectual property in connection with its nightclub, and also provides consulting services to Cin-Lan with respect to operation of the club. Mohney owned the original Deja Vu club, and apparently proceeded over the course of many years to build the Deja Vu enterprise into a national undertaking, with clubs in several states. His relationship with the other **[*4]** defendants will be discussed in detail below.

In this motion, Deja Vu and Mohney both seek summary judgment, on the sole ground that they are not Doe's "employers" within the meaning of the FLSA or MWL.

**LEGAL STANDARD**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir. 1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, **[*5]** to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.; Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, **[*6]** the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

**FACTS**

Doe does not claim to be party to any sort of contract of employment with Deja Vu or Mohney. Instead, **[*7]** her contention that Mohney and Deja Vu are her employers depends in large part on the interrelationships between Mohney and a number business entities, among which are Deja Vu and Cin-Lan. Although the parties' interpretations of them are greatly at odds with each other, there is little or no dispute as to the relevant facts with respect to these entities. In their depositions, some witnesses equivocated or appeared to offer testimony that was inconsistent with other statements by the same witnesses. In these instances, the version of the facts most favorable to Doe has been adopted.

In short, the corporate superstructure surrounding the Lansing Deja Vu nightclub is as follows. The club is operated by Cin-Lan, Inc., which is wholly owned by Imagination Corp., which is wholly owned by the Harry V. Mohney Revocable Trust, of which Harry V. Mohney is both trustee and beneficiary. Cin-Lan has both licensing and consulting agreements with Deja Vu Consulting. Harry Mohney is employed by Deja Vu as a consultant, but Deja Vu is also wholly owned by Dynamic Industries, which is wholly owned by the Durand Trust, the beneficiaries of which are Mohney's children and grandchildren. The trustee of **[*8]** the Durand trust is Paulette Held, who is the president of Modern Bookkeeping, Inc., which is wholly owned by Dynamic Industries. Both Cin-Lan and Deja Vu have bookeeeping contracts with Modern Bookkeeping.

A closer examination of each of these entities follows.

I. Cin-Lan, Inc.

Cin-Lan owns and operates the Deja Vu nightclub in Lansing, Michigan. Its sole officer is its president, Don Krontz. Dep. of Harry V. Mohney at 97. Mohney believes that he would have appointed Krontz president, but has no specific recollection of doing so. Id. As president, Krontz stated that he has the power to set his own compensation, but that he in fact earns only "a nominal fee" of $ 1200 per year. Dep. of Don V. Krontz, document no. 91-10, pp. 165-66. He works less than 100 hours per year in his role as president, in increments of "ten minutes here, ten minutes there." Id. at 167.

As a result, Krontz does not oversee the day-to-day operation of the club. Id. at 101-03,110. That task is left to its general manager, Tom Sime. Id. at 102; dep. of Tom Sime, document no. 98-4, pp. 15-16. Krontz's role at Cin-Lan is limited to ensuring that the corporation "abides by the law, that it's run properly, that the managers **[*9]** are doing what they are supposed to do. . . . I look at the financials, I sign tax returns, I sign the resolutions and stuff like that. I'll sign contracts if I agree to them." Dep. of Don V. Krontz at 101-02. Krontz signs contracts for credit applications, banking contracts, consulting contracts, licensing contract, Cin-Lan's property lease, and any big purchases such as cars. Id. at 119-20.

Sime is a salaried employee of Cin-Lan. Dep. of Tom Sime, document no. 91-13, p. 66. He also receives a monthly bonus. Id. Initially this bonus was 7.5% of the gross rent payments the club collects from its dancers. Id. at 69-70. About a year ago, however, Jim St. John, a

consultant for Deja Vu, felt that Sime was not performing adequately. Dep. of Don V. Krontz, document no. 99-5, p. 277. St. John informed Krontz of this and asked for Krontz's recommendation. Id. Krontz told St. John to "[t]ake part of [Sime's] bonus." Id. So St. John informed Sime that his bonus would be reduced to 5% of gross rent payments. Dep. of Tom Sime at 70. Although St. John was an employee of Deja Vu and not of Cin-Lan, Sime did not protest that St. John had no authority to dock his pay, because, says Sime, "[i]t was **[*10]** understood that Jim had already went through Don." Id. at 71. Sime, however, only discussed the discipline with Krontz after it was imposed, id. at 70-71, and when asked whether Deja Vu could cut his bonus, he stated that "[t]hey could. In fact, they did it." Id. at 162.

Krontz consults with Sime by telephone "[t]wo or three times a year." Dep. of Don V. Krontz at 110; see also dep. of Tom Sime, document no. 98-4, p. 17. Krontz's oversight of Cin-Lan involves reviewing weekly financial reports from its bookkeeper, its bookkeeping service Modern Bookkeeping (discussed below) and from Deja Vu, observing the club interior on its security-camera system, and reviewing financial and tax-compliance reports from Cin-Lan's accounts. Dep. of Don V. Krontz at 111-12. By contrast, Sime consults with Joe Hall, a Deja Vu consultant, "every couple weeks." Dep. of Tom Sime, document no. 98-4, p. 18. Hall is the primary person to whom Sime would report any problems at the club. Id. Sime testified that Deja Vu does not advise him as to hiring or firing employees, id. at 34, but that Hall did tell him to terminate Doe's contract, which Sime "assume[d]" was a recommendation that had been made to Hall by **[*11]** Cin-Lan's counsel. Id. at 33.

Krontz testified that over a three-year period, Cin-Lan's income was roughly $ 3 million yearly, on yearly expenditures of approximately $ 2 million, for profits of roughly $ 1 million each year. Id. at 172. Cin-Lan is wholly owned by Imagination Corp, dep. of Harry V. Mohney at 96, and all its profits are distributed to Imagination, although some may be reinvested in Cin-Lan, dep. of Don V. Krontz at 173-74.

II. Imagination Corp.

Imagination Corp. ("Imagination") appears to be a holding company, with stock in approximately 50 corporations, including sole or majority interests in Cin-Lan and several other Deja Vu nightclubs in Michigan. Id. at 104-05. Its officers are Krontz, Mohney, and Mohney's daughter, Mary Beth Mohney ("Mary Beth").

*Id.* at 99. Krontz is an officer of many of the clubs owned by Imagination, as he is for Cin-Lan. Dep. of Don V. Krontz, document no. 91-10, p. 77. Krontz has responsibility for Imagination's major expenditures, *id.* at 174, which he sometimes but not always discusses with Mohney, *id.* at 175. Krontz is not compensated for his services as Imagination's president. *Id.* When asked how many hours he works in that capacity, he responded **[*12]** "not many," *id.* at 186. Krontz does not recall having seen any profit-and-loss statements for Imagination, although he has reviewed the corporate tax returns. *Id.* at 181.

Mohney is also an employee of Imagination, in an advisory capacity. *Id.* at 175-76. Mary Beth is not involved in the daily operations of Imagination, *id.* at 77, but since she and Krontz are both directors of Imagination, they do meet annually. *Id.* at 182. Mary Beth and her brother Justin are both employed by the corporation as "assistants" to their father. *Id.* at 179-80. Krontz does not assign either of them job duties. *Id.* at 184-85.

Imagination is wholly owned by the Harry V. Mohney Revocable Trust ("the Mohney Trust"). Dep. of Harry V. Mohney at 100. Except those that are set aside by Krontz for capital expenditures, dep. of Don V. Krontz at 189-90, all of Imagination's profits are distributed to the Mohney Trust, dep. of Harry V. Mohney at 101-02, 189.

### III. The Harry V. Mohney Revocable Trust

Mohney is the trustee of the Mohney Trust. *Id.* at 100. As a result, Krontz reports to Mohney about the profitability of Imagination, *id.* at 101, and in a subsidiary fashion about the profitability of the individual nightclubs. **[*13]** The beneficiaries of the trust are Mohney, his children, and his grandchildren. *Id.* at 102.

Mohney thus has an indirect ownership interest in a large number of sex-themed nightclubs. He stated that he has discussed the financial performance of "some of" these clubs with Jim St. John. *Id.* at 17-18. Mohney also testified that no one at Cin-Lan has ever told him that he was not entitled to access to any Cin-Lan document. *Id.* at 66-67. . Krontz acknowledged that as the ultimate owner of Cin-Lan, Mohney would have the power to vote Krontz out of the office of president. Dep. of Don V. Krontz at 167-68. According to Krontz, however, Mohney exercises little practical authority over Imagination's appointment of club directors and officers. *Id.* at 177.

### IV. Deja Vu Consulting

Cin-Lan has consulting and licensing agreements with Deja Vu. Document nos. 92, 92-2. Deja Vu's president is Jim St. John. Decl. of Jim St. John, document no. 55-4, P 1. Its vice president is Don Krontz. Dep. of Jim St. John, document no. 91-9, p. 23. Its consultants are St. John, Joe Hall, Peter Luster, Krontz, Harry Mohney, George Couch, and Jason Mohney. *Id.* at 25-26, 134. Jason Mohney is Harry Mohney's son, *id.* at 134, **[*14]** and Couch is Harry Mohney's son-in-law, who came into the business after marrying Mohney's daughter, *id.* at 135.

Deja Vu holds trademarks and other intellectual property rights in the Deja Vu name and various related logos. Decl. of Jim St. John P 5. It licenses those marks to sexually-themed nightclubs nationwide, *id.*, and also provides consulting services to such clubs, *id.* at 7. These consulting services include "counsel and advice concerning sensitive adult business zoning, licensing and regulatory issues within its particular expertise; offering advice on construction and re-modeling designs; suggesting business procedures and promotions; providing advertising advice and services, along with web site participation and support; and negotiates national product contracts (e.g., cola)." *Id.* Deja Vu also negotiates contracts for ATM machines, advertising, and any other goods or services the clubs need. Dep. of Jim St. John at 11. Hall, one of the consultants, stated that his work is providing "advice and consulting recommendations based on every aspect of the operation from cost controls to promotions, to pricing recommendations. I mean, anything that would be involved in the day-to-day **[*15]** operational activity of an adult nightclub." Dep. of Joseph Hall, document no. 91-14, p. 21.

Deja Vu has consulting agreements of this type with between 40 and 60 clubs, dep. of Harry V. Mohney, document no. 91-8, pp. 17-18, including six in Michigan, dep. of Jim St. John at 11. Most of the clubs for which Krontz is an officer have consulting contracts with Deja Vu. Dep. of Don V. Krontz, document no. 91-10, pp. 77-78. Additionally, Deja Vu sells to the licensees, for retail resale, videos and other products bearing its marks. Decl of Jim St. John P 7.

Deja Vu also publishes a comprehensive manual for running a nude-dancing nightclub. The table of contents and selected portions of this manual are in evidence. Document nos. 92-4, 92-5. According to St. John, the

manual covers every aspect of the business. Dep. of Jim. St. John at 140. St. John stated that the individual club managers are not required to implement the manual's recommendations -- "[t]hey can take it or leave it, like any document that we provide to them." *Id.* at 143. But the manual does include many sections couched in mandatory language, including apparent directives as to how club managers are to treat the dancers. In **[*16]** the section entitled "Entertainers," the manual instructs that "[e]ach entertainer is required to read and sign a Dancer Performance Lease prior to performing. (See example on the following page or in the "Forms" section of this manual." Document no. 92-5, p. 56 § 1. As the text indicates, the next pages of the manual are an "Application for Leased Space" and a "Dancer Performance Lease -- Deja Vu." *Id.* (unpaginated). The manual also states that "[t]o assist Deja Vu in its consulting services, the original Dancer Performance Lease (white copy) must be sent to the corporate office. The yellow copy must be maintained at the club location and the pink copy must be given to the entertainer." *Id.* at 56 § 3. The manual then reiterates that "[a]ll entertainers must fill out a lease before they are allowed to perform." *Id.* § 5. Other sections of the manual state that dancer stage rent forms "must" be filled out in their entirety, and that forms with errors on them "must" be sent to the club's bookkeeper, *id.* at 66 §§ 3-4, that "ABSOLUTELY AT NO TIME SHOULD THERE BE ANY OVERCHARGING OF THE ENTERTAINERS," *id.* § 11, and that every dance "must" be documented, *id.* The manual also details how to **[*17]** collect back rent from dancers, *id.* at 67-68 states that

> [n]o more than $ 500 in back rent should accrue on any one entertainer. Any back rent . . . will only be allowed to remain on the books for a maximum of 120 days. If the back rent is not paid within that time or if it exceeds $ 500, the entertainer's lease is to be terminated.

*Id.* at 68 § 6.

St. John explained that when the manual states that clubs "must" take certain actions, it simply means that they "must" do these things if they were to be successful. Dep. Of Jim St. John at 143. The record is mixed as to whether Cin-Lan uses the procedures set forth in the manual. *Compare* dep. of Tom Sime, document no. 39-4, pp. 34-35 (Sime has only read the manual once and does not follow its suggestions) *with* dep. of Don V. Krontz at 108 (Cin-Lan does follow the procedures). The evidence is uncontradicted, however, that Cin-Lan had been using these procedures since

before the manual was compiled, and that Deja Vu actually got the ideas for these procedures from Cin-Lan. Dep. of Don V. Krontz at 108. A review of the record reveals that Cin-Lan uses a document, also entitled "Dancer Performance Lease -- Deja Vu," that is similar but not identical **[*18]** to the one contained in the manual. *Compare* document no. 14-5 *with* document no. 92-5 (unpaginated, following p. 56).

Deja Vu does not enter directly into contracts with nude dancers. *Id.* at 21. Its agreements are instead with the individual nightclubs. The fees for these services are negotiated on a club-by-club basis. Dep. Of Jim. St. John at 84-85. Cin-Lan pays Deja Vu a consulting fee of $ 4000 per week, *id.* at 84, and an additional licensing fee of $ 1250 per month, *id.* at 99. Although Krontz is the vice president of Deja Vu, he signed both the consulting and licensing contracts in his capacity as Cin-Lan's president. *Id.* at 81-82, 97. According to Krontz, Sime could recommend to Krontz that Cin-Lan reject the licensing fee as too high, but Sime has not and "would never" do so, because the club needs the Deja Vu name. *Id.* at 99-100.

Deja Vu has computerized access to Cin-Lan's daily reports, dep. of Tom Sime at 110, and receives copies of Cin-Lan's orders for office supplies and forms, *id.* at 111 -12, as well as the Cin-Lan managers' work schedules, *id.* at 113-14.

In general, Deja Vu is a profitable operation. Dep. Of Harry V. Mohney at 66. It is wholly owned by another corporation, **[*19]** Dynamic Industries. *Id.* at 57. Dynamic has held Deja Vu's stock essentially since Deja Vu Consulting was created, dep. of Don V. Krontz, document no. 91-10, p. 64, and in fact Dynamic had fronted the costs of Deja Vu's articles of incorporation, *id.* at 66-67.

## V. Dynamic Industries

The record is less revealing about the nature of Dynamic Industries ("Dynamic"). Mohney was unable to say with certainty what Dynamic's business is, whether it has an active business or is simply a holding company, what its sources of revenue are, or even if it has any employees. *Id.* at 58-60. Mohney has never been an employee, officer or director of Dynamic. *Id.* at 58-59. Mohney has never asked for Dynamic's financial statements, and does not know whether he is permitted access to them. *Id.* at 67-68. All of the stock in Dynamic is held by the Durand Trust. *Id.* at 68.

The trustee of the Durand Trust is one Paulette Held. *Id.* at 79. Mohney stated that he himself was a beneficiary of this trust at one time, but that he gave up this status in favor of his children and grandchildren, partly because his criminal history prevented corporations owned by the Trust from obtaining liquor licenses while he was a beneficiary. **[*20]** *Id.* at 77-78. Mohney does not have unfettered access to trust documents; in fact Paulette Held or her subordinates have denied him access to those documents "[q]uite a few times." *Id.* at 95-96. As trustee, Held has the power to appoint officers of Deja Vu. Ms. Held is the president of a concern known as Modern Bookkeeping. *Id.* at 88-89.

## VI. Modern Bookkeeping

Modern Bookkeeping ("Modern") is a bookkeeping and accounting firm. *Id.* at 89. It provides bookkeeping and accounting services to all the Michigan Deja Vu clubs, as well as to Deja Vu Consulting. *Id.* at 90. Like Deja Vu, Modern is wholly owned by Dynamic Industries. *Id.* at 93. Mohney, however, had no involvement in appointing Held the president of Modern. *Id.* at 92. All of the Michigan Deja Vu clubs have retained Modern Bookkeeping to do their bookkeeping. Dep. of Jim St. John, document no. 91-9, p. 81. Although Deja Vu Consulting always recommends this to its clients, due to Modern's familiarity with the sex-themed entertainment business, *id.*, there is no requirement that they do so, *id.* at 80. In addition, Modern performs bookkeeping services for Imagination dep. of Don V. Krontz at 186, and Deja Vu, dep. of Joseph Hall, document **[*21]** no. 91-14, p. 109. Because Modern maintains Cin-Lan's payroll, Cin-Lan sends notices of employee firings to it. Dep. of Tom Sime at 111. Cin-Lan also refers credit card disputes and its annual inventories to Modern. *Id.* at 112-15.

## VII. Harry V. Mohney

Harry V. Mohney was at one time the owner of the original Deja Vu club. The details of the spread of the Deja Vu name since then are not in the record. What is in evidence is that nightclubs branded with the Deja Vu name, and other affiliated trade names, operate in several states. This includes six Michigan "Deja Vu" nightclubs, and one "Little Darlings" nightclub in Kalamazoo, Michigan. Dep. of Harry V. Mohney at 25-26.

Mohney also continues to be an active participant in the sex-themed entertainment industry. He describes himself as having valuable experience in the demographic analysis involved in siting new businesses of this type, as well as in compliance with zoning regulations and the interior design and architecture of such businesses, and in designing trademarks, logos, and other intellectual property for them. Decl. of Harry V. Mohney, document no. 55-5, PP 7-8. Mohney currently uses these skills in his job as a consultant for **[*22]** Deja Vu. *Id.* at 8. His salary in that capacity is $ 125,000 yearly. Dep. of Jim St. John at 127, but according to St. John, "[Mohney] is worth a million a year. He is the best." *Id.* at 133. Mohney has no direct, formal position at Cin-Lan. Decl. Of Harry V. Mohney at 13.

Two to three times per week, Mohney makes "secret shopper" visits to nightclubs in order to assess their performance. Dep. of Harry V. Mohney at 18-20. According to Mohney, he makes these visits both to Deja Vu clubs and to competitors, *id*, and does so both as a consultant and as an interested shareholder, *id.* at 18-20, 223. On the visits, Mohney stated that "I go into various clubs, pay admission, buy drinks, buy dances from the professional entertainers, try to make sure that they are following the laws, make sure their staff is ringing up the sales, the professional entertainers aren't overcharging, the club's cleanliness, the bathroom's cleanliness, the parking lot's cleanliness." *Id.* at 18-19. Mohney occasionally writes reports based on these visits. *Id.* at 20. He also sometimes asks his friends to conduct these visits on his behalf. *Id.* at 224. The reports of Mohney's visit go to Jim St. John, Joe Hall, or the **[*23]** president, general manager, or officers of the club that Mohney visited. *Id.* Mohney also speaks directly with the managers of the individual nightclubs about their performance. *Id.* at 136.

In the last few years, Krontz has discussed Cin-Lan's financial perofrmance with Mohney an average of two or three times per year. Dep. of Don Krontz at 113. Mohney is emailed or faxed weekly income reports for many of the individual nightclubs. *Id.* at 138-39. He reviews them to see how the various profit sales compare to one another: "I look at the door, the sale of drinks, the rent revenue. . . . Income from vending." *Id.* "Occasionally," Mohney will make written comments on these results, and fax them to Krontz, the general managers of the nightclub, and Deja Vu. *Id.* at 137-38. Several of these reports have been adduced in evidence. See document no. 92-8. In one of them, Mohney asks Sime, "Why are dances so low? Used to be 1.5 per guest." *Id.* p. 3. In another, Mohney asks

"why big drop," apparently with respect to Cin-Lan's dances per customer and average spent per customer. *Id.* at 5; dep. of Harry V. Mohney at 192. In yet another, Mohney asks Sime "what's going on you have a big downturn" in overall **[*24]** gross income. *Id.* at 8; dep. of Harry V. Mohney at 199. In another, Mohney's comment was simply that "this sucks." *Id.* at 9.

Mohney testified that the club managers only reply to about 1 in 20 of these comments sent by him. *Id.* at 199. "The rest of the time they just take care of their problems because I don't ask for an answer." *Id.* Sime, the manager of Cin-Lan, stated that when he does respond to Mohney's comments, he never receives a reply from Mohney. Dep. of Tom Sime at 189-90. He further stated that although Mohney will note problems, as discussed above, he does not offer suggestions for fixing those problems. *Id.* Mohney states that he has no written communications with Sime other than these notes, although he does speak to Sime by telephone and in person. Dep. of Harry V. Mohney at 150.

Krontz, as president of Cin-Lan, authorized the release of these reports to Mohney, supposedly in his capacity as consultant. Dep. of Don V. Krontz at 113-14. Krontz acknowledges, however, that Mohney is "not necessarily required to" report any problems he identifies to Krontz, *id.* at 114. Instead, Mohney and Deja Vu were authorized to take their concerns straight to Cin-Lan staff. *Id.* at 115. **[*25]** They were obliged to report problems to Krontz only "[i]f they feel Tom [Sime] hasn't taken care of it." *Id.* This happens, according to Krontz a "couple times a year." *Id.* Mohney also has access to the surveillance cameras at Cin-Lan. Krontz testified that when Mohney observes the club through these cameras, he is looking for theft and other crimes. *Id.* at 117.

Sime, for his part, acknowledged that in his view, since Mohney owns Imagination and Imagination owns Cin-Lan, Mohney really owns Cin-Lan. Dep. of Tom Sime at 198-99. When Mohney wrote to Sime that Cin-Lan's performance "suck[ed]," Sime repsonded by scribbling his own note on the report -- "Attn club Managers Shit rolls down Hill" -- and posting it on the wall of the club. Document no. 92-8 at 9; dep. of Tom Sime at 194. Among the dancers at the clubs, Mohney was also rumored to be the owner and Sime's superior. Dep. of Jane Doe, document no. 91-17, pp. 84-85.

Other written communications from Mohney to club managers are also in the record. In a letter to club managers in Kalamazoo, Mohney "highly recommend[s]" specific changes in several areas, including the frequency of staff meetings, hiring a promotional specialist, lighting **[*26]** in the club, serving suggestions for the club's coffee, the size of the poles on the clubs stage, parking lot signage and lighting, bartender locations and staffing levels, and club decorations. Document no. 91-15. Mohney also informs the managers that "I need to find two nice decorative lights for your auditorium ceiling," and "[a]ll wait staff while [six] be given French Maid uniforms to wear. The club will give each wait person two free ones every six months . . . ." *Id.* He closes by stating that "if you fail to work together you will fail all together. Then someone will make changes." *Id.* In another memo to the same club managers, Mohney suggests rehiring a specific DJ, changing the drink rail on the main stage, hanging a curtain in order to partially block the DJ from customers' view, painting the walls a different color, and hiring and training more staff. Document no. 91-18. He also suggested several slogans for jointly promoting the two Kalamazoo nightclubs. *Id.*

Also in the record is a document authored by Mohney, entitled "Numbers Tell The Story." Document no. 92-3. Mohney stated that he suggested creating this document, to Jim St. John, and that St. John approved it. Dep. **[*27]** of Harry V. Mohney at 232. The document states that it is a guide for comparing the relative performance of various profits centers within a club over a period of time. Numbers Tell the Story, document no. 92-3. The document also makes recommendations such as, "[o]nly during emergencies do [dancers] leave without paying," *id.* at 3 § 4, and "[f]ire anyone that does not give a receipt," *id.* § 6.

Mohney also acknowledges that there are "some lines" in the Deja Vu manual that he "probably wrote," but he doesn't remember which. Dep. of Harry V. Mohney at 243.

Mohney characterizes all of these communications with club managers as "[s]uggestions." Dep. Of Harry V. Mohney at 211. He states that when he instructs the club managers to do something, he means that "I think it's a good idea and I'm suggesting that they do. If they don't, that's their call." *Id.* at 212. Mohney would not visit any consequences on the managers for ignoring his recommendations. *Id.* Mohney stated that he used the words "we" and "our" in the memos, even though he was acting as a consultant, in order to instill a sense of teamwork. *Id.* at 216.

Mohney disclaims any involvement in most of the

dealings between Cin-Lan, Deja [*28] Vu, Modern Bookkeeping, Imagination, Dynamic Industries, MIC, and the trusts. Nevertheless, Mohney does talk to Held approximately ever other week, *id.* at 136, and also emails her, *id.* He also emails St. John and Krontz, and reviews financial statements and other documents with respect to the various corporations. *Id.* Although Mohney maintains that his reviews of the weekly reports of the individual Michigan Deja Vu clubs are part of his consulting duties, he also acknowledges that he has "[a] personal interest as a shareholder" in the revenues of Cin-Lan and other nightclubs, and that "I would be concerned about the overall revenue" in that respect as well. *Id.* at 139-40. As a result, in his dealings with the nightclubs he "wear[s] a couple of hats." *Id.* at 146. As a passive investor, however, Mohney limits his actions to "mak[ing] recommendations through the corporate officers." *Id.* at 145.

## VIII. Classification of Nude Dancers

The record testimony uniformly indicates that classifying nude dancers as tenants and independent contractors -- and not as employees -- has been standard industry practice since before Mohney purchased the Seattle club. *Id.* at 158; dep. Of Jim St. John at 150; [*29] The practice was, however, discussed "from time to time" between Mohney, Krontz, St. John various other corporate officers, and the relevant attorneys. *Id.* at 169-70. Several of the Deja Vu clubs have also been involved in litigation over whether the dancers were classified properly. *Id.* at 171-72. Mohney stated that through the years, "we have always held the fact [sic] that they are classified properly and as they want to be classified." *Id.* at 172. He then hastened to add that "[w]hen I say 'we,' I mean the various clubs." *Id.* Mohney acknowledged, however, that he had been involved in discussions related to some of these disputes. *Id.* at 173. In those discussions, Mohney said, "[m]y position [is], they are what they are. They are tenants and independent contractors by their own choice." Mohney also stated that, despite occasionally discussing the issue with dancers, "I've never talked to a [dancer] that wanted to become an employee except the ones that seem to be fooling around with some attorney somewhere that starts this type of litigation." *Id.* at 176, 179. Mohney further stated that a change to employee status would be problematic for club operators, because it would expose [*30] them to allegations of permitting sexual harassment or a hostile work environment, *id.* at 174-75, but that a club's business model could otherwise be adapted to accommodate employee status

for dancers, *id.* at 179-80.

With respect to the Cin-Lan club in particular, Krontz testified that it was he who made the affirmative decision to classify the dancers as independent contractors and not employees. Dep. of Don V. Krontz at 104. He did so [u]pon advice of attorneys and lots of research." *Id.* Krontz acknowledged that Deja Vu would provide advice to clubs on this topic, but stated that when he made the decision he was acting for Cin-Lan and not Deja Vu. *Id.* at 105. Nevertheless, when asked if he consulted with anyone at Deja Vu about the decision, Krontz responded, "I'm not trying to be funny, but does that include myself? Because I mean I work for Deja Vu Consulting, so I don't know if I've ever had a conversation with myself, but -- I think I have." *Id.* at 104.

## ANALYSIS

## I. "Employer" Status Under the FLSA and MWL

The duties that Doe seeks to impose on defendants under the FLSA and the MWL apply only to "employers." As the term is used in the FLSA, "'[e]mployer' includes any person acting [*31] directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Court of Appeals for the Sixth Circuit has made clear that "[t]he remedial purposes of the FLSA require the courts to define 'employer n' more broadly than the term would be interpreted in traditional common law applications. *Dole v. Elliott Travel & Tours, Inc.*, 942 F. 2d 962, 965 (1991) (citation omitted). Thus, "[i]n deciding whether a party is an employer, 'economic reality' controls rather than common law concepts of agency." *Id.* (citing *Goldberg v. Whitaker House Cooperative*, 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961)). Once the relevant facts are established, whether a party qualifies as an FLSA employer "is a legal determination." *Id.* (citation omitted).

Here, Doe alleges that her dancing at the Lansing nightclub was done in the employ of all three defendants. Under the FLSA, it is legally possible for a single employee to have "several simultaneous employers who may be responsible for compliance." *Id.* (citing *Falk v. Brennan*, 414 U.S. 190, 195, 94 S. Ct. 427, 38 L. Ed. 2d 406 (1973)). Mohney and Deja Vu simply argue that, under the evidence in this case, they do not qualify as Doe's employers. On this motion at least, Mohney [*32] and Deja Vu do not contend that

2009 U.S. Dist. LEXIS 72979, *32

Doe was not an employee of anyone at all. They only argue that even if she *was* an employee, only Cin-Lan was her employer.

Ultimately, a court's determination as to whether, in economic reality, one party is another's employer "depends upon all the facts in the particular case." 29 C.F.R. 791.2(a). The United States Supreme Court has indicated that an entity is an "employer" if it has "substantial control of the terms and conditions of the work of [the] employees [in question]." *Falk v. Brennan*, 414 U.S. 190, 195, 94 S. Ct. 427, 38 L. Ed. 2d 406 (1973). The Sixth Circuit has stated that a party should also be classified as an co-employer of a corporation's employees if it has "operational control of significant aspects of the corporation's day to day functions." *Dole*, 942 F. 2d at 966.

The courts and the Department of Labor have articulated some factors that are highly relevant to these inquiries. According to the latter,

a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly [*33] or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

Further, in inquiring into the economic realities of a business relationship, courts outside the Sixth Circuit have often looked to four factors: (1) whether the alleged co-employer has the power to hire and fire persons who work for the other alleged employer, (2) the extent to which the alleged co-employer supervises or controls those persons' schedules and work conditions, (3) whether the alleged co-employer controls their rate and method of pay, and (4) whether the alleged co-employer maintains employment records on those persons. *Zheng v. Liberty Apparel Co., Inc.*, 355 F. 3d 61, 67-68 (2d Cir. 2003); *Watson v. Graves*, 909 F. 2d 1549, 1553 (5th Cir. 1990); *Bonnette v. Cal.*

*Health & Welfare Agency*, 704 F. 2d 1465, 1470 (9th Cir. 1983), *disapproved on other grounds by Garcia v. San Antonio Metro. Transit Agency*, 469 U.S. 528, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985); [*34] *Baker v. Flint Engineering & Construction* Co., 137 F. 3d 1436, 1440 (10th Cir. 1998).

The Michigan Minimum Wage Law is similar in many respects to the minimum-wage provisions of the FLSA. Mich. Comp. L. §408.382 provides that, for purposes of the minimum-wage requirement, "'[e]mployer' means a person, firm, or corporation, including the state and its political subdivisions, agencies, and instrumentalities, and a person acting in the interest of the employer, who employs 2 or more employees at any 1 time within a calendar year." Subsection (b) of the same section provides in relevant part that "'[e]mployee' means an individual . . . employed by an employer on the premises of the employer or at a fixed site designated by the employer."

It appears that the Michigan courts also apply an economic-reality test in assessing "employer" status under the MWL. In *Kidder v. Miller-Davis Co.*, 455 Mich 25, 456 Mich. 1201, 564 N.W.2d 872 (1997), the Michigan Supreme Court applied an economic realities test in determining whether two entities "must be considered dual or coemployers for purposes of the exclusive remedy provision of the worker's compensation statute." *Id.* at 42. Although the Court knows of no Michigan authority expressly [*35] adopting this test with respect to the Minimum Wage Law, the court in *Manville v. Bd. of Governors of Wayne State Univ.*, 85 Mich. App. 628, 272 N.W.2d 162 (1978) suggested in dicta that such a test would govern in that context, at least with respect to persons working in the private sector. *Id.* at 632, 637. In applying the test, "[c]ontrol [of the alleged employee] is a factor, as is payment of wages, hiring and firing, and the responsibility for the maintenance of discipline, but the test of economic reality views these elements as a whole, assigning primacy to no single one. *Wells v. Firestone Tire & Rubber Co.*, 421 Mich 641, 648, 364 N.W.2d 670 (1984) (citing *Farrell v. Dearborn Mfg. Co.* 416 Mich 267, 330 N.W.2d 397 (1982)).

The Court expresses no opinion on whether the FLSA and MWL economic realities tests are, or are not, identical. With respect to the issues presented in this motion, however, the Court perceives no material difference between the two.

2009 U.S. Dist. LEXIS 72979, *35

## III. Discussion

Here, there is no evidence that Cin-Lan has any formal arrangement to share employees with Deja Vu or with any other business. The question, then, becomes whether the elaborate corporate arrangements described above effectively deprive Mohney and Deja Vu Consulting **[*36]** of "control" of Cin-Lan, its workers and working conditions, and its payroll. This will be determined by the extent to which, despite those arrangements, Mohney or Deja Vu have as a practical matter the authority to hire or fire persons who work at Cin-Lan, and to control their schedules, work conditions, wages, and method of pay, and whether Mohney or Deja Vu maintain employment files on those persons.

## A. Deja Vu Consulting

As noted above, Deja Vu provides extensive consulting services for Cin-Lan. Furthermore, at times Cin-Lan's written communications are couched more as commands than as suggestions. This includes the requirement that, before performing at Cin-Lan, dancers "must" complete a "Dancer Performance Lease" that categorizes them as independent contractors rather than employees.

In itself, of course, this certainly does not demonstrate that Deja Vu has any control over Cin-Lan, or over Cin-Lan's treatment of its workers. Indeed, if the two corporations had no relationship other than the consulting and licensing contractors, these purported requirements could be dismissed as being merely emphatic suggestions of a zealous consultant.

The question is greatly complicated, however, **[*37]** by the overlap in ownership and officers between Cin-Lan and Deja Vu. As noted above, the Mohney and Durand trusts hold stock in a large number of interrelated businesses that operate or service sex-themed nightclubs. Although many or most of these businesses appear to form a single enterprise, they are structured, in baroque fashion, as a multitude of separate business entities, many of which have the same or similar officers or directors, and at least some which pay those officers or directors little or no salary. There is no indication that any of these entities have failed to observe corporate formalities. But the FLSA requires the Court to look past the legal veneer of corporate independence, and to inquire into who runs Cin-Lan's nightclub as a matter of economic reality. In this regard, the apparently artificial layering of trust upon corporation upon corporation, and the invisible web that seems to bind together a vast number of these corporations, smacks of an attempt to obscure who is really in charge at Cin-Lan, and invites close judicial scrutiny of that issue.

In this case, the Court regards Don Krontz as the key figure in determining Deja Vu's level of control over Cin-Lan. **[*38]** As noted above, Krontz is both the president of Cin-Lan and the vice president of, and a consultant for, Deja Vu. Krontz himself acknowledged that "I wear many hats." Dep. of Don V. Krontz, document no. 91-10, p. 79. Krontz claims to have distinguished his actions as a consultant from his actions as an officer by signing papers in the former capacity as Deja Vu Consulting, and in the latter capacity in his own name. *Id.* at 80. But when asked whether the employees of the individual nightclubs understood this distinction between his actions as a consultant for Deja Vu and his actions as an officer of the clubs, he responded that "some" of them "probably" did, but that others simply see him as their boss. *Id.* at 79-80. Thus, in the Court's view, a reasonable jury could find that the distinction between Krontz as Deja Vu consultant and Krontz as Cin-Lan president was not at all clear, either in the minds of Cin-Lan employees or indeed in the minds of Krontz and the other Deja Vu consultants themselves.

Additionally, the record reveals at least two occasions on which Deja Vu consultants exercised authority that would ordinarily have been reserved to the officers of Cin-Lan. First, at Krontz's **[*39]** direction, Jim St. John reduced the bonus of Tom Sime, Cin-Lan's manager. Sime knew St. John did not work for Cin-Lan, but did not protest because, he claims, he "understood" this to have been on Krontz's authority, even though St. John never said as much. At the least, this incident reveals that senior employees of Cin-Lan regarded it as routine for Deja Vu consultants to be privy to, and to actually implement, serious disciplinary measures at Cin-Lan. Second, before he terminated the contract of the plaintiff in this case, Sime spoke with another Deja Vu consultant, Joe Hall, who apparently told Sime to terminate the contract. Sime states, without explanation, that he "assume[d]" this was a relayed recommendation from Cin-Lan's attorney. A jury would not be required to believe this statement that Hall himself did not express an opinion on the matter. Even if it did, however, this testimony would reinforce the impression of Deja Vu consultants as essentially being upper-level executives at Cin-Lan, dealing directly with firm counsel and passing on personnel instructions to the operations manager.

Finally, the evidence indicates Harry Mohney, also a

2009 U.S. Dist. LEXIS 72979, *39

Deja Vu consultant, occupied a privileged **[*40]** place in Deja Vu's hierarchy. The dancers at Cin-Lan had some understanding that Harry Mohney was the ultimate owner of the club. Krontz himself acknowledged that Mohney could vote him out as president, which presumably would permit Mohney to implement whatever changes he desired at the club if he felt things were going seriously badly. This fact was obviously on the minds of Cin-Lan personnel when the dealt with Mohney, who did not always respond to his recommendations as if they were merely the disinterested suggestions of a hired consultant. When Mohney wrote Sime a critical note about Cin-Lan's performance, Sime tacked it on the club wall as a motivational ploy, along with the somewhat ominous warning "*Attn club managers- shit rolls downhill.*" Mohney himself testified, however, that most of his interactions with Sime, including the note at issue, were conducted in his capacity as Deja Vu "consultant."

There is sound authority for the proposition that a "consultant" for a sex-themed nightclub can qualify as an FLSA employer, if in practice it has charge of the operations of the business. In *Reich v. Circle C Investments, Inc.*, 998 F. 2d 324 (5th Cir. 1993), the Fifth Circuit considered **[*41]** such a situation with respect to an individual consultant named Charles Cranford. The Court observed that

> . . . Cranford does not have an ownership interest in Circle C and does not control the day-to-day operations of Circle C. His "consulting" agreement with Circle C purports to exclude personnel matters from his responsibilities. But the testimony at trial convinces us that Charles Cranford exercised control over the work situation: he was the driving force behind Circle C; he hired two of the dancers who testified at trial; several of the witnesses identified him as their supervisor and testified that he gave specific instructions to employees; when he was at the nightclubs, the dancers were required to dance to his favorite songs; he removed money from Circle C's safes; he signed employees' payroll checks; he ordered one employee to refrain from keeping records of the tip-outs; and he spoke for Circle C during the Secretary's investigation of possible FLSA violations. In addition to the above evidence, the Secretary introduced an inter-office memorandum that purports to be from Charles Cranford. The memorandum reports fines that had been assessed for rule infractions and warns **[*42]** of future fines if certain rules were not obeyed.

*Reich v. Circle C Investments, Inc.*, 998 F. 2d 324, 329 (5th Cir. 1993). Accordingly, it affirmed the district court's conclusion that Cranford was an FLSA "employer" of the dancers at the club.

The scope of Deja Vu's control over Cin-Lan evidenced by the record in this case, and in particular the scope of Deja Vu's control over the dancers themselves, is not as extensive as that in *Reich*. Nevertheless, the record would permit a jury to conclude that, as a practical matter at least, Deja Vu had significant if not unfettered authority to control many important aspects of the Cin-Lan's operations. Most importantly, it would be open to a jury to find that Deja Vu had the practical authority to, and did, dictate at least the broad contours of the terms on which Cin-Lan contracted with its dancers, and to instruct Cin-Lan to fire dancers that Deja Vu was displeased with. Krontz stated that the ultimate decision to treat dancers as tenants and not employees was his. Krontz claims that this decision was made in his capacity as president of Cin-Lan, but as just explained, as a practical matter it was never clear to Cin-Lan where this role of **[*43]** Krontz's ended and his role as Deja Vu consultant began. Additionally, the lease agreement used by Cin-Lan is similar in many respects to the sample lease in the manual published by Deja Vu, which according to the manual "must" be used by Deja Vu nightclubs. Hall, of course, also told Sime to fire Doe.

Based on all these facts, a reasonable jury could conclude that although Sime oversaw Cin-Lan's day-to-day operations, the ultimate authority for determining how the club would function, and how it would treat its employees, lay with the consultants at Deja Vu, and that Krontz's position as president of Cin-Lan was effectively indistinguishable from his employment as a Deja Vu consultant. If that were the case, then as a matter of law Deja Vu would be the "employer" of all Cin-Lan's employees. Summary judgment is therefore not appropriate as to Deja Vu on Doe's FLSA claim.

With respect to her MWL claim, both Cin-Lan and Mohney briefly argue that they cannot be liable because Doe did not labor "on the premises of the employer or at a fixed site designated by the employer," as is required under Michigan law for her to qualify as their employee. Mich. Comp. L. § 408.382(b). On the facts of **[*44]** this case, the Court finds this argument is subsumed into the larger question of whether Deja Vu and Mohney were effectively in control of Cin-Lan. There is no serious dispute that the Lansing nightclub was the site designated by Cin-Lan for Doe to perform under their agreement. Thus, if Deja Vu and Mohney

are effectively in control of Cin-Lan, Doe would satisfy this element of the MWL's definition of "employee." Summary judgment therefore is not appropriate on this basis either.

## B. Harry Mohney

Doe's case against Mohney is less clear. It does appear from the record that Mohney and his family ultimately reap the profits from the entire network of businesses entities of which Cin-Land and Deja Vu are parts. One would expect, of course, that in this context Mohney's "suggestions," offered in his capacity as a consultant, would carry more than ordinary weight. Indeed, based on the corporate structure described in the record, Mohney might still have the practical ability to command obedience from employees throughout the family of corporations. In that light, his directives to the Kalamazoo clubs certainly could be read as asserting control over the corporate owners of those clubs.

The **[*45]** problem for Doe is that the record is devoid of evidence indicating that Mohney has ever attempted to exercise this kind of control over Cin-Lan. The record indicates that Mohney has monitored Cin-Lan's financial performance, and occasionally indicates his displeasure to Sime or inquires as to why revenues have fallen off. It also makes clear that Sime and the rest of Cin-Lan management take Mohney's complaints very seriously, and have at least a vague concern about adverse consequences to themselves if Mohney's concerns are not addressed. Further, the record suggests that Mohney occasionally visits the club incognito in order to observe its operations, and that he is also able to observe activity in the club remotely, through its surveillance cameras. Mohney, of course, maintains that all his contact with Cin-Lan has been in his role as consultant. But even if these actions were taken in his role as concerned shareholder, there is little or nothing to indicate that Mohney even makes suggestions as to how the club should actually be run, let alone that he actually exercises any substantial amount of control over its operations. Other Deja Vu consultants may have overstepped the bounds **[*46]** of consulting and actually issued orders, but it does not appear from this record that Mohney himself has done so.

Unfortunately, however, this record is seriously incomplete. Doe's attorneys have filed an affidavit pursuant to Federal Rule of Civil Procedure 56(f). When a motion for summary judgment is filed, Rule 56(f) provides that

> [i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>> (1) deny the motion;
>> (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
>> (3) issue any other just order.

Doe's attorney's affidavit states that, despite multiple extensions of time to respond to her discovery requests, defendants' responses have been seriously deficient. Aff. of Hart L. Rabinovitch, document no. 91-3. According to Doe, Mohney and Deja Vu have not produced any emails or other electronically stored information, id. P 11, and have put off the deposition of Paulette Held by filing for a protective order, id. P 12. Doe's attorney also swears that defendants have not produced "any **[*47]** correspondence or e-mails between themselves," id. P 15, or copies of their testimony in other wage-and-hour cases, id. P 17, as Doe had requested. Further, at his deposition Mohney represented that he was unable to locate most of the memos he sent to the various Deja Vu nightclubs because his 16-year-old son had destroyed his computer. Id. P 22, dep. of Harry V. Mohney, document no. 91-8, p. 217.

Mohney admits that he has an email address, and that he corresponds by email with at least Paulette Held, Jim St. John and Don Krontz. Dep. of Harry V. Mohney at 136-37. Given the record evidence it is also inconceivable that there would not have been correspondence between Deja Vu, Cin-Lan, Mohney, and their employees. It does appear that some small portion of this correspondence is in the record, but in the Court's view these few documents are overwhelmingly unlikely to be the only records of the defendants' dealings with each other. There are also very few of Mohney's memos to nightclubs in the record.

Doe maintains, and the Court agrees, that it is unfair to expect her to create a question of fact as to whether Mohney effectively controls Cin-Lan without access to these records. After all, **[*48]** the best evidence of such control would be written directives from Mohney to the management of Cin-Lan, Imagination, or other members of the corporate family. Defendants' nearly total failure to produce such documents seriously hampers Doe's ability to make her case on this motion, and the Court's ability to decide it properly. Accordingly, the Court finds itself unable to enter summary judgment in favor of Mohney at this time, and the motion will be denied as to

2009 U.S. Dist. LEXIS 72979, *48

him as well. Once all the requested materials have been either produced or ruled to be privileged or otherwise not subject to discovery, Mohney is granted leave to renew his motion for summary judgment. If this renewed motion is filed before November 6th, 2009, it will be decided before the Court rules on any motion for class certification.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that defendants' motion for summary judgment is **DENIED**. Doe's motion for leave to file excess pages in her brief in response, and Deja Vu's motion for excess pages in its reply, are **GRANTED**.

**SO ORDERED**.

/s/ Stephen J. Murphy, III

STEPHEN J. MURPHY, III

United States District Judge

Dated: August 18, 2009

---

**End of Document**