# Kimbrel v. Dea Corp.

United States District Court for the Eastern District of Tennessee

August 2, 2016, Filed

No.: 3:14-CV-161-TAV-CCS

**Reporter**
2016 U.S. Dist. LEXIS 189316 *; 2016 WL 7799340

LUCHYNA KIMBREL, et al., Plaintiffs, v. DEA CORPORATION d/b/a THE MOUSE'S EAR, et al., Defendants.

**Prior History:** Kimbrel v. D.E.A. Corp., 2015 U.S. Dist. LEXIS 38364 (E.D. Tenn., Mar. 26, 2015)

**Counsel:** [*1] For Luchyna Kimbrel, Leia Ball, Marcetta Faulkner, Rebecca Rickman, Plaintiffs: Jesse D Nelson, Law Office of Jesse D. Nelson, PLLC, Knoxville, TN USA.

For Dea Corporation, doing business as The Mouse's Ear, Ralph Browning, Buddy Browning, Defendants: Allen E Schwartz, Gregory H Harrison, LEAD ATTORNEYS, Valliant, Harrison, Schwartz and Green, P.A., Knoxville, TN USA; David A Prather, LEAD ATTORNEY, Ford & Harrison LLP (Memphis), Memphis, TN USA.

**Judges:** Thomas A. Varlan, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** Thomas A. Varlan

## Opinion

FLSA COLLECTIVE ACTION

### MEMORANDUM OPINION AND ORDER

This civil action is before the Court on plaintiffs' Motion for Summary Judgment [Doc. 38], which defendants responded to [Doc. 48], and plaintiffs replied [Doc. 50]. Also before the Court is defendants' Motion for Summary Judgment [Doc. 45], to which plaintiffs responded [Doc. 49]. In addition, defendants filed a Motion for Demand of Jury Trial [Doc. 46]. Plaintiffs have not responded to this motion, and their time in which to do so has passed. E.D. Tenn. L.R. 7.1.

For the reasons that follow, the Court will grant in part and deny in part plaintiffs' motion for summary judgment [Doc. 38], deny defendants' motion for summary judgment [*2] [Doc. 45], and grant defendants' motion for demand of jury trial [Doc. 46].

### I. Background

Defendants Buddy Browning and Ralph Browning are partners that own D.E.A. Corporation ("DEA") [Doc. 39-1 pp. 2-3]. DEA does business in Knoxville under the name "The Mouse's Ear" [*Id.* at 3]. The Mouse's Ear is an adult entertainment club [*Id.*]. Plaintiffs are dancers at The Mouse's Ear.

The Mouse's Ear derives its revenue in several ways. It imposes a $10 cover charge when patrons walk through the door [*Id.* at 62]. Defendants are prohibited from serving alcohol, but they are allowed to charge patrons who wish to bring their own alcohol into the club [*Id.*]. The amount defendants charge patrons to bring alcohol inside depends on the type of beverage the customer possesses [*Id.*]. Defendants also sell cups, ice, and mixers for the alcohol [*Id.* at 63].

Defendants earn money in various ways from their dancers. First, defendants charge a "bar fee" of $15 or $30 to collect from dancers each night the dancer is scheduled to work [*Id.* at 36, 40]. If a dancer cannot afford to pay the fee when she shows up, she may have to pay a late fee of $10 [*Id.* at 40]. Defendants also require each dancer to sell a minimum number of "ladies drinks" per shift [*Id.* at 44]. Ladies [*3] drinks are drinks that the customers buy for the dancers [*Id.*]. If a dancer does not meet her sales quota for ladies drinks by the end of her shift, defendants may require her to pay the full retail price of the drinks she did not sell [*Id.* at 44-45]. Defendants also charge the dancers a portion of the money they receive for performing private dances [*Id.* at 18].

Defendants require the dancers to sign a Performer Lease [*Id.*]. In 1997, defendants presented this document to an attorney and the attorney stated that the

lease was in compliance with employment laws [Doc. 39-2 pp. 6-8]. The compensation provision of the Performer Lease provides that: "The performer understands that any compensation they receive shall be directly from the members of the club and the Performer shall receive no compensation from the Owner in any form" [Doc. 39-3 ¶ 4]. The provision entitled "RELATIONSHIP BETWEEN OWNER AND PERFORMER" provides as follows:

> The relationship between OWNER and PERFORMER is that of Landlord and Tenant, respectively. PERFORMER acknowledges and agrees that in the event that any Federal, State, or Local agency determines that the relationship between OWNER and PERFORMER is other than that of Landlord and Tenant; **[\*4]** PERFORMER agrees to reimburse and otherwise hold OWNER harmless from any and all money determined to be due by PERFORMER. [I]f the aforesaid action was initiated or supported by PERFORMER'S assertion that the relationship is other than Landlord and Tenant, then, in addition to the reimbursement heretofore set forth, PERFORMER shall pay OWNER all additional costs and expenses incurred by OWNER, including actual reasonable attorneys fees in defense thereof

[*Id.* ¶ 9]. The lease also provides that performers shall "supply her own costumes," that the owner "shall have no right to direct or control the nature, content, character, manner or means" of the entertainment, and that the performer "shall provide to owner a weekly schedule of days and hours" that they will use the premises [*Id.* ¶¶ 6-8].

Defendants enforce a number of rules that are listed on a sheet entitled "Entertainers Rules" that set forth certain employment policies [Doc. 39-1 p. 66; Doc. 39-4]. These rules includes provisions detailing the shifts available, the "bar fee," the type of clothing that must be worn, prices for private dances, and the method and manner of dancing, among other procedures [Doc. 39-4]. The rules state that: **[\*5]** "While you are working this time is to be spent on the floor to sit with customers to offer your company and conversation" [*Id.* ¶ 12].

As part of the rules, the dancers needed to wear heels and professional costumes [*Id.* ¶ 7]. The dancers provided their own costumes including shoes and makeup [Doc. 45-3 pp. 12-14; Doc. 45-4 p. 20; Doc. 45-6 pp. 5, 27]. Some dancers would pay $30-$75 per outfit, while others would simply cut up old shirts [Doc. 45-3 pp. 12-14; Doc. 45-6 p. 5]. One plaintiff estimated that she spent $300 or $400 on costumes in a three-year period [Doc. 45-3 pp. 12-14]. Defendants would lease the space for the club, and provide utilities, furniture, the sound system, music, lighting, parking, and marketing, among other things. [Doc. 39-1 pp. 9-10, 20]. Defendants also pay salaries for disc jockeys ("DJ"), waitresses, bartenders, and hostesses [*Id.* at 15, 35-36].

To work as a dancer at The Mouse's Ear, defendants require the applicant to be able to work at least four shifts a week [Doc. 39-1 p. 31]. For those who have issues working four shifts, defendants make allowances, and some dancers only need to work three [*Id.*]. The dancers are allowed to select the shifts they would like to work **[\*6]** [*Id.*; Doc. 45-3 p. 5; Doc. 45-5 p. 5]. They can also work extra shifts [Doc. 45-3 p. 3; Doc. 45-5 p. 3].

Defendant has two shifts available for the dancers [Doc. 39-1 p. 7]. One is from around 4:00 p.m. until midnight and the other is from around 7:00 p.m. until 3:00 a.m. [*Id.*; Doc. 39-4 ¶ 1]. If the circumstances of a particular dancer require it, defendants allow some dancers to change those shifts [Doc. 39-1 p. 7]. For example, some dancers work from 5:00 p.m. to 1:00 a.m. [*Id.*]. Typically, defendants did not allow dancers to work partial shifts [*Id.* at 55]. Should a dancer miss a shift, defendants may threaten the dancer with charging a bar fee [*Id.* at 48]. Once a dancer arrives for work, she is not allowed to leave until her shift ends, and if she would like to eat, her food must be delivered [*Id.* at 65].

Defendants offer their customers a choice of three private dances: (1) a table side dance for $10; (2) a table top dance for $20; and (3) a couch dance for $30 [*Id.* at 59; Doc. 39-4 ¶¶ 9-11]. Defendants set these prices [Doc. 39-1 p. 59]. They require that the dancers pay management $2 per table side dance, $4 per table top dance, and $5 per couch dance [Doc. 39-4 ¶ 2]. On certain nights, defendants offer promotions **[\*7]** for private dances, such as two-for-one, and the dancers need to honor the promotions [Doc. 39-1 p. 17]. Defendants try to prevent underselling dances, but they note that they have no way of knowing what dancers actually charge the customers [*Id.* at 60; Doc. 39-2 pp. 11-12]. Defendants do not include within their gross revenue the amount of money customers pay dancers for private dances [Doc. 39-1 p. 71].

Dancers secure private dances based upon the relationship they establish with individual customers and

the private dances are not set up by defendants [Doc. 45-3 p. 9]. Dancers chose which customers to have conversations with [Doc. 45-4 pp. 6-7]. They had to put forth the effort to mingle and engage with customers to buy private dances [Doc. 45-3 pp. 10-11].

At least fifty-percent of women who start working for defendants do not have prior exotic dancing experience [Doc. 39-1 pp. 29-30]. When a dancer begins her employment, defendants have her watch a current employee to demonstrate the types of dances defendants expect the dancer to perform [*Id.* at 45-46].

While working, defendants require dancers to appear on stage once per hour all together and then for dances according to a rotation [Doc. 39-1 pp. 13-14, **[*8]** 46-47]. The rotation is dictated by when the dancer tells the DJ that she is ready to perform [*Id.* at 13-14; Doc. 45-5 p. 7; Doc. 45-6 p. 19].

Some of the dancers have worked for defendants for years [Doc. 39-6 p. 2-3; Doc. 39-7 p. 4; Doc. 39-8 pp. 3-4]. Dancers are not allowed to work for any competitor clubs in Knoxville while they are working for The Mouse's Ear [Doc. 39-1 p. 33]. Defendant Buddy Browning estimates that approximately 80% of defendants' dancers work exclusively for defendants [*Id.* at 32].

Defendants classify their relationship with the dancers as that of landlord-tenant or refer to them as independent contractors [*Id.* at 19, 21; Doc. 39-3 ¶ 9]. The Performer Lease allows either party to terminate the lease upon providing thirty days' notice to the other party [Doc. 39-3 ¶ 11]. Defendants, however, have never honored nor enforced that provision and routinely terminate dancers at will [Doc. 39-1 pp. 42, 54].

Defendants have been aware for years that other adult entertainment establishments had been and are being sued for similar issues to those in this case [*Id.* at 73; Doc. 39-2 pp. 16-19]. They know that some of the plaintiffs in those suits won and others lost [Doc. 39-1 p. 73; Doc. 39-2 p. 18]. Defendants have **[*9]** attended seminars where the issue of "employee v. independent contractor" was discussed [Doc. 39-2 pp. 18-19]. Despite that, defendants have not substantially changed the Performance Lease since the 1980s and have not sought advice from an attorney since 1997 as to whether they are complying with the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* [Doc. 39-1 pp. 19-22, 73; Doc. 39-2 pp. 4-10].

Defendants would call meetings with the dancers every few months [Doc. 39-1 p. 50]. After this lawsuit was filed, defendants called a meeting with their dancers and explained the portion of the Performance Lease that required the dancers to pay defendants fees should an agency "determine that the relationship between OWNER and PERFORMER is other than that of Landlord and Tenant," and that if a dancer initiated the action, the dancer "shall pay to OWNER all additional costs and expenses incurred by OWNER, including actual reasonable attorneys fees in defense thereof." [Doc. 39-1 pp. 49-53; Doc. 45-7 ¶ 9]. Also in this meeting, defendants showed the dancers a photograph of plaintiffs' attorney and told them to notify defendants if anyone saw counsel in the club [Doc. 39-2 p. 23].

Also after the lawsuit was filed, **[*10]** defendants traveled to the other adult clubs in Knoxville for the purposes of telling the managers and owners that defendants were being sued and to let them know who the plaintiffs were [Doc. 39-2 pp. 14-15]. At this point, several of the plaintiffs worked at these other clubs [Doc. 39-10 pp. 2-5; Doc. 45-3 pp. 27-30].

Plaintiffs filed this action alleging that defendants violated the FLSA because they did not pay plaintiffs minimum wage or overtime, and because they engaged in illegal retaliation [Doc. 10]. Plaintiffs also allege a claim under Tennessee common law for unjust enrichment [*Id.* ¶¶ 29-32]. Plaintiffs move for summary judgment on all their claims and also ask the Court to sanction defendants for their conduct after plaintiffs filed suit [Docs. 38, 39]. Defendants move for summary judgment on plaintiffs' FLSA claims [Doc. 45],[1] and move the court for a jury trial [Doc. 46].

## II. Cross-Motions for Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. **[*11]** *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most

---

[1] While defendants do not label their motion as a motion for partial summary judgment, their motion only addressed plaintiffs' FLSA claims [Doc. 45].

favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). The plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[M]ere conclusory and unsupported allegations, rooted in speculation, do not meet that burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (quotations and citation omitted). Summary judgment may not be defeated "based on rumors, conclusory allegations, or subjective beliefs." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson*, 477 U.S. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Hein*, 232 F.3d at 488.

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh **[*12]** the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Because there are cross-motions for summary judgment before the Court, the Court must look at the evidence in the light most favorable to plaintiffs, and also look at the evidence in the light most favorable to defendant, to determine whether either party is entitled to summary judgment. *Matsushita Elec. Indus.*, 475 U.S. at 587; *Burchett*, 301 F.3d at 942.

## A. Fair Labor Standards Act Claims

The FLSA seeks to prohibit "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). It does so in part by setting minimum wage, hour, and overtime standards. *Id.* §§ 206(a)(1)(C), 207(a)(1). It relies upon "information and complaints received by employees seeking to vindicate rights claimed to have been denied." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11, 131 S. Ct. 1325, 179 L. Ed. 2d 379 (2011) (citation omitted). The "anti-retaliation **[*13]** provision makes this enforcement scheme effective by preventing fear of economic retaliation from inducing working quietly to accept substandard conditions." *Id.* (internal quotation marks omitted) (citation omitted).

Plaintiffs filed claims under the FLSA for defendants' failure to provide minimum wage and overtime pay, and for illegal retaliation. Pursuant to the FLSA, "[e]very employer shall pay to each of his employees . . . not less than the minimum wage rate," 29 U.S.C. § 206(b), and may not employ any of his employees "for a workweek longer than forty hours unless such employee receives compensation "at a rate not less than one and one-half times the regular rate at which he is employed," *Id.* § 207(a)(1). Furthermore, it is illegal for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint for instituted or caused to be instituted any proceeding under or related to [the FLSA]." *Id.* § 215(a)(3).

In order for plaintiffs to recover under these provisions, the Court must first determine if they constitute employees as defined in the act. *See id.* §§ 206(b), 207(a)(1), 215(a)(3) (all limiting the FLSA protections to "employees"). Defendants contend that plaintiffs are independent contractors, **[*14]** not employees, and do not receive protections under the FLSA. The Court will first address this argument and, should the Court find that plaintiffs are employees, will then turn to liability under the FLSA.

### 1. Employees or Independent Contractors

The FLSA defines an "employee" as "any individual employed by an employer," *Id.* § 203(e)(1), and defines "employ" as "to suffer or permit to work." *Id.* § 203(g). The Sixth Circuit has noted that in interpreting the

FSLA, courts should construe the definitions "liberally to effectuate the broad policies and intentions of Congress." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984). The definition of "employee," in particular, is "strikingly broad," and "cover[s] some parties who might not qualify as such under a strict application of traditional agency law principles." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804, 806 (6th Cir. 2015) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992)).

The Sixth Circuit adopted the "economic realities" test to determine whether an individual is an employee or an independent contractor for FLSA purposes. *Id.* at 807. Regardless of the label an employer gives an individual, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Id.* The Sixth Circuit has noted that "explicit contractual relationships," while relevant, are not dispositive in [*15] determining employee status in FLSA cases. *Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27 (Table) [published in full-text format at 1998 U.S. App. LEXIS 21073], 1998 WL 598778, at *4-5 (6th Cir. 1998). The purpose of the FLSA is to "defeat rather than implement contractual arrangements." 1998 U.S. App. LEXIS 21073, [WL] at *5 (citations omitted).

To assist in the application of the economic-reality test, the Sixth Circuit has identified the following six factors for courts to consider: (1) the permanency of the relationship between the parties; (2) the degree of skill required from the worker; (3) the extent of the worker's investment in equipment or materials; (4) the worker's opportunity for profit or loss, depending on her skill; (5) the degree of the alleged employer's right to control the manner in which the work is performed; and (6) whether the service rendered is an integral part of the business. *Keller*, 781 F.3d at 807 (citing *Donovan*, 736 F.2d at 1117). "This test is a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances." *Imars*, 1998 U.S. App. LEXIS 21073, 1998 WL 598778, at *3. "Employee status is a mixed question of fact and law and can be determined on summary judgment where there are no genuine disputes of material fact." *Lester v. Agment LLC*, No. 1:15-CV-886, 2016 U.S. Dist. LEXIS 52916, 2016 WL 1588654, at *4 (N.D. Ohio Apr. 20, 2016).

Before engaging in an analysis of these factors, the Court notes that many courts have addressed whether exotic dancers [*16] are employees under the FLSA. The clear majority have found that the dancers are employees. *See, e.g.*, *McFeeley v. Jackson Street Entm't*, 825 F.3d 235, 2016 WL 3191896, at *6 (4th Cir. 2016); *Reich v. Circle C. Invest., Inc.*, 998 F. 2d 324, 329 (5th Cir. 1993); *Lester*, 2016 U.S. Dist. LEXIS 52916, 2016 WL 1588654, at *7; *Hanson v. Trop, Inc.*, No. 1:14-CV-01096, 167 F. Supp. 3d 1324, 2016 WL 861347, at *3 (N.D. Ga. Mar. 3, 2016); *Foster v. Gold & Silver Private Club, Inc.*, No. 7:14-CV-698, 2015 U.S. Dist. LEXIS 165217, 2015 WL 8489998, at *5 (W.D. Va. Dec. 9, 2015); *Gardner v. Country Club, Inc.*, No. 4:13-CV-03399, 2015 U.S. Dist. LEXIS 162009, 2015 WL 7783556, at *17 (D.S.C. Dec. 3, 2015); *Mason v. Fantasy*, LLC, No. 13-CV-02020, 2015 U.S. Dist. LEXIS 97640, 2015 WL 4512327, at *13 (D. Colo. July 27, 2015); *Verma v. 3001 Castor, Inc.*, No. 13-3034, 2014 U.S. Dist. LEXIS 88459, 2014 WL 2957453, at *5 (E.D. Pa. June 30, 2014); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 912-13 (S.D.N.Y. 2013); *Collins v. Barney's Barn, Inc.*, No. 4:12-CV-685, 2013 U.S. Dist. LEXIS 184276, 2013 WL 11457080, at *3 (E.D. Ark. Nov. 14, 2013); *Thornton v. Crazy Horse, Inc.*, No. 3:06-CV-00251, 2012 U.S. Dist. LEXIS 82770, 2012 WL 2175753, at *6 (D. Alaska June 14, 2012); *Thompson v. Linda & A. Inc.*, 779 F. Supp. 2d 139, 151 (D.D.C. 2011); *Morse v. Mer Corp.*, No. 1:08-CV-1389, 2010 U.S. Dist. LEXIS 55636, 2010 WL 2346334, at *6 (S.D. Ind. 2010)*;* *Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1348 (M.D. Fla.1997); *see also Doe v. Cin-Lan, Inc.*, No. 08-CV-12719, 2008 U.S. Dist. LEXIS 107802, 2008 WL 4960170, at *17 (E.D. Mich. 2008) (in assessing a motion for preliminary injunction, finding that the dancer was substantially likely to succeed on a claim requiring that she is an employee under the FLSA). *But see Cruthis v. Vision's*, No. 4:12-CV-244, 2014 U.S. Dist. LEXIS 8773, 2014 WL 282028, at *3 (E.D. Ark. Jan. 24, 2014) (finding genuine issue of material fact as to exotic dancers' status as employees).

In contrast, the authority favoring defendants' position is minimal, and includes a fifteen-year-old decision from the District of Oregon and a two-page order from the Eastern District of Arkansas. *See Matson v. 7455, Inc.*, No. 98-788, 2000 U.S. Dist. LEXIS 23013, 2000 WL 1132110, at *4 (D. Or. Jan. 14, 2000) (providing two short paragraphs of analysis); *Hilborn v. Prime Time Club, Inc.*, No. 11-00197, 2012 U.S. Dist. LEXIS 188881, 2012 WL 9187581, at *1 (E.D. Ark. July 12, 2012) (granting the defendant's seemingly unopposed motion for summary judgment).

With these principles and previous case law in mind, the Court now addresses each factor of the economic

realities test in turn "with an **[*17]** eye toward the ultimate question-[plaintiffs'] economic dependence on or independence from [defendants]." *Keller*, 781 F.3d at 807.

### a. The Permanency of the Relationship

Regarding the permanency of the relationship between the parties, generally, a long, exclusive relationship weighs in favor of finding that workers are economically dependent on defendants, and thus are employees. *See id.* Here, some plaintiffs worked for defendants for years [Doc. 39-6 p. 2-3; Doc. 39-7 p. 4; Doc. 39-8 pp. 3-4]. Plaintiffs work at the club with no specified end date or contract-completion date [Doc. 39-3 ¶ 11]. They are not allowed to work at any competitor clubs in Knoxville and approximately 80% of defendants' dancers work exclusively for defendants [Doc. 39-1 pp. 32-33]. Defendants point out that plaintiffs could work at other clubs outside of Knoxville as evidence of lack of permanency. However, given the long, exclusive relationship between plaintiffs and defendants, this factor weighs in favor of finding plaintiffs' economic reality is dependent on defendants.

### b. The Degree of Skill Required

The Court next considers the degree of skill and required of the workers—the more skill a worker has, the less dependent they are. **[*18]** Courts have generally held that there is no special skill required to be an exotic dancer, pointing to the lack of instruction, certification, and prior experience required to become an exotic dancer. *See, e.g.*, *Circle C. Invest.*, 998 F.2d at 328; *Thompson*, 779 F. Supp. 2d at 149-50; *Butler*, 2013 U.S. Dist. LEXIS 159417, 2013 WL 5964476, at *5. Furthermore, the record demonstrates that at least fifty-percent of dancers who start working for defendants do not have any prior exotic dancing experience [Doc. 39-1 pp. 29-30].

Defendant argues the dancers' position necessitated that they be able to engage in conversation to cultivate customers [Doc. 45 p.19]. Courts, however, have consistently rejected similar attempts by defendants to argue that such "hustling" amounts to skilled work. *See Hart*, 967 F. Supp. 2d at 920 (citing cases) (noting that "every court to consider such a 'hustling' argument by a strip-club proprietor has rejected it"). Additionally, "courts have consistently held that exotic dancers do not exhibit the skill or initiative indicative of persons in business for themselves." *Lester*, 2016 U.S. Dist. LEXIS 52916, 2016 WL 1588654, at *5 (internal quotation marks omitted) (citing cases). Defendants have not offered any evidence that distinguishes the exotic dancers at The Mouse's Ear from the exotic dancers that courts have held to be employees in analogous situations. The Court, therefore, **[*19]** finds that the second factor also favors plaintiffs' argument that the dancers at the club are economically dependent, and thus are employees.

### c. The Extent of the Workers' Investment in Equipment or Materials

In assessing the weight to give the third factor—whether the workers have made a significant capital investment—the Court "must compare the worker[s'] investment in the equipment to perform [their] job with the company's total investment." *Keller*, 781 F.3d at 810. The more capital investment a worker has, the less economically dependent they are on the company. *See id.* The record is silent as to the total dollar amount the defendants spend on operating the club and is also silent as to exactly how much plaintiffs invest. However, based on the evidence available, a reasonable jury could only find that defendants invest a significant amount more than plaintiffs.

The record demonstrates that plaintiffs invest in their costumes—including shoes and makeup [Doc. 45-3 pp. 12-14; Doc. 45-4 p. 20; Doc. 45-6 pp. 5, 27]. Some of the plaintiffs would pay $30-$75 per outfit, while others would simply cut up old shirts [Doc. 45-3 pp. 12-14; Doc. 45-6 p. 5]. One plaintiff estimated that she spent $300 or $400 on costumes **[*20]** in a three-year period [Doc. 45-3 pp. 12-14]. Plaintiffs also pay a "bar fee" of $15 or $30 each night they are scheduled to work and pay defendants $2 per table side dance, $4 per table top dance, and $5 per couch dance [Doc. 39-1 pp. 36, 40; Doc. 39-4 ¶ 2].

In contrast, defendants would lease the space for the club, provide utilities, furniture, the sound system, music, lighting, parking, marketing for the club, salaries for employees, etc. [Doc. 39-1 pp. 9-10, 15, 20, 35-36].

"Like nearly every court that has addressed this issue," the Court finds that this factor weighs in favor of finding that plaintiffs are economically dependent on defendants because the evidence shows that defendants' investment in operating The Mouse's Ear is significantly greater than plaintiffs' investment in their positions as dancers. *Lester*, 2016 U.S. Dist. LEXIS

52916, 2016 WL 1588654, at *6.

#### d. Opportunities for Profit or Loss

The fourth factor is the workers' opportunity for profit or loss, depending on their "management and technical skills." *Keller*, 781 F.3d at 812. The greater the opportunity for profit or loss depending on skill, the more independent the worker is. *See id.*

A dancer's potential for loss is limited to her investment in the business. *See Doe*, 2008 U.S. Dist. LEXIS 107802, 2008 WL 4960170, at *14. As discussed in conjunction **[*21]** with the previous factor, plaintiffs do not invest a significant amount of resources in the necessary equipment or materials to perform. Consequently, their opportunity for loss is low.

As for the potential for profit, plaintiffs make money from tips while dancing on stage and from private dances. The Court, however, has already found—based on the fact that most dancers do not have any previous experience and that the "hustling" argument is universally rejected by courts—the dancers at the club do not have a high degree of skill. Consequently, any opportunity for profit based on their limited skills is minimal. Furthermore, the Court notes that the club rules state: "While you are working this time is to be spent on the floor to sit with customers to offer your company and conversation" [*Id.* ¶ 12]. As such, defendants require plaintiffs to mingle in order to sell private dances—taking some control out of plaintiffs' hands.

Defendants' managerial role also controls many major determinants of plaintiffs' profits. Defendants control advertising and promotion for the club as well as create and control the atmosphere and surroundings at the club—without which neither the club nor its dancers **[*22]** would attract any customers. Defendants also manage all aspects of the business operation and control all staff members.

Defendants set the prices and types of private dances available [Doc. 39-1 p. 59; Doc. 39-4 ¶¶ 9-11]. They require that plaintiffs pay management a set fee per dance—$2 per table side dance, $4 per table top dance, and $5 per couch dance [Doc. 39-4 ¶ 2]. On certain nights, defendants offer promotions for private dances, such as two-for-one, and the dancers need to honor the promotions—further limiting the dancers' ability to control profit [Doc. 39-1 p. 17]. The Court notes, however, that while defendants set the prices, and while they try to prevent underselling dances, defendants have no way of knowing what dancers actually charge the customers [*Id.* at 60; Doc. 39-2 pp. 11-12]. Even still, setting "minimum prices for services also controls the dancers' ultimate ability to earn a profit." *McFeeley v. Jackson Street Entm't, LLC*, 47 F. Supp. 3d 260, 270 (D. Md. 2014); *see also Reich v. Priba Corp.*, 890 F. Supp. 586, 593 (N.D. Tex. 1995) (finding that a club controlled the opportunity for profit and loss when it set the minimum charge for table dances).

The Court also notes that defendants require dancers to be able to work at least four shifts a week, though they do make some allowances for that requirement [Doc. **[*23]** 39-1 p. 31]. While working four shifts is typically the minimum number of shifts required, dancers are allowed to work extra shifts [Doc. 45-3 p. 3; Doc. 45-5 p. 3]. Even though dancers may have input in how many shifts they work—thereby controlling their profits—such control over profits is, at most, weakly related to management or technical skills. *See Keller*, 781 F.3d at 812. In addition, working more than the minimum number of shifts is not unusual for an employee and should not be a strong indicator that a worker is an independent contractor.

Viewing the evidence in the light most favorable to defendants, plaintiffs had some control over the amount of their profit. The evidence, however, demonstrates that plaintiffs' opportunities for profit or loss depend highly on defendants' management and decision-making. As such, this factor too weighs in favor of finding plaintiffs were economically dependent on defendants, and thus employees. *See Circle C. Invest.*, 998 F.2d at 328; *Hart*, 967 F. Supp. 2d at 920 ("Given [the defendant's] control over most critical determinants of the number of customers who visited the Club on any given night or over time, the [defendant] exercised a high degree of control over a dancer's opportunity for profit.").

#### e. The Degree of Control [*24] Exercised by Defendants

Finding that the first four factors weigh in favor of finding that plaintiffs are economically dependent on defendants, the Court now turns to the fifth factor, that is, the degree of the alleged employer's right to control the manner in which the work is performed. Defendants contend that plaintiffs "obviously controlled the manner in which their work was performed" because they: set their own schedules, did not always come to work as

scheduled, chose their own outfits, controlled the dance rotation, controlled the manner in which they performed (absent a few legal constraints), and did not pay taxes as required by law [Doc. 45 pp. 17-18]. Even when viewing the evidence in the light most favorable to defendants, however, the Court finds that defendants exerted significant

control over plaintiffs' work. To work as a dancer at The Mouse's Ear, defendants require the applicant to be able to work at least four shifts a week [Doc. 39-1 p. 31]. For those who have issues working four shifts, defendants make allowances, and some dancers only need to work three [*Id.*]. The dancers are allowed to select the shifts they would like to work [*Id.*; Doc. 45-3 p. 5; Doc. 45-5 **[*25]** p. 5]. They can also work extra shifts [Doc. 45-3 p. 3; Doc. 45-5 p. 3]. Defendant has two shifts available for the dancers [Doc. 39-1 p. 7]. One is from around 4:00 p.m. until midnight and the other is from around 7:00 p.m. until 3:00 a.m. [*Id.*; Doc. 39-4 ¶ 1]. If the circumstances of a particular dancer require it, defendants allow some dancers to change those shifts [Doc. 39-1 p. 7].

Looking specifically at the facts defendants presented to support their position on this factor, defendants misconstrue the evidence in the record. The record establishes that the dancers are allowed to pick which shifts they work but are still limited to established shifts and must work four shifts a week unless they obtain special permission [Doc. 39-1 pp. 7, 31; Doc. 39-1 p. 7; Doc. 39-4 ¶ 1; Doc. 45-3 p. 5; Doc. 45-5 p. 5]. If a dancer did not come to a scheduled shift, she could face penalties, including termination [Doc. 39-1 pp. 67-68]. While it may be true that defendants did not always enforce penalties if dancers did not arrive for scheduled shifts, the "potential power" to do so is a form of control. *See Hart*, 967 F. Supp.2d at 918.

While the dancers are able to pick their own outfits, they must wear "professional costumes," **[*26]** and they must wear heels [Doc. 45-8 ¶ 7]. Even though the rotation was determined by when dancers told the DJ they were ready to perform, defendants created the methodology of this rotation [*Id.*]. The rules for private dances are more extensive than those prohibiting criminal liability for prostitution, and include the following: (1) "At no time should your feet extend over the inside boundaries of the stage;" (2) "These dances must be confined to the table top during your entire performance;" (3) "You may only get nude while upright on the table;" (4) "You should only get nude while dancing on the coffee table" [*Id.* ¶¶ 9-11]. Outside of the general rules for dances, defendants set the types of dances available, including table side, table top, and couch dances [*Id.*]. Finally, the fact that plaintiffs did not pay taxes has no bearing on the extent to which defendants control plaintiffs' work.

Here, defendants actually exercise significant control over the manner in which the dancers work, including, among other rules: establishing the minimum amount of shifts each dancer must work, setting the work shifts, requiring dancers to wear professional costumes, setting parameters for the types **[*27]** of private dances, setting the prices for private dances, prohibiting certain conduct during dances, requiring dancers to sit with customers while not on stage, mandating that dancers sell a minimum number of ladies drinks, among other things.

Even viewing the evidence in the light most favorable to defendants, while the dancers have the ability to control some aspects of their work, that flexibility is only within the fairly tight constraints defendants have in place for dancers at the club. As such, the Court finds that this factor also supports plaintiffs' position that dancers are economically dependent on defendants, and thus are employees.

### f. Whether Plaintiffs' Services are Integral to the Business

The final factor that the Court considers is whether the service plaintiffs rendered is an integral part of the business. The Court agrees with plaintiffs' assessment that "[t]his is a given" [Doc. 39 p. 13]. Defendants operate an adult entertainment club and their entire business centers around customers watching women dance provocatively. *See Harrell*, 992 F. Supp. at 1352 ("Exotic dancers are obviously essential to the success of a topless nightclub."). Defendants argue that the service rendered is not integral by pointing **[*28]** out that The Mouse's Ear has been in business since 1980—long before any of plaintiffs began working there [Doc. 45 p. 20]. Defendants, however, misconstrue the Court's inquiry. The Court must determine whether the services renders by the dancers is integral, not whether the services rendered by these specific plaintiffs is integral. Although plaintiffs in this action may not have worked for defendants in the 1980s, The Mouse's Ear has always operated as an adult entertainment club, and exotic dancers have always been integral to its operation. No reasonable jury could find that exotic dancers are not integral to the operation of the club.

### g. Consideration of All Factors

Viewing the facts a light most favorable to defendants, and upon consideration of all the factors, the Court concludes that plaintiffs were employees of The Mouse's Ear for purposes of the FLSA. Though the parties disagree as to some of the underlying facts, a reasonable jury could only conclude that the totality of the circumstances shows that plaintiffs were economically dependent on defendants. *See Keller*, 781 F.3d at 807 (providing that court's ultimate inquiry is whether "employees are those who as a matter of economic reality are dependent **[*29]** upon the business to which they render service"). While defendants did not label plaintiffs as employees, as a matter of economic reality, they were.

This finding is also consistent with the Sixth Circuit's conclusion that courts should construe the definitions of the FLSA liberally. *Donovan*, 736 F.2d at 1116. Consequently, the Court finds that plaintiffs are employees and are entitled to FLSA protections.

### 2. Improperly Compensated

Having found that plaintiffs are employees, the Court must now determine whether defendants are in compliance with the FLSA. The Court first addresses whether plaintiffs were improperly compensated.

Plaintiffs have the initial burden of proving that they "performed work for which [they were] improperly compensated and . . . producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). "The burden then shifts to [defendants] to come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference to be drawn from [plaintiff's] evidence." *Id.* at 687-88. If defendants fail to produce such evidence, the Court may award plaintiffs damages, even if they are approximate. *Id.* at 688.

As employees, **[*30]** plaintiffs were entitled to receive a minimum wage and overtime pay for each hour worked in excess of forty hours per week. 29 U.S.C. §§ 206(a)(1), 207(a)(1). Here, it is undisputed that defendants do not pay dancers a minimum wage, or any wage at all. That fact alone, however, is not sufficient for the Court to determine that defendants violated the FLSA. The FLSA allows employers to offset their obligation to pay minimum wage if they provide for a valid alternative method of compensation in the form of service charges or tips.

### a. Service Charges

Under certain circumstances, service charges can be used to offset an employer's obligation to pay minimum wage. 29 C.F.R. § 531.55. A "service charge" is a "compulsory charge for service . . . imposed on a customer by an employer's establishment." 29 C.F.R. § 531.55(a). In order to qualify as a service charge, however, the fee must be distributed by the employer to the employee and must be included in the gross receipts. *See* 29 C.F.R. § 531.55; *see also McFeely*, 825 F.3d 235, 2016 WL 3191896, at *7-8; *Hart*, 967 F.Supp.2d at 929 (stating that the "critical issue" is whether employer recorded all monies in its gross receipts); *Priba Corp.*, 890 F. Supp. at 595 ("The fact that all of the table dance fees are not reported as gross receipts is fatal to [the defendant's] claim that the tips are more properly classified as wages."); *Reich v. ABC/York-Estes Corp.*, No. 90-cv-6265, 1997 U.S. Dist. LEXIS 6874, 1997 WL 264379, at *5 (N.D. Ill. May 12, 1997) **[*31]** ("an employer must include payments in its records as gross receipts as a prerequisite to 'service charge' classification under the FLSA"). "These requirements are necessary to ensure that employees actually received the service charges as part of their compensation as opposed to relying on the employer's assertion or say-so." *McFeely*, 825 F.3d 235, 2016 WL 3191896, at *7 (citing *Hart*, 967 F.Supp.2d at 930).

Neither condition for applying the service-charge offset is met here. Defendants do not dispute that they do not include within their gross revenue the amount of money customers pay for private dances [Doc. 39-1 p. 71]. In addition, the fees for dances are not distributed from defendants to plaintiffs [Doc. 39-3 ¶ 4]. The only compensation plaintiffs received was from customers. As such, the money plaintiffs received from private dances cannot be used to offset defendants' minimum wage obligation.

In support of their argument that these fees constitute service charges, defendants ask the Court to follow the reasoning in *Matson*, 2000 U.S. Dist. LEXIS 23013, 2000 WL 1132110. In *Matson*, the court found that an exotic dancer did not meet her burden of proving that the was improperly compensated in receiving fixed fees for private dances because there is "[n]o

limitation" **[*32]** in the FLSA that "preclud[es] the use of such fixed fees in the calculation of an employee's minimum wage." *Id.* at *5-6.

The Court, however, finds *Matson* unpersuasive. As an initial matter, *Matson* is "at odds with the vast majority of cases decided in the last [sixteen] years." *Degidio v. Crazy Horse Saloon & Rest., Inc.*, No. 4:13-CV-02136, 2015 U.S. Dist. LEXIS 132558, 2015 WL 5834280, at *17 (D.S.C. Sept. 20, 2015) (declining to follow *Matson* in determining whether payments can be considered service charges when they are not included in gross receipts). In addition, the Court is in disagreement with *Matson*, because the FLSA does have limitations that can preclude the use of fixed fees in the calculation of an employee's wage. The Court in *Matson* did not address the requirements that the fee must be distributed by the employer to the employee and must be included in the gross receipts. *Matson*, 2000 U.S. Dist. LEXIS 23013, 2000 WL 1132110, at *6. As such, the Court declines to follow *Matson*, and concludes that the fees for private dances do not constitute service charges.

### b. Tips

The Court now turns to whether defendants can claim tip credit against their minimum wage obligation under the FLSA's tip provisions. In order to be eligible for "tip credit," employers are required to pay dancers the minimum wage set for those receiving tip income **[*33]** and to notify employees of the "tip credit" provision. 29 U.S.C. § 203(m). Here, it is undisputed that defendants did not pay plaintiffs any wages. Also, there is no evidence in the record that defendants inform dancers of the applicable tip credit provisions. Defendants actually emphasize that dancers will not receive any compensation from defendants [Doc. 39-3 ¶ 4]. As such, defendants are also not entitled to any tip credit.

In sum, defendants cannot offset their obligation to pay minimum wage through either service charges or tip credit, and consequently, the Court finds that a reasonable jury could only find that defendants improperly compensated plaintiffs because they did not pay plaintiffs any minimum wage or overtime pay.

### 3. Retaliation Claim

Plaintiffs also allege that defendants engaged in illegal retaliation in violation of the FLSA. The Court notes that defendants did not directly address plaintiffs' FLSA retaliation claim in their motion for summary judgment.[2] Accordingly, the Court need not determine whether defendants are entitled to summary judgment as to this claim. The only inquiry for the Court, therefore, is whether plaintiffs are entitled to summary judgment.

The anti-retaliation provision **[*34]** of the FLSA provides that an employer is prohibited from "discharg[ing] or in any other manner discriminat[ing] against [an] employee because such employee has filed [a] complaint or instituted . . . any proceedings under [the FLSA]." 29 U.S.C. § 215(a)(3). The anti-retaliation protections contained in the FLSA apply to former employees as well as to current ones. *Patterson v. N. Cent. Tel. Co-op. Corp.*, No. 2:11-CV-00115, 2014 U.S. Dist. LEXIS 149171, 2014 WL 5322937, at *10 (M.D. Tenn. Oct. 17, 2014).

The burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies to an FLSA claim of retaliation. *See, e.g., Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006); *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004). To establish a *prima facie* case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this activity was known by the employer; (3) thereafter, the employer took an employment action adverse to the employee; and (4) there was a causal connection between the protected activity and the adverse employment action. *See, e.g., Williams v. Gen. Motors Corp.*, 187 F.3d 553, 568 (6th Cir. 1999). Such a *prima facie* showing of retaliation "creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). If plaintiffs establish a *prima facie* case, the burden then shifts to defendants to set forth a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If defendants carry this **[*35]** burden, plaintiffs must then prove by a preponderance of the evidence that defendants' proffered reasons were not their true reasons, but merely a pretext for illegal discrimination. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).

Here, there is no dispute that plaintiffs engaged in the protected activity of filing suit under the FLSA and that

---

[2] Defendants did not mention plaintiffs' retaliation claim and did not argue the merits of whether they violated the retaliation provision of the FLSA.

defendants knew about the protected activity. The Court, therefore, turns to whether defendants engaged in a materially adverse action. A challenged action is materially adverse if "a reasonable employee would find it so," meaning the action might have "dissuaded a reasonable worker from making or supporting" a FLSA claim. *Patterson*, 2014 U.S. Dist. LEXIS 149171, 2014 WL 5322937, at *10.

Plaintiffs argue that defendants engaged in a materially adverse action by traveling to other adult clubs where some plaintiffs worked for the purpose of telling the managers and owners that defendants were being sued and to let them know who the plaintiffs were. Viewing the evidence in the light most favorable to defendants, the Court does not find, as a matter of law, that this action is materially adverse. There is no indication in the record that defendants travelled to these clubs to get plaintiffs fired. A reasonable jury could find that the action of mentioning **[*36]** the suit to other club owners would not dissuade a reasonable worker from pursuing the FLSA claim.

As such, the Court finds that this question is more appropriately left for the jury and will deny plaintiffs' motion for summary judgment as to their FLSA retaliation claim.

### 4. Individual Liability

Having found that plaintiffs are entitled to summary judgment on their FLSA claim for improper compensation, the Court must determine whether Ralph and Buddy Browning can be individually liable to plaintiffs. The Brownings can be individually liable to plaintiffs if they meet the definition of "employer." Under the FLSA, an "employer" is defined to "include[] any person acting directly or indirect in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The term "employer" is construed broadly in light of the remedial purposes of the FLSA. *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991). "[M]ore than one 'employer' can be simultaneously responsible for FLSA obligations." *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994). Whether a defendant qualifies as an "employer" for purposes of the FLSA is a legal determination for the court based on the economic realities presented by the facts of the case. *Dole*, 942 F.2d at 965.

"To be classified as an employer, it is not required that a party have exclusive control of **[*37]** a corporation's day-to-day functions." *Id.* at 966. However, the party must have "operational control of significant aspects of the corporation's day to day functions." *Id.* (citation omitted).

Here, there is no question that the Brownings are employers. The following facts in the record establish, as a matter of law, that the Brownings have "operational control over significant aspects of [DEA's] day to day functions:" they are the only two owners of DEA, they make every decision with respect to hiring and firing, they were involved in drafting the Performer Lease, they set all policies and rules, they set prices, they maintain financial records, they ensure the dancers' compliance with club rules, they have supervisory authority over all workers, and they exercise discretion in whether to waive rules, among other facts. Consequently, the Brownings are personally liable to plaintiffs under the FLSA.

### 5. Willful Violation

The FLSA's statute of limitations is three years from the time the cause of action accrued if the violation was willful, but only two years if the violation was not willful. 29 U.S.C. § 203(d). Plaintiffs argue that defendants' FLSA violations are willful as a matter of law and that they are entitled **[*38]** to damages for three years of improper compensation.

A FLSA violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). Violations that result from mere negligence or a good-faith but incorrect assumption that a pay plan complied with the FLSA are not willful. *Id.* at 135. Whether an FLSA violation was willful can be decided by courts as a matter of law or by a jury if the issue is not appropriate for summary judgment. *Compare Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 472 (6th Cir.1999) (deciding willfulness issue on summary judgment), *with Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 842-45 (6th Cir.2002) (upholding jury determination of willfulness).

Plaintiffs argue that defendants' conduct was willful because they were aware, for a few years, that courts had ruled that exotic dancers were employees but defendants did not contact an attorney or change their practices. Plaintiffs cite to several cases to support their contention that defendants' conduct was willful as a matter of law. The Court, however, finds the cases

distinguishable and that the question of willfulness is more appropriate for a jury determination.

As an initial matter, none of the cases plaintiffs cite to support the finding that defendants' actions were willful **[*39]** are binding authority. Plaintiffs cite to *Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39-41 (2d Cir. 1995), *Brown v. L & P Industries, LLC*, 2005 U.S. Dist. LEXIS 39920, 2005 WL 3503637, at *9-11 (E.D. Ark. Dec. 21, 2005), and *Hardrick v. Airway Freight Systems., Inc.*, 63 F. Supp. 2d 898, 904 (N.D. Ill. 1999). In those three cases, however, the courts found the law was clear that the employers were in violation of the relevant portion of the FLSA. *Waldbaum, Inc.*, 52 F.3d at 39-41; *Brown*, 2005 U.S. Dist. LEXIS 39920, 2005 WL 3503637, at *9-11; *Hardrick*, 63 F. Supp. 2d at 904. The employers in those cases had also never contacted an attorney to see if they were in compliance with the FLSA. *Waldbaum, Inc.*, 52 F.3d at 39-41; *Brown*, 2005 U.S. Dist. LEXIS 39920, 2005 WL 3503637, at *9-11; *Hardrick*, 63 F. Supp. 2d at 904.

Here, however, defendants presented the lease to an attorney in 1997 and the attorney stated that the lease was in compliance with employment laws [Doc. 39-2 pp. 6-8]. While it is true that defendants have not contacted an attorney since that time regarding their compliance with the FLSA, defendants did rely on the attorney's determination in concluding that plaintiffs were not employees. In addition, while this Court finds that plaintiffs are employees, some courts have ruled that exotic dancers are independent contractors. *Matson*, 2000 U.S. Dist. LEXIS 23013, 2000 WL 1132110, at *4; *Hilborn*, 2012 U.S. Dist. LEXIS 188881, 2012 WL 9187581, at *1. As such, because courts have ruled on both sides of the issue, the law on whether exotic dancers are employees was not necessarily clear.

Viewing the evidence in the light most favorable to defendants, therefore, a reasonable jury could find that defendants' conduct was not willful. As such, the Court will not find that defendants' actions were willful **[*40]** as a matter of law.

### B. Unjust Enrichment

Plaintiffs also move for summary judgment on their unjust enrichment claim. Defendants did not move for summary judgment this claim. The only inquiry for the Court, therefore, is whether plaintiffs are entitled to summary judgment.

"Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist." *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998). Tennessee courts may impose a contract implied-in-law under the theory of unjust enrichment "when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasicontractual obligation." *Id.* The elements of an unjust enrichment are: 1) a benefit conferred upon defendants by plaintiffs; 2) appreciation by defendants of the benefit; and 3) acceptance of the under such circumstances that it would be inequitable for defendants to retain the benefit without payment of the value to plaintiffs. *Freeman Indus., LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (citation omitted). "The most significant requirement of an unjust enrichment claim is that the benefit to [defendants] be unjust." *Id.* (citations omitted).

In support of their argument **[*41]** that they are entitled to summary judgment on this claim, plaintiffs state in a conclusory manner that "it would be inequitable as a matter of law for [d]efendants to keep the financial benefits without having to compensate [p]laintiffs" [Doc. 39 p. 24]. Plaintiffs, however, fail to acknowledge that they received the benefit of the ability to dance in the club and, as a result, had access to patrons who tipped them for dancing. Viewing the evidence in the record in a light most favorable to defendants, there is, at minimum, a question of fact as to whether defendants were unjustly enriched. As such, the Court will deny plaintiffs' motion for summary judgment as to this claim.

### III. Sanctions for Willful Interference

Plaintiffs move the Court to sanction defendants for their willful interference with dancers' rights to participate in this lawsuit. Plaintiffs argue defendants' actions of calling a meeting to discuss the lawsuit and to explain the portion of the lease agreement addressing fees, was a willful interference with the dancers' rights to join the lawsuit.

The record, however, demonstrates that defendants would call this type of meeting every few months, and that they would commonly review portions of **[*42]** the lease during these meetings. As such, this type of meeting does not appear to be out of the ordinary or evidence of coercion. While defendants did point out the clause in the lease, there is conflicting evidence in the

record as to whether defendants informed the dancers that they would be pursuing fees as noted in the lease [Doc. 39-1 p. 51; Doc. 39-2 p. 21]. During this meeting, defendants also emphasized that the decision of whether or not to participate in the lawsuit was entirely up to the dancer [Doc. 39-2 p. 21]. Defendants submit that they called this meeting to provide general information about the lawsuit and to inform dancers that they will be getting a letter in the mail regarding the lawsuit [*Id.* at 20-21; Doc. 39-1 p. 49-53]. These facts do not amount to coercion as plaintiffs are alleging.

Furthermore, in pointing to the clause in the lease, defendants did not provide any information to the dancers that they did not already know. All of the dancers had to sign the lease, as such, they should have already known, or at least assumed, that defendants would attempt to collect fees as provided in the lease. There is no information in the record that defendants discussed any other **[*43]** information relating to the suit.

The Court does not find that defendants' actions warrant sanctions. Plaintiffs' motion for sanctions will be denied.

### IV. Motion for Demand of Jury Trial

Defendants request that a jury try all issues in this case. Plaintiffs did not respond to defendants' motion.

"[A] party may demand a trial by jury by: (1) serving upon the other parties a written demand—which may be included in a pleading—no later than 14 days after the last pleading directed to the issues is served; and (2) filing the demand in accordance with Rule 5(d)." Fed. R. Civ. P. 38(b). Should a party fail to properly serve and file a demand, that failure to file constitutes a waiver. Fed. R. Civ. P. 38(d). However, under Rule 39(b), courts "may, on motion, order a jury trial on any issue for which a jury might have been demanded." Fed. R. Civ. P. 39(b). The Sixth Circuit has indicated that this Court's discretion in considering such a motion should be exercised in favor of granting a jury trial "in the absence of strong and compelling reasons to the contrary." *Kitchen v. Chippewa Valley Sch.*, 825 F.2d 1004, 1013 (6th Cir. 1987) (citation omitted).

Here, defendants did not make a demand for a jury trial within the time limit provided in Rule 38(b). On April 3, 2014, defendants filed a Notice of Jury Demand [Doc. 34]. This notice was not filed in compliance **[*44]** with the Federal Rules of Civil Procedure because defendants needed to file a motion as provided in Rule 39(b). The Court notes, however, that this April 3, 2014, demand should have put plaintiffs on notice that defendants would seek a jury trial. Defendants then properly filed a motion for jury trial on June 7, 2016 [Doc. 46]. Plaintiffs did not respond to this motion. Consequently, plaintiffs did not present any strong and compelling reasons to deny the motion for jury trial. *Kitchen*, 825 F.2d at 1013. The Court will, therefore, grant the motion.

### V. Conclusion

For these reasons, the Court **GRANTS in part and DENIES in part** plaintiffs' motion for summary judgment [Doc. 38], and **DENIES** defendants' motion for summary judgment [Doc. 45]. Plaintiffs are entitled to summary judgment on their FLSA improper compensation claim and have shown as a matter of law that Ralph and Buddy Browning are individually liable to plaintiffs. The following issues and claims will proceed to trial: (1) plaintiffs' FLSA retaliation claim; (2) plaintiffs' unjust enrichment claim; and (3) the determination of whether defendants' violation of the FLSA was willful. Defendants' actions do not warrant sanctions and plaintiffs' request for sanctions **[*45]** is denied.

In addition, defendants' motion for demand of jury trial [Doc. 46] is **GRANTED**. The Court will issue an amended scheduling order contemporaneously with this order.

IT IS SO ORDERED.

/s/ Thomas A. Varlan

CHIEF UNITED STATES DISTRICT JUDGE

---

**End of Document**