# Heng Chan v. Sung Yue Tung Corp.

United States District Court for the Southern District of New York

February 1, 2007, Decided ; February 1, 2007, Filed

03 Civ. 6048 (GEL)

**Reporter**

2007 U.S. Dist. LEXIS 7770 *; 154 Lab. Cas. (CCH) P35,256; 12 Wage & Hour Cas. 2d (BNA) 507

HENG CHAN, SHING TAO AU, YAN BIN CAO, AI YIN CHEN, WAN ZHEN JIANG, FONG LI, JIAN YUN LIN, WEI CHAO TAN, FENG QIN ZENG TANG, SUM KAY WONG and YONG CAI ZHANG, Plaintiffs, v. SUNG YUE TUNG CORP. d/b/a 88 PALACE, KUNG TAK YEUNG, GUI YANG, GONG GUI GUAN, CHEUK HONG LAU, and YEUNG CHAO LO, Defendants.

**Subsequent History:** Costs and fees proceeding at, Motion granted by Heng Chan v. Sung Yue Tung Corp., 2007 U.S. Dist. LEXIS 33883 (S.D.N.Y., May 4, 2007)

**Prior History:** Heng Chan v. Triple 8 Palace, Inc., 2006 U.S. Dist. LEXIS 15780 (S.D.N.Y., Mar. 30, 2006)

**Counsel: [*1]** Mark S. Cheffo, Rachel B. Passaretti, and Mara Cusker Gonzalez, New York, New York, and Raymond Brescia, Urban Justice Center, New York, New York, for plaintiffs.

Daniel Hochheiser and Michael Sande, Hochheiser & Hochheiser LLP, New York, New York, for defendants.

**Judges:** GERARD E. LYNCH, District Judge.

**Opinion by:** Gerard E. Lynch

# Opinion

## OPINION AND ORDER

GERARD E. LYNCH, <u>District Judge</u>:

Plaintiffs, a group of eleven waiters, busboys, and captains who worked at the 88 Palace Restaurant in New York City's Chinatown, brought this case alleging violations of federal and state labor laws by the restaurant and its managers and owners. The parties tried the case before the Court from November 27 to December 6, 2006. This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### I. <u>The Parties</u>

#### A. Plaintiffs

1. Plaintiffs Heng Chan, Shing Tao Au, Yan Bin Cao, Ai Yin Chen, Wan Zhen Jiang, Fong Li, Jian Yun Lin, Wei Chao Tan, Feng Qin Zheng Tang, Sum Kay Wong, and Yong Cai Zhang are eleven Chinese immigrants who are current or former **[*2]** waiters, waitresses, buspersons, and captains at a Chinese restaurant known as 88 Palace Restaurant, located at 88 East Broadway, New York, New York 10002 (the "restaurant"). The restaurant is located in a mall in Chinatown.

2. Plaintiffs bring this action against defendants Sun Yue Tung Corp. d/b/a 88 Palace Restaurant, Gui Yang, Kung Tak Yeung, Gong Gui Guan, Cheuk Hong Lau, and Yeung Chao Lo with respect to acts or omissions occurring after August 8, 2002. [1]

3. Prior to August 8, 2002, the restaurant was known as Triple 8 Palace. On August 8, 2002, the restaurant was sold to defendant Sun Yue Tung Corp., a New York corporation formed by some of the defendants. After the sale, Sun Yue Tung Corp. opened for business as 88 Palace Restaurant.

4. At all relevant times, the restaurant has been a business **[*3]** or enterprise engaged in interstate commerce with annual gross sales over $ 500,000. The restaurant annually purchases and receives goods valued in excess of $ 5,000 at its New York facility from

---

[1] Defendants Triple 8 Palace, Inc., Kwok Ming Chan, and Grace Chan were dismissed from the case by stipulation on November 28, 2006. Defendant Hang Li was also dismissed by stipulation on December 14, 2006.

points outside of New York.

5. Plaintiff Heng Chan was employed as a waiter by 88 Palace from on or about August 14, 2002 until December 31, 2002.

6. Plaintiff Shing Tao Au has been employed as a waiter by 88 Palace from on or about August 14, 2002 through the present.

7. Plaintiff Yan Bin Cao has been employed by 88 Palace as a captain from on or about August 14, 2002 through the present.

8. Plaintiff Ai Yin Chen was employed by 88 Palace as a busboy from on or about August 14, 2002 through April 18, 2004.

9. Plaintiff Wan Zhen Jiang was employed by 88 Palace as a busgirl from on or about August 14, 2002 through on or about June 21, 2004, and again from on or about December 18, 2004 through the present.

10. Plaintiff Fong Li was employed by 88 Palace as a waiter from on or about August 14, 2002 through on or about May 28, 2004.

11. Plaintiff Jian Yun Lin has been employed by 88 Palace as a waiter from on or about August 14, 2002 through the present.

12. Plaintiff Wei Chao Tan has [*4] been employed by 88 Palace as a captain from on or about August 14, 2002 through the present.

13. Plaintiff Feng Qin Zheng Tang was employed by 88 Palace as a captain from on or about August 14, 2002 through February 23, 2006.

14. Plaintiff Sum Kay Wong has been employed by 88 Palace as a captain from on or about August 14, 2002 through the present.

15. Plaintiff Yong Cai Zheng was employed by 88 Palace as a busboy from on or about August 14, 2002 until September 14, 2003.

**B. Defendants and Managers of the Restaurant**

16. Defendant Kung Tak Yeung assembled a group of investors to purchase Triple 8 Palace in August 2002. The investors included Yeung, Gui Yang, Yeung Chao Lo, and Gong Gui Guan. (P. Ex. 13.) The investors purchased the restaurant for $ 1.3 million, with each

investor contributing a percentage of the purchase price that was commensurate with his ownership interest.

17. At all relevant times, Gui Yang has been 88 Palace's president and largest shareholder, with approximately five and one half shares. (P. Ex. 13 at 88-003696.) At all relevant times, Gui Yang has also been the head manager of the restaurant. His responsibilities have included hiring and firing [*5] employees, supervising operations in the dining room and kitchen, buying supplies, managing the payroll, and signing checks.

18. At all relevant times, Kung Tak Yeung has owned three and one-half shares of 88 Palace and been an officer of 88 Palace. At all relevant times, he has also been a manager at 88 Palace and has been in charge of public relations and employee relations at the restaurant. Kung Tak Yeung signs employee paychecks and other checks on behalf of 88 Palace, and can hire and fire employees.

19. At all relevant times, Yeung Chao Lo has owned three shares of 88 Palace and been an officer and manager of 88 Palace who has assisted Gui Yang in running the restaurant. Yeung Chao Lo signs checks on behalf of 88 Palace, and can hire and fire employees.

20. Cheuk Hong Lau served as the general manager at 88 Palace from the time it opened in August 2002 until October 2003. He had the authority to hire and fire employees, set schedules and tip shares, and generally assign work and supervise employees.

21. Gong Gui Guan owned three shares of 88 Palace from August 2002 until late 2004 or early 2005. (See Tr. 316. [2]) He also worked at the restaurant, where he raised and [*6] cared for live shrimp and prepared cooked shrimp. The evidence did not establish that Gong Gui Guan exercised managerial power. He wore the same uniform as a waiter, and as plaintiff Sum Kay Wong acknowledged, Gong Gui Guan did the same work with shrimp that plaintiff Yong Cai Zhang, a busboy, did with snails and clams. (Tr. 96.) Yong Cai Zhang, when asked how his job differed from Gong Gui Guan's, was unable to identify any specific differences. (Tr. 400.)

─────────────────

[2] Because of the order in which transcripts were ordered in this case, the page numbers in the transcript run consecutively throughout the trial, except for the transcript of the last day, December 6, which begins again at page 1. Accordingly, citations to the transcript will refer to the page number without indicating the date, except for the last day's transcript, which will be cited as "12/6/06 Tr."

22. Gong Gui Guan may have had certain unique job responsibilities and a measure of discretion. It appears, for example, that Gong Gui Guan on some occasions [*7] was the person who physically took some of the money from the tip collection box to bring to the part-time workers to whom it was paid. (Tr. 162.) Also, various plaintiffs testified that he had more flexibility regarding the area where he worked and the ability to leave the restaurant to "run out to buy things" (Tr. 66), and plaintiff Sum Kay Wong testified that as the distributor of shrimp, "if [Gong Gui Guan was] in favor of certain customers, he would make a bigger scoop on that plate." (Tr. 65.)

23. Plaintiffs claimed that Gong Gui Guan had the power to hire and fire employees, but there was little evidence of this. Plaintiff Wan Zhen Jiang claimed that Gong Gui Guan hired and supervised her (P. Ex. 19 P 13), but when asked at trial to provide specific illustrations of what he did that constituted supervising her, she was able to provide no relevant examples. (Tr. 412.) In her deposition, Wan Zhen Jiang stated that Gong Gui Guan had asked her whether she had a valid employment authorization card (Wan Zhen Jiang Dep. 33-34), but even if true, this appears to have been a ministerial rather than a managerial function.

24. Although Gong Gui Guan may have had special [*8] responsibilities and a favored position among the employees, this does not amount to a supervisory role. It is not clear why Gong Gui Guan, if indeed he was a manager, would give himself a .8 tip share, the share received by waiters, rather than a 1.06 tip share, the share received by captains. Moreover, Gong Gui Guan participated in a meeting of waiters and captains to discuss possible actions against the restaurant to remedy perceived labor rights violations (Tr. 88, 294), which strongly suggests that he was not regarded as their employer. In light of all the evidence, the Court concludes that Gong Gui Guan was not a manager or supervisor.

25. The corporation indicated in filings with the New York State Department of State that Dai Hai Nan, a non-party who is presently general manager of the restaurant, owned one-half of one share in the restaurant. (P. Ex. 13 at 88-3706.) The evidence indicated, however, that although Dai Hai Nan originally wished to become an investor, he quickly discovered that he could not afford to do so, and the check he had written to the corporation was voided and returned to him uncashed. (P. Ex. 33 at 4.) The Court credits Dai Hai Nan's testimony that [*9] he was never an owner of the restaurant and that he did not have management responsibilities. Unlike many other witnesses, Dai Hai Nan's demeanor on the witness stand was never defensive, and there is no apparent reason why the other defendants would deny Dai Hai Nan's ownership interest while freely admitting Gong Gui Guan's.

26. Moreover, there was little evidence of Dai Hai Nan's involvement in management activities prior to his promotion to general manager in late 2004. As with Gong Gui Guan, the plaintiffs alleged that Dai Han Nan had the power to hire and fire employees, but direct testimony concerning his activities pertained more to his role in processing hiring-related paperwork than to his role in decisions about who would work at the restaurant. Dai Hai Nan stopped participating in the tip pool when he was promoted to general manager. (Tr. 689.) Accordingly, the Court finds that Dai Hai Nan was not a manager or owner of the restaurant at any time during which he participated in the tip pool.

## II. <u>Wage and Hour Practices at 88 Palace</u>

27. At all relevant times, plaintiffs have received income in two ways: through weekly paychecks, and through cash distributions [*10] of tips at the end of each night. While wages are calculated on an hourly basis, tips are not.

28. At all relevant times, the restaurant has taken a tip credit to satisfy federal and state minimum wage requirements for waiters, busboys and captains when those employees worked banquet shifts. In other words, the restaurant pays its employees wages that are below minimum requirements and claims that it is entitled to do so because the employees receive tips. Employees are paid the same hourly or weekly wage, based on the maximum available tip credit, whether they work banquet or non-banquet shifts.

29. Waiters and busboys at 88 Palace, including plaintiffs, received wages of no more than $ 3.30 per hour from 2002 to 2004, no more than $ 3.85 per hour during 2005, and no more than $ 4.35 per hour during 2006.

30. Captains received no more than $ 3.70 per hour from 2002 to 2004, no more than $ 4.25 per hour in 2005, and no more than $ 4.75 per hour in 2006.

31. During the same time period, non-tipped employees at 88 Palace, such as dishwashers, were paid the federal minimum wage of $ 5.15 per hour.

32. Waiters, busboys and captains at 88 Palace not infrequently work a span of hours [*11] that exceeds 10 hours in a single day (including breaks). For example, on many days, waiters and captains start work at approximately 11:00 a.m. and finish work at approximately 11:00 or 11:30 p.m., with a half hour off for lunch and an employer-mandated two-hour afternoon break. 88 Palace has never compensated these employees for an additional hour of work on the days that their spread of hours has exceeded 10 hours.

33. At all relevant times, the total compensation received by all plaintiffs exceeded the amount they would have received if paid a flat hourly wage equal to the legally-required New York State minimum wage, including all overtime requirements.

### III. Tip-Sharing and Banquets at 88 Palace

#### A. The Tip Pool

34. The restaurant has, at all times, operated a tip-pooling system through which tips left by customers are combined and then redistributed among the waiters, busboys, captains, and the restaurant, according to a tip pool share formula determined by management. The management has also used money from the tip pool to pay a portion of the approximately $ 9.00 hourly rate paid to part-time employees. Employees who participate in the tip pool are assigned [*12] a number between 0 and 2 that determines their share of the tip pool; the higher the number, the greater the share.

35. The various plaintiffs received tip pool shares ranging from .055 to 1.06.

36. Defendant Gong Gui Guan has at all relevant times received a .8 share in the tip pool. Dai Hai Nan shared in the tip pool at 88 Palace from the time the restaurant opened in August 2002 until late 2004, when he became general manager.

#### B. Banquets and the 15 Percent Additional Payment

37. Along with meals served to individual tables, the restaurant offers patrons the opportunity to pre-reserve large parties or banquets. These banquets are reserved and paid for by a host, rather than by the individual diners who attend the banquets.

38. Aside from the cost of the food served at the banquet, banquet hosts pay an additional amount of 15

percent. This 15 percent payment is distributed on the following basis: first, a deduction is made to pay half the wages of the part-time workers who worked at the banquet. 25 percent of the remaining amount is kept by the restaurant, while 75 percent is added to the tip pool (which also contains the tips from non-banquet customers). Thus, at the [*13] end of each day, the tip pool includes (1) the amounts left as tips by non-banquet customers on their tables or in credit card payments, and (2) 75 percent of the additional amount paid by banquet customers, not including the portion of that additional amount used to pay part-time workers.

#### C. The Additional Payment Functionally Replaces Tips

39. Unlike non-banquet customers, who leave money on the table or with their credit card charge as a tip for their servers, banquet customers at 88 Palace almost never leave any additional tip for those who have served them, other than the 15 percent additional payment discussed above. In other words, customers who would ordinarily leave tips for servers do not do so when they pay the 15 percent additional charge at issue.

40. Banquet hosts rarely decline to pay the 15 percent payment. Although certain plaintiffs did remember isolated instances on which hosts paid significantly less than 15 percent (Tr. 199, 219), they acknowledged that this had happened "maybe once or twice" in the entire period the restaurant was opened. (Tr. 57-59 (Wong Direct).) It is also rare for banquet hosts to include in their payment an additional amount beyond [*14] the 15 percent payment.

#### D. The 15 Percent Payment Is Described To And Understood By Customers As Tips

41. The additional 15 percent payment is referred to by defendants and their employees by the Mandarin and Cantonese words used to refer to tips. (See, e.g., 12/6/06 Tr. 43.)

42. From the time that 88 Palace opened in August 2002 until January 2005, the banquet menus distributed to customers included Chinese characters meaning "15% tips," indicating that an amount equivalent to 15% of the cost of the banquet would be added to each bill. (P. Exs. 3, 4.) In January 2005, some time after the commencement of this litigation, the management changed the character in the menus to one that can be read as "service charge" or "tips." However, the 15

percent payment is collected and distributed in the same manner as before.

43. The defendants and other managers at 88 Palace have never informed banquet customers, on the banquet menu, banquet bill, or otherwise, that of the 15 percent additional tips or surcharge, only 75 percent would be provided to the waiters, busboys, and captains, and 25 percent would be retained by the restaurant. [3]

 **[*15]** 44. Instead, the defendants and other managers have advised customers that the 15 percent added to the bill was for tips for the banquet servers. Numerous witnesses testified with varying degrees of specificity to having overheard managers so advising banquet hosts and customers. For example, Fen Qin Zeng Tang remembered specific occasions on which she personally translated such comments made by Cantonese-speaking managers to Fuzhou-speaking customers. (P. Ex. 8 P 11 (Tang Aff.).)

45. The defendants' claim that customers were advised of the restaurant's practice of retaining a portion of the 15% payment was not persuasive; indeed, some of the restaurant's managers, testifying for the defense, carefully avoided making this claim. For example, Cheuk Hong Lau testified that he had not discussed the subject with customers (12/6/06 Tr. 17), and Hang Li, the supervisor generally responsible for working with banquet hosts to plan their events, testified that it was not his practice to inform customers that the restaurant would retain a portion of the 15% payment. (Id. at 23, 32.) In fact, Hang Li testified that he had never advised customers that the restaurant **[*16]** would retain a portion of the additional payment. (12/6/06 Tr. 37.)

46. Defendant's witness Dai Hai Nan, general manager of the restaurant, testified that he had said to banquet hosts that the 15 percent amount added to the banquet bill was a tip to be paid to the servers. (Tr. 690.) The Court credits Dai Hai Nan's testimony. As noted above,

---

[3] During the course of the trial, it was suggested that the restaurant's menus may have been modified at some point to contain a notice regarding the restaurant's practice of retaining a portion of the 15 additional fee. In light of the fact that the first mention of modifications to the menu was during the trial, that no modified menus were provided to plaintiffs in the course of discovery or at any point prior to trial, and that counsel were unable to reach a stipulation as to when, if ever, such modified menus came into use, the Court ruled that evidence of such menus could not be offered at trial. (Tr. 568-78.)

his responses in general were not defensive or evasive; in fact, when counsel informed the Court that direct examination was complete, he protested, "But I have lots of stories to tell." (Id.) Moreover, Dai Hai Nan had no incentive to fabricate an answer that would disadvantage his employer. His testimony therefore supports the Court's conclusion that employees and customers of the restaurant generally understood the 15% additional payment to have been tips.

47. According to Wendy Soo Hoo, the restaurant's bookkeeper, the 15% additional payment was not separately billed to the customer. Instead, she calculated the total banquet receipts after the banquets, subtracted 25% from the 15% additional payment, and then distributed the rest to the servers. (Wendy Soo Hoo Dep. 29, 31-32.) The bill presented to banquet hosts did not separately identify **[*17]** the 15 percent charge. (Tr. 56 (Wong Direct).) The receipt given to the host at banquets makes no mention of the 15% payment. (Wendy Soo Hoo Dep. 35.)

48. Gui Yang claimed that the restaurant routinely provided a bill of some kind to banquet hosts after their meal on which food charges and the 15% additional payment were separately tabulated. (Tr. 602-604, 637.) If true, this might to some extent support defendants' claim that the 15% charge was a mandatory additional fee, distinguishable from the tips that are traditionally left by customers in addition to the amounts billed to them by a restaurant. Gui Yang's testimony on this question was not credible, however, because the bills Gui Yang described were not produced in discovery or at trial. Gui Yang's testimony that the bills were not retained because they were not needed is inconsistent with the restaurant's general practices, as evidenced by the fact that the restaurant retained and produced at trial copies of almost every conceivable document exchanged in the course of transactions between customers and servers at the restaurant, including menus containing dim sum orders (Tr. 602) and cash register print-outs totaling the payments **[*18]** received from each banquet. (P. Ex. 32.) The restaurant even saved meal bills for lunches, [4] which makes it difficult to imagine why bills for banquets -- which served a similar function, but involved much larger sums of money -- would not have been retained.

49. Moreover, it appeared from the sample banquet receipt introduced by plaintiffs that the bookkeeper had

---

[4] These documents were not given exhibit numbers, but were admitted into evidence in large boxes that once contained Heineken beer.

for that particular receipt calculated the amount of the 15% additional fee by adding the total amounts received from two banquets. (P. Ex. 32.) If there had been bills to the customers showing the 15% payment, as Gui Yang testified, it would have been logical and easier for the bookkeeper simply to copy the 15% figures from those bills, not to make a calculation herself based on the total of the two unenhanced bills. Thus, the Court concludes that no separate bill showing the 15% payment existed.

### E. How the Additional [*19] Payment Is Treated for Accounting and Tax Purposes

50. The restaurant's payroll register has classified the money collected at banquets and distributed to employees as "tips." (See 2002-2004 Payroll Records.) Similarly, internal financial records from the restaurant labeled the money collected at banquets and distributed by 88 Palace as "tips." (P. Ex. 23, at MIU 88 Palace 00358.) Louis Miu, the restaurant's accountant and designated corporate witness, repeatedly and unambiguously characterized the waiters' share of the 15% payment as tips, describing it as "not a wage . . . . That [payment] becomes gratuity going to the employees" (Tr. 496), and stating that "of the 15 percent service charge that [the restaurant] received, 75 percent was paid over to the employees as tips." (Id. at 514.) When the restaurant computed overtime payments due to the servers, the servers' percentage of the 15% fee was not included. (Tr. 509.)

51. Defendant Gui Yang stated that internal documents used the terms "tips" and "service charge" interchangeably, "due only to confusion on my part, or on the part of other persons, regarding the distinction" between the two, and that "[i]n [his] [*20] mind, the word 'tips' serves as a kind of shorthand for 'service charge.'" (Gui Yang Aff. P 7.) This highlights the fact that there was no meaningful distinction between tips and the money defendants argue is a service charge; the restaurant managers did not see a meaningful distinction between "tips" and the money collected at banquets.

52. Once the 75 percent of the additional banquet payment was added to the tip pool, it was distributed in exactly the same manner as tips. It was not distributed on a per hour basis, as wages were. Nor was the employees' share of the 15 percent payment treated as wages for the purposes of overtime calculation.

53. The defendants have never included the amount of the banquet payments that they distribute to the waiters, busboys and captains through the restaurant's tip pool on the employees' W-2 forms as wages, nor deducted federal, state, city, FICA, or disability taxes from that amount. By contrast, at all relevant times, the defendants have deducted federal, state, city, FICA and disability taxes from the waiters', busboys', and captains' hourly wage payments.

54. Louis Miu testified that in tax filings prepared by the restaurant, the money from [*21] banquets that was distributed to the waiters, busboys and captains was included in the same category as tips left on the table, rather than in the category for wages. (Tr. 471-73, discussing P. Ex. 22 at 88-000034 (Feng Qin Zheng Tang W-2 form).) Plaintiffs have been required to declare and pay taxes on the amount they receive from the 15 percent banquet payment in the same manner they do with other tips they receive from the tip pool. (Id.)

55. The defendants have never included the amount of the banquet payments that they distribute to the waiters, busboys and captains in their records of the restaurant's gross receipts. The defendants have never deposited that amount into a bank account controlled by the restaurant nor paid any sales tax on that amount. Indeed, software customized by Louis Miu classifies the money collected at banquets and distributed by the restaurant to employees as "75% Tips Paid Out," and shows that those payments were not included in 88 Palace's total sales. (P. Ex. 23.)

56. The defendants have not reported the additional amount provided by banquet customers as gross sales in documents filed with the city, state, and federal governments. The additional [*22] amount left by banquet customers at 88 Palace during the 2002 tax period totaled approximately $ 417,000. If the additional amount left by each banquet customer was usually 15% of the banquet bill, 88 Palace's gross receipts for banquets alone during the 2002 tax period should have been approximately $ 2.780 million. The defendants reported only $ 1.547 million in gross receipts on 88 Palace's 2002 corporate tax return. Therefore, the defendants failed to report at least $ 1 million in gross receipts in 2002. The defendants' receipts were similarly underreported for 2003.

57. However, relatively little weight will be given to the underreporting as a factor in assessing how 88 Palace treated the banquet charges, because the underreporting of gross receipts for tax purposes was in general so extensive and pervasive that the failure to

report this particular charge cannot clearly be attributed to any specific choice by 88 Palace as to how particular items should be characterized.

## IV. Notice and Posting of Minimum Wage and Tip Credit Laws at 88 Palace

58. Plaintiffs claimed that the restaurant did not post a sign informing employees of federal minimum wage laws or tip **[*23]** credit laws until January 2004, and that no sign informing employees of New York minimum wage or tip credit laws was posted until January 2006. There was testimony from some of the defendants that signs had been posted prior to those dates (Gui Yang Dep. 107), and although it is difficult to see why new signs would be posted if old signs were already in place, the evidence did not support a clear finding as to the periods of time in which signs were posted.

59. Regardless of when the signs were posted, however, it is clear that they were in English, not Chinese, a language which is not understood well by any of the plaintiffs. Moreover, the managers at the restaurant appear to have made no effort to explain or otherwise inform employees of the federal or state minimum wage or tip credit laws. Thus, the Court finds that the employees of the restaurant were not given effective notice of these laws.

## V. Uniforms

60. The defendants have required waiters and busboys to wear a uniform consisting of a green jacket or vest, white shirt, tie, black pants, and black shoes, and captains to wear a uniform consisting of a black suit, white shirt, tie, and black shoes.

61. With **[*24]** the exception of the waiters' and busboys' jackets and vests, the defendants have not provided employees with any of the items of their uniforms, nor reimbursed them for the cost of their uniforms.

62. From the opening of the restaurant until March 2004, the defendants did not pay or reimburse employees for the laundering of their uniforms. Although the restaurant began to provide laundry service for waiters' and busboys' jackets and vests and captains' suits in March 2004, plaintiffs continue to clean or pay for the cleaning of all of the other items of their uniforms.

63. Defendants contend that a washing machine was available at the restaurant for the use of the plaintiffs, free of charge. Various plaintiffs testified that they had been unable to use the machine for their laundry. (See, e.g., Tr. 73 (Sum Kay Wong Direct).) Even if the machine was in theory available, the defendants offered no evidence that any of the plaintiffs ever used this machine, or were told of its existence.

## VI. Recordkeeping at 88 Palace

64. The defendants and employees of 88 Palace were not instructed to preserve documents that were or could be potentially relevant to this litigation.

**[*25]** 65. As Magistrate Judge Francis set out in detail in his opinion and order on plaintiffs' motion for sanctions based on spoliation, Heng Chan v. Triple 8 Palace, No. 03 Civ. 6048, 2005 U.S. Dist. LEXIS 16520, 2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) ("Heng Chan II"), the defendants engaged in systematic destruction of several categories of relevant business records, including banquet and tip records, during the pendency of this litigation. Defendants have not appealed that decision.

66. In particular, the defendants discarded banquet receipts dating from the opening of the restaurant in August 2002 through the end of 2003. The receipts showed, for each banquet: the size of the banquet, the income from the banquet, written terms and representations to customers, and the tip percentage collected.

67. The defendants maintained a "money received book" in which gross lunch (or dim sum) sales were recorded each day. At the end of each month, Gui Yang or Yeung Chao Lo ripped out of the money received book the pages for that month and discarded those pages.

68. The defendants also destroyed daily records, known as "tip distribution sheets," which showed: (1) how much each tipped employee **[*26]** received in tips, including amounts paid from the additional amount left by banquet customers; (2) the amount retained by 88 Palace from the additional amount left by banquet customers; (3) the names of the employees who worked the banquets; and (4) the number of banquets. As defendants admitted, and Magistrate Judge Francis found, the defendants regularly discarded or otherwise failed to retain these tip distribution sheets during the pendency of this litigation.

69. Although the evidence supports plaintiffs' position even without an adverse inference, the defendants' destruction of documents warrants, as a matter of logic as well as of a sanction for spoliation of evidence, an

inference that the missing documents would support plaintiffs' position.

## VII. Credibility Determinations

70. Numerous plaintiffs who testified were impeached in a variety of ways. Several acknowledged having violated tax or immigration laws, or were shown to have done so. The Court gives such information little weight; while such conduct is improper, in the context of this case the Court does not find it to be indicative of general dishonesty. More significantly, certain witnesses were shown **[*27]** to have testified inconsistently in matters of detail during depositions, and one or two witnesses appeared defensive or inappropriately combative on cross examination. In general, the Court attributes these weaknesses to language difficulties or unfamiliarity with court procedures on the part of witnesses of foreign birth, and of limited education and experience, testifying against their employers or former employers. For the most part, without endorsing every detail of every witness's testimony, the Court finds the plaintiffs' testimony credible, and impressive in its cumulative effect. [5]

 **[*28]** 71. Credibility determination in this case was particularly difficult. Nearly all of the witnesses testified in one or another of three Chinese languages: Mandarin, Cantonese, and Fuzhou. Thus, the factfinder lacked direct access to the sort of linguistic cues or nuances of expression that can provide evidence of honesty or evasion. Many of the witnesses on both sides resorted to claims of misunderstanding, mistranslation of prior, apparently inconsistent deposition testimony, or their own failure to understand a question. Moreover, many witnesses' answers were non-responsive or defensive. On a cold reading of the transcript, the dialogue often suggests defensive evasiveness, but the degree to which the testimony should be attributed to translation problems, cultural differences, lack of familiarity with court procedures, or

poor preparation of difficult witnesses by counsel is difficult to determine.

72. Finally, because the witnesses are immigrants living within a relatively insular community, often lacking English skills after many years in the country, it is hard to be confident that testimony professing ignorance of basic legal or business matters that might appear incredible **[*29]** to one steeped in the culture is in fact untrue. The Court's overall impression in the end was that many witnesses in the case shared a constitutional aversion to sharing information about themselves, even where it was apparently in their interest to do so.

73. Despite the general difficulty of making credibility determinations, there were certain witnesses whose credibility could be fairly assessed with confidence. In particular, defendant Gui Yang's answers in general were so evasive, and his demeanor so suggestive of untruthfulness -- frequently giving the impression that he was embarrassed by his own claims -- that there was no possibility of cultural misunderstanding. In addition, the substance of Gui Yang's testimony was in places patently implausible, such as the assertion discussed in paragraphs 48 and 49 above that the restaurant retained almost every conceivable document pertaining to meals served, but inexplicably disposed of banquet bills that itemized the 15% banquet payments.

74. On occasion, Gui Yang's reluctance to be forthright was to some extent understandable, as for example when he sat in awkward silence when asked about his involvement in any practice **[*30]** of tax evasion. In at least one instance, however, he was caught in an outright and material misstatement of fact. One of the exhibits received in evidence was a document prepared at the restaurant listing the total amount of the 15% additional payments received at banquets during 2002, 2003 and 2004. (P. Ex. 12.) Each of the three pages of this document bore the heading "Tips," which at some point had been crossed out and the phrase "Service Charge" written in its place. When this exhibit was offered, defense counsel explained that he had made the alterations himself on the original document in the course of trial preparation, mistakenly thinking he was taking notes on a copy rather than the original. [6] (Tr. 306-09.) Gui Yang, however, claimed that he himself had instructed the restaurant's bookkeeper to make the

---

[5] Defendants attempted to suggest that it is not credible that certain plaintiffs would be permitted to overhear or translate comments to banquet customers inconsistent with defendants' positions in this lawsuit after the lawsuit was filed. This argument fails to take account of the practical necessities of running a restaurant, which presumably take precedence over litigation-related strategy. For example, if a banquet host during a conversation translated by one of the plaintiffs asked a manager what became of the fifteen percent additional payment, it would be extremely awkward -- and would look highly suspicious -- to ask the plaintiff to find a substitute translator.

---

[6] It should be emphasized that defense counsel did nothing untoward in altering the document; it appears that counsel was merely taking notes for purposes of trial preparation, and no suggestion was made otherwise at the trial.

alterations, and that he had handed the document to defense counsel with those changes made. (Tr. 588-90.)

 **[\*31]** 75. If true, Gui Yang's claim that he had been responsible for the alteration in the document would have been significant evidence that some meaningful distinction between the two concepts had been made at the restaurant. Thus, his false testimony was directly relevant to a central issue in the case: whether the defendants themselves considered the 15% payment to be tips or a service charge. Beyond this particular untruth, Gui Yang's demeanor and general reticence made him a particularly incredible witness. Because he was a key witness for the defendants, holding more shares and having more managerial responsibility than any other owner, his lack of credibility weighed heavily in the Court's consideration of factual questions as to which credibility was relevant.

## VIII. The Investigation By The Department of Labor

76. It should be noted that the defendants at various points during the trial relied upon a document pertaining to an investigation of the restaurant by the United States Department of Labor. (Tr. 494-95 (Louis Miu Direct), 536-37 (Louis Miu Cross).) The document is a "Summary of Unpaid Wages" and cover letter dated June 8, 2004, which reflects the Department's **[\*32]** findings that the restaurant had violated federal labor law by failing to pay overtime to certain employees. (D. Ex. J.)

74. The document does not, as the defendants appeared to believe, vindicate the restaurant of any other labor violations; in addressing the overtime issue, it does not discuss any other possible violations or indicate that investigations on any other subject were conducted. While it may be inferred that the investigation touched on other matters and that the investigator did not find violations, this is of little significance, because nothing in the report suggests that the investigator had access to all the evidence introduced at trial. Accordingly, the document's lack of reference to other matters is no reason to disregard the evidence that emerged at trial, which was in most respects unambiguous.

## CONCLUSIONS OF LAW

## I. The Defendants, With the Exception of Gong Gui Guan, Are Employers Subject to the Requirements of the Fair Labor Standards Act and New York Labor Law

1. The defendants, with the exception of Gong Gui Guan, are subject to the requirements of the Fair Labor Standards Act ("FLSA") and New York labor law because they were or **[\*33]** are plaintiffs' "employers" at the restaurant, a business enterprise engaged in commerce with annual gross sales of over $ 500,000. See 29 U.S.C. § 206(a); see also id. §§ 203(r)(1) & (s)(1).

2. The FLSA defines "employer" broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has emphasized the "expansiveness" of this definition. Falk v. Brennan, 414 U.S. 190, 195, 94 S. Ct. 427, 38 L. Ed. 2d 406 (1973); see Herman v. RSR Sec. Svcs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999). New York labor law also defines the term broadly. See N.Y. Lab. Law §§ 2(6), 651(6); 190(3).

3. When determining whether a given person is an "employer" for purposes of FLSA, "the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." Herman, 172 F.3d at 139, quoting Goldberg v. Whitaker House Coop., 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961). Under the **[\*34]** "economic reality" test, courts consider factors including "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984) (internal citations and quotations omitted). No one factor is dispositive. Herman, 172 F.3d at 139. "Instead, the 'economic reality' test encompasses the totality of circumstances, no one of which is exclusive." Id. Employer status "does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees. Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA." Id.

4. "New York law adopts a similarly broad definition of "employer" in the context of its minimum wage and overtime laws." Moon v. Kwon, 248 F. Supp. 2d 201, 236 (S.D.N.Y. 2002).

5. Defendants Gui Yang and Yeung Chao Lo are employers of plaintiffs. **[\*35]** They have been owners, officers, and/or managers of the restaurant at all times

relevant to this action, and have had the power to hire and fire plaintiffs, control the conditions of their employment, and determine the rate and methods of their payment. "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation." Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983). The evidence at trial showed, and defendants did not introduce evidence contesting, that Gui Yang and Yeung Chao Lo were shareholders and boardmembers of 88 Palace and who exercised control over the operations of the restaurant and its employees. Therefore, Gui Yang and Yeung Chao Lo, as well as the corporation itself, are employers of the plaintiffs.

6. Defendant Kung Tak Yeung is also an employer of plaintiffs. Kung Tak Yeung asserted that he did not "manage the restaurant" and that he did not "set salaries, hire or fire workers, set schedules, take reservations, distribute tips, or participate in other management activities." (Kung Tak Yeung Aff., D. Ex. G P 8.) However, he acknowledged **[*36]** that he was a member of the board, that he was in charge of public relations for the restaurant, a responsibility that involved outreach in Chinatown to generate business for the restaurant. (Id.) Kung Tak Yeung also acknowledged involvement in the affairs of the restaurant, including "receive[ing] and review[ing] written complaints from customers and workers" (id.), signing tax returns on behalf of the corporation (Tr. 431), and maintaining an office at the restaurant. (Tr. 425.) Moreover, defendant Yeung Chao Lo testified that Kung Tak Yeung had interviewed him for the job of general manager, after which he was immediately hired. (12/6/06 Tr. 9.) Considering the totality of the circumstances, this evidence is sufficient to establish that Kung Tak Yeung, like the other two board members, exercised operational control over the restaurant.

7. Defendant Cheuk Hong Lau, a manager at 88 Palace, was also an employer of plaintiffs for the period between August 2002 and October 2003 when he worked for the restaurant. The evidence established, and defendants did not contest, that Cheuk Hong Lau had the authority to hire and fire captains, waiters and busboys (Cheuk Hong Lau Aff. **[*37]** , D. Ex. M P 2, Tr. 627), and that he handled shift assignments. (12/6/06 Tr. 5.)

8. Defendant Gong Gui Guan, however, is not an employer of plaintiffs, because the evidence did not establish that he had operational control. Gong Gui Guan was a minority shareholder in the restaurant from August 2002 until late 2004 or early 2005, but the totality of the circumstances suggest that his investment did not carry with it managerial responsibility. His primary responsibility at the restaurant involves working at a cart where he tends and prepares shrimp. Various plaintiffs testified that Gong Gui Guan had the power to hire and fire employees, but the Court found Gong Gui Guan's denials of the power to hire and fire employees persuasive. Few concrete examples of Gong Gui Guan's exercise of managerial power were given. Although the plaintiffs suggested that Gong Gui Guan was responsible for taking money from the tip box to pay the part-timers, there was no testimony establishing that this was because he was in any way responsible for allocating the part-timers' pay, as opposed to merely handing out payments in the way a low-level human resources employee might.

9. On the other hand, **[*38]** there was strong evidence suggesting that Gong Gui Guan was not a manager in any meaningful sense. Another employee, Yong Cai Zhang, works at a station similar to Gong Gui Guan's (Yong Cai Zhang's station prepares snails and clams, rather than shrimp), and Yong Cai Zhang is a plaintiff and undisputedly an employee. Gong Gui Guan received only a .8 tip share, lower than the captains; it would be odd for an employee who outranked a captain to be assigned a lower tip share than a captain received. The evidence also suggested that Gong Gui Guan had accompanied several of the plaintiffs to a meeting to consider action against their employers, which strongly suggests that they did not regard him as their employer.

10. The plaintiffs seemed to base their claim that Gong Gui Guan was an employer primarily on their understanding that Gong Gui Guan was able to move freely around the restaurant, whereas other employees were assigned to particular areas. This may be evidence of favored status, but is not evidence of managerial responsibility. Although the Court believes that Gong Gui Guan likely knew more about the affairs of the corporation than he conceded in his testimony, he appears to have **[*39]** been a silent investor with no real managerial responsibility. Accordingly, the Court finds that Gong Gui Guan was not an employer of the plaintiffs.

11. Because the Court finds that Gong Gui Guan was not a manager of 88 Palace, he is not an employer of the plaintiffs under the standards discussed below. In the interests of convenience, these conclusions of law will at times refer to the "defendants" collectively, but in

each such instance it should be understood that Gong Gui Guan is not referenced thereby.

## II. The 15% Additional Payments Collected From Banquet Customers Are Tips

12. A "tip" for purposes of the FLSA is "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.52. By contrast, a "service charge" is a mandatory charge imposed by an employer on a customer that is the property of the employer, not the employees, and becomes part of the employer's gross receipts. 29 C.F.R. § 531.55. Although the messy realities of the restaurant's operation do not fit neatly into the simple binary conceptual structure of the regulations, the overwhelming **[*40]** weight of the evidence establishes that, at all relevant times, the additional amount paid by banquet customers was a tip.

13. The evidence indicates that, at all relevant times, the 15 percent additional payment referenced on the restaurant's menus and added to banquet invoices has been presented to and understood by banquet customers as an amount that would substitute for the customary gratuity left by customers for the employees servicing the banquets. Fifteen percent is the standard and customary tip amount throughout the United States, and banquet customers, unlike non-banquet customers at the restaurant, did not leave any additional money on the tables for banquet servers. Although customers left more or less than the 15% payment only on rare occasions, they understood the payment to be a tip for the employees.

14. The Mandarin and Cantonese words used by restaurant managers in describing the charge to customers (and to each other) are best translated as "tips." There is no evidence that customers were advised that any portion of the 15 percent additional payment would be retained by the restaurant. The evidence established that customers had not been told that a portion **[*41]** of the 15 percent payment would be retained by the restaurant; nor did the menus disclose this fact. In fact, the bills given to the customer did not separately itemize the 15% payment.

15. Dai Hai Nan, a manager at the restaurant and a non-party to this litigation, testified that he had told customers that the 15% payment would be provided to the employees as tips. This testimony, elicited by defense counsel, was eminently credible; Dai Han Nan had nothing to gain by alienating his employers and fellow managers by giving this testimony. Another

manager, Hang Li, who was at the time a defendant in the case, testified that he had never told customers that a portion of the additional payment was retained by the restaurant.

16. The defendants' wage and accounting practices treated the portion of the banquet monies they paid to plaintiffs and other employees in the same way they treated tips from non-banquet customers. The evidence establishes that defendants always combined the portion of banquet monies that they provided to plaintiffs with any non-banquet tips collected that day and distributed the pooled amount pursuant to the tip share formula. Defendants deducted federal, state, **[*42]** local, FICA and disability taxes from the plaintiffs' wages. They did not, however, deduct these taxes from tips distributed to plaintiffs, nor from the amount paid to plaintiffs from the banquet monies.

17. Defendants required plaintiffs to declare and pay taxes on the amount they received from banquets in the same manner as with all other tips they received from the tip pool. Although management required the employees to sign documents falsely understating the amounts of tip income received, the amounts nevertheless necessarily included a portion of the tips received from banquets. Defendants did not include the portion of the banquet monies they provided to plaintiffs and other employees in the restaurant's gross receipts or pay sales tax on that amount.

18. If the additional amount added to the banquet bill and paid by customers was a service charge, the full amount should have been included in the defendants' gross receipts, and any portion paid to plaintiffs should have been paid as wages and reported as such on plaintiffs' W-2 forms. See Reich v. Priba Corp., 890 F. Supp. 586, 595 (N.D.Tex. 1995) ("The fact that all of the table dance fees are not reported **[*43]** as gross receipts is fatal to Cabaret Royale's claim that the tips are more properly classified as wages."). Similarly, if the banquet monies had been paid to plaintiffs as wages, defendants would have deducted FICA and taxes from that amount, as they have always done with the base wages they pay plaintiffs by check. Although the defendants may have violated federal and state tax laws in multiple ways, their failure to pay taxes on the banquet monies they distributed to plaintiffs and other employees does not appear to have been solely a function of their generalized failure to comply with their tax reporting obligations. Rather, the testimony of the restaurant's accountant, Louis Miu, and the defendants themselves indicates that they consciously and

intentionally treated the banquet monies they paid to plaintiffs as tips.

19. Common sense suggests, moreover, that customers would assume that the 15 percent amount referenced on the banquet bill was a tip. The Chinese term used for most of the relevant period was a standard term for "tip." The amount was the regular and customary restaurant tip amount. Any restaurant customer would expect to provide a tip to the servers, absent such **[*44]** a charge, and would naturally assume that the charge on the menu was a substitute for a direct payment of tips by the customer to the wait staff. It is entirely credible, as testified to by certain plaintiffs, that some customers would seek to verify with management their understanding that the 15 percent charge added to their bill would in fact be distributed to the waiters, to "take care" of the customer's customary tip obligations. Some customers would inquire into the distribution of the payment because it is generally considered rude to leave less than a 15 percent gratuity unless there is some specific reason to do so; customers would therefore want to make sure that the waiters were being duly tipped. Other customers would simply want to know where their money was going.

20. It would be quite surprising if management disclosed to customers who inquired about the 15 percent charge that only 75 percent of the amount was being provided to the waiters, and it would be astonishing if any customer who was so advised would not question the rationale of a charge that was only partially conveyed to the staff. The managers would have known that customers who discovered 88 Palace's actual **[*45]** practice would likely feel that both they and the servers were being cheated, because the servers received less than the customary tip amount, and because the customer was paying money to the restaurant for services whose nature was hardly apparent. Management would therefore have been reluctant to disclose the real arrangement. Moreover, a customer who discovered that servers were receiving less than 15 percent tips during banquets would feel obligated to make sure that servers received a customary tip. There was, however, no evidence that any customer ever attempted to leave extra money to compensate for the portion of the payment that was retained by management.

21. The testimony of plaintiff Jian Yun Lin that customers would sometimes remark to the waiters that they would be leaving the tip as part of the bill (P. Ex. 11 P 12), and that of numerous plaintiffs that they heard

managers reassuring the customers that the 15 percent charge was for the waiters, entirely accords with common experience. Given the likely negative consequences of disclosing that the restaurant took a percentage of the 15 percent charge, it is difficult to see how managers could avoid denying **[*46]** this fact to customers, even in the presence of plaintiffs during the pendency of the litigation.

22. In sum, the 15 percent additional payment was referred to, understood to be, treated as, and never in practice distinguished from, tips. The Court therefore finds that the 15% payments were tips, not a service charge.

### III. Defendants Violated Federal Minimum Wage and Tip Credit Laws

23. Federal and state laws require employers to pay employees a legally-prescribed minimum hourly wage. Federal law sets the minimum at $ 5.15, while New York law sets a minimum of $ 6.75. See 29 U.S.C. § 206(a)(1); N.Y. Labor Law § 652(1). Provided certain conditions are satisfied, however, an employer may "pay tipped employees an hourly rate less than the federal minimum wage, by allowing them to credit a portion of the actual amount of tips received by the employee against the required hourly minimum wage." Chung v. New Silver Palace Rest., Inc., 246 F. Supp. 2d 220, 228 (S.D.N.Y. 2002) ("New Silver Palace I").

24. Under federal law, an employer is eligible for this "tip credit" if (1) the employer has informed **[*47]** the tipped employee of statutory requirements related to the tip credit; and (2) "all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. § 203(m); see New Silver Palace I, 246 F. Supp. 2d at 228. These requirements should be "strictly construed, and must be satisfied even if the employee received tips at least equivalent to the minimum wage." Id. at 229. Thus, an employer may not take a tip credit unless it complies strictly with both statutory requirements.

25. Though New York state requirements are not structured identically, state law similarly allows employers to take a tip credit, see N.Y. Labor Law § 652(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.4, but prohibits them from retaining for themselves any portion of employees' tips, regardless of whether the employer takes a tip credit. See New York Labor Law § 196-d. New York law does not preclude employers from

retaining part of a service **[*48]** fee added to the customer's bill, as long as the fee is a fixed charge and not a tip. Id.; see Weinberg v. D-M Rest. Corp., 53 N.Y.2d 499, 506-07, 426 N.E.2d 459, 442 N.Y.S.2d 965 (1981).

26. In short, if the banquet service fees were "tips," federal law prohibited defendants from retaining any portion of them if defendants also relied on the "tip credit" to satisfy the minimum wage. 29 U.S.C. § 203(m). Under state law, defendants were barred from collecting a portion of plaintiffs' tips or "gratuities" no matter how the minimum wage requirement was satisfied. N.Y. Labor Law § 196-d.

27. At all relevant times, plaintiffs, as well as all captains, waiters and busboys at the restaurant, have been "tipped employee[s]" within the meaning of the law because they have been "engaged in an occupation in which [they] customarily and regularly receive[] more than $ 30 a month in tips." 29 U.S.C. § 203(t).

28. The defendants failed to comply with the requirement under 29 U.S.C. § 203(m) that all tips be provided to employees with positions that "customarily and regularly" receive tips. At all relevant **[*49]** times, the defendants have retained for the restaurant itself a significant portion of the tip pool, in the form of 25 percent of all banquet tips. "Congress, in crafting the tip credit provision . . . of the FLSA did not create a middle ground allowing an employer both to take the tip credit and share employees' tips." New Silver Palace I, 246 F. Supp. 2d at 230.

29. The defendants also violated the strict requirements of the laws concerning tip credits by taking part of the tip pool to help pay part-time workers. These workers were not paid in tips, but with an hourly wage. [7]

**[*50]** 30. Plaintiffs argue that the defendants mandated a tip pooling system which allocated shares to certain individuals who acted as managers, including part-owners Gong Gui Guan and Dai Hai Nan, and that,

because these individuals acted as supervisors rather than servers, they do not qualify as employees who "customarily and regularly receive[] tips." See id. at 229 (holding that forced sharing of tips with management was an illegal practice). This contention is rejected.

31. While the evidence reflects that Gong Gui Guan and Dai Hai Nan may have had some supervisory responsibilities, and exercised somewhat greater autonomy than captains or waiters, and that Gong Gui Guan had a modest financial interest in the restaurant, defendants amply demonstrated that Gong Gui Guan generally acted in effect as a server, with particular responsibility for preparing and serving shrimp dishes in many respects parallel to the duties of plaintiff Yong Cai Zhang, who served clams and snails. Gong Gui Guan wore a waiter's uniform and worked at a food table. Dai Hai Nan became general manager of the restaurant in early 2005, and ceased participating in the tip pool at that time. **[*51]** Before that time, although he purchased supplies (and exercised some personal authority), he also was described by several plaintiffs as acting as a captain. Thus, at the time these individuals received tips, they also acted as ordinary serving personnel, of the sort who customarily and regularly receive tips.

32. Unlike the situation in New Silver Palace I, any receipt of tips by Gong Gui Guan and Dai Hai Nan did not constitute part of part of a general practice of forced tip sharing with management, see 246 F. Supp. 2d at 230-31, even if those individuals had a management or ownership role. Numerous managers worked in and around the restaurant, but only these two, who regularly worked in a service capacity, participated in the tip pool, and Dai Hai Nan stopped doing so when he stopped performing in that capacity. Other than the confiscation of the 25 percent share of the banquet tips and the distribution of some tips as wage payments to part-time workers, there was no generalized practice of management participation in the tip pool. [8]

**[*52]** 33. The defendants were also ineligible for the federal tip credit because they failed to provide plaintiffs with proper notice of minimum wage laws. Employers

---

[7] Plaintiffs' proposed damages calculation does not include any proposed recovery for tips misappropriated to pay part-time workers. Because plaintiffs have not indicated what recovery they believe is appropriate for this category of misappropriate tips, if any, no damages in this regard will be awarded. The documents evidencing the misappropriation of plaintiffs' tips to pay part-timers are in Chinese, so the Court would be unable to calculate these damages without further submissions from the parties even if it was appropriate to do so on its own initiative.

[8] Plaintiffs appeared sincerely to resent Gong Gui Guan and Dai Hai Nan's participation in the pool, which may be evidence in itself that these experienced waiters did not regard them as persons who customarily receive tips. However, this resentment appeared to have colored some of their testimony and led them to minimize the extent to which these individuals acted as ordinary waiters or captains.

bear the burden of showing that they have satisfied this requirement by, for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law. "If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum-wage." Reich v. Chez Robert, Inc., 28 F.3d 401, 403 (3d Cir. 1994).

34. It appears that the restaurant did not post any notice for a significant period of time after it opened. The notice it did post is insufficient under the statute both because it is in English, a language that few of the plaintiffs can read, and because it is posted in a relatively inconspicuous area. Moreover, numerous plaintiffs testified credibly that they had never been told anything about the minimum wage laws or the tip credit. Thus, the defendants did not comply with their duty to make sure that plaintiffs had [*53] notice of minimum wage and tip credit laws.

35. In light of the foregoing, plaintiffs are entitled to recover the difference between the full minimum wage and the reduced hourly wage they were paid because of the tip credit allowance that the defendants took. See New Silver Palace I, 246 F. Supp. 2d at 231. Plaintiffs are also entitled to recover the amount of tips that the defendants illegally retained.

36. The Court is aware of a certain apparent irony in this regard. It is undisputed that plaintiffs in fact were paid total compensation in excess of the minimum wage. While their pay may be modest, they are not exploited in the sense of receiving less than the minimal subsistence pay required by law. It may seem peculiar, then, to hold that such employees are entitled to additional compensation calculated with reference to a minimum pay scale that their total actual income exceeded. Tipping, however, is a somewhat anomalous method of compensation that is strictly regulated by the FLSA. In form and to some degree in substance, tips are gifts from customers to wait staff, not compensation paid by the employer. The FLSA permits such gifts to be deemed compensation [*54] satisfying a portion of the required minimum to be paid by the employer, but only if certain very specific requirements are met. Employers who wish to qualify for this credit must comply strictly with these requirements. If they fail to do so, they must pay the full minimum hourly wage, not the reduced amount permitted when the tip credit is available.

## IV. Defendants Violated New York Minimum Wage

## Laws and Supporting Regulations

37. New York law, like federal law, requires employers to pay employees a certain minimum wage. See N.Y. Lab. Law § 652(1). The New York minimum wage for the relevant time period was $ 5.15 until January 1, 2005; $ 6.00 on and after January 1, 2005; and $ 6.75 on and after January 1, 2006. Id. Like the FLSA, New York law allows an employer who meets certain requirements to pay tipped employees an hourly rate less than the minimum wage by treating a portion of the employees' tips as a credit, or allowance, against the employer's minimum wage obligations. Id. § 652(4). Where an employer takes a tip credit, the New York minimum wage for the relevant time period was: $ 3.30 prior to January 1, 2005; $ 3.85 on [*55] or after January 1, 2005, and $ 4.35 on or after January 1, 2006. Id.

## A. Defendants Violated New York's Tip Appropriation Law

38. Regardless of how an employer meets its minimum wage obligations, New York law prohibits "any employer or his agent or an officer or agent of any corporation, or any other person" from "demand[ing] or accept[ing], directly or indirectly, any part of the gratuities, received by an employee, or retain[ing] any part of a gratuity or of any charge purported to be a gratuity for an employee." N.Y. Lab. Law § 196(d). The statute provides an exception for "sharing of tips by a waiter with a busboy or similar employee." Id. The term "similar employee" refers to employees similar to waiters, including hosts or greeters. New Silver Palace I, 246 F. Supp. 2d at 229.

39. New York labor law also requires employers to post, in a conspicuous manner in the workplace, section 196-d and "any regulations promulgated pursuant thereto relating to illegal deductions from wages and tips by employers." N.Y. Lab. Law § 198-d. This requirement applies to all restaurant employers, regardless [*56] of whether the employer takes a tip credit. State law also requires restaurants to post summaries of state minimum wage orders in conspicuous locations in the workplace. N.Y. Lab. Law § 661.

40. The defendants violated New York Labor Law § 196(d) by permitting persons other than captains, waiters, busboys, and similar employees to share in the tip pool. At all relevant times, the defendants have retained 25 percent of the banquet tips collected at 88 Palace for the restaurant itself. This practice is prohibited by § 196(d).

41. The defendants' violation of New York law is even clearer than their violation of federal law. The New York statute prohibits the employer from "retain[ing] any part of a gratuity *or of any charge purported to be a gratuity* for an employee." N.Y. Labor Law § 196-d (emphasis added). Whatever non-frivolous argument can be made about what the banquet charge "really" was, or about how it was treated by the defendants, or about how it is properly characterized under federal regulations, there is no doubt that the fee was "purported" to be a tip or gratuity for the servers, and would **[*57]** be so understood by a customer. The characterization of the charge on the menu and the representations to the customers, while significant factors in the analysis under federal law, are absolutely dispositive under the New York standard.

42. New York law is also more favorable to plaintiffs with respect to the sharing of tips by Gong Gui Guan and Dai Hai Nan. New York law does not look to whether an employee is of the type that customarily receives tips -- arguably a broad and flexible standard that focuses on the serving duties of the employee. Rather, it expressly forbids sharing of tips with anyone who can be characterized as an "employer." § 196-d.

43. For the reasons discussed above, Gong Gui Guan cannot be considered an "employer" within even a broad reading of the law. See Ayres v. 127 Restaurant Corp., 12 F. Supp. 2d 305, 308 (S.D.N.Y. 1998) (holding that under New York law, although a general manager could not share in the tip pool, there was "a triable issue of fact as to whether [an individual] was an 'employer or agent' . . . or whether he was merely a senior floor captain with more limited supervisory responsibilities during this period" and that only in the **[*58]** former case would the individual's participation in the tip pool be unlawful). Similarly, as discussed above, Dai Hai Nan stopped sharing in the tip pool when he began acting as general manager of the restaurant.

44. Although § 196-d "clearly prohibits part-owner employees who wield . . . broad managerial authority" from retaining tips, New Silver Palace I, 246 F. Supp. 2d at 230, the plaintiffs did not demonstrate that either Dai Hai Nan or Gong Gui Guan wielded broad managerial authority during the time they participated in the tip pool. For the time Dai Hai Nan shared in the tip pool, he was not a "general manager" but a "senior floor captain with more limited supervisory responsibilities." Ayres, 12 F. Supp. 2d at 308. He wore a captain's uniform, and although he at one point attempted to buy a share of the restaurant, the evidence indicated that Dai Hai Nan

received only the tip share to which another employee doing the same job would have been entitled. Thus, Dai Hai Nan is not an employer for purposes of New York law. Similarly, although Gong Gui Guan for some period of time owned shares in the restaurant, he was a passive investor who did **[*59]** not exercise broad management authority, or indeed any authority.

45. In addition, the defendants have failed to comply with New York Labor Law § 198-d's notice requirement. Although the restaurant apparently posted a sign about New York labor law in or around January 2006, nearly three and a half years after it opened, that sign is posted in English only, and defendants made no other efforts to give notice to the plaintiffs of the relevant New York labor law.

46. Accordingly, plaintiffs are entitled to recover the amount of tips that the defendants illegally retained.

**B. Defendants Violated New York's Spread of Hours Regulation**

47. Under New York Law, employers must pay "one hour's pay at the basic minimum hourly wage rate before allowances, in addition to the minimum wages otherwise required" for "each day in which the spread of hours exceeds 10." N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.7. The "spread of hours" measures the interval between the beginning and end of an employee's workday" and "includes working time plus time off for meals plus intervals off duty." Id. § 137-3.11. Another provision clarifies this requirement: "An employee **[*60]** shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required in this Part for any day in which: (a) the spread of hours exceeds 10 hours; or (b) there is a split shift; or (c) both situations occur." Id. § 142-2.4

48. This Court's earlier opinion denying summary judgment in this case explained that "[t]he plain text of § 142-2.4 ensures an additional wage only 'in addition to the *minimum* wage' required under New York law (emphasis added)." Heng Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048, 2006 U.S. Dist. LEXIS 15780, 2006 WL 851749 ("Heng Chan I"), at *21 (S.D.N.Y. Mar. 30, 2006). The Court therefore interpreted the spread-of-hours provision not to affect "workers whose total weekly compensation is already sufficiently above the minimum rate." Id. In other words, "If the total compensation is equal to or greater than the minimum wages due, including compensation for an additional hour for each day in which the spread of hours exceeds

ten," the spread-of-hours provision does not entitle the employee to any further payments. Id.

49. In this case, however, the plaintiffs' total weekly compensation did not exceed the minimum **[\*61]** wages due, because the money paid from the banquet fee, which made up the difference between plaintiffs' wages and the minimum wage, was tips, not wages. Because the banquet fee was tips, not wages, defendants did not qualify for the tip credit, and the "total weekly compensation" received by plaintiffs did not comply with New York's minimum wage law. Thus, as defendants acknowledged during the trial, if the banquet fee is legally considered a tip, "the dominos fall for [plaintiffs]." (12/6/06 Tr. 64 (Mr. Hochheiser.)) The plaintiffs are entitled to recover an additional hour's pay at minimum wage for days when plaintiffs worked a spread of hours exceeding ten hours.

## C. Defendants Violated New York's Uniform Expenses Regulation

50. New York law provides that in the restaurant industry, "[n]o allowance for the supply, maintenance, or laundering of required uniforms shall be permitted as part of the minimum wage." N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.8. "Where the employer fails to launder or maintain required uniforms for any employee, he shall pay such employee in addition to the minimum wage. . . (a) $ 6.40 per week on and after March 31, 2000, if the employee **[\*62]** works more than 30 hours weekly . . . ." Id. The provision only applies "if the employees' expenditures for [uniform-maintenance] purposes would reduce their wages to below minimum wage." Ayres, 12 F. Supp. 2d at 310. Thus, if the wages paid to plaintiffs were less than the minimum wage -- as they effectively were, because defendants were ineligible for the tip credit -- defendants must reimburse them for all uniform-related expenses.

51. A "required uniform" is any "clothing worn by an employee, at the request of an employer, while performing job-related duties" unless it is "clothing that may be worn as part of an employee's ordinary wardrobe." N.Y. Comp. Codes R. & Regs. tit. 12, § 137-3.13. The uniforms that plaintiffs and other employees wear at 88 Palace, consisting of either suits or jackets, and pants, shirts, and ties of specific colors, constitute "required" uniforms.

52. Plaintiffs purchased, and were not reimbursed for the price of, all of the items in their uniforms other than the waiters' and busboys' jackets, which were provided to plaintiffs by the restaurant upon payment of a deposit.

In addition, plaintiffs have paid for the laundering **[\*63]** of most, if not all, of the items in their uniforms.

53. Because, at all relevant times, plaintiffs were paid wages of no more than the New York minimum wage with a tip credit, their uniform expenses necessarily decreased their wages below minimum wage.

54. Accordingly, plaintiffs are entitled to recover from defendants (1) the cost of those uniform items for which they paid; (2) the full statutory weekly uniform maintenance allowance for all weeks that the defendants did not offer any laundry service; and (3) a reasonable percentage of the statutory weekly uniform maintenance allowance for weeks on which the restaurant provided laundry service for only the jacket or suit portion of plaintiffs' uniforms.

## V. Defendants Violated Federal and New York Overtime Laws

55. Both the FLSA and New York labor regulations require employers to pay employees an overtime rate of at least one and one-half times their regular rate for hours worked in excess of 40 hours per week. See 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.107; N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.3. All sources of remuneration, except as specifically **[\*64]** exempted, must be counted towards an employee's "regular rate." 29 C.F.R. § 778.108. Where an individuals is "unlawfully paid less than the minimum wage, the overtime calculation must be based on the minimum wage to which he was entitled." Guo Xing Cao v. Chandara Corp., No. 00 Civ. 8057, 2001 U.S. Dist. LEXIS 8631, 2001 WL 34366628, at *6 (S.D.N.Y. July 25, 2001).

56. A weekly salary does not include the overtime premium for workers who regularly work more than 40 hours a week unless there is evidence that the parties understood and intended such an arrangement. In other words, "[t]here is a rebuttable presumption that a weekly salary covers 40 hours; the employer can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours." Giles v. City of New York, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999).

57. As established above, defendants have paid plaintiffs an overtime rate based on a "regular rate" of the minimum wage calculated with the maximum tip credit. Because defendants were not eligible to take a tip credit under the FLSA, plaintiffs' "regular rate" for purposes of overtime should have been the **[\*65]** full minimum wage. Accordingly, plaintiffs are entitled to

2007 U.S. Dist. LEXIS 7770, *65

recover, for all hours over 40 hours a week that they worked at 88 Palace, the difference between (1) the reduced hourly overtime rate they were paid because of the tip credit allowance claimed by defendants and (2) the federally prescribed overtime rate of one and one-half times the full statutory minimum wage.

## VI. Damages

### A. Statute of Limitations

58. The defendants are liable for all damages accruing under the FLSA and New York law from the time 88 Palace opened in August 2002 through the present. See 29 U.S.C. § 255(a) (two-year statute of limitations, running from the date the cause of action accrued; three-year statute of limitations where violation is "willful"); N.Y. Lab. Law § 198(3) (six-year statute of limitations); id. § 663(3). This action was initiated on August 11, 2003, well before the shortest relevant statute of limitations expired.

### B. Plaintiffs' Entitlement to Compensatory Damages

59. Plaintiffs' evidence of compensatory damages is presumptively correct. Under federal and state law, employers are responsible for keeping **[*66]** detailed records of wages, hours, tips, and other employment information. See 29 U.S.C. § 211(c) (requiring employers to keep personnel records); N.Y. Lab. Law § 195(4) (same); id. § 661 (same). These requirements are not mere technicalities, but substantive obligations that are 'fundamental underpinnings' of FLSA and critical to ensuring the statute's effectiveness, for an employer's '[f]ailure to keep accurate records can obscure a multitude of minimum wage and overtime violations.'" Moon v. Kwon, 248 F. Supp. 2d 201, 218 (S.D.N.Y. 2002), quoting Wirtz v. Miss. Publishers Corp., 364 F.2d 603, 607 (5th Cir. 1966).

60. Specifically, employers must maintain and preserve, for each tipped employee, records of, inter alia, (1) the total daily and weekly hours worked; (2) the regular hourly rates of pay for each week in which overtime compensation is due; (3) the total daily and weekly earnings; (4) the total wages paid; (5) the total weekly premium pay for overtime hours; (6) the weekly or monthly amounts of tips received by employees; (7) the amount by which the wages of each tipped employee have **[*67]** been deemed increased by tips; and (8) the hours worked and total payment for both tipped and non-tipped work. See 29 C.F.R. §§ 516.2, 516.5, 516.28. New York law imposes similar obligations on restaurant employers. See N.Y. Comp. Codes R. &

Regs. tit. 12, § 137-2.1; id. § 137-2.2.

61. The Supreme Court has held that when a defendant fails to comply with these recordkeeping requirements, a plaintiff employee may carry his burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Moon, 248 F. Supp. 2d at 219, quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). "[I]t is possible for plaintiff to meet this burden by relying on his recollection alone." Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005). New York law similarly provides that where an employer fails "to keep adequate records, . . . the employer in violation shall bear **[*68]** the burden of proving that the complaining employee was paid wages, benefits and wage supplements." N.Y. Lab. Law § 196-a.

62. Here, the record establishes that the defendants disregarded multiple obligations under federal and state recordkeeping laws. Defendants have not maintained and preserved several categories of records that they were required to preserve under the statutes, particularly those concerning the critical issues of tips owed and paid to plaintiffs. As Magistrate Judge Francis found in his opinion and order on plaintiffs' motion for sanctions based on spoliation, the defendants were grossly negligent in destroying relevant evidence, including banquet receipts, the money-received book, and tip distribution sheets, during the pendency of this litigation. Heng Chan II, 2005 U.S. Dist. LEXIS 16520, 2005 WL 1925579, at *8. Defendants did not appeal that ruling or seek reconsideration. The plaintiffs are therefore entitled to an adverse inference that the evidence destroyed would have been favorable to plaintiffs. See id. (noting that there is "ample extrinsic evidence" that the missing evidence would have been favorable to plaintiffs). In addition, **[*69]** it is undisputed that the records of tip income signed by employees were deliberately falsified, and that employees were required to sign false verifications in order to receive their paychecks.

63. Thus, plaintiffs' evidence of their hours worked and wages and tips earned is entitled to a reasonable inference of correctness which the defendants bear the burden of negating, pursuant to the burden-shifting framework adopted by the Supreme Court in Mt. Clemens Pottery. See Reich v. Southern New England Telecommc'ns Corp., 121 F.3d 58, 66-67 (2d Cir. 1997).

Because New York law imposes an even higher recordkeeping burden on employers, a "finding of FLSA liability . . . necessarily implies a finding of liability under New York law." Doo Nam Yang, 427 F. Supp. 2d at 337. Therefore, in the absence of rebuttal by defendants, plaintiffs' recollection and documentation of hours worked and compensation owed is presumed to be correct. Zeng Liu v. Jen Chu Fashion Corp., No. 00 Civ. 4221, 2004 U.S. Dist. LEXIS 35, 2004 WL 33412, at *3 (S.D.N.Y. Jan. 7, 2004).

64. Each plaintiff is entitled to compensatory damages totaling:

(a) the difference between the **[*70]** reduced hourly wage he or she was paid because of the tip credit allowance the defendants took and the statutorily-prescribed minimum wage, including at the applicable New York minimum wage for all hours after January 1, 2005, when New York's rate was increased above the federal minimum wage, see 29 U.S.C. § 218(a) (requiring employers to comply with the higher state minimum wage);

(b) his or her share of the amount of tips that the defendants illegally retained for themselves;

(c) an extra hour of pay at the applicable New York minimum wage for each day on which he or she worked a spread of more than 10 hours;

(d) the cost of those uniform items for which he or she paid, the full statutory weekly uniform maintenance allowance for all weeks that the defendants did not offer any laundry service, and a reasonable percentage of the statutory weekly uniform maintenance allowance for weeks on which the restaurant provided laundry service for only the jacket or suit portion of plaintiffs' uniforms; and

(e) the difference between the reduced hourly overtime rate they were paid because of the tip credit allowance that the defendants claimed **[*71]** and the federally prescribed overtime rate of one and one-half times the full statutory minimum wage, including at the applicable New York minimum wage for all hours after January 1, 2005.

## C. Compensatory Damages Calculation

65. Plaintiffs have submitted detailed damages calculations for each plaintiff on each issue in this litigation. Defendants submit an alternative calculation only on the question of damages for illegally retained tips. In light of the presumption in favor of plaintiffs' damages calculation discussed above, the defendants' failure to offer any evidence that plaintiffs' calculations

are inaccurate, and the Court's independent review of the record and plaintiffs' calculation, the plaintiffs' calculations will be adopted as to each category of damages. Defendants' arguments as to how damages for illegally retained tips should be calculated will be discussed below.

### 1. Tip Credit Damages

66. The Court finds that the plaintiffs are entitled to the following compensatory damages for the tip credit unlawfully taken by defendants. As discussed above, these figures represent the difference between the reduced hourly wage each defendant was paid because **[*72]** of the tip credit allowance taken by defendants and the statutorily-prescribed minimum wage, for both regular and overtime hours.

🔲 Go to table1

67. The total compensatory damages for the tip credit unlawfully taken by defendants is $ 97,446.40.

### 2. Damages for Illegally Retained Tips From Banquet Fees

68. The issue of damages for illegally retained tips from the banquet fees is the only issue on which the parties have submitted differing calculations. Although the difference between the parties' calculation methods is not very large, amounting to a dispute of about 10 or 15 percent, it is significant.

**[*73]** 69. Both parties' methods account for the fact that some plaintiffs worked only some of the relevant months. Of the months worked by all plaintiffs, however, records for some months are missing. Therefore, it is necessary to make an educated guess as to the tips retained during the missing months. The parties rely on different sets of records: the defendants rely primarily on individual tip distribution sheets for each plaintiff (D. Exs. Q1-Q11), while the plaintiffs rely on these documents but also on records of the entire tip income received by the restaurant (P. Ex. 12).

70. Aside from using different sources, the parties use different methods of calculation. Defendants' method works as follows. First, defendants calculate for each plaintiff the total tips withheld by the restaurant for all recorded months, [9] **[*74]** then divide by the number of

---

[9] To get this number, defendants add together the banquet tips received by each plaintiff for all recorded months. The

recorded months. This gives the average withheld tips over the course of the plaintiff's employment. Second, defendants multiply this average withheld tip by the number of months the plaintiff worked. [10] This method thus uses the average of the recorded months to project the amounts received during the unrecorded months.

71. Plaintiffs' method is different. Plaintiffs first calculate the total amount of banquet tips withheld by the restaurant, relying on defendants' records where available and prior years' records where the relevant year's records are not available. [11] Plaintiffs then calculate each plaintiff's share in the total tips withheld. To determine each plaintiff's share, they divide the plaintiff's tip-share number (e.g., 1.06) by the average total number of tip-shares -- i.e., the average total number of servers. They estimate the average total number of tip-shares at 20. In other words, to determine each server's share, the plaintiffs estimate that about 20 servers were sharing in the tips on any given [*75] night, and then calculate how much money each plaintiff would have received, based on the plaintiff's tip share and the total tips withheld.

72. The Court finds that plaintiffs' calculation method is more reliable, because more of the numbers it relies on are real, rather than estimated. Defendants' method rests on their estimate that during the unrecorded months, plaintiffs made roughly the same tips as in the recorded months. Defendants' records, however, show that the total tips received varied dramatically from month to month, ranging for example from $ 20,691 in

---

restaurant withheld 25 of the tips, so the defendants then divide the total tips received by 75, or .75. In other words, they solve the equation *.75x = (total tips received)*. This gives the total tips taken in by the restaurant for all recorded months. Finally, the defendants subtract from the total tips *taken in by the restaurant* the total tips *received by the plaintiff*. This gives the total tips *withheld* for all recorded months.

[10] This method in effect credits the plaintiff for the average monthly withheld tips for each month -- even those months for which an actual number is available. But because the average is the sum of all known months divided by the number of known months, the sum of the averaged number is the same as the sum of the actual numbers. This method therefore involves no inaccuracies for the known months.

[11] For the period from August 2002 through September 2004, this number is available because it is recorded in defendants' internal records (P. Ex. 12). For the period October 2004 through November 2006, plaintiffs rely on defendants' records where they are available and prior years' amounts where they are not available.

April 2003 to $ 52,475 the very next month. 27 out of 52 of the relevant months -- roughly half -- are missing from defendants' [*76] records of individual tips received. Thus, defendants' use of an average for the missing months rests on a great deal of guesswork.

73. Plaintiffs, on the other hand, rely on monthly totals of received tips (P. Ex. 12), for which there are records of the first 26 of the relevant months. For the remaining months, plaintiffs rely on individual plaintiffs' tip distribution charts (D. Ex. Q1-Q11), which exist for 16 of the remaining months. Plaintiffs therefore rely on significantly more actual records than defendants.

74. It is true that plaintiffs' method, like defendants', rests on an estimate: that on an average night, there were 20 shares participating in the tip pool. As plaintiffs acknowledge, "an exact calculation of total shares is simply not possible" (P. Damages Submission at 10 n.5), because total shares vary daily, from approximately 8.57 to 22.77 total shares. Plaintiffs' estimate of 20 is close to the highest number of shares recorded. (Cf. Tr. 21 (Wong Direct) (noting that there are currently 22 or 23 employees eligible for the tip pool).) The higher the number of shares, the less money each plaintiff will receive, just as when more slices are cut from a pie, each [*77] slice must be smaller. Plaintiffs' calculation, therefore, is cautious and errs on the side of being generous to defendants. As noted before, it also relies on more actual numbers. It should also be noted that although the defendants adopt a different calculation method, they make no challenge to the accuracy of the numbers on which plaintiffs rely.

75. Accordingly, the Court finds that plaintiffs' method of calculating tips withheld by the restaurant is more reliable than that of defendants. The following damages for unlawfully retained tips will therefore be awarded to each plaintiff:

Go to table2

76. The total compensatory damages for the tips unlawfully retained by defendants is $ 229,439.23.

3. Spread of Hours Damages

77. The Court finds that plaintiffs are entitled to the following damages, representing an extra hour of pay at the applicable New York minimum wage for [*78] each day on which he or she worked a spread of more than 10 hours:

[Go to table3]

78.  The total compensatory damages for spread-of-hours violations is $ 28,226.10.

4. Uniform Maintenance Damages

79.  The Court finds that the plaintiffs are entitled to the following damages for uniform and laundry expenses:

[Go to table4]

80.  The total compensatory damages for uniform and laundry expenses are $ 8,256.35.

5. Total Compensatory Damages

81.  The total compensatory damages awarded to each plaintiff are as follows:

[Go to table5]

 [*79]

82.  The total compensatory damages for all plaintiffs is $ 363,368.08.

**D. Plaintiffs' Entitlement to Liquidated Damages**

83.  The defendants are liable for liquidated damages under both the FLSA and New York law. An employer who violates the minimum wage or overtime provisions of the FLSA "shall be liable to the employee or employees who are affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). [12]

84.  An employer may avoid liquidated damages only if it meets the "'difficult' burden of establishing, [*80] by 'plain and substantial' evidence, its subjective good faith and objective reasonableness." Moon, 248 F. Supp. 2d at 234. "Double damages are the norm, single damages the exception." Southern New England Telecommc'ns, 121 F.3d at 71. Courts have discretion to deny an award of liquidated damages where the employer shows that, despite the unlawful acts, the employer acted in

---

[12] "As used in the FLSA 'liquidated damages' is something of a misnomer. It is not a sum certain, determined in advance as a means of liquidating damages that may be incurred in the future. It is an award of special or exemplary damages added to the normal damages." Brock v. Superior Care, Inc., 840 F.2d 1054, 1063 n. 3 (2d Cir. 1988).

subjective "good faith" and had objectively "reasonable grounds" for believing that the acts or omissions giving rise to the failure did not violate the FLSA. 29 U.S.C. § 260. "'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them." Southern New England Telecomms., 121 F.3d at 71.

85.  Defendants have not established that they acted in good faith in claiming a tip credit to meet their federal minimum wage obligations at the same time that they retained a significant portion of the employees' tips. Defendants have pointed to no "active steps" taken by any [*81] of them to determine whether they were entitled to retain a portion of the tips. Southern New England Telecomms., 121 F.3d at 71. They have shown neither a subjective belief in the lawfulness of their wage practices nor that these practices were objectively reasonable.

86.  Similarly, under New York labor law, an employee may be awarded liquidated damages amounting to 25% of the total wages owed by the employer "upon a finding that the employer's failure to pay the wage required . . . was willful." N.Y. Lab. Law. § 198(1-a); id. § 663(1) (same). An employer acts "willfully" if it "knowingly, deliberately, or voluntarily disregards its obligation to pay wages." Ayres, 12 F. Supp. 2d at 309, quoting P & L Group, Inc. v. Garfinkel, 150 A.D.2d 663, 541 N.Y.S.2d 535, 537 (2d Dep't 1989). The plaintiff need not prove that the defendants acted maliciously or in bad faith. Id.

87.  For the same reasons as those discussed above, the defendants' violations of New York's minimum wage, tip allocation, spread of hours, and uniform laws were knowing and willful. In fact, the evidence supports a view that the defendants, who routinely referred [*82] to the banquet fees as tips both with customers and among themselves, and treated those fees as tips for internal accounting purposes, subjectively and reasonably believed themselves to be taking a percentage of plaintiffs' tips.

88.  Accordingly, the defendants are liable for the full amount of liquidated damages under federal and New York law. Each plaintiff is thus entitled to recover liquidated damages under the FLSA equivalent to 100 percent of:

(a) the difference between the reduced hourly wage he or she was paid because of the tip credit allowance the defendants took and the statutorily-

prescribed minimum wage, at the federally prescribed overtime rate of one and a half times the full statutory minimum wage (where relevant); and

(b) his or her share of the amount of tips that the defendants illegally retained for themselves.

In addition, each plaintiff is entitled to recover liquidated damages under New York law equivalent to 25 percent of:

(c) an extra hour of pay at the applicable New York minimum wage for each day on which he or she worked a spread of more than 10 hours;

(d) the cost of those uniform items for which he or she paid, **[*83]** the full statutory weekly uniform maintenance allowance for all weeks that the defendants did not offer any laundry service, and a reasonable percentage of the statutory weekly uniform maintenance allowance for weeks on which the restaurant provided laundry service for only the jacket or suit portion of plaintiffs' uniforms.

### E. Liquidated Damages Calculation

89. The plaintiffs are entitled to the following liquidated damages:

⊞ Go to table6

90. The total liquidated damages awarded under the FLSA are $ 326,885.63. The total liquidated damages awarded under New York law are $ 9,120.61. The total **[*84]** liquidated damages for all plaintiffs are $ 336,006.24.

### F. Total Damages Awarded

91. The total damages awarded to each plaintiff are as follows:

⊞ Go to table7

92. The total damages awarded for all plaintiffs are $ 699,374.32.

### VII. <u>Joint and Several Liability</u>

93. The defendants, with the exception of Gong Gui Guan, who is not liable for the reasons discussed above, are jointly and severally liable for the judgment. Each defendant (again, excluding Gong Gui Guan) acted as plaintiffs' joint employer and is responsible both individually and jointly for defendants' federal and state law violations. <u>See</u> 29 C.F.R. § 791.2; <u>Doo Nam Yang</u>, 427 F. Supp. 2d at 342-43.

### CONCLUSION

Accordingly, for the foregoing reasons, the Court concludes that plaintiffs have proven, by a preponderance of the evidence, that the defendants **[*85]** other than Gong Gui Guan violated FLSA and the New York Labor Law in the various ways discussed above. For these violations, the Court awards plaintiffs damages totaling $ 699,374.32, as calculated and set forth above, for which the defendants other than Gong Gui Guan are jointly and severally liable. Judgment will be entered in favor of defendant Gong Gui Guan.

Plaintiff shall submit an application for the amount of their fees and costs, a request for prejudgment interest, and an appropriate form of a judgment no later than February 16, 2007. The defendants shall submit any opposition to this submission no later than March 2, 2007.

SO ORDERED.

Dated: New York, New York

February 1, 2007

GERALD E. LYNCH

United        States        District        Judge

2007 U.S. Dist. LEXIS 7770, *85

**Table1** ([Return to related document text](#))

|  | Regular Hours | Overtime Hours | Total |
|---|---|---|---|
| Yan Bin Cao | $ 10,814.03 | $ 38.43 | $ 10,852.46 |
| Sum Kay Wong | $ 11,420.45 | $ 53.65 | $ 11,474.10 |
| Jian Yun Lin | $ 13,167.56 | $ 66.60 | $ 13.234.16 |
| Wei Chao Tan | $ 10,696.46 | $ 36.53 | $ 10,732.99 |
| Shing Tao Au | $ 14,388.95 | $ 70.30 | $ 14,459.25 |
| Wan Zhen Jiang | $ 12,344.03 | $ 57.35 | $ 12,401.38 |
| Feng Qin Zheng Teng | $ 7,512.26 | $ 49.30 | $ 7,561.56 |
| Fong Li | $ 5,884.85 | $ 68.45 | $ 5,953.30 |
| Ai Yin Chen | $ 5,643.43 | $ 74.93 | $ 5,718.36 |
| Yong Cai Zhang | $ 3,638.95 | $ 34.23 | $ 3,673.18 |
| Heng Chan | $ 1,340.33 | $ 45.33 | $ 1,385.66 |

**Table1** ([Return to related document text](#))

---

**Table2** ([Return to related document text](#))

| Yan Bin Cao | $ 33,928.75 |
|---|---|
| Sum Kay Wong | $ 33,928.75 |
| Jian Yun Lin | $ 28,807.43 |
| Wei Chao Tan | $ 33,928.75 |
| Shing Tao Au | $ 25,606.60 |
| Wan Zhen Jiang | $ 17,604.54 |
| Feng Qin Zheng Teng | $ 28,220.22 |
| Fong Li | $ 12,464.78 |
| Ai Yin Chen | $ 7,833.15 |
| Yong Cai Zhang | $ 4,580.02 |
| Heng Chan | $ 2,536.24 |

**Table2** ([Return to related document text](#))

---

**Table3** ([Return to related document text](#))

| Yan Bin Cao | $ 3,674.85 |
|---|---|
| Sum Kay Wong | $ 3,674.85 |
| Jian Yun Lin | $ 3,674.85 |
| Wei Chao Tan | $ 3,674.85 |
| Shing Tao Au | $ 3,674.85 |
| Wan Zhen Jiang | $ 3,304.05 |
| Feng Qin Zheng Teng | $ 2,824.35 |
| Fong Li | $ 1,359.60 |
| Ai Yin Chen | $ 1,282.35 |
| Yong Cai Zhang | $ 803.40 |
| Heng Chan | $ 278.10 |

**Table3** ([Return to related document text](#))

---

**Table4** ([Return to related document text](#))

| Yan Bin Cao | $ 1,004.45 |
|---|---|
| Sum Kay Wong | $ 1,004.45 |
| Jian Yun Lin | $ 1,004.45 |
| Wei Chao Tan | $ 1,004.45 |

2007 U.S. Dist. LEXIS 7770, *85

| Shing Tao Au | $ 1,004.45 |
| Wan Zhen Jiang | $ 924.45 |
| Feng Qin Zhen Teng | $ 828.05 |
| Fong Li | $ 524.80 |
| Ai Yin Chen | $ 508.80 |
| Yong Cai Zhang | $ 332.80 |
| Heng Chan | $ 115.20 |

**Table4** ([Return to related document text](#))

---

**Table5** ([Return to related document text](#))

| Yan Bin Cao | $ 49,460.51 |
| Sum Kay Wong | $ 50,082.15 |
| Jian Yun Lin | $ 46,720.89 |
| Wei Chao Tan | $ 49,341.04 |
| Shing Tao Au | $ 44,745.15 |
| Wan Zhen Jiang | $ 34,234.42 |
| Feng Qin Zheng Teng | $ 39,434.18 |
| Fong Li | $ 20,302.48 |
| Ai Yin Chen | $ 15,342.66 |
| Yong Cai Zhang | $ 9,389.40 |
| Heng Chan | $ 4,315.20 |

**Table5** ([Return to related document text](#))

---

**Table6** ([Return to related document text](#))

| | FLSA | NY | Total |
|---|---|---|---|
| Yan Bin Cao | $ 44,781.21 | $ 1,169.83 | $ 45,951.04 |
| Sum Kay Wong | $ 45,402.85 | $ 1,169.83 | $ 46,572.68 |
| Jian Yun Lin | $ 42,041.59 | $ 1,169.83 | $ 43,211.42 |
| Wei Chao Tan | $ 44,661.74 | $ 1,169.83 | $ 45,831.57 |
| Shing Tao Au | $ 40,065.85 | $ 1,169.83 | $ 41,235.68 |
| Wan Zhen Jiang | $ 30,005.92 | $ 1,057.13 | $ 31,063.05 |
| Feng Qin Zheng Teng | $ 35,781.78 | $ 913.10 | $ 36,694.88 |
| Fong Li | $ 18,418.08 | $ 471.10 | $ 18,889.18 |
| Ai Yin Chen | $ 13,551.51 | $ 447.79 | $ 13,999.30 |
| Yong Cai Zhang | $ 8,253.20 | $ 284.05 | $ 8,537.25 |
| Heng Chan | $ 3,921.90 | $ 98.33 | $ 4,020.23 |

**Table6** ([Return to related document text](#))

---

**Table7** ([Return to related document text](#))

| Yan Bin Cao | $ 95,411.55 |
| Sum Kay Wong | $ 96,654.83 |
| Jian Yun Lin | $ 89,932.31 |
| Wei Chao Tan | $ 95,172.61 |
| Shing Tao Au | $ 85,980.83 |
| Wan Zhen Jiang | $ 65,297.47 |
| Feng Qin Zheng Teng | $ 76,129.06 |
| Fong Li | $ 39,191.66 |
| Ai Yin Chen | $ 29,341.96 |

2007 U.S. Dist. LEXIS 7770, *85

| | |
|---|---|
| Yong Cai Zhang | $ 17,926.65 |
| Heng Chan | $ 8,335.43 |

**Table7 (**Return to related document text**)**

---

**End of Document**