### Page 1

```
 1           IN THE UNITED STATE DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF MICHIGAN
 3                     SOUTHERN DIVISION
 4
 5   CHAD MCFARLIN, individually
     and on behalf of all
 6   similarly situated persons,
 7
 8           Plaintiffs,
 9
10   vs.                          Civil Action No:
                                  2:16-cv-12536
11
                                  HON. GERSHWIN A. DRAIN
12   THE WORD ENTERPRISES, LLC,
     et al,
13
14
             Defendants.
15
16   _____/
17
18
19        The Deposition of MICHELE FOLLMAN was taken
20   before me, Barbara Phillips, (CER #5598) and Notary
21   Public, in and for the County of Washtenaw, State of
22   Michigan, at 221 N. Main Street, Suite 300, Ann
23   Arbor, Michigan, on Tuesday, December 5, 2017, at
24   1:45 p.m.
25
```

### Page 2

```
 1   APPEARANCES:
 2
 3              DAVID M. BLANCHARD (P67190)
 4              221 N. Main Street, Suite 300
 5              Ann Arbor, Michigan  48104
 6              734-929-4313
 7
 8              Appearing on behalf of the Plaintiffs.
 9
10
11              JEFFREY S. THEUER (P44161)
12              124 West Allegan Street, Suite 700
13              Lansing, Michigan  48933
14              517-482-2400
15
16              Appearing on behalf of the Defendants.
17
18                    ** ** ** ** **
19
20   REPORTED BY:  Barbara Phillips,
21                 (CER #5598)
22                 and Notary Public.
23
24
25   ALSO PRESENT:  Kevin Dittrich
```

### Page 3

```
 1                       I N D E X
 2   WITNESS:                                      PAGE:
 3              M I C H E L E   F O L L M A N
 4
 5        Examination by Mr. Blanchard                 4
 6
 7
 8
 9                    ** ** ** ** **
10
11              E X H I B I T S
12   EXHIBITS:                                     PAGE:
13
14        Deposition Exhibit No. 25                   51
15
16
17                    ** ** ** ** **
18
19
20
21
22
23
24
25
```

### Page 4

```
 1              Ann Arbor, Michigan
 2              Tuesday, December 5, 2017
 3              1:45 p.m.
 4
 5              ** ** ** ** **
 6
 7        M I C H E L E   F O L L M A N
 8    after having been first duly sworn to tell the
 9    truth, the whole truth, and nothing but the
10    truth, was examined and testified upon her
11    oath as follows:
12
13              ** ** ** ** **
14            E X A M I N A T I O N
15   BY MR. BLANCHARD:
16   Q. Thank you, Ms. Follman.  You've been here the whole
17      time during part one and part two of Mr. Dittrich's
18      testimony; is that correct?
19   A. Yes.
20   Q. And he has been speaking on behalf of the companies,
21      defendant companies pursuant to what we marked
22      previously.  We've got these exhibits in front of
23      you.  The re-notice of the deposition is Exhibit 16
24      which I'm showing you right now.  It's in front of
25      you.  And you've been designated as somebody who can
```



Page 5
1  answer some of the additional questions and you've
2  heard what those questions are and stuff, right?
3  A. Yes.
4  Q. And you've heard the testimony of Mr. Dittrich. Was
5     there anything as to the topics that we're noticing
6     in this deposition that I asked about, anything in
7     particular that stands out that needs to be
8     corrected or was incorrect in any way?
9  A. No.
10 Q. I'd like you to turn to Exhibit 17 which is the next
11    one here and that's your affidavit. I'm going to
12    ask you about that one. Who, if anyone, helped you
13    prepare this document?
14 A. Counsel.
15 Q. Anyone other than counsel?
16 A. No.
17 Q. And what was your understanding of the purpose of
18    this document?
19 A. I'm not sure.
20 Q. Like, for instance, were you under the understanding
21    that this was for the purpose of informing the
22    expert or the accountant on certain business
23    practices?
24 A. I'm not sure.
25 Q. Do you know what the purpose of it was really?

Page 6
1  A. I don't know. I answered the questions my lawyer
2     asked me.
3  Q. In paragraph eight of your affidavit declaration
4     here -- are you familiar with it by the way? Do you
5     need to take time to read it or review it?
6  A. I'm familiar.
7  Q. In paragraph eight you testify the driver employees
8     at the two operating companies -- this was before
9     Durand was added, were not paid on the basis of
10    minimum wage plus vehicle reimbursement. Why did
11    you say that?
12 A. We did not pay a minimum wage plus reimbursement
13    there. We used the tip credit to get them to
14    minimum wage with their compensation for the vehicle
15    costs.
16 Q. So all you're saying in that particular sentence,
17    the first sentence of paragraph eight, is that you
18    were using the tip credit and paying a cash wage
19    that was below the minimum wage rather than on the
20    basis of minimum wage and vehicle reimbursement?
21        MR. THEUER: I'll object to the
22    characterization, but go ahead and answer.
23 BY MR. BLANCHARD:
24 Q. I'm just trying to understand what you're trying to
25    say there?

Page 7
1  A. We use the tip credit to get them to minimum wage
2     with their compensation for their vehicle costs. So
3     not just the minimum wage, but with their costs
4     included.
5  Q. What components of the money that's given to the
6     drivers is intended to be a reimbursement for their
7     mileage?
8  A. It's the whole -- the package. Their wages, their
9     compensation per delivery and their tips.
10 Q. So are you saying that there is no specific portion
11    of a driver's money that they receive that's
12    intended to be reimbursement for driving expenses?
13 A. Can you ask that again one more time?
14 Q. Yeah. I want to get a clear answer and I want to be
15    clear about what the question is, too, so I'm not
16    doing the best job. Is there any particular piece
17    of the money that changes hands between the
18    defendant companies and the driver that's intended
19    and designated as reimbursement for the expense
20    incurred by the drivers?
21 A. That is only designated for that expense?
22 Q. That is designated at all or in part as
23    reimbursement for the expense incurred by the
24    drivers.
25 A. I would say yes.

Page 8
1  Q. Can you tell me what that is?
2  A. If I'm understanding you correctly then part of
3     their pay package with the tips. The hourly pay and
4     compensation goes to reimbursing them their vehicle
5     costs.
6  Q. Which part of that?
7  A. It's a package deal so I mean there's nothing
8     specifically designated just to that.
9  Q. So we talked in your prior testimony about a
10    delivery fee that's paid to drivers?
11 A. Yes.
12 Q. And that was 75 cents per delivery?
13 A. Yes.
14 Q. Plus, at the Laingsburg location it was something
15    different. It was $1,75 and now I guess it's 2.75,
16    right?
17 A. Yes.
18 Q. And now is the base delivery fee that's paid still
19    75 cents or is it a dollar?
20 A. 75 cents still.
21 Q. And that's for all the defendant stores?
22 A. Yes.
23 Q. And we had a question about the cash wage that's
24    paid to drivers at all defendant stores. Is it
25    still $5 for all the drivers?



MICHELE FOLLMAN
MCFARLIN vs WORD ENTERPRISES
December 05, 2017
17–20

Page 17
1  THE CLERK: Okay. So you're in the middle of a
2  30(b)(6) deposition and you have an issue about a
3  particular line of questioning you say and you want
4  the judge to decide the issue now?
5     MR. BLANCHARD: Yeah.
6  THE CLERK: Is that what you're asking?
7     MR. BLANCHARD: Yes, if it's his practice to
8  hear discovery disputes of this sort. I mean the
9  other alternative is we'd have to adjourn the
10 deposition which the defendants have told us they
11 would object to that as well.
12    THE CLERK: In this case has the discovery --
13 and what specifically, I guess, is the question?
14    MR. BLANCHARD: Whether the deponent should be
15 directed to answer the question or another person
16 that can answer the question can be designated?
17    THE CLERK: Hold on one second.
18       (Break in proceedings at 2:07 p.m.)
19       (Back on the record at 2:09 p.m.)
20    THE CLERK: Hello. The judge is unavailable at
21 the moment. I don't know if there's a magistrate
22 judge you want to call, I guess, about the discovery
23 issues that have been referred to or if you want to
24 call back later on.
25    MR. BLANCHARD: Okay. Do you know if it's the

Page 18
1  judge's preference to terminate the deposition and
2  bring a motion on the issue?
3     THE CLERK: No. I can't -- bringing a motion I
4  think is the best practice and I think it's the
5  ordinary practice.
6     MR. BLANCHARD: Okay.
7     THE CLERK: Yeah. It's uncommon for things to
8  just be handled over the phone especially like not
9  on the record. Yeah, that would be my suggestion.
10    MR. BLANCHARD: Okay. Thank you.
11    THE CLERK: All right. Thank you.
12    MR. BLANCHARD: Off the record.
13       (Break in proceedings at 2:10 p.m.)
14       (Back on the record at 2:19 p.m.)
15    MR. BLANCHARD: Let me ask a slightly different
16 question. It looks like we're going to have to
17 bring a motion to come back to the question that we
18 were dealing with before.
19 BY MR. BLANCHARD:
20 Q. A slightly different question. Of the delivery fees
21    that were paid to drivers at the end of the night in
22    cash was there any portion of that that was taxable
23    compensation to the driver?
24 A. That the drivers pay taxes on?
25 Q. Yeah. That the company that's paying this money

Page 19
1  considered to be taxable compensation to the driver.
2  A. No.
3  Q. In your affidavit you refer at one time to a mistake
4     that was made where credit card tips were paid out
5     twice?
6  A. Yes.
7  Q. And for what period of time did that occur and in
8     what locations?
9  A. I don't remember the exact period of time. I
10    believe --
11 Q. Was it in April of 2016 was when the error was
12    found?
13 A. April of 2016 is when the error was found.
14 Q. And did it go all the way back to November 2014?
15 A. Not that far back. I believe it was about a year,
16    but I'm not specific on the dates.
17 Q. And was that an error that was occurring in the
18    books at all locations or just the Perry location?
19 A. Not all locations. I believe it was Perry and
20    Haslett, but I'm not a hundred percent sure.
21 Q. It was more than one store?
22 A. It was more than one store.
23 Q. Did that error occur at the Durand store?
24 A. No, I don't believe so.
25 Q. Did that error occur at the St. Johns store?

Page 20
1  A. It might have. I'm not sure on that.
2  Q. I want to turn your attention to Exhibit 20. It
3     should have a tag on it. It's a spreadsheet I
4     believe you prepared. You have that in front of you
5     now?
6  A. Yes.
7  Q. Did you prepare this document?
8  A. I prepared the data for the document, yes.
9  Q. Who inputted the data?
10 A. Counsel.
11 Q. And what form did you prepare the data in?
12 A. In an Excel sheet also.
13 Q. So what are you suggesting, just like the titles and
14    formatting were done by counsel or something else?
15 A. Yeah.
16 Q. Just the titles and formatting?
17 A. Yes.
18 Q. In the document that you prepared did it have
19    formulas within the document like, you know, take
20    this cell and times this one and then come up with
21    another one?
22 A. Yes.
23 Q. And do you have a copy of this final document with
24    the -- does it have formulas in it, this version as
25    well if you know?



800.211.DEPO (3376)
EsquireSolutions.com

Page 21

1  A.  This one here?
2  Q.  Yes.
3  A.  Yes.
4      MR. BLANCHARD:  I think at some point we're
5   gonna need -- just so we understand where the math
6   is going in here, where the calculations are coming
7   from, we're gonna need an electronic format of this.
8   As far as I know I've only gotten this small PDF.
9   Will you be able to provide that?
10     MR. THEUER:  I don't know with certainty, but
11  we can explain anything.
12     MR. BLANCHARD:  Well, I am going to ask her
13  what she knows, but I think the simplest way to get
14  this kind of information is going to be in a
15  spreadsheet that speaks for itself.
16 BY MR. BLANCHARD:
17 Q.  So you prepared for each week the information that's
18   found on this sheet, Exhibit 20?
19 A.  Yes.
20 Q.  And in the first three columns -- well, the first
21   column it says date of pay and that's the actual pay
22   date, right?
23 A.  Yes, the check.
24 Q.  And in the three columns after that you have the
25   hours in store, hours out of store, and total number

Page 22

1   of hours, right?
2  A.  Yes.
3  Q.  And then the pay rate in store and road because
4    there's a split wage system and it looks like it
5    went to 8.50 at some point?
6  A.  Yes.
7  Q.  And then if I look at the column for January 14th of
8    2016 or I should say the row for January 14th of '16
9    and it says the rate is 8.50, and then I look over
10   to the -- you inputted this column total minimum
11   wage to be paid, right?
12 A.  Yes.
13 Q.  Would we expect that to be -- the full minimum wage
14   at that point would be 8.50 times the total number
15   of hours?
16 A.  Yes.
17 Q.  So that's the kind of thing.  If I look at this
18   column and the data behind it it would say take
19   column three, total hours, multiply by column four,
20   minimum wage, equals that column six?
21 A.  Yes.
22 Q.  And then tell me what the next three columns are.
23   Regular wage paid, credit card tips, and I think the
24   next one says estimated cash tip paid, and tell me
25   where you got those numbers.

Page 23

1  A.  The regular wages would be the in store hours and
2    then the on the road hours.
3  Q.  The cash wage?
4  A.  The cash wage paid.  The gross pay for those.
5  Q.  Okay.  Go ahead.
6  A.  The credit card tips would be the reported credit
7    card tips that the computer kept track of.  And then
8    the estimated cash tips is what we estimated based
9    on our findings of cash tips to be, what they should
10   have made for cash tips at that time period.
11 Q.  So these three columns you just explained here are
12   in your formula considering the three parts of the
13   driver's wages; is that right?
14 A.  Three parts, yes.
15 Q.  And part of the driver's wages you're saying you
16   estimated?
17 A.  The cash tips were estimated.  We did not have
18   actual numbers for those, but we used a formula to
19   figure it out.
20 Q.  Did you do tax withholding on the total of those
21   three columns?
22 A.  On the regular wages and the credit card tips there
23   was tax withholding.
24 Q.  And what is your basis for believing that the store
25   is entitled to count the tips paid by a customer to

Page 24

1   a driver as wages?
2  A.  Because they're a tipped employee and we use the tip
3    credit.
4  Q.  And how does the tip credit work to your
5    understanding?
6  A.  To my understanding we pay them -- well, we're
7    paying them $5 an hour and they make up the
8    difference between that and the minimum wage
9    inputting all the reimbursements to the minimum
10   wage.  To the 8.15, 8.50, 8.90, whatever the minimum
11   wage is at that time.
12 Q.  The store gets to take a credit and treat as wages
13   that portion that brings it up to the minimum wage?
14 A.  Yes.
15 Q.  And that portion of tips paid to the driver that's
16   above the minimum wage, are you saying it's your
17   understanding or your belief that the store gets to
18   treat those as wages as well?
19     MR. THEUER:  I'll object to the extent that it
20  calls for a legal conclusion, but you can answer if
21  you can.
22     THE WITNESS:  I don't know the answer.  I don't
23  know.
24 BY MR. BLANCHARD:
25 Q.  Let's look -- I'm going to come back to this Exhibit



Page 25

1  20.  It's definitely going to be a touchstone we'll
2  talk about today, but I wanted to direct you to
3  Exhibit 18 which is the minimum wage notice for
4  tipped employees.  And Mr. Dittrich directed me to
5  you to ask some of these questions about this
6  notice.  You already testified to it.  We don't need
7  to repeat it all, but this is a notice that was
8  posted at each of the defendant stores, right?
9  A.  Yes.
10 Q.  And that was for a period of time that probably
11    would have been around 2014 to the end of 2015?
12 A.  Yes.
13 Q.  And then in 2016 the minimum wage went up.  Was
14    there a new notice prepared in the same format as
15    this one and then pasted at the stores?
16 A.  Yes.
17 Q.  And then it's going up -- has it gone up from 8.50?
18 A.  Yes.
19 Q.  What's the current minimum wage?
20 A.  8.90.
21 Q.  And when it went up to 8.90 was it the same -- well,
22    let me ask it, was there a similar notice posted
23    that has the 8.90 number on it?
24 A.  I believe so.
25 Q.  Was it made off the same template?  Was it like the

Page 26

1    exact same notice except just the number was
2    changed?
3  A.  It's a part of our labor law poster.
4  Q.  Oh, that says what the minimum wage is?
5  A.  Yes.
6  Q.  But I'm asking in the format of Exhibit 18 --
7  A.  There is a portion on the labor law poster that has
8     the tipped wage information on it.  It's in pretty
9     much the same format.
10 Q.  Was there a version of Exhibit 18 that was posted
11    with the new rates that came out?
12 A.  Yeah.  I believe so, yeah.
13 Q.  And it says here we apply the difference between
14    your regular hourly rate and 8.15 as a quote, "tip
15    credit" for each hour worked.  That's the heart of
16    the tip credit, right, where a portion of the tips
17    get to be treated as wages?
18 A.  Yes.
19 Q.  And the amounts in this case when it was the 8.15
20    minimum wage, the amounts over 8.15 are tips from
21    the customer to the driver that belong to the
22    driver, right?
23 A.  Yes.
24 Q.  Exhibit 23 is this reimbursement sheet.  Have you
25    seen that before?

Page 27

1  A.  No.
2  Q.  Have you done any studies yourself of what a
3     reasonable reimbursement is or what factors should
4     be considered in a reasonable mileage reimbursement
5     for employees?
6  A.  No.
7  Q.  So let's go back to Exhibit 20 again and then next
8     we talked about the wages part.  So when you're
9     reporting on this spreadsheet the total wages paid
10    you're counting the cash wage, plus the credit card,
11    all tips.  Not just the portion that's between the
12    cash wage and 8.15 an hour, but all credit card tips
13    reported, plus an estimated cash tip, right?  You're
14    counting all of those things as wages?
15 A.  Yes.
16 Q.  The next column is driver commission paid?
17 A.  Yes.
18 Q.  Well, let me ask this way, did you put the name
19    driver commission paid in the title there?
20 A.  I don't remember.
21 Q.  Is that -- I'm sorry.  Go ahead.
22 A.  I don't remember if that was my wording or theirs.
23 Q.  Do you usually call it driver commission, the
24    delivery fee that we were talking about?
25 A.  Yes.

Page 28

1  Q.  And that is the delivery fee we were talking about
2     that appears in that column, right?
3  A.  Yes.
4  Q.  And that was -- just so I have this right, for all
5     of the numbers in that column on Exhibit 20, the
6     so-called driver commission paid, that was never
7     subject to a withholding tax reported on a paycheck
8     or reported to the IRS at the end of the year,
9     correct?
10 A.  Yes.
11 Q.  Yes, that's correct?
12 A.  Yes, that's correct.
13 Q.  So the next column over you have total wages, tip
14    and commission paid.  So that's just an adding up of
15    the previous four columns, right?
16 A.  Yes.
17 Q.  Treated as wages, the total amount of estimated tips
18    the driver receives, plus the untaxed so-called
19    driver commission, and total all that up together
20    for the driver commission paid -- total wages, tip
21    and commission paid?
22 A.  Yes.
23 Q.  And again, do you remember if you gave it that title
24    or if somebody else gave it that title?
25 A.  I don't remember.



Page 53

1  right, in Exhibit 25?
2  A. Of what the computer keeps track of, yes.
3  Q. And then Exhibit 21, TWE000367, that's another
4     payroll summary report?
5  A. Yes.
6  Q. And that's 3-1 through 5-31-2016. So that would
7     overlap some of the same weeks as the payroll report
8     that we looked at in Exhibit 25, right?
9  A. Yes.
10 Q. Is there a reason why the period in this Exhibit 21
11    payroll summary report at the point we're looking
12    at -- 3-1-2016 to 5-31-2016, is that part of a
13    quarter in a fiscal year or is that just how it --
14 A. That's just how someone produced them, yes.
15 Q. They just chose a start date and end date and that's
16    how it came out?
17 A. Yes.
18 Q. Do you know -- how do I ask this? Exhibit 22, this
19    is the employee check record. That's what comes
20    from the accountant, right?
21 A. Yes.
22 Q. And on TWE669 --
23    MR. THEUER: You're on Exhibit 25?
24    MR. BLANCHARD: I'm on Exhibit 25.
25 BY MR. BLANCHARD:

Page 54

1  Q. If we could look at that against the first page of
2     Exhibit 22. That's what I'm trying to understand
3     here. So 22 has a gross pay column for July 14th
4     and July 28th of 2016 and that gross pay column is
5     recorded and -- this is the accountant's stuff, so
6     reported and taxed. It's made up of -- some of the
7     numbers we see on Exhibit 25, that's what I'm trying
8     to walk you through.
9  A. Yes.
10 Q. So, for instance, at 7-14-16 we have a total of
11    590.46. Do you see that gross pay on Exhibit 22 for
12    July 14th? Do you see that?
13 A. It's 549.48.
14 Q. I'm seeing 590.46 gross pay on July 14th.
15 A. I have 549.48. Which employee are you looking at?
16 Q. Oh, you're on the second page. You're right. I'm
17    looking on the wrong page because that's not Chad
18    McFarlin. So we're looking at the second page of
19    this. It's TWE0246. You're absolutely right. For
20    July 14th we've got 549.48 you're saying --
21 A. Yes.
22 Q. -- is the number on Exhibit 22 for that payroll
23    period, right?
24 A. Yes.
25 Q. That's the gross pay. And the gross pay -- can you

Page 55

1  tell me which numbers on Exhibit 25 correspond to
2  that gross pay number.
3  A. I would have to look at a calendar because the check
4  date would be the Thursday after the pay period
5  ended and then it would go back.
6  Q. The pay period ends on?
7  A. On Sunday.
8  Q. So four days after?
9  A. So that would be the 10th. So it would have been
10 week nine and week 10 on page 669.
11 Q. So the 165.95 and the 213.85 numbers are a part of
12 that gross pay?
13 A. Yes.
14 Q. And then also the credit card tips that were
15 reported as 60.22 and 109.74 are also a part of that
16 gross pay, right?
17 A. Yes.
18 Q. And then in Exhibit 25 there's a column for comp
19    that we talked a lot about. It's the delivery fee
20    money, right?
21 A. Yes.
22 Q. And remind me. I just read through the transcript
23    for the prior deps last night. That's kind of all
24    the delivery fee money except Laingsburg does not
25    show up on there?

Page 56

1  A. Correct.
2  Q. And the only way to get an accounting for the
3     Laingsburg delivery fee is by looking at the
4     actually delivery addresses?
5  A. Yes.
6  Q. So back to this. Exhibit 25, the comp for week nine
7     and week 10, those numbers 31.50 and $48 are not a
8     part of this gross number --
9  A. Correct.
10 Q. -- that's recorded on Exhibit 22; is that right?
11 A. Yes.
12 Q. And those delivery fee numbers don't show up
13    anywhere on this Exhibit 22; is that right?
14 A. Right.
15 Q. Well, let's see if it's the same thing. If we take
16    Exhibit 20 now and look at your calculations, the
17    curious question there that reminded me when I asked
18    the other question, the delivery fees for
19    Laingsburg, did you take those into account when you
20    made this new spreadsheet thing?
21 A. Yes.
22 Q. And you did that again by looking at the actual
23    addresses and trying to figure out well, if it's in
24    Laingsburg we assume he got that extra pay for that,
25    correct?



Page 57

1  A.  Yes.
2  Q.  So this is the pay period for July 14th.  Driver
3     commission paid, we have $85 here.  It's not on
4     Exhibit 22.  We've established that.  And on Exhibit
5     25 for those two weeks you have $48 plus 31.50 is
6     79.50 that shows up on Exhibit 25.  And would I be
7     correct in assuming that the difference between
8     79.50 that shows up on there and the $85 that you
9     have on your spreadsheet you created, Exhibit 20, is
10     because of the Laingsburg deliveries?
11  A.  Yes.
12  Q.  Cool.  So we've talked about all these payment
13     components really on all these exhibits, but I'll
14     focus on Exhibit 20.  All these different components
15     of compensation that you testified, is there any
16     particular one of them that the defendant can point
17     to as intended to reasonably compensate delivery
18     drivers for the expenses incurred in driving their
19     cars?
20  A.  It is all a package deal.
21        MR. BLANCHARD:  Thanks.  I don't have anything
22     further.  Do you want to follow-up?
23        MR. THEUER:  No.  I think I have nothing.
24            ** ** ** ** **
25        (Deposition concluded at 3:36 p.m.)

Page 58

1  STATE OF MICHIGAN    )
                        ) ss.
2  COUNTY OF OAKLAND    )
3            CERTIFICATE OF NOTARY PUBLIC
                AND COURT REPORTER
4
5        I, BARBARA PHILLIPS, Notary Public in
6     and for the County of Oakland, State of
7     Michigan, do hereby certify that the witness
8     whose attached deposition was taken before me
9     was first duly sworn to testify to the truth,
10     the whole truth and nothing but the truth;
11     that thereupon the foregoing questions were
12     asked and the foregoing answers were made by
13     the witness, which were duly recorded by me
14     electronically; and were reduced to
15     typewritten form by computer-aided
16     transcription under my direction; and that
17     this is, to the best of my knowledge and
18     belief, a true and correct transcript of my
19     electronic records so taken.
20        I further certify that I am neither of
21     counsel to either party, nor interested in the
22     events of this cause.
23     _Barbara Ann Phillips_
24     Barbara Phillips, #5598
       Notary Public, Oakland County, MI
25     My Commission Expires:  11-27-2018

