**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          IN THE EASTERN DISTRICT OF MICHIGAN
 2                 SOUTHERN DIVISION
 3   CHAD McFARLIN, individually
 4   and on behalf of all
 5   similarly situated persons,
 6         Plaintiff,
 7      -v-                   No. 2:16-cv-12536
 8                            Hon. Gershwin A. Drain
 9   THE WORD ENTERPRISES, LLC,
10   et al.,
11         Defendants.
12   _____/
13   PAGE 1 TO 80
14
15        The deposition of MICHELE FOLLMAN,
16        Taken at 221 North Main Street, Suite 300,
17        Ann Arbor, Michigan,
18        Commencing at 1:20 p.m.,
19        Monday, June 19, 2017,
20        Before Cheryl McDowell, CSR-2662, RPR.
21
22
23
24
25
```

**Page 2**

```
 1   APPEARANCES:
 2   MS. TIFFANY R. ELLIS - P81456
 3   Blanchard & Walker PLLC
 4   221 North Main Street, Suite 300
 5   Ann Arbor, Michigan  48104
 6   (734) 619-0970
 7   tiffanyrellis@gmail.com
 8        Appearing on behalf of the Plaintiff.
 9
10   MR. JEFFREY S. THEUER - P44161
11   Loomis Ewert Parsley Davis & Gotting PC
12   124 West Allegan Street, Suite 700
13   Lansing, Michigan  48933
14   (517) 482-2400
15   jstheuer@loomislaw.com
16        Appearing on behalf of the Defendants.
17
     ALSO PRESENT:  MR. KEVIN DITTRICH
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              TABLE OF CONTENTS
 2   Witness                                   Page
 3   MICHELE FOLLMAN
 4
 5   EXAMINATION BY MS. ELLIS:                   4
 6
 7                 EXHIBITS
 8   Exhibit                                   Page
 9   DEPOSITION EXHIBIT NO. 6                    4
10   Employee Handbook
11   DEPOSITION EXHIBIT NO. 7                    4
12   Minimum Wage Notice to Tipped Employees
13   DEPOSITION EXHIBIT NO. 11                   4
14   Conditional Employee or
     Food Employee Reporting Agreement
15
     DEPOSITION EXHIBIT NO. 12                   4
16
     Summary Report for Andrew Wilson
17
     DEPOSITION EXHIBIT NO. 13                   4
18
     Daily Delivery Orders
19
     DEPOSITION EXHIBIT NO. 14                  58
20
     The Word Enterprises, LLC Employee List - Condensed
21
     DEPOSITION EXHIBIT NO. 15                  67
22
     State of Michigan New Hire Reporting Form
23
24        (Exhibits attached to transcript.)
25
```

**Page 4**

```
 1   Ann Arbor, Michigan
 2   Monday, June 19, 2017
 3   About 1:20 p.m.
 4         (Deposition Exhibits Nos. 6, 7, 11, 12,
 5         and 13 premarked and attached.)
 6             MICHELE FOLLMAN,
 7   having first been duly sworn, was examined and testified
 8   on her oath as follows:
 9   EXAMINATION BY MS. ELLIS:
10   Q.  Could you please state your name for the record?
11   A.  Michele Follman.
12   Q.  What is your address?
13   A.  3777 Bath Road, Perry, Michigan, 48872.
14   Q.  What's your home telephone number?
15   A.  (989) 225-2408.
16   Q.  Your work address?
17   A.  3058 West Britton Road, Perry, Michigan, 48872.
18   Q.  Is that a Hungry Howie's location?
19   A.  Yes.
20   Q.  Is that the Perry, the Hungry Howie's location owned
21       by The Word Enterprises-Perry?
22   A.  Yes.
23   Q.  Who is your employer?
24   A.  Kevin Dittrich.
25   Q.  Who do you receive payments from?
```



Page 25
1  Q.  What about the Haslett location, how many drivers
2      would you say are on average employed there?
3  A.  Per day or just employed altogether?
4  Q.  Altogether first.
5  A.  Five or six.
6  Q.  Does it change per day?
7  A.  Yes.
8  Q.  Based on what?
9  A.  Sales.
10 Q.  Some days are busier than others?
11 A.  Yes.
12 Q.  Fridays and Saturdays are busier?
13 A.  Yes.
14 Q.  Other days, which other days might be busy?
15 A.  Thursdays and Sundays.
16 Q.  So Thursday through Sunday are busier than Monday
17     through Wednesday?
18 A.  Yes.
19 Q.  You have more drivers on staff then?
20 A.  Yes.
21 Q.  What about in the Perry location, how many drivers
22     would you have altogether there on average?
23 A.  Eight to nine.
24 Q.  Would it be -- would the busyness of the days be the
25     same for the Perry location as the Haslett location?

Page 26
1  A.  Yes.
2  Q.  What about the St. Johns location, how many delivery
3      drivers would you have had on average there?
4  A.  Four.
5  Q.  And why would there be more in the Perry location
6      versus Haslett or St. Johns?
7  A.  More sales.
8  Q.  More people deliver or more people order pizzas from
9      that location?
10 A.  Yes.
11 Q.  Would it have anything to do with the size of the
12     delivery area?
13 A.  Yes.
14 Q.  Because Perry has a bigger delivery area than the
15     other two stores?
16 A.  Yes.
17 Q.  Why would that matter?
18 A.  So we can get our deliveries out quicker, we would
19     have more on staff with the bigger delivery area.
20 Q.  It takes longer in Perry to delivery a pizza than it
21     would in Haslett or St. Johns, in other words?
22 A.  Depending on the delivery.
23 Q.  But it could?
24 A.  Yes.
25 Q.  Are you familiar with the process by which drivers are

Page 27
1      assigned deliveries?
2  A.  Yes.
3  Q.  How does that happen?
4  A.  There is a delivery dispatch screen.  The deliveries
5      show up on one side, the drivers available are on the
6      other side.
7          They will pick their deliveries starting
8      with the top one, and then if there's any that go with
9      it in that time frame, they click them to dispatch
10     into their name, and the computer says they have taken
11     those deliveries.
12 Q.  So let's back up for a second.  When a driver comes
13     into work --
14 A.  Uh-huh.
15 Q.  Yes.  He or she checks in to the computer, is that
16     right?
17 A.  Yes.  They clock in.
18 Q.  They clock in.
19         Is that using the Revention System?
20 A.  Yes.
21 Q.  What does that person do then, wait for a delivery?
22 A.  Yes.
23 Q.  Does that person work as a cook?
24 A.  No.
25 Q.  They just sit and wait?

Page 28
1  A.  No.
2  Q.  What do they do?
3  A.  They will do dough, cleaning, any prep that we have.
4  Q.  And they're called an insider when they're doing those
5      things?
6  A.  Yes.
7  Q.  When they're an insider, are they paid at a different
8      rate than they are as an outsider?
9  A.  Yes.
10 Q.  How does the computer -- do they designate on the
11     computer what they're doing?
12 A.  The computer calculates it as a driver-in, driver-out
13     calculation.  When they dispatch a delivery, it
14     automatically puts them into the driver-out at the
15     lower rate, and as soon as they come back in and
16     return from that delivery, it puts them back into the
17     driver-in rate.
18 Q.  So the driver-in rate is the minimum wage, right?
19 A.  Yes.
20 Q.  It's always the minimum wage?
21 A.  Yes.
22 Q.  In all stores?
23 A.  Correct.
24 Q.  And let's just for the sake of the record be clear.
25     When I'm asking you these questions about driver



Page 29

 1   practices, are these the same practices that are
 2   followed at the Haslett, the Perry, and the St. Johns
 3   stores, all three?
 4   A.  Yes.
 5   Q.  And if they're at any time different among the three,
 6       you'll tell me, right?
 7   A.  Yes.
 8   Q.  So the driver clocks in and is classified as an
 9       insider?
10   A.  Yes.
11   Q.  And then the driver will look at the screen when a
12       delivery comes in, correct?
13   A.  Yes.
14   Q.  And how do they know that a delivery has come in?
15   A.  They pop up on the dispatch screen.
16   Q.  Is there a separate computer just for drivers?
17   A.  Yes.
18   Q.  And they're responsible for monitoring it when they're
19       in that location?
20   A.  Yes.
21   Q.  What if there's more than one driver on at the same
22       time.  How do they determine who takes the delivery
23       out?
24   A.  The computer puts the first or the last -- whoever is
25       at the top of the screen on the list of drivers is the

Page 30

 1   next one to take the next delivery, and then once they
 2   take that delivery, they move to the bottom of the
 3   screen and then the next person moves to the top, and
 4   then it would be their turn to take the next delivery.
 5   Q.  So there's a queue of drivers?
 6   A.  Yes.
 7   Q.  So the computer system Revention assigns drivers to
 8       deliveries based on that queue?
 9   A.  No.  It says this driver is the next one out, but it
10       does not assign the deliveries to them.  They assign
11       the deliveries to themselves.
12   Q.  So it notifies them that that should be their
13       delivery?
14   A.  It's just, it's just on the screen.  If they're at the
15       top of the list, whatever that first delivery is is
16       the next one to go out, and it would be theirs.  It
17       doesn't notify them necessarily.  It just is there.
18   Q.  So if a delivery comes up, first delivery of the day,
19       to 123 Main Street and there's one delivery driver
20       there, Joe Smith, it would assign that delivery to Joe
21       Smith, right?
22   A.  He would assign it to himself.  He dispatches, what we
23       call dispatch.  So when the order is ready to leave
24       the store, they highlight the order, highlight their
25       name, hit dispatch which means they're leaving the

Page 31

 1   store.
 2   Q.  So it would suggest that that driver be the one to
 3       take it?
 4   A.  Yes.
 5   Q.  A different driver could potentially dispatch the
 6       order?
 7   A.  Yes.
 8   Q.  And then when they hit dispatch, does that mean that
 9       they will start accumulating time at a different rate
10       of pay?
11   A.  Yes.
12   Q.  What is that rate of pay, do you know?
13   A.  Five dollars per hour.
14   Q.  Do you know how long it's been that rate?
15   A.  Since September 1st, 2014.
16   Q.  And what was it before that?
17   A.  Minimum wage straight time.  They were not -- they did
18       not have two different pay rates before that.
19   Q.  They were paid at minimum wage prior to September 1,
20       2014?
21   A.  Yes.
22   Q.  And on September 1, 2014, they began splitting their
23       time?
24   A.  Yes.
25   Q.  Were you involved in that decision?

Page 32

 1   A.  Yes.
 2   Q.  And why was that change made?
 3   A.  Minimum wage was going up.  To help with labor costs,
 4       we made the decision to do what most other businesses
 5       in this category were doing and do the split wage.
 6   Q.  When you say split wage, what do you mean?
 7   A.  The split to where if they're inside the store, they
 8       get the minimum wage.  If they're on the road, they
 9       get the five dollars per hour.
10   Q.  They were paid more than five dollars an hour, though,
11       right?
12   A.  Yes.
13   Q.  Would they -- I mean, they have to be paid minimum
14       wage, right?
15   A.  Yes.
16   Q.  Why wouldn't -- how would they get paid minimum wage
17       based on the five dollar per hour out wage?
18   A.  They're compensated seventy-five cents per delivery
19       run in Perry.  When they take a Laingsburg delivery,
20       they're given an extra dollar.
21           And then they also receive tips in the form
22       of credit cards or cash.
23   Q.  And then for the St. Johns location, was that a
24       seventy-five cent per delivery reimbursement as well?
25   A.  Yes, yes.



Page 53

1  Q.  What is it?
2  A.  Our employee handbook.
3  Q.  Has this been the same employee handbook that has been
4      used since you began working for defendants in 2011?
5  A.  Yes.
6  Q.  Are you aware if it's changed at any point over time?
7  A.  No.
8  Q.  You're not -- has it changed or you're not aware?
9  A.  I'm not aware of any changes.
10 Q.  Would you be aware of them as the area director?
11 A.  Yes.
12 Q.  Are you aware of any changes that have been
13     implemented in this handbook since you became area
14     director?
15 A.  No.
16 Q.  Okay.  I'll direct you to page Bates number page 9 and
17     10.
18         You see the delivery personnel
19     responsibilities, right?  Do you see that number two
20     requires delivery personnel to provide proof of title,
21     registration, and insurance with a valid driver's
22     license to the store manager, right?
23 A.  Yes.
24 Q.  Does number two and the rest of the items in this
25     section, delivery personnel responsibilities, reflect

Page 54

1      your understanding of the requirements to be a
2      delivery driver at any of the three Hungry Howie's
3      locations we've discussed?
4  A.  Yes.
5  Q.  Are you aware of any additional documents besides
6      what's listed here that are provided to delivery
7      drivers specific to their responsibilities?
8  A.  No.
9  Q.  Are you aware if there -- have there ever been any
10     documents since you've been area director in addition
11     to this that have been supplied to delivery drivers?
12 A.  No.
13 Q.  Has there ever been discussion of supplying any
14     additional documents to delivery drivers?
15 A.  No.
16 Q.  How do delivery drivers find out about the driver's
17     compensation rate we discussed earlier when they're
18     hired?
19 A.  We talk about it in an interview and also on their
20     first day.
21 Q.  You don't give it to them in writing?
22 A.  No.
23 Q.  Why not?
24 A.  I don't know.
25 Q.  Handing you Exhibit 7, are you familiar with this

Page 55

1      document?
2  A.  Yes.
3  Q.  What is it?
4  A.  Minimum Wage Notice to Tipped Employees.
5  Q.  Is this a document that you understand is supplied to
6      all employees of the Hungry Howie's locations owned by
7      The Word Enterprises?
8  A.  It is posted in the store.
9  Q.  It's posted in the store?
10 A.  Yes.
11 Q.  Is it also given to employees?
12 A.  No.
13 Q.  Is this posted in The Word Enterprises in Haslett?
14 A.  Yes.
15 Q.  And Perry?
16 A.  Yes.
17 Q.  Was it in St. Johns?
18 A.  Yes.
19 Q.  Has it been the same since you've been the area
20     director starting in 2011?
21 A.  It's been the same since September 1st of 2014.
22 Q.  And prior to that was there a similar minimum wage
23     notice with a different minimum wage rate?
24 A.  No.
25 Q.  Because prior to that, everyone was paid a flat rate?

Page 56

1  A.  Yes.
2  Q.  And who developed this sheet?
3  A.  I'm not sure.
4  Q.  Who signed management here?
5  A.  I don't know.
6  Q.  Did you sign it?
7  A.  No.
8  Q.  Do you know if Kevin Dittrich signed it?
9  A.  No.
10 Q.  Do you know of anybody else that would have signed
11     this as management?
12 A.  No.
13 Q.  Are there any -- is there anyone else besides you, a
14     general manager of a store, and Kevin Dittrich that
15     may be considered management of any of the Hungry
16     Howie's locations we've discussed?
17 A.  Management is a general term.  So it could have been a
18     number of assistant managers.
19         Someone, I just made a copy of a sheet, so
20     it could have been someone just writing management on
21     there.  I don't know that it's necessarily a
22     signature.
23 Q.  You made a copy of this sheet, you mean when this
24     document was produced?
25 A.  Yes.



Page 77

1 locations that we have not discussed here today?
2 A. No.
3 Q. Are you aware of any freestanding dress code that we
4    have not discussed here today?
5 A. No.
6 Q. Are you aware of any handbook besides that Exhibit 6
7    that we discussed earlier today?
8 A. No.
9 Q. Are you aware of any additional driver's rules and
10    policies besides that included in the employee
11    handbook that we have not discussed today?
12 A. No.
13 Q. Do you know why you would have an employee sign this
14    if those documents don't exist?
15        MR. THEUER: I'll object to the form of the
16    question.
17        But go ahead and answer if you can.
18        THE WITNESS: I don't know. All that
19    information is included in the employee handbook. So
20    I'm not sure why it has it listed as four separate
21    entities.
22 BY MS. ELLIS:
23 Q. On TWE30, this is a Receipt of Employee Handbook and
24    Acknowledgment of Employment Terms?
25 A. Uh-huh.

Page 78

1 Q. Yes?
2 A. Yes. Sorry.
3 Q. Employee Orientation Checklist.
4    Are employees given an orientation when
5    they are hired?
6 A. Yes.
7 Q. Who does that?
8 A. Myself or a manager.
9 Q. Are these topics one through nine topics that are
10    covered verbally?
11 A. Yes.
12 Q. Are there any written materials that are part of items
13    provided to these employees?
14 A. The handbook.
15 Q. Are there any written materials that are provided to
16    employees on these topics?
17 A. No.
18 Q. Is there any additional training that's given to
19    drivers besides that which is listed on this Employee
20    Orientation Checklist?
21 A. No.
22        MS. ELLIS: Okay. I'll just reserve the
23    right to continue the deposition upon production of
24    additional documents that Mr. Dittrich mentioned
25    before, if necessary.

Page 79

1        MR. THEUER: I acknowledge the request.
2        MS. ELLIS: No further questions at this
3    time.
4        MR. THEUER: I've got no questions, either.
5
6        (Deposition concluded at 2:58 p.m.)

Page 80

1 STATE OF MICHIGAN    )
                       )SS.
2 COUNTY OF LIVINGSTON )
3        CERTIFICATE OF NOTARY PUBLIC
4            I certify that this transcript
5    is a complete, true, and correct record of the
6    testimony of the deponent to the best of my ability
7    taken on Monday, June 19, 2017.
8            I also certify that prior to
9    taking this deposition, the witness was duly sworn by
10   me to tell the truth.
11           I also certify that I am not a
12   relative or employee of a party, or a relative or
13   employee of an attorney for a party, have a contract
14   with a party, or am financially interested in the
15   action.



Cheryl McDowell, CSR-2662, RPR
Notary Public, Livingston County
State of Michigan
Commission Expires September 13, 2019