# Martin v. Petroleum Sales, Inc.

United States District Court for the Western District of Tennessee, Western Division

July 9, 1992, Decided ; July 9, 1992, Filed; July 15, 1992, Entered

No. 90-2453-4A

**Reporter**
1992 U.S. Dist. LEXIS 21339 *; 124 Lab. Cas. (CCH) P35,750; 1 Wage & Hour Cas. 2d (BNA) 363

LYNN MARTIN, Secretary of Labor, United States Department of Labor, Plaintiff, v. PETROLEUM SALES, INC.; WILLIAM D. FLOWERS, President of Petroleum Sales, Inc.; and WILLIAM DALLAS FLOWERS, JR., Defendants.

**Counsel:** [*1] For LYNN MARTIN, Secretary of Labor, U. S. Department of Labor, plaintiff: Theresa Ball, Esq., OFFICE OF THE SOLICITOR, U. S. Department of Labor, 2002 Richard Jones Road, Ste. B-201, Nashville, TN 37215, 615 781-5328.

For PETROLEUM SALES, INC, WILLIAM D. FLOWERS, WILLIAM DALLAS FLOWERS, JR., defendants: Walter L. Evans, Esq., EVANS & KYLES, 200 Jefferson Avenue, Ste. 850, Memphis, TN 38103, 901 522-1200.

**Judges:** McRAE

**Opinion by:** ROBERT M. McRAE

# Opinion

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Secretary of Labor, hereinafter the Secretary or plaintiff, filed the complaint in which the relief sought is to determine if defendants violated the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 201, *et seq.*), hereinafter the Act. In support of the complaint, the plaintiff contends that the defendants, since 1987, had violated and continued to violate the minimum wage, overtime and record-keeping provisions of the Act.

Prior to the date set for a preliminary injunction hearing, a Consent Order on Application for Preliminary Injunction was signed by the parties, William D. Flowers, Sr. and William D. Flowers, Jr., as individual defendants and the corporate defendant. [*2] This Consent Order was entered on the docket sheet on July 20, 1990. It provided, in relevant part, that the defendants were restrained from deducting shortages and other losses such as uncollectible credit card sales, from the wages of any employee in a non-overtime week in which such deductions would reduce the employee's rate of pay below $ 3.80 an hour. It further restrained the defendants from deducting such shortages from any employee in any workweek in which the employee worked more than 40 hours. The Order further restrained the defendants from failing to compensate employees at rates required by the Act for pre-shift and post-shift work, training periods and other time devoted to the employers business. The Order also specifically enjoined the defendants from failing to pay overtime compensation to store managers where deductions had been made from the pay of store managers for shortages or other items. The defendants were also required to maintain adequate and accurate records of all hours worked each workday and all hours worked each workweek by each of their employees.

At the eight-day trial of this case, forty-six witnesses were called consisting of forty of the [*3] defendants' former employees, three Department of Labor employees of the Wage-Hour Division, each of the individual defendants, and one former employee of Shelby Bank.

This ruling has been delayed because counsel for plaintiff ordered the entire transcript and prepared forty pages of proposed Findings of Fact and Conclusions of Law which were completed when an Amendment was filed May 20, 1992.

The Findings of Fact, due to the peculiar facts and circumstances of this case, in some particulars must be approximate. The defendants operated the six outlets with insufficient employees who were inexperienced and inadequately trained. The individual defendants as corporate officers adopted policies that shortages and company losses from inventory were the responsibility of the shift employees or the managers. Consequently, policies were adopted whereby deductions were made from the employees' pay. In some cases, there were no

pay checks given for the week's work. Similarly, some managers gave orders not to record overtime and to falsify the poorly kept time sheets. There was an extremely large turnover among the employees and some of the managers did not fully comply with all of the **[*4]** unlawful policies. The attorneys for the plaintiff in some instances have shown such eagerness and zeal to prosecute the defendants that they have applied facts and circumstances which are peculiar to some persons, to all employees in the same group. This has made the fact finding very difficult, particularly on the issue of failure to pay the amounts due under the Act as overtime.

### FINDINGS OF FACT

1. The corporate defendant, Petroleum Sales, Inc., was incorporated in 1986, and since that time, has done business solely in Shelby County, Tennessee. The defendant corporation has been engaged in the operation of gasoline self service and convenience stores (hereinafter "outlets" or "stores").

2. At the main office, the company received all the daily reports for all the business locations, prepared payrolls and paperwork for all locations, and conducted business for the company. It also maintained records at that location. APO [1]

**[*5]** 3. The six outlets operated by the defendants are the Germantown Commons, Bartlett Amoco, Kirby Gate Amoco, Sycamore View Amoco, Poplar Amoco and Winchester Amoco.

4. Each of the outlets was engaged in the sale of gasoline, food, beverages, cigarettes and miscellaneous items. Employees working at each of these locations regularly handled goods and materials that had been moved in and produced for commerce in states other than Tennessee and which are shipped to Tennessee and sold by the defendants at their various store locations.

5. At all times relevant to this action, William D. Flowers has been president of Petroleum Sales, Inc. He has actively managed the operation of Petroleum Sales, Inc., directed the policies of the company, determined wage rates, and has acted directly and indirectly in the interest of the aforesaid corporation in relation to its employees and is an employer within the meaning of § 3(d) of the Act. APO

---

[1] Hereinafter Exhibit will be "Ex.", Transcript will be "Tr." and Agreed Pretrial Order will be "APO."

6. The defendant, William Dallas Flowers, Jr., at all times relevant to this action, has been vice-president. He also has actively managed Petroleum Sales, Inc., including determining of wage rates, directing or company personnel and payroll policy. He **[*6]** has acted directly and indirectly in the interest of Petroleum Sales, Inc. in relation to its employees and is an employer within the meaning of § 3(d) of the Act. APO

7. William D. (Bill) Flowers is the father of William Dallas Flowers, Jr. (also called Dallas Flowers). The two defendants are co-owners of Petroleum Sales, Inc., each having a 50% interest. Tr. 338.

8. A typical day shift at one of the outlets had about $ 2,000 in cash business, the evening shift about $ 3,000 and the night shift about $ 600 to $ 700 in business. The outlets have over $ 100,000 in gas pumped each month. Tr. 294. Only one cashier was on duty each shift, with the exception of one outlet which had two cashiers and registers for several weeks in 1989. Tr. 299.

9. Stores were frequently shorthanded, and the single cashier on duty frequently found it difficult to wait on customers in the store, watch inventory, monitor the gas pumps and perform shift and closing duties required by the defendants. The defendants also expected the cashiers to perform other duties in addition to waiting on customers. Ex. 30. These duties were variously cleaning restrooms and floors, emptying trash, stocking food **[*7]** and other inventory, making ice, cleaning windows, completing the counts of cigarettes and beer before and after shifts, cleaning fast food machines and counters, counting cash, clearing the cash register, and preparing shift reports. The closing cashier, that is the cashier working the shift ending at 7 or 8 a.m., had more of those additional duties because that was the shift with less customers than the other two. Ex. 20.

10. The payroll checks for all cashiers were issued through the main office. Dallas or Bill Flowers signed all payroll checks. Tr. 1395. Bill Flowers visited each of the stores several times each week to check on operations, Tr. 922, 1600, as did Dallas Flowers. Tr. 57, 69, 726. Both gave instructions directly to area supervisor, store managers and cashiers. Bill Flowers, about one per month, called store employees and had them hold their "drops" [2] out of the safe so he could come and get

---

[2] The term "drops" means a procedure wherein store managers were required to put money and checks in a safe by dropping them through a slot. These drops were collected by the area supervisor or one of the Flowers.

some money. Tr. 316.

[*8] 11. Bill and Dallas Flowers hired some employees themselves, but the area supervisor was generally responsible for hiring. Tr. 350. The store managers were responsible to the area supervisor who was responsible to Bill or Dallas Flowers. Tr. 1545. The Messrs. Flowers communicated and agreed on company policies; however, when one was on vacation, the other handled matters for him and stayed in contact every day. Tr. 315.

**DEDUCTION POLICIES**

12. On several occasions, Ollie Conner, the area supervisor, went to outlets at Bill Flowers' direction and picked up several thousand dollars in cash, delivered the cash to Bill's brother on a Friday night or Saturday morning, and had it returned to her on Sunday evening for deposit to the company by Bill's brother. Tr. 393. Bill Flowers would occasionally order Ollie Conner to pick up a thousand dollars, cash, from one of the stores and leave it on his desk after lunch. Tr. 394. Bill Flowers visited stores on occasion, operated the cash register and gave employees directions, such as ordering them to stock coolers. Tr. 462.

13. The company policies of deducting alleged cash and cigarette shortages, shift shortages, drive-offs, incorrectly [*9] processed credit card charges, bad checks from customers, beer shortages, penalties for failure to complete shift duties or paperwork properly were implemented by Dallas Flowers. Tr. 216, 221, 224, 230, 232, 234, 1607. Bill Flowers "was constantly on Dallas to put in the systems that were all set to reduce . . . shrinkage" (Tr. 1548) and "constantly badgering Dallas to put systems in that would protect the corporation from . . . loss." Tr. 1549. Bill Flowers further acknowledged that some "overkill" might have been involved in deductions from wages. Tr. 1549.

14. The defendants had formal, written policies for these deductions. All store managers and cashiers were required to sign a document (Ex. 11) stating that ". . . all shortages that cannot be balanced out at the end of the day are to be deducted from the cashier's paycheck this includes shortages as a result of mistakes and carelessness. Credit card errors which are uncollectible by our office staff are also to be deducted. . . . This also goes for SVB slips that don't have the complete account number. . . ." Tr. 210-215. Employees were required to sign an acknowledgement that a deduction would be made from wages where [*10] customer credit cards were used for purchases and a complete car tag number was not on the slip. Ex. 21; Tr. 244. Some of these deductions occurred whether or not the credit card company paid the charge. Tr. 247. Memoranda from the defendants reflect deductions from wages were made when customers drove off without paying for gas ("drive-offs"). Ex. 22, 23. At various times, drive-offs in excess of two per month, and those where no tag number or report was filed were deducted. Beer inventory shortages were to be deducted from employee wages. Ex. 33. Where credit card micro slips were no processed correctly or did not imprint, the amount of the purchase was deducted from wages. Ex. 24, 25. [3] Over-rings on the cash register where not processed properly were deducted. Ex. 27; Tr. 281. Deductions were taken from managers' wages for failure to return beepers and keys. Ex. 16. The company deducted penalties from wages where an employee failed to complete listed shift duties. Ex. 30; Tr. 300. The company would also reduce the rate of pay of the employee to minimum wage for the entire shift or pay period for this. Tr. 300, 241. Deductions were made from store managers' wages [*11] for any discrepancies in their change funds. Tr. 232, 233; Ex. 16.

15. When a new employee was being trained at a store, errors were frequent. Tr. 359. In some cases, where a shortage or other error occurred during such a shift, half was deducted from the wages of the manager and half from the new employee. Tr. 401, 460.

16. The cashier was ordered to stay with the register at all times unless the store was emptied of customers and the door was locked; however, because of the location of soft drink machines, other equipment and inventory, the cashier could not observe all of the gas pumps from where the cash register was located. Tr. 253. This prevented getting tag numbers of some drive-off [*12] vehicles, especially during the very busy afternoon shift when most drive-offs occurred. Tr. 253. In spite of the fact drive-offs were a common occurrence at the stores, the defendants continued to deduct the amount of the theft from wages. Tr. 253.

17. Cashiers were required to manually count beer inventory during and after their shift. Each store

---

[3] The employer had a cumbersome process whereby the employee could apply for reimbursement of the micro deduction after 90 days *if* the employee submitted the shift sheet for the deduction period, collected the credit card sum, provided a copy of the micro and made a trip to the office to get the refund.; Tr. 1380, 1441.

maintained about 1,200 bottles and cans of beer. Tr. 239. Customers would sometimes grab beer and run. Tr. 401. Any shortages were deducted from the pay of the cashier determined to be short.

18. Cashiers had to manually count 1,500 to 2,000 packages of cigarettes in opened or unopened cartons each shift and report the counts. Tr. 145, 211. They were expected to accomplish their counts between waiting on customers. Tr. 212. Shortages sometimes resulted from miscounts by a prior shift. Sometimes cartons counted earlier as full were found to be partially empty. The difference was deducted from the wages of the cashier who made the discovery. Tr. 214. Inventory counts were sometimes altered at the main office, ostensibly to correct them. Cigarette shortages were deducted from the employees' wages at the full retail single [*13] package price. Tr. 716, 740. If an overage occurred in the count, employees were not credited. Tr. 740. Undoubtedly, some of the shortages did in fact occur due to employee malfeasance; however, the system of recovery by the employer was grossly unfair.

19. Most employees had cigarette and other shortages deducted from wages at one time or another. Tr. 215. Store managers frequently had accumulated deductions of the type referred to above taken out of their last paychecks after they quit, instead of on a week-to-week basis. Tr. 216. This sometimes resulted in store managers receiving no wages at all for their last pay period. Melody Slaughter, a manger of one of the stores, called Bill Flowers when she didn't receive her paycheck for the last week she worked. He "cussed her out." When Ms. Slaughter's father called seeking payment of wages to his daughter, Bill Flowers threatened to have his daughter arrested and thrown in jail if he bothered him again about the wages. Tr. 648. In other cases, salaried store managers such as Melody Bell, Melody Slaughter, Cedric Branch, and Robert Bruce had deductions taken from their wages for cigarette and cash shortages on a week-to-week [*14] basis. Tr. 647, 691, 1229.

20. In a few instances, the store managers never had illegal deductions of the type discussed made while they were employed as a store manager. Tr. 668. It is clear, however, that every store manager's salary was *subject to* the shortage and other deductions discussed above. Managers were required to sign documents acknowledging such just as other employees were. Tr. 215, 251, 259, 285, 286; Ex. 11.

21. Each of the six market stores had a safe. Dallas Flowers, Bill Flowers, Michelle Ingram, Susan McMasters and Ollie Conner had keys and access to each of the safes. Tr. 289. The money in the safe was picked up on a daily basis by these people, usually Michelle Ingram, Susan McMasters and Ollie Conner. Tr. 371. Cashiers at each of the six stores kept cash for change in their registers. When more cash was accumulated in the cash drawer than was needed for change (usually $ 100), the cashier placed the money, not to exceed $ 200, in a brown bag, dropped it into the safe and recorded it. Tr. 217. Cash was routinely held out of drops to pay vendors of bread, beer, etc. upon delivery. Tr. 289.

22. The envelopes of the drops were not opened and counted [*15] at the stores. They were taken to the offices of Petroleum Sales, Inc., where they were opened and counted. At a later time, the company initiated the policy of counting the number of drops, not the amount, at the time the drops were picked up by the central office employees. Tr. 1439. Once this policy was initiated, the number of drops was theoretically witnessed by the cashier on duty at the time. However, the cashier was the only person on duty and was required some of the times to wait on customers, operate the cash register or watch the gas pumps at the same time the money was being removed from the safe. Tr. 1439. Each store turned in shift reports which listed the amounts and numbers of each drop. The drops listed on the shift reports were compared to the drops picked up at the offices of Petroleum Sales, Inc. by Michelle Ingram, Susan McMasters and sometimes Ollie Conner. Tr. 372.

23. Cash shortages were claimed as a result of this process. Teresa Betterton-White testified that when she substituted for Ollie Conner as area supervisor while the latter was ill, she observed the counting at the central office. Michelle Ingram would just throw all the money on the desk [*16] ad count it without breaking it out by shift and store. Tr. 858. Betterton-White testified "it was just like she had pulled it out of the air" that this or this person was short. Tr. 858. When the company claimed a shortage in the drops or a missing drop, it was taken in its entirety out of some cashier's or store manager's paycheck. The process so disturbed Betterton-White that she refused to participate either in the counting or the pick up of drops. Tr. 858.

24. The company routinely claimed that drops or cash was missing and deducted it. Managers or cashiers frequently objected, claiming they had taken no money and had made the drops in question. Kim Young

testified after the company had deducted pay for missing drops from her wages several times, she began holding the drops in her register until her shift ended at 7 a.m. and personally delivering them to Ollie Conner at that time when she came to pick up the drops. Tr. 811. She did this to make sure no one claimed a missing drop; however, she was written up by Ollie Conner, the area supervisor, for a violation of company policy.

25. Employees would first be notified of the alleged shortages when they received their **[*17]** reduced paychecks or no pay at all. Tr. 144, 197, 410. At the time they submitted paperwork at the end of the shift, no shortage might be shown but by payday, some shortage or other would be claimed by the company and deducted. Tr. 183, 197. Steven Spurlock worked 52 hours as a cashier the week ending June 19, 1988, and 17 hours the following week. When we received no paycheck for either week, he contacted Ollie Conner. Later, he received $ 14 for the 17-hour week. He next called Dallas Flowers and was told a drop was missing and there were deductions for cigarette shortages. He was also told there was nothing he could do about it. Mr. Spurlock was not told of these deductions or of the allegedly missing drop until he inquired about his pay. Tr. 132-140.

26. Defendants placed no limits on the shortage and other deductions they took. Lisa Stewart presented a pay stub showing a net pay of minus $ .22 for the pay period 2/3/89 when she worked 40-1/2 hours. Ex. 34. Numerous employees testified that their entire paychecks were withheld. Tr. 135, 558, 587, 719, 795, 807, 841, 875, 923, 926, 1021.

27. When cashiers were hired, they were supposed to spend three days working **[*18]** with a store manager or another cashier as training. The new employee was not compensated for these three days if they didn't work a fourth day. Tr. 291. During these days, the new employee worked the cash register, performed cleaning and other duties on the shift sheet (Ex. 30), and learned how to operate certain equipment at the store. Tr. 291, 747, 902.

However, Paula Rankins testified that the defendants put her in a store to work alone after one day's training. She then worked 73 hours in an eight-day period beginning May 4, 1990, for which the defendants refused to pay her because something was missing from the store. Tr. 814. The defendants worked and trained Tammy Fogelman for 28 hours. After she worked 9 hours on the fourth day, she was not paid for any part of the 37 hours because allegedly her money was not in the safe. Tr. 1035, 1038.

28. Susan McMasters, the sister-in-law of Dallas Flowers, was employed by the defendants and worked as an assistant to Michelle Daniels. She worked Monday through Friday on a full-time basis. Tr. 303. She picked up drops and paperwork from the stores and assisted with the bookkeeping at the main office. No records were maintained **[*19]** of her employment, wages, rate of pay, name, social security number, and no withholdings were made for taxes from her wages. Tr. 1070. She was paid in cash by Dallas Flowers. Tr. 303. She was sent out of the office and the desk plaque with her name was removed when the Department of Labor and other visitors were expected at the offices of the defendants. Tr. 305. She received disability payments which appear to have motivated the Flowers to hide her employment. Tr. 303.

29. Although employees were on occasion permitted to work without a drivers license with photo, copy of social security card and beer permit, the company refused to issue a paycheck before these items were furnished. Tr. 389-390. Some employees were never paid for hours worked as a result of this policy. Tr. 390.

30. Each store had a weekly time sheet which was posted. The time sheet was used as both a schedule to show which employee was to work the three shifts each day and as a time sheet. Tr. 298. The company maintained no other record of hours worked. The sheet had an "in" and "out" time for employees. Tr. 298. Ollie Conner stated that cashiers were instructed to put down the actual time they arrived **[*20]** and left (Tr. 298) but that they were not paid for the actual time they put down as worked. She stated that cashiers were not paid for more than a 15-minute overlap with any other employee in one shift. Tr. 295, 299. The operating policy was that two cashiers would not be paid for work at the store at the same time except for 15 minutes at check-in and check-out time. Tr. 289.

31. When employees did write down on the time sheet their true hours worked, frequently all the hours did not show up on their paycheck. Tr. 477. Some stores permitted the cashiers to put no more than 15 minutes beyond their scheduled shift down if they came early or worked late. Tr. 506. Some cashiers were told they could not put time spent on pre- and post-shift duties on the time sheet at all, but just the scheduled time. Tr. 645, 712, 779, 792, 809, 841, 882, 926, 952, 1003, 1012 and 1030. No payment was received for such duty

time by these employees. Tr. 646, 712, 882. Store Manager Minnie Childeress did not permit cashiers at her store to report time worked in excess of their scheduled time. Tr. 674. Other store managers also refused to let cashiers report more than their scheduled hours **[*21]** as worked on their time sheet. Tr. 907.

32. Jackie Matheny, a store manager, received instructions from Ollie Conner and Michelle Ingram that no one was to get over 42 hours a week. Based on these instructions, he reduced time shown on the time sheets. Tr. 746. Ollie Conner reduced the hours employees showed as having worked on their time sheets. Tr. 907. Michelle Ingram also altered hours worked records. Tr. 1402.

33. Employees were never paid for time they did not put down on the time sheets. Tr. 646. While reported hours worked were frequently reduced, none were added or paid for if not on the time sheet. Michelle Ingram testified she never added any time to hours on the time sheet. Tr. 1435. She did, however, admit that she reduced the hours reported by the employees if they overlapped other employees by more than 30 minutes. Tr. 1402, 1409. Ollie Conner had earlier testified that up to a 15-minute overlap was tolerated at the beginning and end of each shift.

34. The employers definitely paid for *some* recorded pre-shift and post-shift time, but significant amounts of unrecorded off-the-clock time was not compensated for pre- and post-shift work.

35. The defendants **[*22]** failed to keep accurate records of the hours worked and have offered no evidence of the approximate amount of time involved. The plaintiff's representative made a calculation of the necessary amount of overtime for duties in changing the shift based upon the testimony at trial of 29 employees. He testified that a total time of 30 minutes overtime per hours was reasonable. Ex. 50; Tr. 1134.

36. Ten salaried store managers out of 34 who worked during the time covered in this action testified concerning their hours of work. Their estimated number of hours worked per week is contained in Ex. 48. The plaintiff's investigator discarded the two highest estimates as not being representative of the group because of unusual circumstances. When considered with the testimony of the area supervisor that she required managers to work a minimum of 48 hours per week (Tr. 353), the 55 hours per week used to calculate overtime compensation due all managers is supported by the record and is reasonable.

37. Defendants' records also showed that numerous employees had worked and not been paid. In some cases, there was no record of the employee's last name. Plaintiff calculated the wages due these **[*23]** employees. Ex. 51; Tr. 1149-60. At the time that this evidence was offered, the Court asked Ms. Ball, one of the attorneys for the plaintiff, "How are you ever going to pay them?" To which she replied, "We won't. I think there is a provision in the event that we cannot contact the employees, the money is deposited to the Treasury." Tr. 1152. Presumably the amounts claimed in Ex. 51 were obtained from Ex. 1 (1 volume for each of the years 1987, 1988, 1989 and 1990). These records are hopelessly inaccurate and unusable to check and verify the amounts claimed for this group of employees who are identified solely by their first names.

The largest amount claimed for the 25 persons referred to in Ex. 51 is $ 242.25 for "Amy." The work sheet which Investigator Baker made from Ex. 1 shows no pay "due to 154 garn Loan +50 ded."; however, Investigator Baker testified that he treated that as a bona fide garnishment and treated the amount owed Amy as the hours worked including overtime with no deduction for a garnishment loan because she had never been paid and had deductions taken from her wages. Tr. 1158-60. (These pages of the transcript show how difficult it is for a trier of fact **[*24]** to try to verify the amounts which the attorneys for the plaintiff claim to be due the employees of the corporate defendant.)

**FACTS RELATED TO OLLIE CONNER DISCHARGE CLAIM**

38. The claim of a retaliatory constructive discharge of Ollie Conner by Bill Flowers is based upon a confrontation between Conner and Bill Flowers at the company offices in August 1990. Therefore, there is a swearing match between the two of them.

She testified that Bill told her that he cold prove that she had talked to someone from the Wage and Hour office and that she had given them documents. She testified that she denied talking to them and giving them any documents. She also testified that she was ordered not to talk to them, and she was to leave work that day, and he would deal with her when Dallas Flowers got back. From this, she decided she was going to be fired the next day so she quit that day. She telephoned her husband and told him to come get her so she could take her company car and keys back. When she went back to take the keys, she was told that Bill wanted to see

her, but she refused to see him or talk to him. Tr. 320-21.

She further testified that about a month or so before, Bill [*25] and Dallas had kept her in the office to discuss with her a report that she had mistreated one of the black employees, Shawn Moore, and had her crying. They wanted to know why, but her testimony on the topic does not indicate her version of why she had Shawn Moore crying. Tr. 322.

The testimony of Bill Flowers places the Shawn Moore confrontation and an accusation by a store manager that Conner had misappropriated a drop of money from one of the outlets on the same day that Conner quit and left her keys.

Bill Flowers testified that he told Conner that he had talked to Shawn Moore who stated that when she and Conner got into a confrontation, Conner made a derogatory racial remark. Bill Flowers testified that he told Conner that he felt that the company was exposed to a possible EEO complaint. He further testified that Conner denied some of the things that were allegedly said; however, Flowers reminded her of the law and company policy and how far she could and could not go. Tr. 1550.

Bill Flowers testified that at the same meeting when the racial incident with Shawn Moore was discussed, he also confronted her with the accusation that Minnie Childeress made to him that Conner [*26] had taken some of the allegedly missing drops into the safe after Conner came and picked up the items in the safe from the Winchester store. Tr. 1550-52. The fact that Minnie Childeress had made a statement reporting that Conner had taken some drops was confirmed by her testimony in a leading question on cross examination. She was asked if she had made the statement to "Dallas," but in a following question she was asked if she addressed "Mr. Flowers" about this. Tr. 677.

Bill Flowers further testified that in his last conversation with Conner, he mentioned that Dallas was not in, that he wanted to talk to Dallas about what had gone on in the meeting and that they would talk to her the next day. He further told Conner that he was sure that Dallas would back him up by their requiring Conner to apologize to Shawn Moore.

According to Bill Flowers' further testimony, a couple of hours later Michelle reported to him that Conner had come to the office window, turned in her key, said she quit and left. Tr. 1552-53.

The Court, as the sole trier or fact, finds that the preponderance of the evidence establishes substantially that Ollie Conner quit for her own reason as opposed to being [*27] constructively discharged.

She was never told nor threatened with being fired for talking to the Labor Department. She denied that she had done so. Therefore, it is more believable that she quit because she thought she would be confronted with whether she was exploiting the employees for her own benefit as well as her employers.

39. The two defendants, Petroleum Sales, Inc. and William Dallas Flowers, Jr., each filed a Chapter 11 Bankruptcy Petition with the United States Bankruptcy Court, Western District of Tennessee, on February 6, 1991. Ex. 37A, 37B, 38A, 38B. The three defendants continued to operate at least two of the stores at the time of the trial.

**FACTS RELATED TO GOOD FAITH AND WILLFULNESS**

40. John Blaine, Assistant District Director, Department of Labor, Wage-Hour Division, first contacted both Dallas and Bill Flowers by phone in early April 1988. The father of a teenager had contacted Mr. Blaine to obtain help in getting the daughter's wages which had been withheld by the defendants. Mr. Blaine informed the Flowers that it was illegal to withhold wages, that they must pay at least $ 3.35 per hour and they could not reduce her wages below $ 3.35 per hour. [*28] The defendants refused to agree to pay or comply in the future. Tr. of 9/6/91, 51-54.

41. On December 14, 1988, David Wynn, Compliance Officer of the Department of Labor, went to the offices of Petroleum Sales, Inc. to conduct an investigation. He informed the Flowers that the Labor Department had information they were making illegal wage deductions. He explained that no shortage or other such deductions could be taken in an overtime week and such deductions could not reduce an employee below the minimum wage rate in a non-overtime week. Tr. 627-628. Flowers asked when the policy about no overtime week deductions came into effect, and Wynn told him the policy had been changed in Memphis on March 15, 1988. The Flowers admitted deducting wages for shortages for drive-offs, cigarettes, etc., but refused to alter their practice. Tr. 628.

42. On January 6, 1989, Mr. Wynn returned to defendants' offices, examined payroll records, and prepared back wage calculations. His examination of

the records confirmed shortage deductions for all employees, including managers, for both overtime and non-overtime weeks, reducing some below a minimum wage rate. Tr. 630-32. He again advised [*29] the Flowers, on each of the three days he was there, that no such deductions were permissible in an overtime week and none reducing employees below minimum wage were permissible otherwise. During this time, he also informed them that their records showed shortages being deducted from salaried managers' salaries, and that no exemption could be claimed where this was done. Tr. 630-31. Defendants were also provided a copy of the pertinent regulations. Tr. 631.

43. On March 21, 1989, John Blaine, David Wynn, Dallas Flowers, and Bill Flowers met at the Wage-Hour office in Memphis. All violations found in the investigation were again reviewed with the Flowers. These included shortage deductions from wages of hourly and salaried employees in overtime weeks, deductions in non-overtime weeks reducing employees below the minimum wage rage, withholding of pay and failing to pay employees for all hours worked. Defendants were again informed it was illegal to make such deductions. The defendants were informed that shortages were a cost of doing business which could not be passed to employees. Tr. 54-57. Defendants were specifically informed that defendants' practice of deduction from [*30] manager wages caused them to lose the entire exemption, not just for the pay period of the deduction. Tr. 57.

44. The defendants promised future compliance with the Act but never paid any back wages. Tr. Sept. 6, 1991, 71. Shortly after entry of the Agreed Preliminary Injunction on July 20, 1991, Dallas Flowers called John Blaine and asked if he could make deductions for a *bona fide* garnishment and was told he could because that is a court-ordered procedure. Tr. 58-59. Blaine told him, however, that classifying repayment of shortages as a garnishment and deducting it was illegal. Flowers asked about employer loans and told Blaine he intended to have employees sign loan documents for shortages. He was told no because no deductions were permitted in an overtime week and none reducing an employee below minimum wage were permitted in a non-overtime week. Tr. 60.

45. Bill Flowers testified he called the Wage-Hour office in early 1987 and was told he could take deductions down to minimum wage. Tr. 1555.

46. The Flowers acknowledged receiving a copy of plaintiff's attorney's letters dated October 22 and 29, 1990, advising their attorney of continued violations of the July 20, [*31] 1990 Order. Ex. 7, 8; Tr. 1595, 1598.

47. The defendants did not rely upon nor follow the instructions or information provided by the Wage-Hour Division to them regarding application of the Act. To the contrary, they elected to disregard deliberately portions of them.

## FACTS RELATED TO THE CONTEMPT CHARGE

48. The Consent Order on Application for Preliminary Injunction was entered on July 20, 1990. The defendants and their attorney signed it; however, the same deductions continued to be made after entry of the Order. Tr. 309. Michelle Ingram, at the instruction of Bill and Dallas Flowers, initiated a "loan program," requiring employees to sign "loan" agreements for shortages agreeing to payroll deductions, or be fired. Tr. 1451. She initiated this shortly after the July 1990 Consent Order was entered. Tr. 1448, 1450. The "loans" represented shortages for cigarettes, cash, customer bad checks, etc. Tr. 1450, 1453. These "loans" were taken out of wages and shown as deductions for loans on the payroll records. Numerous of these "loan" documents were found in defendants' personnel records, all dated post-July 1990, deductions for which reduced employees below rates required [*32] by the Act. Ex. 3; Tr. 1075-94.

49. Some of the "loans" for shortages, after the July 1990 Consent Order were shown on the payroll records as deductions for "garnishment." Ex. 52; Tr. 1454, 1456, 1457. This was done to replace old procedures for deducting shortages. Tr. 1458.

50. In addition to deducting shortages from paychecks as "loans" or "garnishments" after July 1990, the defendants also forced employees to pay alleged shortages to them in cash by dropping the cash into the safe in marked envelope. Tr. 1500, 422, 510, 514, 673. No record was kept where this was done. Tr. 1500.

51. Michelle Ingram prepared a document dated September 2, 1990 (Ex. 39), providing that Petroleum Sales, Inc. would loan cashier Virginia Reed $ 35.82 to be deducted as a loan. The $ 35.82 represented two customer checks accepted by Ms. Reed which were later rejected by the bank. Petroleum Sales, Inc. deducted $ 35.82 from her paycheck dated December 7, 1990 (Tr. 1070), reducing her rate of pay below the then applicable minimum wage for hours worked. Ex. 2.

Virginia Reed testified that the signature on the alleged loan document was not hers and that the name "Virginia" was misspelled on the document. **[*33]** Tr. 162, 173. Her name had been forged on the document by someone without her knowledge.

52. Minnie Childeress was manager at one of the defendants' stores from 1989 until August 16, 1991, two weeks before the trial. On August 9, 1991, Dallas Flowers tried to force her to forge the endorsement of Tanya Reed, her daughter, on Reed's paycheck to repay an allegedly missing drop. Tr. 669-70. Reed had worked 42 hours during the previous week covered by the check. Tr. 670. Several employees, including Bill Flowers, had access to the allegedly missing funds at the store before it was claimed to be missing. Tr. 671. Flowers held the check until the Labor Department was contacted and then he delivered it to Ms. Childeress, stating that ". . . there would be repercussions." Tr. 672.

53. Defendants, after July 1990, did not pay overtime compensation to store managers, did not keep a record of their hours worked nor an accurate record of the hours worked by hourly paid cashiers. They continued to withhold some entire paychecks for shortages.

54. The plaintiff's Proposed Findings of Fact included Appendix "A" which referred to Exhibits 2, 31, 32, 36 and 51. These constituted "Back **[*34]** Wages" and "Liquidated Damages" claimed for the former employees as determined by the calculations of Investigator Baker. The Back Wages and Liquidated Damages totalled $ 130,000.48 for each category.

**SUPPLEMENTAL FINDINGS OF FACT**

On May 20, 1992, the attorneys for the plaintiff filed a Motion to Amend Proposed Findings of Fact and Conclusions of Law based upon an agreement between William Dallas Flowers, Jr., the Petroleum Sales, Inc. and the Secretary of Labor whereby the priority wage claims in the bankruptcy proceedings of Dallas Flowers and the corporate defendant would be paid and would satisfy or partially satisfy some of the claims made in this case in behalf of some of former employees of the corporate defendant. The motion is granted, and the findings of fact are amended in the manner set forth below.

55. By Agreed Order entered in the Bankruptcy cases, William Dallas Flowers, Jr. and Petroleum Sales, Inc. agreed to the minimum wages and overtime compensation (including liquidated damages) due employees for the 90-day priority period from October 23, 1990, to January 23, 1991. Pursuant to Order of the Bankruptcy Court, these sums are being paid to the designated **[*35]** employees and checks have been delivered to the plaintiff for this purpose. The plaintiff no longer requests an injunction against withholding wages or liquidated damages for the period of October 23, 1990, through January 23, 1991, for this reason; however, the remainder of the Secretary's claim remains at issue.

56. Plaintiff's claim for back wages and liquidated damages as set forth in Appendix A to plaintiff's original Proposed Findings of Fact was also amended by the payment of priority wages to read as follows:

Go to table1

57. There is attached to the Amendment to Proposed Findings of Fact of the plaintiff a copy of an Agreed Order Resolving Objections to Motion to Approve Settlement Agreement and Objections to Disclosure Statements filed in the Bankruptcy Court on March 6, 1992 (hereinafter **[*36]** Agreed Order). Attached to the Agreed Order as Exhibit A is a two-page document entitled Priority Wages Earned October 23, 1990 to Close of Business on January 23, 1991, which lists alphabetically the employees and the amount each received as priority wages. The sums paid pursuant to the Agreed Order represent part of the wages and liquidated damages claimed in Ex. 36 (Wages due between October 1, 1990, and January 23, 1991); however, the record does not reflect the remaining amounts due and to which employees listed originally in Ex. 36.

*CONCLUSIONS OF LAW*

1. This Court has jurisdiction because the subject action is within the "police power" exception to the automatic stay in Chapter 11 Bankruptcy proceedings. 11 U.S.C. 362(b)(4), (5).

2. The defendants, at all times relevant herein, have constituted an enterprise engaged in commerce within the meaning of the Act.

3. Defendants, William D. Flowers ("Bill") and William Dallas Flowers, Jr. ("Dallas"), at all times relevant hereto, have been employers within the meaning of § 3(d) of the Act (29 U.S.C. § 203(d). Both admitted this status in their answer **[*37]** and stipulated to it in the APO. Both are employers and, thus, liable jointly and

severally with the corporation under the Act, for unpaid wages. See *Donovan v. Agnew,* 712 F.2d 1509 (1st Cir. 1983); *McLaughlin v. Lunde Truck Sales, Inc.,* 714 F. Supp. 920 (N.D. Ill. 1089).

4. The defendants did not timely nor properly assert the affirmative defense of an exemption claim for store managers. The defendants did not plead the defense or raise it as an issue before trial. They have failed to carry their burden of proving that the store managers were exempt under the Act. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196 (1974); *Walling v. General Industries Co.,* 330 U.S. 545, 548 (1947).

5. The first test requires that the employee be paid on a guaranteed "salary basis" as defined by 29 C.F.R. 541.118. *Walling v. Morris,* 155 F.2d 832 (6th Cir. 1946). The defendants had a well settled and written policy of deducting from managers' pay cash shortages, cigarette and beer shortages, paperwork penalties, drive-offs, credit card processing **[*38]** errors, discrepancies in their change draw. The deductions were accumulated for some managers until they quit and were taken from their last paychecks. Other store managers had the deductions taken on a week-by-week basis. A few of the managers had no actual deductions of this nature taken from their wages. The determining factor is not whether such deductions were actually taken but whether the wages of the manager were *subject to* such deductions. *Knecht v. City of Redwood City,* 683 F. Supp. 1307 (N.D. Cal. 1987). A written policy for such improper deductions defeats the exemption for all employees subject to it. *Martin v. Malcolm Pirnie, Inc.,* 120 Lab. Cas. (CCH) P 35,574 (2d Cir. 1991) (only 24 of the 400 employees in question had actual deductions made from pay, but all were non-exempt).

6. The defendants failed to maintain a record of the hours worked by the store managers in violation of § 11(c) of the Act (29 U.S.C. § 211(c)) and 29 C.F.R. 516. In calculating the overtime compensation,the plaintiff reasonably relied upon the testimony of ten salaried store managers **[*39]** out of the 34 employed by the defendants during the relevant time frame to establish the 55 hours typically worked by such employees.

Where the employer has failed to keep the required records:

> . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, *even though the result only be approximate.* (Emphasis added).

> The employer cannot be beard to complain that the damages lack the exactness and precision of measure that would be possible had he kept records in accordance with the requirements of § 11(c) of the Act. *Anderson v. Mt. Clemens Pottery,* 328 U.S. 680, 687-88 (1946).

7. Defendants failed to produce accurate records concerning **[*40]** work performed by either the cashiers or the salaried store managers. It is not necessary for every affected employee to testify to prove violations or recoup back wages. *Brennan v. General Motors Acceptance Corp.,* 482 F.2d 825, 829 (5th Cir. 1973). Non-testifying employees much be awarded back pay where there is fairly representative testimony of testifying employees. *Martin v. Tony and Susan Alamo Foundation,* 952 F.2d 1050 (8th Cir. 1992).

8. The testimony and evidence of representative employees established proof of a pattern and practice of violation of the Fair Labor Standards Act. See *Donovan v. Simmons Petroleum Corp.,* 725 F.2d 83, 86 (10th Cir. 1983); *Donovan v. Williams Oil Company,* 717 F.2d 503, 504-505 (10th Cir. 1983).

9. As part of the pattern and practice of violations, the plaintiff demonstrated that the hourly paid cashiers employed at defendants' stores worked hours for which they were not compensated. The defendants did not pay for any hours which were not recorded on the shift reports and never added any hours, according to Michelle Ingram. **[*41]** Tr. 1435, 1471. She stated that the company paid for eight and one-half hours per shift, and the cashier could use 15 minutes before and after the shift to check in and out or use all 30 minutes after the shift. Tr. 1399-1400. Ollie Conner claimed the policy was to limit this practice to 15 minutes over scheduled time. Tr. 236. Many times Ms. Ingram, pursuant to instruction by Dallas Flowers, Ollie Conner and store managers reduced hours recorded as "worked" on the time sheets when they considered them excessive. To compound the problem, some cashiers were instructed never to record more time on the sheets than their

actual schedule, and not to record their pre-shift and post-shift working time at all. In at least one store, the manager made all entries on the time sheets and did not record anything but scheduled hours. Tr. 160. When employees had to work an additional full shift or several hours waiting for someone to relieve them, this was usually recorded and paid. While some recorded pre-shift and post-shift time was paid by defendants, none of the unrecorded time was paid. Defendants were able to show, for example, that Alan Adair was paid for one hour as opposed to **[\*42]** one-half hour total for recorded pre- and post-shift work, but plaintiff was able to demonstrate that during the same work week, he was not paid for all hours he recorded on his time sheet. Tr. 1297. Michelle Ingram further testified that, had she noticed at the time, she would have reduced any time shown over 8.5 hours per day to 8.5 and stated if he was paid for more it was a "mistake." Tr. 1474.

10. During the trial, the representative of the plaintiff made a calculation based upon the testimony of 29 cashiers regarding their off-the-clock, uncompensated work and averaged the number of minutes per day they testified to spending in uncompensated work. Ex. 50. This resulted in a total of 30 minutes per eight-hour shift. The payroll records of cashiers employed during the time in question were then examined and the total weekly hours compensated determined for each. Thirty minutes for every eight hours worked was then added to each cashier's weekly total hours worked. Wages received for that week were then examined to determine whether they were sufficient to meet the requirement of §§ 6 and 7 of the Act for all hours worked.

11. In partial response to this proof, the defendants **[\*43]** asserted that the "graveyard" (11:00 p.m. to 7:00 a.m. and 12 midnight to 8:00 a.m.) shift did not involve off-the-clock work. Plaintiff's proof, however, demonstrated that, in addition to an extensive list of regular shift duties (Ex. 30), waiting on customers and monitoring gas pumps, the "graveyard" shift was given a lengthy list of "closing cashier duties" (Ex. 20) to be performed. In some cases, if any duty was not performed before the employee left, the employee's wages were reduced to the minimum wage rate or a fine was deducted from wages. While this shift had fewer customers than the other two, it had more paperwork, much of which could not be completed until after the closing of the shift. Tr. 159. Several people who actually worked this shift testified that they had to stay late to complete paperwork which could not be done until shift change. Tr. 159, 812, 982-985. They had "morning rushes" of customers going to work from 5:00 a.m. to 7:00 a.m. preventing them from doing paperwork and then shift duties until after the end of the shift (Tr. 812, 982-985), and that this time was unrecorded and unpaid. The defendants, therefore, have not established any exception nor **[\*44]** have they shown the hours actually worked. The defendants failed to show the inferences drawn were unreasonable and wages determined due to testifying and non-testifying employees were proper. *Donovan v. New Floridian Hotel, Inc.,* 94 Lab. Cas. (CCH) P 34,194 (11th Cir. 1982).

12. The defendants' deductions from cashier's wages of alleged inventory and cash shortages, credit card charges from customers where there were processing errors, drive-offs, beer and cigarette shortages, penalties for paperwork errors or failing to complete shift duties, including withholding entire paychecks for such, violate the minimum wage and overtime provisions of the Act. *Mayhue's Super Liquor Stores, Inc. v. Hodgson,* 464 F.2d 1196 (5th Cir. 1972); *Brennan v. Haulover Shark & Tarpon Club, Inc.,* 105 Lab. Cas (CCH) P 34,871 (S.D. Fl. 1986).

13. Any "agreement" by an employee to allow such deduction amounts is no more than an attempt to waive violation of the law. Such an agreement is invalid. *Mayhue's Super Liquor Stores, Inc. v. Hodgson,* 464 F.2d 1196, 1199 (5th Cir. 1972); **[\*45]** Wage payments must be made "free and clear" and without "kick-backs" to the employer or to another person for the employer's benefit. 29 C.F.R. 531.35. Such an attempt to shift part of the employer's cost of doing business to the employee is illegal. Protections afforded by the Act may not be waived by agreement between employer and employee. *Tony and Susan Alamo Foundation,* 471 U.S. 290, 302 (1985).

14. In a week in which a cashier worked more than forty hours, no deduction at all may be taken for wages for the alleged shortages, penalties. In overtime weeks, cashiers were entitled to their full regular rate for overtime purposes and could not have had such deductions made without defeating the purpose of § 7 of the Act. This section requires 150% of the regular rate, not the minimum wage, to be paid. *Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572, 577 (1942).

Based upon the entire record, the Court concludes that the calculation of additional overtime at the rate of one-half hour for every eight hours worked is reasonable based upon the proof. It is noted that the defendants are responsible for keeping hopelessly **[\*46]** inaccurate

records and some of the employees have exaggerated their estimate of hours worked while the defendants and some of their employees have minimized the wrongs committed by the defendants and some of their supervisory employees. Therefore, the Court concludes that an award of back pay shall include for all cashiers an additional one-half hour for every eight hours shown on the schedule time sheets. This shall include Alan Adair and all others who claimed and received pre- and post-shift time.

The above one-half hour shall be in addition to any awards based upon failure to pay the minimum wage and wages not paid due to improper deductions. The above shall also apply to managers who shall be paid pursuant to an hourly rate for an approximated number of hours of overtime.

15. The defendants violated § 11(c) of the Act by failing to maintain records of hours worked by store managers; failing to maintain accurate records of hours worked by cashiers; failing to maintain any records required concerning employee Susan McMasters; falsely recording wages as paid when checks were withheld; falsifying records by showing de facto deductions for shortages as "loan" or "garnishment" **[\*47]** deductions; falsifying records of hours worked by altering them to show false, reduced hours worked; and failing to record cash payments of shortages coerced from employees. 29 C.F.R. § 516.

16. Ex. 51 constitutes claims for gross wages due 25 former employees who are identified in the record only by a first name. The exhibit consists of a separate work sheet form used by Investigator Baker. The dates and hours worked were apparently obtained from Exhibit 1 which consists of four volumes (one for each of the years 1987, 88, 89 and 90). Those volumes are extremely confusing and disorganized. Some of them are the inadequate posted shift schedules which sometimes are incomplete time records on which the manager used first names only of regular employees.

Furthermore, as noted in Finding 37, one of the attorneys for the plaintiff advised the Court that the Secretary did not expect to pay Amy and the other 24 no-last-named employees. The attorneys expect to collect that money for the United States, not the employees. Because the identify of the true claimant cannot be established and the plaintiff is not suing for it for the former employees, the back wages and liquidated damages **[\*48]** sued in Ex. 51 are denied.

17. The defendants have acted in deliberate violation and contempt of the Consent Order on Application for Preliminary Injunction entered on July 20, 1990. The defendants then contacted John Blaine of Wage-Hour in an obvious attempt to find a way around the Order. After being told by him they could not deduct loans and could deduct only court-ordered garnishments, they almost immediately entered into a program to disguise shortage deductions in violation of the Order as loans and garnishments. They coerced or attempted to coerce de facto deductions from pay for shortages by threatening termination if loan documents were not signed or cash repayments not made. They kept no records of employee cash shortage repayments so as to prevent their discovery. They continued to withhold entire paychecks at times for shortages. They continued to fail to maintain records of hours worked for on-exempt managers and failed to keep accurate records of hours worked for cashiers. Two weeks before the trial, Dallas Flowers tried to coerce a manager into forging the endorsement of an employee onto a payroll check to be retained in payment of claimed shortages. The check **[\*49]** represented one employee's entire week's wages.

18. For willful contempt of this Court's Order, the defendants jointly and severally are ordered to pay to the plaintiff as a fine a sum equal to the cost of investigative, trial preparation and trial time and travel expense by the plaintiff's attorneys and the wage-Hour Division after July 20, 1990, concerning this case. Attorneys for the plaintiff will submit an affidavit with this information within ten days of receipt of this decision, and defendants shall have ten days to object to the claim. In civil contempt proceedings, the punishment is remedial and for the benefit of the complainant. *Gompers v. Bucks Stove and Range Co.,* 221 U.S. 418, 441 (1911); see also *Hicks v. Feiock,* 485 U.S. 624 (1988). [4]

19. To avoid an award of liquidated damages pursuant to § 16(c) of the Act, the **[\*50]** defendants must show ". . . to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended. . . ." 29 U.S.C. 260. To invoke the Court's discretion to award a reduced amount, the defendants must satisfy both prongs of the test. *McClanahan v. Mathews,* 440 F.2d 320 (6th Cir. 1971). In Finding of Fact number 40, the Court found that in

---

[4] The fine is nondischargeable by individuals. 11 U.S.C. 1141(d)(2) and 523(a)(7).

early April 1988, John Blaine, Assistant District Director of Wage and Hour Division, informed both Messrs. Flowers that it was illegal to pay an employee below the minimum wage for every hour worked. In spite of that admonition, the defendants refused to pay the specific employee about whom Blaine had called and failed to comply numerous times thereafter. The defendants' abusive and oppressive wage withholdings, their refusal to pay heed to other numerous admonitions and requests from plaintiff's agents and their refusal to comply with the July 20, 1990 Order in this case dispel any illusion of "good [*51] faith." Therefore, the Court concludes liquidated damages are allowable for all awards of back pay on or after early April 1988.

20. To constitute a willful violation and invoke the three-year statute of limitations there must be a showing that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McMaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988). As previously indicated, the defendants were notified in early April 1988 by Mr. Blaine of the Wage and Hour Division that it was unlawful not to pay an employee at least the minimum wage for every hour worked. They refused, however, to comply based upon their erroneous conclusion that they could refuse to pay because the employee in question, according to the defendants, had not returned an apron furnished by the employer, which the employee denied. Therefore, the defendants had knowledge that they could not make deductions nor withhold pay in favor of the employer if the deductions caused the wages to be below the minimum wage for every hour worked. The Court does not find in the record any other proof of willfulness under [*52] *McLaughlin* tests before June 20, 1988.

Therefore, the Court concludes that the tests for willful violations set forth in *McLaughlin v. Richland Shoe, supra,* were not met for activating more than the two-year statute of limitations for any of the violations sued upon except the violation for failure to pay employees at least the minimum wages caused by deductions in favor of the employer or otherwise. Because the defendants did not know nor show reckless disregard for the violations of the Act before June 20, 1988, the date two years before the suit was filed, except for the below-minimum-wage violation about which they knew in early April of 1988, the wage and hour claims sued for shall be limited to the violations which occurred after June 20, 1988, except the "below minimum wage violations" which shall be limited to those violations which occurred after the end of the first full pay period of Petroleum Sales, Inc. in April of 1988.

21. The plaintiff has not proved that the defendants have violated the provisions of 29 U.S.C. § 215(a)(3) by discharging Ollie Conner. That section provides that it is unlawful:

> to discharge or in any [*53] other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding. . . .

As the Court indicated in the Findings of Fact, the evidence preponderates in favor of a rejection of the claim of Ollie Conner that she was constructively discharged by Bill and Dallas Flowers for talking to and furnishing documentary evidence to the Labor Department officials. Furthermore, there is no proof that she was discharged or discriminated against because she "filed any complaint . . . or caused to be instituted any proceeding . . . or has testified or [was] about to testify in any such proceeding" at the time that she quit her employment with the defendant Petroleum Sales, Inc.

22. The plaintiff is not entitled to an injunction restraining defendants from violating the Act in the future as claimed. The Court is imposing severe penalties and sanctions for their unlawful contemptuous conduct in this case. There is no need to enjoin them for doing this again. Any proven continuous or repetitious violation will be dealt [*54] with even more punitively than in this case. Similarly, the relief sought in the form of a bond to assure future compliance with the Act is denied.

### *MOTION FOR NEW TRIAL*

The above Findings of Fact and Conclusions of Law constitute the Court's factual finding and rulings upon the issues of law; however, the Court has also determined that the amount of back wages and liquidated damages cannot be set by the Court without clarification of the amounts due in the light of the Court's holding as set forth above and due to the condition of the records kept by the defendants and the records compiled by Investigator Baker, the representative of the Secretary in the trial of this case. Therefore, the Court on its own motion for new trial hereby orders that further evidence be furnished and offered so that the Court may amend the above findings or make additional findings of fact and conclusions of law so that a final

judgment may be entered in the case. Rule 59(a) FRCP.

The new trial will be for the purpose determining how much back wages and liquidated damages each claimant shall be entitled to receive under the conclusions set forth above. The Court has further determined that the **[\*55]** new trial phase of the case can be handled expeditiously under the procedure set forth below.

The Court hereby directs the attorneys for the plaintiff to have the claims for former employees recalculated as necessary in the light of the Court's ruling herein and have all claims presented in a more coherent manner.

The Court's ruling limits the claims to those persons who are entitled to money awards based upon the present record and the Court's Findings of Fact and Conclusions of Law. After the recalculation for the plaintiff, they shall be prepared for presentation in the record as Supplemental Exhibits, whereby each person shall be listed by name alphabetically, the amount claimed, the job held, i.e. cashier or manager, the source of the factual material used, i.e. Ex. 2 and Ex. 1, and the basis for the award, i.e. failure to pay overtime, failure to pay minimum wage, improper deduction and additional straight time or overtime. The use of letter symbols may be used to designate the type of violation asserted.

After the proposed Supplemental Exhibits are completed, they shall be filed with the clerk with a copy for the Court and a copy shall be furnished to opposing counsel. **[\*56]** Within 15 days, counsel for the defendants shall file any objections to the Supplemental Exhibits, and the Court will promptly set a hearing to resolve any differences.

These proceedings shall be limited to the scope of the case as set forth above. No evidence shall be offered for the purpose of altering the claims except to correct errors caused by oversight or other types of inadvertent mistakes. Furthermore, these supplemental proceedings shall not include any attempt to have the Court alter or amend the other portion of its ruling.

The Court considers that the claims to be reconsidered are those arising from Exhibits 36 and 2.

Exhibit 36 is entitled "Summary of Back Wages Due Employees October 1, 1990 to January 23, 1991. When introduced at the trial, it had a coversheet which showed the names of 33 claimants with the amounts of the claims listed. Attached to the coversheet were Wage Computation Sheets for each claimant setting forth pay records for various weeks between October 1, 1990 and January 23, 1991.

As indicated above, the plaintiff and the defendants caused to be entered in the Bankruptcy Court an Agree Order whereby some of the claimants listed in Ex. 36 received **[\*57]** priority wages from the Bankruptcy Court which diminished the total amount claimed in Ex. 36 so that the total was reduced to $ 625.04. The Supplemental Exhibit should set forth who listed in Ex. 36 is entitled to how much.

Trial Ex. 2 is the other source of wage and liquidated damage claims; however, it is much more difficult to resolve due in part to the records of the defendant from which Investigator Baker got the information which he used to prepare the garbled and sometime erroneous Ex. 2.

Ex. 2 is a large bound stack of worksheets arranged by tabs to separate the worksheets for former employees arranged more or less by their surnames. The worksheets are 11 by 17 inches in length and breadth. The stack of sheets is 3 inches tall. On the cover of the front, there is a label which says "Summary July 87-August 90." Inside the cover, there are 22 sheets which are compilations of names arranged alphabetically. On each sheet, there are varying amounts of money which are totalled at the bottom of each sheet. On the top sheet there is written "Exhibit Total $ 113,872.63," which is the amount of the total claims of the plaintiff for back wages and liquidated damages in the same **[\*58]** amount.

Because the Court has ruled that all claims are limited to two years back from June 20, 1990, except claims for failure to pay an employee the minimum wage for every hour worked in a non-overtime week, those claims are payable for violations on and after the first full payroll record in April 1988.

This Court wants the Supplemental Exhibits to conform to the Court's ruling and to set forth the claims of each individual in the manner set forth above.

The Court will supplement its Findings of Fact and Conclusions of Law and cause to be entered a final judgment after the above-prescribed proceedings have been completed.

ENTER: This 9th day of July, 1992.

ROBERT M. McRAE

SENIOR UNITED STATES DISTRICT JUDGE

**Table1 (**Return to related document text**)**

### AMENDED APPENDIX "A"

| Ex. No. | BACK WAGES | LIQUIDATED DAMAGES | TOTAL |
|---|---|---|---|
| 2 (calculations for employees with pay records) | $ 113,872.63 | $ 113,872.63 | $ 277,745.26 |
| 36 (wages due between (10/1/91 and 1/23/91) | 625.04 | 625.04 | 1,250.08 |
| 51 (calculations for employees with no first name) | 1,269.28 | 1,269.28 | 2,538.56 |
|  | $ 115,766.95 | $ 115,766.95 | $ 281,533.90 |

**Table1 (**Return to related document text**)**

---

**End of Document**