# Metzler v. Express 60-Minutes Delivery

United States District Court for the Northern District of Texas, Dallas Division

May 21, 1997, Decided ; May 21, 1997, FILED

No. 3:95-CV-1850-T

**Reporter**
1997 U.S. Dist. LEXIS 11217 *

CYNTHIA A. METZLER, Secretary of Labor, United States Department of Labor, Plaintiff, v. EXPRESS 60-MINUTES DELIVERY SERVICE, INC., et al., Defendants.

**Counsel: [*1]** For ROBERT B REICH, Secretary of Labor, United States Department of Labor, plaintiff: Robin S. Horning, Attorney at Law, Jennifer Walls Hilburn, Attorney at Law, US Dept of Labor, Office of the Solicitor, Dallas, TX USA. Margaret Terry Cranford, Attorney at Law, US Dept of Labor, Office of the Solicitor, Dallas, TX USA. Madeleine T Le, Attorney at Law, Office of the Solicitor, US Dept of Labor, Dallas, TX USA. For CYNTHIA A METZLER, Secretary of Labor, US Dept of Labor, plaintiff: Robin S. Horning, Attorney at Law, (See above), Jennifer Walls Hilburn, Attorney at Law, (See above). Margaret Terry Cranford, Attorney at Law, (See above). Madeleine T Le, Attorney at Law, (See above).

For EXPRESS 60-MINUTES DELIVERY SERVICE INC, defendant: Kimberly Sumner Moore, Attorney at Law, Earl Jeffery Story, Attorney at Law, Strasburger & Price, Dallas, TX USA. William Bryan Peterson, Attorney at Law, Donald A Ferrill, Brown & Thompson, Fort Worth, TX USA. For LYNN WILLIAMS CLAYTON, defendant: Kimberly Sumner Moore, Attorney at Law, (See above), Earl Jeffery Story, Attorney at Law, (See above). William Bryan Peterson, Attorney at Law, (See above), Donald A Ferrill, (See above). For CHARLES THOMAS **[*2]** CLAYTON, defendant: Kimberly Sumner Moore, Attorney at Law, (See above), Earl Jeffery Story, Attorney at Law, (See above). William Bryan Peterson, Attorney at Law, (See above), Donald A Ferrill, (See above). For DEE ANN HOPKINS, defendant: Kimberly Sumner Moore, Attorney at Law, (See above), Earl Jeffery Story, Attorney at Law, (See above). William Bryan Peterson, Attorney at Law, (See above), Donald A Ferrill, (See above).

For JET EXPRESS COURIERS INC, movant: James Lowery Hicks, Jr, Attorney at Law, Scott Adam Rosuck, Attorney at Law, Hicks & Associates, Dallas, TX USA. For CHARLES MCLEAN, III, movant: Danny Gles Hartsfield, Attorney at Law, Baker & Botts, Dallas, TX USA. For DAN WEISMAN, movant: Bill H Yarborough, Attorney at Law, Yarborough Law Offices, Hurst, TX USA. For JEFFREY HAVENS, movant: Frank Edward Kohn, Attorney at Law, Eyres & Kohn, Dallas, TX USA. For STEPHANIE DAWSON, movant: Janice Eve Cohen, Attorney at Law, Law Office of Janice E Cohen, Dallas, TX USA. For YASMINE SOWARDS, movant: Maurice E Klein, Attorney at Law, Law Office of Maurice Klein, Dallas, TX.

**Judges:** Robert B. Maloney, U.S. District Judge

**Opinion by:** Robert B. Maloney

# Opinion

FINDINGS OF FACT AND CONCLUSIONS **[*3]** OF LAW

This action came before the Court, Honorable Robert B. Maloney, presiding, on a non-jury trial concluded April 14, 1997. After considering the argument and evidence presented at trial and the post-trial brief, the Court makes the following findings of fact and conclusions of law. The Court reserves the right to enter more specific findings of fact and conclusions of law should the Court consider it necessary.

**Introduction**

Plaintiff Cynthia A. Metzler, Secretary of Labor, brings this action against Defendants Express 60-Minutes Delivery Service, Inc., Lynn Williams, Charles Clayton, and Dee Ann Hopkins, to enforce the provisions of the Fair Labor Standards Act. Metzler brings claims pursuant to (1) the minimum wage provisions, 29 U.S.C. § 206, § 215(a)(2), (2) the overtime provisions, *id.* § 207, § 215(a)(2), and (3) the record keeping provisions. *Id.* § 211(c), § 215(a)(2); 29 C.F.R. Part 516. The Secretary seeks damages on behalf of the alleged

employees in excess of $ 1.2 million.

Defendants deny that certain delivery drivers are employees for purposes of the FLSA. Defendants contend that these drivers provide or provided a delivery service for Express **[*4]** pursuant to contract and are independent contractors.

**Findings of Fact**

1. The relevant period for this action is August 21, 1993, to present. The Court accepts the stipulated facts in the joint pretrial order, filed April 7, 1997, as true.

2. Defendant Express 60-Minutes Delivery Service, Inc., is a courier delivery service operating in Dallas and Tarrant Counties, Texas. Express is a corporation with a place of business and doing business at One Summit Avenue, Suite 104, Fort Worth, Texas 76102, with a branch office at 2710 Stemmons Freeway, No. 1106, Dallas, Texas 75207.

3. Defendant Lynn Williams Clayton is an individual resident of Tarrant Country, Texas, and is an owner and president of Express. She manages the affairs of Express.

4. Defendant Charles Clayton is an individual resident of Tarrant County, Texas, and is an owner and vice-president of Express. He directs the daily operations of the company.

5. Defendant Dee Ann Hopkins is an individual resident of Tarrant County, Texas, and is the secretary-treasurer of Express. She directs the daily affairs of the business.

6. Lynn Clayton founded Express in 1985. During its first week of business, **[*5]** Express delivered one parcel and contracted with two courier-drivers. Currently, Express averages 525 deliveries per day. Express contracts with approximately 50 drivers to perform these deliveries. The contract drivers are the focus of this lawsuit.

**Structure of the Business**

7. Express's business organization is tailored to meet the needs of its clientele. Clients of Express include various individuals and businesses, such as law firms, hospitals, and laboratories. Over 50 percent of the deliveries are related to the practice of medicine, such as transporting blood or tissue samples from hospitals to laboratories.

8. Customers choose from various delivery options. For example, "stat" deliveries must be picked up and delivered within one-hour, "hot-shots" within two-hours, and all others within four-hours of the time the order is taken. Delivery of a parcel within the promised period is critical to the success of the business, and in the case of the medical deliveries, is sometimes a "matter of life or death."

9. To accomplish the high volume of time-sensitive deliveries, Express uses a sophisticated computer-dispatch system.

10. Customer orders are taken **[*6]** by customer-service personnel over the telephone and are entered into a computer system. The data entered include the site of pick-up and delivery, type of order (eg. "stat"), type of parcel, and customer billing information. After the orders are entered, the information is automatically transferred to the dispatchers.

11. The computer screens used by the dispatchers are divided into three segments. Information entered by customer service appears in the first segment, information regarding the location and status of the drivers who are logged-in appears in second segment, and the status of jobs to be completed appears in the third segment. The job-status segment is color-coded by priority of job. For example, when a stat order is nearing the delivery deadline, it flashes red to alert the dispatcher that this delivery requires priority treatment.

12. Dispatchers communicate with the drivers by pager, two-way closed-channel radio, and telephone.

13. Once a dispatcher receives information regarding a particular delivery, he or she must determine which driver should receive the first offer for the job. This determination is not an exact science. Different factors guide the **[*7]** dispatcher's decision. Generally, the last on-duty driver to receive an offer who is also closest to the pick-up point receives the offer. To increase efficiency, dispatchers also attempt to offer drivers multiple pick-ups and deliveries along the same route and avoid offering "deadhead" runs.

14. A deadhead run is one that requires a driver to travel a long distance to deliver a parcel with no delivery available for the return trip. Deadhead runs are inefficient and not as profitable for the driver.

15. For billing purposes, the company divides the

Dallas-Fort Worth metroplex into numerous geographical zones. The rate each customer is billed depends on the size of the package, the priority of the delivery, and the distance between start and finish. For example, a heavy, one-hour delivery that originates and terminates in distant zones costs considerably more than a light, four-hour delivery that originates and terminates in the same or an adjoining zone. Regular, high-volume customers are sometimes charged less than the standard rate.

**Control**

16. Before making deliveries, contract drivers must attend a short orientation, have the relevant "tools-of-the-trade," [*8] and sign an "Independent Contractor Agreement." The majority of drivers who testified at trial indicated that they read, understood, and agreed to abide by the terms of the agreement.

17. Drivers are encouraged to become a notary public. Some runs require notary services. Most drivers become notaries. Drivers are not required by Express to became notaries.

18. Orientation usually lasts less than one day. It primarily concerns the procedures drivers follow to receive compensation from Express and how to handle bio-hazardous material. The drivers are required by the Occupational Safety and Health Administration to complete the bio-hazardous material portion of the orientation before they are allowed to carry bio-hazardous material, such as blood or tissue samples.

19. Although not required to do so, most of the drivers wear a uniform which is leased from Express. The uniform displays a patch with the Express logo on one shoulder and a patch with the label "Independent Contractor" on the other. In exchange for wearing the uniform and advertising for Express, the drivers earn an extra one to five percent commission for each delivery.

20. Wearing an Express uniform makes [*9] the drivers' job easier and safer. Most Express customers, individuals and businesses alike, are concerned about crime and unwelcome intruders. Many customers will not open their doors to a driver unless he or she is wearing a uniform. Wearing a uniform is beneficial to the driver and a practical necessity of the job.

21. The drivers are not required to display the Express logo on their vehicles.

22. The drivers set their own hours and days of work. Drivers work as little or as much as they please.

23. When a driver elects to begin the work-day, he or she typically radios dispatch and informs the dispatcher of his or her location. The dispatcher logs this information into the computer, and the driver is now ready to receive offers for runs. The driver is not required to report to any specific location before he or she receives offers for runs.

24. When a driver decides to quit for the day, as a courtesy, he or she radios dispatch and informs the dispatcher that he or she is not available to take any more runs. During peak times, dispatchers will sometimes request that drivers make one more run before quitting. The driver may accept or decline this request without [*10] retaliation.

25. The agreement expressly provides that the driver has the right to accept or reject offers for individual jobs and that no promise is made by Express to offer a specific number of jobs during any period. When a driver accepts a job, he or she agrees to provide the service subject to the terms and conditions of the particular offer and in a professional and business-like manner. In practice, drivers can and do turn down runs. Drivers suffer no retaliation for refusing to accept a run.

26. Several drivers testified that, on occasion, they felt pressured into accepting runs or feared that they would suffer retaliation in the form of being "put at the bottom of the list" if they turned down a run. For example, one driver, David Giddens, testified that after he refused to accept a run, the dispatchers would not give him favorable runs for a short period. The Court finds that this and similar assertions are contrary to the credible evidence and based on speculation.

Lynn Clayton testified that the policy of Express was to not retaliate against drivers for refusing to turn down runs, and that she was unaware of any such instances of retaliation. Clayton is a self-described [*11] "workaholic" who is intimately familiar with all facets of the operations of Express. She noted that, on one occasion, a driver came to her with an accusation of retaliation by dispatchers, but that she demonstrated to the driver through company records that customers simply did not call for deliveries in the area in which he was located during the period for which he complained. The driver's subjective impression of retaliation was contradicted by objective data. The Court finds Clayton's testimony to be credible and persuasive. Her testimony is buttressed by the credible testimony of numerous

drivers who stated that they regularly turned down runs and were never subjected to any form of retaliation.

Further, although a dispatcher has some discretion as to who receives the initial offer for a particular run, this discretion is limited by certain realities of the courier business. A dispatcher cannot offer a run until a customer orders one, and then the offer is defined by the customer's request. If a customer requests a run to be delivered within the hour, the dispatcher must, as a practical matter, offer the run to the driver who is in the best position make the delivery within **[*12]** the prescribed period.

27. Assuming that the drivers were placed "at the bottom of the list," the Court does not equate this with retaliation. Dispatchers do not care who delivers a parcel as long as it gets delivered. If a driver elects to pass on an offer, it would not be improper or retaliatory for the dispatcher to move down the list to find drivers who are willing to accept runs.

28. One driver, Dennis Louiselle, testified that he often "greased the dispatcher's palm" in the hopes of getting more favorable runs. There is no credible evidence that he was successful in his attempt, and the Court finds the implication of his testimony to be speculative at best.

29. Some drivers testified that dispatchers would "yell" or "raise their voice" if drivers quit before the end of a peak period. The Court finds, based on the credible evidence, that yelling, if it occurred at all, was limited to isolated incidents.

30. Drivers are compensated every two weeks. A list of each run made by the driver and its corresponding amount of commission accompanies each commission check. Through experience, drivers develop a sense of what each individual run pays and how much it costs. **[*13]** Thus, experienced drivers are able to approximate the amount of profit they will make before deciding to accept an individual run. In addition, the drivers are allowed to and frequently do ask dispatchers how much a run pays before deciding whether to accept it.

31. Sometimes, drivers accept individual runs that are marginally profitable. The drivers who testified gave various reasons to explain why they would occasionally accept these runs. Some drivers indicated that they believed that the dispatchers would work harder on their behalf at finding multiple pick-ups along the same route if they accepted some of the less-profitable runs. Conversely, others believed that if they turned down runs dispatchers would be less likely to offer them more profitable runs in the future. Others stated that they would accept unprofitable runs as a courtesy to the dispatchers, who would sometimes "beg and plead" that the run be accepted. Some stated that they would simply refuse to accept runs that they deemed to be unprofitable.

32. When there are no contract drivers who will accept a particular job, the dispatcher will either: (1) direct an employee driver to complete the delivery; (2) **[*14]** perform the job himself; (3) request that another member of management complete the job; or (4) contract with another local courier service. Express is frequently forced to resort to one of these options.

33. Aside from the contract drivers, Express employs approximately 25 people, including four that it considers to be "employee" drivers.

34. Employee drivers are treated differently than the contract drivers. They: (1) report for work at a specified time; (2) are paid by the hour; (3) work a set number of hours that are determined by Express; (4) are required to were a uniform; (5) are provided with a company vehicle and all of the necessary tools-of-the-trade; (6) are reimbursed for expenses; (7) are not allowed to turn down runs; and (8) are under the control and supervision of Express.

35. The independent contractor agreement does not contain a "covenant-not-to-compete." The drivers are authorized to, and at times do, contract with other courier companies while contracting with Express. They may also contract with Express for specific runs on specific dates.

36. Express provides twenty-four hour delivery service. The contract provides that the drivers make themselves **[*15]** available for 24-hour pickup and delivery in exchange for Express's promise to solicit and tender pickup, delivery, and service of process jobs. In practice, most drivers make themselves available for 24-hour deliveries by being "on-call" several days per month.

37. While on-call, a driver may take care of personal business, sit at home and watch T.V., sleep, eat, and so forth. When a customer places an order, the dispatcher pages the driver, who then decides whether to accept the run. Although most drivers accept offers for runs while on-call, some refuse.

38. The contract agreement provides that drivers work

on-call. Nevertheless, in practice, it is not mandatory. Although Express strongly encourages drivers to be available on-call, several drivers testified that they simply refused to do so. These drivers indicated that they suffered no retaliation for this decision.

39. Some drivers elect to work on-call more than is required by the contract because the opportunity for profit is better. The commission rate is usually higher during the on-call period and there are fewer drivers available to receive offers.

40. One driver, Anthony Mullins, testified that his contract **[*16]** was terminated for failing to work on-call. The Court finds his testimony to be incredible and unpersuasive. His testimony is contrary to other drivers who testified that they refused to work on-call without retaliation. From his demeanor, it appeared to the Court that Mullins had a personal dislike for Express and its management. The Court does not believe that the termination of his contract was motivated solely or predominately by his refusal to work on-call.

41. Most drivers acknowledged that working on-call is a necessary part of the courier business, and indicated that they were willing to honor their agreement to make themselves available to work on-call.

**Relative Investments**

42. A driver's necessary "tools-of-the-trade" include a vehicle, automobile insurance, dolly, Mapsco, tarp, two-way radio, pager, medical delivery bag, and so forth. Drivers purchase or lease all of the necessary tools-of-the-trade. Express does not provide drivers with any equipment.

43. Drivers are responsible for all fuel, maintenance, and depreciation of their vehicles. The drivers are not reimbursed for mileage by Express. Expenses include the cost of gasoline, tires, oil **[*17]** changes every three thousand miles, repairs, and so on. These costs can be considerable, as some drivers drive in excess of 70,000 business miles per year. The vast majority of drivers who testified at trial stated that they kept daily logs of miles driven for tax purposes and reported vehicle expenses as business expenses on their federal income tax returns.

44. Although the capital investment of Express is more than that of each individual driver, the Court finds the capital investment of each driver to be substantial. Further, although no direct testimony was presented on this point, it appears to the Court that the aggregate investment of all of the contract drivers is substantially more than that of Express.

**Opportunity for Profit and Loss**

45. Drivers are compensated for their service on a commission basis. Typically, a driver receives between 40 and 50 percent of the gross price charged to the customer. Express drivers can and do negotiate for increased commissions.

46. Some drivers who testified failed to turn much of a profit, while others made upwards of $ 1000 per week. The ones who made the most money appeared to the Court to be the most experienced **[*18]** and most concerned with efficiency. The drivers who were less successful tended to be inexperienced and appeared to the Court to be less concerned with efficiency. A driver's profit or loss is determined largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business.

47. Additionally, drivers control their opportunity for profit or loss by selecting the most profitable hours to work. For example, many drivers prefer to work "regular" work hours. At least one driver testified that he would generally begin work around 3:00 or 4:00 p.m., when other drivers began to quit for the day. He would work for the rest of the night. He testified that he could make more money in this fashion because there were fewer drivers available to accept runs and the night runs would usually pay higher commissions.

**Skill and Initiative**

48. Once a job is offered to the driver, the driver is not told how to deliver a parcel or what route to take. The driver must rely on his own judgment, knowledge of traffic patterns and road conditions in the Dallas-Fort Worth metroplex, ability to read a Mapsco, and ability to anticipate the need for an alternate **[*19]** route. Experienced drivers possess specialized skill beyond that of merely driving an automobile.

49. Some drivers had no previous experience in the courier business before contracting with Express. These drivers tended to make less money than the more experienced drivers. Many drivers testified that their profits increased as they became more experienced and efficient.

**Permanency of the Relationship**

50. The majority of drivers contract with Express for a relatively short period. Many of the drivers who testified contracted with other courier companies either before or after contracting with Ex-press. Drivers frequently contract with Express, then contract with other companies, and then return to Express. The labor market for couriers is liquid and it is easy for drivers to contract with numerous other local companies.

**Damages**

51. The Secretary requests an award of back wages in excess of $ 1.2 million. The following findings assume that the Secretary has established that the drivers are employees.

52. The Secretary assumes for purposes of calculating minimum wage that each driver should be compensated $ 4.25 per hour. She also assumes that **[*20]** the drivers must be reimbursed $ .30 for each mile driven to cover the drivers' expenses in operating his or her vehicle. She relies on the testimony and analysis the case agent, Shirley Kenyon, and an expert witness, Dr. Chris Kukok.

53. To obtain data regarding the average number of hours and days the drivers work, Department of Labor attorneys, with the aid of Kukok, conducted a survey. The survey was sent to approximately 330 former and present drivers of Express. Approximately 102 drivers responded.

54. The questionnaire sent to the drivers starts by stating: "The U.S. Department of Labor has filed a lawsuit against Express-60 Minutes Delivery Service for minimum wage violations. The relief sought by the Department of Labor includes back wages for drivers who worked for Express from August 1993 to present. Our records indicate that you were employed by Express as a driver during this time period." It goes on to ask: (1) how many days a week did you work?; (2) how many hours did you work each day? (3) how many miles did you drive each day? (4) did you keep any records of the miles you drove?; and so on.

55. The preface of the questionnaire immediately informs the **[*21]** drivers that they may be entitled to back wages, and it is obvious from the questions that the answers that they give may directly affect the amount of recovery they might receive. This gives the drivers incentive to provide exaggerated responses.

56. The vast majority of drivers who answered the questionnaire indicated that, for tax purposes, they kept daily milage logs. The Secretary failed to verify the accuracy of the responses to the questionnaire by examining even one milage log. It would have been easy to do so.

57. During trial, the vast majority of the drivers who testified brought their milage logs with them. By comparing the mileage logs to the survey responses, it is apparent that the mileage data obtained from the survey was significantly exaggerated.

58. The Secretary failed to follow-up on the survey to determine if the drivers properly understood the questions. In response to the question, "How many days a week do you work?" most drivers responded with the range "5-7." At trial, most drivers indicated that this meant usually 5 days a week, but sometimes they would work on-call on Saturday and Sunday. To determine the average number of days each driver **[*22]** worked, Kukok used the mean of the range. The mean of the typical answer is six.

59. In response to the question, "How many hours did you work each day," the drivers usually indicated a range. A representative example of a range would be "10-24." To determine the average number of hours worked, Kukok used the mean of the range. The mean of the example is 17. Kukok testified that he would have "preferred" that the questions were phrased differently.

60. In this case, using the mean of the responses results in a figure which is higher than the actual average. This finding is supported by the testimony of the vast majority of the drivers who testified. They stated that their mileage responses would have been substantially lower if the questions were phrased in terms of averages rather than ranges.

61. According to Kukok, the initial results of the survey indicated that, on average, each driver works 5.54 days per week, 10.66 hours per day, and drives 300.82 miles per day. Defendant's Exhibit 69.

62. Using the results of the survey and the assumed $ .30 per mile reimbursement figure, Kukok determined that, on average, to comply with the minimum wage requirements of **[*23]** the FLSA, Express must compensate each driver $ 13.24 per hour.

63. Kenyon examined the employment records of

Express. She attempted to determine the number of weeks each individual driver contracted with Express and the total amount each particular driver was actually paid.

64. To determine the amount that each driver should have been paid, Kenyon used the average figures and the compensation rate derived by Kukok from the survey. She multiplied the average number of hours and days each driver worked over the period they contracted with Express by $ 13.24. After subtracting the amount of compensation that each driver was actually paid, as reflected by Express's records, Kenyon determined the amount of back wages each driver is purportedly owed.

65. As a hypothetical example, if a driver contracts with Express for a fifty-week period, Kenyon assumes that the driver worked 5.54 days per week and 10.66 hours per day. Thus, to comply with minimum wage requirements, Express must pay the hypothetical driver $ 39,095.33. If the driver was actually paid $ 25,000 by Express, the hypothetical driver would be entitled receive $ 14,095.33 in back wages.

66. The drivers do **[\*24]** not drive similar numbers of hours, days, or miles. Because the drivers are not required to work any particular number of hours or days, some drivers make as little as one delivery per day and drive as little as one hour per day, while others make deliveries 14 to 16 hours per day, six days a week, and drive over 400 miles per day. Other drivers may work many hours one week, but then take the next three weeks off while working on other projects.

67. Using the Secretary's method, those who worked the least over the longest period are entitled to the most back pay, while the ones who worked the most over shorter periods will recover the least.

68. Adjusting of the amount of reimbursement per mile and the average number of miles driven per day by each driver will significantly affect the back wage calculation.

69. The Government failed to provide any credible evidence that $ .30 per mile is an accurate reimbursement figure. To the contrary, the credible evidence indicates, and the Court finds, that this figure should be much lower.

70. The questionnaire used to conduct the survey is misleading, ambiguous, and based on unacceptable survey methodology. This finding is **[\*25]** supported the testimony Defendants' expert witness, Dr. Daniel Slottje. The Court finds Slottje's testimony to be credible and convincing. This finding is also supported by common sense. The Court deems the data derived from the survey results and any analysis based on that data to have no probative or persuasive value.

71. If the Court adopted the Secretary's requested back wage award and method of allocation, the Court would necessarily find by implication that a number of the drivers who contracted with Express for extended periods were working as employees for less than 10 percent of the minimum wage. This finding is supported by evidence of the employment history of the employees who are alleged to be owed the most back wages. The Court does not believe that any of the drivers who testified would work as employees in the present economy for such low wage for extended periods. The drivers who testified appeared to be rational, intelligent people.

This finding is not inconsistent with the Court's previous finding that some of the drivers who were inexperienced or inefficient made relatively small profits. Drivers who do not quickly obtain the necessary skills simply do not **[\*26]** survive long in the courier business. Drivers that have or quickly obtain the necessary skills can make a significant profit.

72. During the pretrial phase of this litigation, Defendants attempted to assist the Secretary in arriving at more appropriate figures though the use of objective data and computer estimates. Department of Labor attorneys refused this assistance, preferring to rely on obviously flawed and inflated figures.

**Other Claims**

73. During trial, some brief testimony was presented regarding claims for back wages for various non-driver employees of Express. Shirley Kenyon testified that back wages were owed to office personnel because overtime was not properly computed. Defendants, on cross examination and during their case-in-chief, demonstrated that these calculations were neither accurate nor reliable. The Court finds that the Secretary failed to present sufficient credible evidence to support claims for back wages for the office workers.

74. During her investigation, Kenyon determined that Express was not in compliance with various record keeping requirements of the FLSA. Assuming without deciding that her determination was correct, the evidence **[\*27]** indicates that Clayton changed her

method of bookkeeping as instructed by Kenyon. There is no evidence that Express currently violates any record keeping provision of the FLSA.

**Conclusions of Law**

1. The Court has federal question subject matter jurisdiction over this action under Section 17 of the Fair Labor Standards Act of 1938, as amended. *See* 29 U.S.C. § 201 *et seq.*; 28 U.S.C. § 1331. No defendant has asserted an objection to the personal jurisdiction of this Court.

2. Venue is proper under 28 U.S.C. § 1391.

3. During the relevant period, Defendants have been and are an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

4. During the relevant period, Defendants have been and are an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s) of the FLSA, 29 U.S.C. § 203(s).

5. During the relevant period, Defendants have been and are employers within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

6. The Court is entitled to afford speculative or self-serving testimony little weight. *See Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, **[*28]** 40 (5th Cir. 1996); *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993); *Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115, 119 (5th Cir. 1993).

7. To determine employee status under the FLSA, the court focuses on whether the alleged employee, as a matter of economic reality, is dependant upon the business to which he renders his services. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043 (5th Cir. 1987), *cert. denied*, 484 U.S. 924, 98 L. Ed. 2d 246, 108 S. Ct. 286 (1987). The task is to determine whether the individual is in business for himself. *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981).

8. To gauge the degree of the alleged employee's dependency on the alleged employer, five factors are to be considered: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the alleged employee and the alleged employer; (3) the degree to which the alleged employee's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Carrell v. Sunland Const., Inc.* (5th **[*29]** Cir. 1993). No single factor is determinative-the court looks to the totality of the circumstances.

9. The Court concludes that the lack of control exercised by Express over the drivers indicates that they are independent contractors.

10. The Court concludes that the extent of the relative investments of the drivers and Express indicates that the drivers are independent contractors.

11. The Court concludes that the degree to which the drivers' opportunity for profit and loss is determined by their own skill and initiative indicates that they are independent contractors.

12. The Court concludes that the skill and initiative required in performing their job indicates that the drivers are independent contractors.

13. The Court concludes that the lack of permanency of the relationship indicates that the drivers are independent contractors.

14. The Court's conclusions are not based, in whole or in part, on evidence of industry custom or practice. The Court's conclusions are based solely on the credible evidence of the relationship between Express and the drivers who testified. The Court specifically does not rule on whether it is entitled to consider evidence **[*30]** of industry custom and practice.

15. The drivers' economic situation in this case more resembles that of the drivers in *United States v. Silk*, 331 U.S. 704, 91 L. Ed. 1757, 67 S. Ct. 1463 (1947), and the welders in *Carrell*, 998 F.2d 330, than the topless dancers in *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324 (5th Cir. 1993).

16. Assuming that the Secretary established that the drivers are employees, she has the burden of producing evidence sufficient to show damages as a matter of just and reasonable inference. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88, 90 L. Ed. 1515, 66 S. Ct. 1187 (1946); *Le Compte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264 (5th Cir. 1986). Under the facts of this case, it is unreasonable to use representative

averages to calculate individual damages. The Court concludes that the method of calculating damages used by the Secretary leads to absurd results which can only be described as punitive.

17. The data obtained from the survey conducted by the Secretary and its expert is so unreliable that the analysis derived from the data fails to meet the relevance requirement for admissibility under the Federal **[*31]** Rules of Evidence. *See* FED. R. EVID. 402; FED. R. EVID. 703; *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993); *United States v. Posado*, 57 F.3d 428, 433 (5th Cir. 1995); *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1994). The Court concludes that the Secretary failed to carry its burden of establishing that the requested damages are reasonable.

18. The Court is entitled to disregard a party's implausible or irrational legal or factual theory. *See, eg., United States v. Winstar Corp.*, 135 L. Ed. 2d 964, 116 S. Ct. 2432, 2449 (1996); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348, (1986) (rejecting, on summary judgment, party's theory of predatory pricing scheme because it made "no economic sense"); *Appleby v. Delaney*, 271 U.S. 403, 413, 70 L. Ed. 1009, 46 S. Ct. 581 (1926) (rejecting theory because "it is unreasonable to suppose that the grantees would pay $ 12,000 . . . and leave to the city authorities the absolute right completely to nullify the chief consideration for seeking this property, . . . or that the parties then took **[*32]** that view of the transaction"); *The Binghamton Bridge*, 70 U.S. 51, 3 Wall. 51, 78, 18 L. Ed. 137 (1866) (refusing to construe charter in such a way that it would have been "madness" for private party to enter into it). The Court concludes that rational people in today's labor market would not work for an extended period as an employee for less than 50 percent of the minimum wage.

19. Under the Fair Labor Standards Act, compensable work is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598, 88 L. Ed. 949, 64 S. Ct. 698 (1944). Whether time spent working on-call is compensable time is a question of fact dependant upon all the circumstances of the case. *See Paniagua v. City of Galveston, Texas*, 995 F.2d 1310, 1316 (5th Cir. 1993). The Court concludes that, while drivers work on-call, only the time drivers spent making deliveries can be considered compensable time.

20. An employer is required to make, keep, and preserve records of the persons it employs and of the wages, hours, **[*33]** and other conditions and practices of employment it maintains. 29 U.S.C. § 211(c). The Court concludes that Defendants are not currently violating FLSA record keeping requirements.

21. The Court concludes that the Secretary failed to establish that any office workers are owed back wages.

22. The Court concludes that an injunction should not issue under 29 U.S.C. § 217.

**Reasons for Judgment**

To a large degree, the drivers in this case control when and how much they work, their opportunity for profit and loss, and how they perform their delivery services. To be successful, the drivers must possess a substantial amount of skill and initiative. The drivers' relationship with Express is usually short term. The drivers are free to contract with other courier companies. Although the drivers receive offers for runs through the dispatchers, for the most part, the customers' orders, the nature of the business, and the amount of drivers available determine when and how often the drivers are offered jobs. Although some evidence, if believed, would tend to indicate that the case is a close one, the credible evidence compels the conclusion that the drivers are independent contractors. **[*34]** Accordingly, the Secretary shall take nothing on her claims.

Signed this 21 day of May, 1997.

Robert B. Maloney

U.S. District Judge

FINAL JUDGMENT - ENTERED ON DOCKET 5-22-97

This action came before the Court, on a non-jury trial concluded April 14, 1997, Honorable Robert B. Maloney, presiding, and the issues having been duly considered and a decision having been rendered:

It is **ORDERED** and **ADJUDGED** that Plaintiff Cynthia A. Metzler, Secretary of Labor, shall take nothing on her claims against Defendants Express 60-Minutes Delivery Service, Inc., Lynn Williams, Charles Clayton, and Dee

Ann Hopkins, for violations of the Fair Labor Standards Act.

It is **FURTHER ORDERED** and **ADJUDGED** that Plaintiff Cynthia A. Metzler, Secretary of Labor, is not entitled to injunctive relief on her claims against Defendants Express 60-Minutes Delivery Service, Inc., Lynn Williams, Charles Clayton, and Dee Ann Hopkins, for violations of the Fair Labor Standards Act.

It is **FURTHER ORDERED** and **ADJUDGED** that all relief not specifically granted herein is denied.

Signed this 21 day of May, 1997.

Robert B. Maloney

U.S. District Judge

**End of Document**